| | |
|---|---|
| **From:** | "Kessler, John" <John.Kessler@state.vt.us> |
| **To:** | "Moulton, Pat" <Pat.Moulton@state.vt.us> |
| **Cc:** | "Raymond, Brent" <Brent.Raymond@state.vt.us> |
| **Subject:** | FW: Q Burke - MA, Jiangyan |
| **Date:** | Fri, 31 Oct 2014 11:38:14 -0400 |

Pat

Make sure you scroll to the bottom for the email from Michelle, one of Lincoln Stone's partners. The concerns raised are all concerns Brent has also flagged previously. I am going to forward to Mark Scribner and ask that he make his clients aware.

JK

**John W. Kessler**
General Counsel
Agency of Commerce and Community Development
National Life Bldg., 6th Floor
Montpelier, VT 05620
(802) 828-5202
Parking at National Life

**From:** Kessler, John
**Sent:** Friday, October 31, 2014 10:43 AM
**To:** Raymond, Brent
**Cc:** Moulton, Pat
**Subject:** RE: Q Burke - MA, Jiangyan

Thanks Brent. The questions and concerns from Lincoln Stone and Gary Dong reflect what we already know to be weaknesses of the projects.

Pat, Lincoln Stone is one of the more highly regarded immigration/EB5 attorneys in EB5. So his law firm's perspective is very telling.

JK

**John W. Kessler**
General Counsel
Agency of Commerce and Community Development
National Life Bldg., 6th Floor
Montpelier, VT 05620
(802) 828-5202
Parking at National Life

**From:** Raymond, Brent
**Sent:** Friday, October 31, 2014 8:51 AM
**To:** Kessler, John
**Cc:** Moulton, Pat
**Subject:** Fwd: Q Burke - MA, Jiangyan

!! ATTORNEY CLIENT PRIVILEGED COMMUNICATION !!

FYI below. One of his China agents. No longer promoting until he receives a reply to his questions. My guess is he'll no longer promote once he receives reply won't because of the large % of EB-5 capital in the stack.

He's the deputy head of an entire region of agents. Next year he'll be the head. Note that he's copied Lincoln on his email. Lincoln has had Q-Burke's I-526 RFE reply for a month now, but hadn't submitted for his and Gary's clients.

When Gary spoke to me he stated Lincoln "doesn't like Jay's 2 projects (i.e. Q-Burke and AnC).

Brent Raymond | Executive Director of International Trade & Foreign Investment
Vermont EB-5 Regional Ctr
Vermont Global Trade Partnership
1 National Life Dr, Davis Bldg, 6th Floor | Montpelier, VT 05620-0501
802-522-2540
eb5.vermont.gov
export.vermont.gov

Sent from my iPhone

Begin forwarded message:

**From:** 苗世华 <gary.d@wonderfulsz.com>
**Date:** October 31, 2014 at 8:41:28 PM GMT+8
**To:** bill stenger-jaypeak <bstenger@jaypeakresort.com>

**Exhibit 2**

ACCD013518

Cc: Michele Franchett <michele@sggimmigration.com>, Lizzy Button <lbutton@jaypeakresort.com>, Lincoln Stone <lincoln@sggimmigration.com>, brent-vermont RC <brent.raymond@state.vt.us>, Alex MacLean <amaclean@jaypeakresort.com>, 张翠兰 <mona.z@wonderfulsz.com>, 童素艳 <rdf33@wonderfulsz.com>
Subject: Re:Re: Q Burke - MA, Jiangyan

HI,BILL:
  I am happy we are keep going on.
Now I have some clients questions to you ,i have to stop to promote Jaepeak program until you give me confidence.And I still want to invite you to take part in our Guangdong EB5 summit in next March or May when you got the first Burke's I 526 approval.


1、第八期的216个EB-5投资人指标现什有多少个人到位了？
1. How many investors have been in place of the 216 target EB-5 investors in Phase 8?

2、第八期除了EB-5的资金外，是否有其它资金投入到项目中，如：项目方自有资金、贷款、发债、政府投资等。
2. Apart from the EB-5 capital, are there any other funds in phase 8 of the project, such as developer`s equity, loan, bond, government investment?

3、各期项目的土地是租用地还是购买的有产权的土地，如果是租用的土地，向谁租的地，如果买的地，资金是从EB-5中出资还是其它资金。
3. Is the land of each phrase leasehold or freehold? If it is leasehold, who owns the right of the land? If it is freehold, is it pay by the EB-5 investor or other funds?

4、杰伊峰以往的项目（1期至6期）投资人很少，集资时间很短，拿到录卡的时间也短，还款的时间会有5年期比较准时，第八期投资人216人，资金全都到位的时间也许要更多，再加上面面的人有移民审核排期，等到216人都拿到绿卡的时间会很长，偿还投资的时间也会远远超过5年，这对较早投入资金的人是很不公平的，因为较早的第八期投资或者下于拥的计划，如果这样，前期到帐的投资人不致于受后期帐人的影响。
4.In the previous projects of Jaypeak (Phrase 1 to phrase 6),there is only a few investors and the capital raising & green card acquisition time is short. Capital repayment is usually 5 years. However, there will be 216 investors in Phrase 8 and putting all the capital funds in place would take at least 3 years. Including the Visa Retrogression time, it would be more than 5 years to wait for all 216 investor obtain their green card, the investment repayment time should be more than 5 years, which is unfair to the early investors. is it possible to divide the project into a few sub-projects? if it is possible, the early investors would not be affected by the laters.

5、听说你们的还款来源是靠项目经营盈利，请问你们以往项目的净资产收益率是多少？如果项目建成要两年，经营二年，五年后还款，项目二年的利润是无法偿还EB-5投资人的全部投资的，请问偿还资金如何安排？
5.I heard that your repayment rely on the project`s profit, could you tell me the net assets income rate in the previous projects? If the project takes two years in construction and three years in operation, then the repayment take place in the fifth year, the profit of the three years operation should not be enough to repay all the EB-5 investment. How would you arrange for the repayment?

6、 如果216名投资人长期不能完全到位，是否会影响到项目的整体进度或项目成败，是否影响到投资人的绿卡及还款安全？
6. If the target 216 investor takes too long to be in place, will it affect the whole progress or the prosperity of the project? Will it affect the investors green card and the repayment security?

7、如果绿卡或还款有问题如何补救
7. If there is any problem with the green card or repayment, how would you solve it out?


--
Best regards,
**Gary DONG** 董世革
**Director** 总裁
-----------------------------------------------------------------
【瑞裕裕出国】
Wonderful（SZ.）Inte'l Economy and Culture Exchange Ltd. [Wonderful Shenzhen]
地址：深圳市福田区深南大道2008号中国凤凰大厦2号楼19B
Mobile：139 024 86432
Email：gary.d@wonderfulsz.com

Office：0755-2399 0058; FAX：0755-23990032
网址：www.wonderfulsz.com

作 2014-10-31 18:46:12，"Alex MacLean" <amaclean@jaypeakresort.com> 写道：

  Hi Michele -

  Can you please tell me specifically what discrepancies you have identified?

  Thank you.

  Alex

  Sent from my iPhone

  On Oct 30, 2014, at 9:29 PM, "Michele Franchett" <michele@sggimmigration.com> wrote:

    Alex,

    We've been looking at the draft response to the RFE this week, and we see some issues with respect to job creation associated with the construction phase.

    It seems that discrepancies between the construction figures in the business plan and the economic impact report persist, and the costs are still not broken down in the business plan.  The economic impact report contains detailed costs, and states that the data is taken from the business plan, but no corresponding data in the

ACCD013519

business plan is apparent (economic impact report, pages 8-9).

Also, it appears that no detailed construction timeline has been provided.  Given the duration of construction activities extending beyond two years forms the basis for a significant portion of job creation claimed, USCIS will be focused on this.  Thus, the lack of a detailed timeline, and moreover, an independent validation of the timeline, may be a problem.  The letters from the contractor and architect both note they have worked for Jay Peak for seven years, and may not be viewed as independent.  Also, their letters discuss the status of the project and major landmarks in construction, but do not provide a detailed timeline.

We will follow-up as soon as possible with additional comments pertaining to the operations phase.

Sincerely,

Michele Franchett
Attorney at Law | Partner

<image001.jpg>
Michele@sggimmigration.com
www.sggimmigration.com

THIS TRANSMISSION AND THE ATTACHED DOCUMENTS, IF ANY, ARE INTENDED ONLY FOR THE USE OF ADDRESSEE, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE OR RETURN E-MAIL AND DELETE THIS E-MAIL MESSAGE. THANK YOU.

ACCD013520

USAO-EXEC 00005752

**From:** London, Sarah [Sarah.London@state.vt.us]
**Sent:** Monday, November 17, 2014 6:02 PM
**To:** Kessler, John
**CC:** Miller, Elizabeth; Moulton, Pat
**Subject:** Re: EB5

Thanks John.  Talk to you tomorrow.

Sent from my iPad

On Nov 17, 2014, at 6:00 PM, Kessler, John <John.Kessler@state.vt.us> wrote:

### !!!  Attorney-Client and Executive Privileged Communication  !!!

Sarah

I just wanted to let you know I'm meeting with Jacob Humbert at the AG's Office Friday on our request for an updated review of the state's risk generally and the potential risk specifically by a project, using AnC Bio as an example.  I had asked Susanne Young for an opportunity for both and Jacob was assigned.
We should catch up by phone beforehand.  I'll try calling you tomorrow.

Thanks!

JK

***John W. Kessler***
General Counsel
Agency of Commerce and Community Development
National Life Bldg., 6th Floor
Montpelier, VT  05620
(802) 828-5202
Parking at National Life

**From:** Miller, Elizabeth [Elizabeth.Miller@state.vt.us]
**Sent:** Friday, November 28, 2014 4:14 PM
**To:** Moulton, Pat
**CC:** London, Sarah
**Subject:** Fwd: AnC Bio
**Attachments:** Gordon Letter to Kessler 11-24-2014.pdf; ATT00001.htm


Thanks for the update on this. Happy to schedule a further briefing with you/John/me/sarah.  Overall it appears that the company has provided quite a bit of additional information; that, along with the confirmation of the fact that they will seek re-subscription, seems to go a long way to answering the questions your folks had posed.  Liz

Elizabeth H. Miller
802-522-3090, cell
elizabeth.miller@state.vt.us

Begin forwarded message:

> **From:** "Kessler, John" <John.Kessler@state.vt.us>
> **To:** "Miller, Elizabeth" <Elizabeth.Miller@state.vt.us>, "London, Sarah"
> <Sarah.London@state.vt.us>
> **Cc:** "Moulton, Pat" <Pat.Moulton@state.vt.us>, "Raymond, Brent"
> <Brent.Raymond@state.vt.us>
> **Subject: AnC Bio**

Liz and Sarah,

I forwarded the attached letter to Walter St. Onge at Edwards Wildman, who had reviewed the updated AnC Bio PPM.  He recommends discussing AnC Bio with him before Brent and I have our next phone conference with the enforcement attorneys from the SEC's Miami office next Tuesday afternoon.  I'm trying to make that happen before I leave around 1130 today.  Otherwise, when Brent is back in first thing next week.  You would be interested in knowing that when we explained Bill Kelly's description of the SEC having gone through the original PPM line by line and not having any problems with it, both of the attorneys spontaneously laughed out loud.  As you might imagine, SEC enforcement attorneys try really hard to maintain a stern matter-of-fact composure without betraying any indication of their own opinions.  Their reaction is likely very telling.

In addition, as I think you also know, I met at length with AAG Jacob Humbert last Friday.  I understand that Bill Griffin and Susanne Young are paying attention.  Yesterday, after summarizing the SEC's call, I suggested Jacob let Bill and Susanne know of that conversation and that we would be having a follow up call next Tuesday.  My impression is that things are going to pick up pace here in the next couple weeks.  I am particularly eager to hear the advice Walter and his

1

securities partner Stan Keller have for us on the SDEC inquiry.  To be clear, as I
explained to the SEC, the State is bound by its 2012 MOU with AnC Bio and our
actions have to be well-grounded in the authority and relevant provisions in that
document.  I described how AnC Bio is challenging because it straddles the old
and new eras in EB5 – the pre- and post-Sec involvement times.  The 2012 MOU
shows the beginnings of my effort to introduce securities law requirements, which
were notably absent from the earlier AnC Bio MOU that the 2012 MOU
replaced.  This is where I want to be sure the AG's Office understands the
position we are in and is informed well enough to advise on the best ways to
manage any risk exposure to the state.

We are staying on the course I laid out for this matter beginning back in May of
this year.  I have strategic plans for the likely scenarios we may pursue.  We
should have a briefing on AnC with you in the next week or so, as we gain more
insight from both the SEC and Edwards Wildman.

Thank you for your attention to this matter.  Together, I think we will be able to
work through this thorny case effectively.  I'm not promising it won't be difficult
or messy, but I think we are following a good plan and are well-positioned for the
next steps.

JK

John W. Kessler
General Counsel
Agency of Commerce and Community Development
National Life Bldg., 6th Floor
Montpelier, VT  05620
(802) 828-5202
Parking at National
Life<http://accd.vermont.gov/sites/accd/files/Documents/accd/NL_Campus%20P
arking_Map.pdf>



RICHARDSON
PATEL LLP
Business Minds for Legal Matters™

November 24, 2014

<u>Via Email</u>

John W. Kessler, General Counsel
State of Vermont Agency of Commerce and Community Development
One National Life Drive
Montpelier, VT 05620-0501

     RE:   **AnC Bio EB-5 Project**

Dear Mr. Kessler:

     We, along with Primmer Piper Eggleston & Cramer, PC, are counsel to AnC Bio Vt LLC ("AnC"). We write to respond to your letters dated November 7, 2014 and November 18, 2014 (together, the "Letters").

     AnC submitted proposed revised offering documents relating to Jay Peak Biomedical Research Park LP ("JPBMRP") to your office, so that your office would have the opportunity to review and comment on the updated materials. Unfortunately, it appears as though the process has gotten off track.

     First, we note that you have been providing comments with respect to the original offering materials. For example, in the November 7 letter, you wrote that, "Significant changes have been made to the PPM, as evidenced by the extensive redlining in the updated version. Much of the information appears to be material and does not necessarily simply reflect more recent developments, but may call into question the accuracy and completeness of earlier documents." Preliminarily, the earlier documents were accurate and complete. Any suggestion to the contrary is simply untrue. But, to the point, the process in which AnC agreed to engage related exclusively to the updated documents. Comments with respect to the original documents are off point and do not advance anything.

     Second, inquiries and requests have been made with respect to EB5 projects unrelated to JPBMRP. But the only offerings at issue are the JPBMRP offering and the QBurke offering. There is no reason to address unrelated offerings.

**From:** Kessler, John [John.Kessler@state.vt.us]
**Sent:** Thursday, December 18, 2014 9:17 PM
**To:** Moulton, Pat; Raymond, Brent
**CC:** Humbert, Jacob
**Subject:** RE: Tomorrow mtg w/ Stenger

**!!! Attorney-Client Privileged Communication !!!**

Pat and Brent

I can't emphasize strongly enough how important it is to keep tomorrow as a **listening** session.  What started as Bill Stenger asking for a call or meeting has been coopted by AnC Bio and its attorneys and converted into a full-court press they would like to put on us, but you in particular Pat.

The most important things to remember are that we have been trying since June to get the information necessary for us to determine if the updated AnC Bio offering is adequate and we still don't have it.  In fact, we still have some very significant questions for which they have not provided answers.  Even information provided by AnC continues to raise more material questions.

Witness the email I sent David Gordon et al. today regarding Alex Choi's YouTube marketing video of AnC Bio stating that Ariel Quiros and he founded the Company, even though the AnC Response accompanying Attorney Gordon's letter stated Ariel Quiros was never a founder or owner of AnC Bio Inc.

And we haven't yet raised the issue regarding the repeated material misrepresentation of the education credentials of AnC Bio's CEO Ike Lee -- both in a number of public presentations as well as in the four-page color brochure titled "Meet the CEO, From Ike Lee" that state he is a graduate of Harvard Medical School and the University of Michigan when he never attended either school, let alone earned a degree from them.

At this moment in time, AnC Bio owes us a substantial amount of information as well as some critical clarifications and explanations.  Until AnC Bio responds in full to the requests we have been making, we should not engage in a question and answer meeting format with its principals or their attorneys.  In the normal course of events, AnC Bio would have first fully responded to our information requests and afforded us a chance to review the material before meeting on it.

So, as I advised at the outset, if we are going to grant the entire cast of AnC Bio our time tomorrow, we should do nothing more than listen.  Any questions they ask can and should be taken under advisement.  This matter is well beyond the milestone where there could be such a thing as in insignificant or inconsequential discussion.  Any information AnC Bio chooses to provide tomorrow can be accepted for later consideration.  Bottom line is that AnC Bio owes us information, not the other way around.  While it is true that we are the Regional Center that controls their fate, the ball as been deep in their court for some time and we haven't seen a lot of encouraging signs of a successful return over the net.  Let's hold our position -- we've proceeded so thoughtfully and purposefully up to this point.

JK

---

**From:** Moulton, Pat
**Sent:** Thursday, December 18, 2014 8:05 PM
**To:** Raymond, Brent

USAO-EXEC00025167

**Cc:** Kessler, John
**Subject:** Re: Tomorrow mtg w/ Stenger

It just worries me that they are lawyered up.  BUT...that I don't want to over react.  So let's discuss in the am.

Patricia Moulton, Secretary
Agency of Commerce and Community Development
802-451-9578
Sent from my iPad, please excuse the typos!

On Dec 18, 2014, at 7:52 PM, Raymond, Brent <Brent.Raymond@state.vt.us> wrote:

> Jacob would be good if he's available and willing. I'll call JK tonight.
>
> Brent Raymond | Executive Director of International Trade & Foreign Investment
> Vermont EB-5 Regional Ctr
> Vermont Global Trade Partnership
> 1 National Life Dr, Davis Bldg, 6th Floor | Montpelier, VT 05620-0501
> 802-522-2540
> eb5.vermont.gov
> export.vermont.gov
>
> Sent from my iPhone
>
> On Dec 18, 2014, at 6:43 PM, Moulton, Pat <Pat.Moulton@state.vt.us> wrote:
>
>> Just heard from Bill S.  He will be here tomorrow with Bill Kelly, Mark Scribner and David Gordon (from Richardson & Patel).
>>
>> John, you are a must at this meeting.  Wondering if Jacob Humbolt should be there ?  Or Stan or Walter from EWP on the phone?
>>
>> Pat
>>
>> Patricia Moulton, Secretary
>> Agency of Commerce & Community Development
>> One National Life Drive
>> Dean C. Davis building, 6th Floor
>> Montpelier, Vermont 05620-0501
>> 802-451-9578
>> Sent from my iPhone

2

USAO-EXEC00025168

**From:** Kessler, John [John.Kessler@state.vt.us]
**Sent:** Tuesday, February 03, 2015 11:17 AM
**To:** Donegan, Susan; Cassetty, Dave; Moulton, Pat; Raymond, Brent
**CC:** Miller, Elizabeth; London, Sarah
**Subject:** RE: DFR Meeting with AnC Bio

**Follow Up Flag:** Flag for follow up
**Flag Status:** Flagged


**CONFIDENTIAL -- Attorney-Client and Executive Privilege Communication**

All

Having learned that DFR is nearing approval of the AnC Bio PPM, I would advise deferring a Final decision until the State has afforded Walter St. Onge and Stan Keller of Locke, Lord Edwards an opportunity to review and comment.   Walter and Stan have been advising ACCD on this extraordinary matter since June 2014 on both the original and revised version of the AnC Bio PPM, as well as ACCD's response to the Miami SEC.  In light of the significant concerns previously expressed by Walter and Stan, I believe it is in the State's best interests to know whether or not any of their concerns persist and the degree of risk and severity of harm they present to the State if left unresolved.

Walter's Contact Information:

**Walter J. St. Onge III**
**Locke Lord LLP**
111 Huntington Avenue
Boston, MA 02199
T: 617-239-0389
C: 617-605-7451
F: 866-955-9149
walter.stonge@lockelord.com
www.lockelord.com

If any of you have questions or need additional information, please feel free to ask me.

Thanks.

JK

*John W. Kessler*
General Counsel
Agency of Commerce and Community Development
National Life Bldg., 6th Floor
Montpelier, VT  05620
(802) 828-5202
Parking at National Life

1

**From:** Smith, Christopher
**Sent:** Friday, January 30, 2015 3:43 PM
**To:** Pieciak, Michael; Donegan, Susan; Cassetty, Dave
**Cc:** Kessler, John; Moulton, Pat; Raymond, Brent
**Subject:** RE: DFR Meeting with AnC Bio

John,

Glad to hear that AnC Bio counsel described our meeting as productive.  We concur with that sentiment.  In summary, the meeting consisted of a frank conversation of DFR's new role in the Vermont Regional Center and addressed our questions and comments regarding the project's PPM, which included unaddressed ACCD concerns.

Today, Primmer followed up on most of our comments.   Within the coming week Primmer will provide responses to remaining items, a new draft PPM, and a complete market study.  Generally, the revised PPM is in good shape.  We anticipate giving the project a green light after Primmer provides us with the outstanding information.

The Commissioner reached out to both Liz Miller and Secretary Moulton to update them.  We will discuss with Brent the best way to normalize EB-5 communications going forward.

Lastly, Liz mentioned that Brent's SEC deposition is available and would like us to review it; could you please send us a copy?

Thank you for your help.  Have a great weekend.

Best,

Christopher


Christopher M. F. Smith
Director of Capital Markets
Vermont Department of Financial Regulation
christopher.smith@state.vt.us
802.828.0727

---

**From:** "Kessler, John" <John.Kessler@state.vt.us>
**Date:** January 29, 2015 at 3:35:28 PM EST
**To:** "Pieciak, Michael" <Michael.Pieciak@state.vt.us>
**Cc:** "Raymond, Brent" <Brent.Raymond@state.vt.us>, "Moulton, Pat" <Pat.Moulton@state.vt.us>
**Subject: DFR Meeting with AnC Bio**

Mike

I read with great interest the reference in Jay Peak's weekly EB5 report to ACCD that AnC Bio's counsel, Mark Scribner, had a constructive meeting with a DFR representative yesterday.  Please provide us as much of an outline or update as you are permitted to share, as we have regular communication with Bill Stenger and the Jay Peak EB5 projects and would like to be as current as they are with comments and questions you have shared with them so we aren't caught off guard and can most effectively interact with them as well.

Thanks!

JK

**John W. Kessler**
General Counsel
Agency of Commerce and Community Development
National Life Bldg., 6th Floor
Montpelier, VT  05620
(802) 828-5202
Parking at National Life

## Raymond, Brent

| | |
|---|---|
| **From:** | Smith, Christopher |
| **Sent:** | Friday, January 30, 2015 3:43 PM |
| **To:** | Pieciak, Michael; Donegan, Susan; Cassetty, Dave |
| **Cc:** | Kessler, John; Moulton, Pat; Raymond, Brent |
| **Subject:** | RE: DFR Meeting with AnC Bio |

John,

Glad to hear that AnC Bio counsel described our meeting as productive.  We concur with that sentiment.  In summary, the meeting consisted of a frank conversation of DFR's new role in the Vermont Regional Center and addressed our questions and comments regarding the project's PPM, which included unaddressed ACCD concerns.

Today, Primmer followed up on most of our comments.   Within the coming week Primmer will provide responses to remaining items, a new draft PPM, and a complete market study.  Generally, the revised PPM is in good shape.  We anticipate giving the project a green light after Primmer provides us with the outstanding information.

The Commissioner reached out to both Liz Miller and Secretary Moulton to update them.  We will discuss with Brent the best way to normalize EB-5 communications going forward.

Lastly, Liz mentioned that Brent's SEC deposition is available and would like us to review it; could you please send us a copy?

Thank you for your help.  Have a great weekend.

Best,

Christopher

Christopher M. F. Smith
Director of Capital Markets
Vermont Department of Financial Regulation
christopher.smith@state.vt.us
802.828.0727

---

**From:** "Kessler, John" <John.Kessler@state.vt.us>
**Date:** January 29, 2015 at 3:35:28 PM EST
**To:** "Pieciak, Michael" <Michael.Pieciak@state.vt.us>
**Cc:** "Raymond, Brent" <Brent.Raymond@state.vt.us>, "Moulton, Pat" <Pat.Moulton@state.vt.us>
**Subject: DFR Meeting with AnC Bio**

Mike

I read with great interest the reference in Jay Peak's weekly EB5 report to ACCD that AnC Bio's counsel, Mark Scribner, had a constructive meeting with a DFR representative yesterday.  Please provide us as

much of an outline or update as you are permitted to share, as we have regular communication with Bill Stenger and the Jay Peak EB5 projects and would like to be as current as they are with comments and questions you have shared with them so we aren't caught off guard and can most effectively interact with them as well.

Thanks!

JK

**John W. Kessler**
General Counsel
Agency of Commerce and Community Development
National Life Bldg., 6th Floor
Montpelier, VT  05620
(802) 828-5202
Parking at National Life

**From:** London, Sarah [Sarah.London@state.vt.us]
**Sent:** Wednesday, February 11, 2015 10:49 AM
**To:** Moulton, Pat
**Subject:** Fwd: AnC Bio Update


Pat, give me a call at your convenience.  Cell is 279-7215.

Sent from my iPad

Begin forwarded message:

> **From:** "Kessler, John" <John.Kessler@state.vt.us>
> **Date:** February 11, 2015 at 10:44:33 AM EST
> **To:** "Moulton, Pat" <Pat.Moulton@state.vt.us>, "Raymond, Brent"
> <Brent.Raymond@state.vt.us>
> **Cc:** "London, Sarah" <Sarah.London@state.vt.us>
> **Subject:** FW: AnC Bio Update
>
> <span style="color:red">**Attorney-Client Privilege and Executive Privilege Communication**</span>
>
> Pat and Brent
>
> How timely for Jacob to advise us to maintain our reliance on Walter St. Onge and Stan
> Keller only one hour after I shared my concern that arose from an article regarding the
> absolute necessity to retain counsel when contacted as part of an SEC inquiry.  I remain
> concerned over the amount of risk to the state that is riding on my counsel.  Although
> the AG's Office wants to stay current on the SEC proceeding, as you can see below, they
> are disclosing their own deficiency in securities law and advising us to continue
> obtaining substantive legal advice from Walter and Stan.  Learning that the AG's Office is
> echoing the advice I have been giving for some time now, I have to advise we at a
> minimum determine what funds are available to consult Walter and Stan and make as
> strategic use as possible of both those funds and the expertise possessed by Walter and
> Stan.
>
> You will also see that Jacob recommended I advise Bill Duchac, Director of Risk
> Management, of the SEC investigation.  One aspect of the risk of liability to the state
> stems from the potential for the SEC to take action regardless of the state's decision on
> AnC Bio.  I asked Jacob to research that for us, but have the impression he has only
> stated the obvious to me at this point – that the doctrine of preemption would likely
> come into play based on the broad authority given the SEC under the comprehensive
> scheme of federal securities law.
>
> I still believe the fact that the SEC has actively investigated Jay Peak, Ariel Quiros, and
> AnC Bio since the issuance of its Formal Order of Investigation May 23, 2013
> demonstrates the seriousness of this matter and that they are more likely than not to
> take some form of action rather than simply walk away from the almost two years
> invested by their senior legal counsel.  I also remain concerned over the potential for a

favorable outcome by DFR on the AnC Bio PPM to incite the SEC to take a much more critical stance with the state -- mainly ACCD for its decision not to cancel the MOU based on the record of information it possessed.  Again, the likely effect of preemption would render almost meaningless any action by DFR inconsistent with the SEC's view of the matter.

JK

**John W. Kessler**
General Counsel
Agency of Commerce and Community Development
National Life Bldg., 6th Floor
Montpelier, VT  05620
(802) 828-5202
Parking at National Life


**From:** Humbert, Jacob
**Sent:** Wednesday, February 11, 2015 9:50 AM
**To:** Kessler, John
**Cc:** Young, Susanne; Moulton, Pat
**Subject:** RE: AnC Bio Update

ATTORNEY-CLIENT COMMUNICATION
PRIVILEGED AND CONFIDENTIAL

John:

In response to your request for the AGO's advice on steps that should be taken to minimize risk, our advice remains to continue to obtain substantive legal advice from Walter St. Onge and Stanley Keller, or other counsel having relevant expertise with the EB-5 program, securities law and SEC investigations.  The AGO does not employ any attorneys who have expertise with the EB-5 program or securities law, so we are unable to provide you with legal advice in these highly specialized areas.  Based on the information you provided in the below e-mail, I also recommend that you notify Bill Duchac at Risk Management about the investigation if you have not done so already.

As for your question related to concurrent federal and State jurisdiction, the answer will likely hinge on the doctrine of pre-emption.  Here, the inquiry would start with a review of federal securities law.  It is reasonable for ACCD to assume that SEC enforcement action remains a clear possibility, regardless of any DFR determination.  Thank you.

Jacob A. Humbert
Assistant Attorney General
General Counsel and Administrative Law Division
Office of the Vermont Attorney General
109 State Street

USAO-EXEC00012333

Montpelier, VT 05609
T: (802) 828-3689
F: (802) 828-3187
PLEASE NOTE MY NEW E-MAIL ADDRESS: jacob.humbert@state.vt.us

The information transmitted by this e-mail is intended only for the addressee and may contain confidential and/or privileged material. Any interception, review, retransmission, dissemination, or other use of, or taking of any action upon this information by individuals or entities other than the intended recipient is prohibited by law and may subject them to criminal or civil liability. If you received this communication in error, please contact us immediately at 802-828-3171 and delete the communication from any computer or network system.

 Please consider the environment before printing this e-mail

**From:** Kessler, John
**Sent:** Friday, February 06, 2015 3:31 PM
**To:** Humbert, Jacob
**Cc:** Raymond, Brent; Moulton, Pat
**Subject:** AnC Bio Update

Jacob

To keep you up to date and informed as you had requested, I have attached the transcript of Brent Raymond's 1/13/15 deposition with the Miami SEC. Trisha Sindler, senior counsel in the Miami SEC office is seeking a date to continue Brent's deposition. Trisha is also requesting the latest version of the PPM as it is being revised in consult with DFR. I advised her that ACCD did not have a copy at the moment, but may at the end of DFR's work on the matter. I also noted, and Trisha acknowledged, that any records at DFR would be outside the scope of the December 9, 2014 Document Production Subpoena served on ACCD. (copy attached) My thinking is that if the SEC is doing its job well and pursuing all records related to AnC Bio, then a Subpoena on DFR for all of its records would not come as a surprise.

Since I last updated you on this matter, I have formally requested and obtained a copy of the May 23, 2013 Order of Investigation issued by the Secretary of the SEC, which states in part, "The Commission has information that tends to show that from at least December 2006…. such acts and practices, if true, to be possible violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder." As the transcript of Brent's deposition will suggest rather clearly, the Miami SEC is concerned with the Vermont Regional Center's knowledge, analysis and response to acts and practices of AnC Bio that the SEC counsel seem to consider possible grounds for Vermont to cancel the MOU authorizing AnC Bio's EB5 project. To date, my impression is that ACCD is not n their sights for enforcement, but one could reasonably conclude form their counsel's statements that they may not be too reluctant to level some criticism for the amount of time and numerous extra chances the state

has afforded AnC Bio to recast its PPM into one that compliance with the disclosure requirements of the SEC's anti-fraud regulations.

As always, I have been trying to watch carefully for any potential risks to the state that the Attorney General should know about in order to best enable the AG's Office to provide advice as early as possible.  To that end, please let me know if there are any steps we should consider to minimize or avoid liability or simply to practice sound risk management.  My greatest concern remains that the SEC has come out in the last two years with enforcement actions backing up its announced priority of holding government officials responsible under its anti-fraud rule.  One securities law firm published an annual summary of SEC enforcement described it this way:

> For some time now, it has signaled its
> intent to pursue enforcement actions against individuals, and
> it now is clear that **state and local government officials will fall**
> **within the SEC's enforcement focus**. The SEC also has signaled
> that it intends to recommit to its scrutiny of gatekeepers, such as
> lawyers and auditors, and that it considers underwriters to serve
> as gatekeepers.

(emphasis added).
http://www.ballardspahr.com/~/media/files/alerts/2014-01-27-municipal-market-enforcement-newsletter.pdf

In this context, it seems prudent to me to consider the risk of the SEC finding that the Vermont Regional Center did not take reasonably available steps to protect investors through omission, or worse, that the State by act or omission "aided and abetted" fraud as the SEC has found in other enforcement actions.  For example, Page 2 at the article linked above, a summary of one SEC enforcement case includes the following description of the SEC's concern about the aiding and abetting of securities fraud:

> The SEC further alleges in its complaint that the Authority's
> 2008 Official Statement was false and misleading because,
> according to the SEC, it misstated the tax increment available to
> repay bondholders and the debt service ratio for the bonds. The
> SEC alleges that the calculations of the tax increment and debt
> service ratio were based on an **improperly inflated $65 million**
> **valuation by the developer of the new airplane hangars.**

(emphasis added).  To our knowledge, AnC bio has yet to substantiate the EB5 investors' purchase of the unimproved Newport site for $6 million paid via a disclosed related party transaction to GSI of Dade County Florida (owned by Ariel Quiros).  In a similar fashion, AnC Bio has used $10 million of the EB5 investor funds to pay AnC Bio Korea for the distribution rights for the rights to commercialize certain biotechnology products in North America without adequate factual disclosure of the specific basis for that value, which is compounded by the lack of any history of successful revenue generation from those products and technology in South Korea.  Thus my concern for the state's exposure to liability through its EB5 program – AnC Bio in particular -- to the extent we

are acting as a "gatekeeper" or worse, in a way the SEC might characterize as "aiding and abetting" securities fraud.

Although the state through DFR has concurrent authority to regulate securities in the area of anti-fraud, I am concerned over the risk of liability that may arise where the state regulator exercises its enforcement discretion differently than the federal regulator – in this case the SEC, and the possibility of it taking a harsher stance than DFR. Before we find ourselves in that situation, I would greatly appreciate any information and advice from the AG's Office on any instances in which a federal agency exercised its concurrent jurisdiction to eclipse the actions taken (or not taken) by the state regulator in the same matter. I'm suspecting that has come up somewhere else in the State's not too distant past in areas of concurrent jurisdiction, such as environmental, labor, transportation and other fields.

Thanks for lending your assistance to us on the significant legal issues the state is encountering in its administration of the EB5 program.

JK

*John W. Kessler*
General Counsel
Agency of Commerce and Community Development
National Life Bldg., 6th Floor
Montpelier, VT  05620
(802) 828-5202
Parking at National Life

**From:** Miller, Elizabeth [Elizabeth.Miller@state.vt.us]
**Sent:** Monday, February 23, 2015 5:10 PM
**To:** London, Sarah
**Subject:** Re: conf ac re PRA request

Thank you-your instincts are exactly right on this. That's what I needed someone to bird-dog this thank you. Donegan is aware of the timing issue so I don't think the absence of her GC is a significant barrier. We should check in with her tomorrow. I left a message for Pat on this Thursday and it wasn't until today that she returned the call; I think you and I both just need to realize that the secretary has too many things on her plate to manage this effectively on her own. She appreciates your help.

Sent from my iPhone

On Feb 23, 2015, at 4:57 PM, London, Sarah <Sarah.London@state.vt.us> wrote:

> Re Digger AnC PRA:  I have made clear that I do not want to go down the road of suggesting that state oversight communications are "trade secrets", which AGO/ Jacob has already advised and which John gets, despite detailed feedback.  I don't expect any significant difference of opinion there, just typical process…  We're also all agreed the negotiation of contracts exemption does not apply.  John mostly hung up on SEC part.  Ultimately, clearly most State communications will be disclosed; supposedly no potentially EP docs to date and we will see everything before it goes.  I have said everything needs to go at once and not piecemeal.  As for audit timing, GC of DFR is out this week but can try to connect with him next week.  Otherwise, see below re extreme detail on ACCD side.
>
> ---
>
> **From:** Kessler, John
> **Sent:** Monday, February 23, 2015 4:45 PM
> **To:** Moulton, Pat
> **Cc:** London, Sarah; Humbert, Jacob
> **Subject:** RE: Records Request on EB5 Suspension
> **Importance:** High
> **Sensitivity:** Confidential
>
> **Confidential – Attorney-Client and Executive Privileged Communication**
>
> Pat
>
> I consulted Trisha Sindler in the Miami SEC office because when she first contacted us middle of last year, she advised us the Miami SEC investigation was a "confidential fact finding" and that we should not disclose to anyone.  You will recall our concern about Brent's scheduled event in China with AnC Bio and the planned inclusion of Senator Leahy and Representative Welch after learning of the SEC investigation of Jay Peak and AnC Bio.  We consulted the AG's Office advised it would be best to honor the SEC's request for confidentiality.

1

The second round of contacts with the Miami SEC office came between November of last year and now.  In the current phase, we were advised of the formal Order of Investigation and its docket number, issued a subpoena for all of our records related to AnC Bio and a deposition order for Brent's testimony.  The Order of Investigation issued directly by the Secretary of the SEC is not public.  Indeed, we are only permitted to obtain a copy upon a formal written request (which I have done) and use it solely for the purposes of legal representation in the SEC investigation and responding to the subpoena and deposition order (which I have also done – shared the Order with Walter St. Onge and Stan Keller at Locke, Lorde and Edwards).

Today I consulted Trisha Sindler in the Miami SEC on the latest VTDigger records request because numerous records Anne Galloway seeks include information about the pending SEC investigation.  At present, the AG's Office is inclined to find public disclosure is required of records we generated that discuss the suspension of EB5 investments in Jay Peak projects.  From among all of those records, you will recall we have addressed the suspension of EB5 marketing and investment regarding Anc Bio and Q Burke in at least the seven detailed letters beginning with a July 9, 2014 letter summarizing the marketing and investment suspension agreed to at our June 27, 2014 meeting with Bill Stenger et al. at ACCD and running through the last one Dated December 30, 2014.

The release of the records showing the suspension of EB5 marketing and investment for AnC Bio and Q Burke will likely have dramatically adverse consequences on both projects.  Accordingly, I am in discussion with the AG's Office to ensure we are on the same page in terms of what must be disclosed and what, if anything, can be withheld under the Public Records Act exemption in 1 VSA 317(c)(9) for trade secrets and other confidential business information.  The initial AG position is records we created on the requested subject would likely need to be disclosed.  But that's not final yet and we have the additional ten days to figure this out – through Friday, March 6.

Consulting the SEC on the VTDigger request was necessitated by the specific references to the SEC investigation not only in our letters dated November 7 and November 18, but also in many other records we have that also discuss the suspension of EB5 marketing and investment for AnC Bio.  We need to know whether or not the SEC considers its investigation confidential and, therefore, information it would not want disclosed pursuant to the VTDigger request.  Unfortunately, here's the vague and not too helpful response I just received from Trisha in the Miami SEC:

    John:

    As you know, our investigations are confidential.  We cannot advise the ACCD on how to proceed in responding to this request.

    Thank you,

    Trisha D. Sindler
    Senior Counsel
    U.S. Securities and Exchange Commission
    Miami Regional Office

2

Not exactly the most helpful guidance.  I've swapped voice messages since receiving that reply and am hopeful for clearer guidance on how to treat the references in my letters (and surely in other correspondence) to the SEC investigation.

Lastly, as you can imagine, there has been voluminous correspondence regarding the suspension between each of the seven letters we sent on the AnC Bio project.  However, the seven letters represent perhaps the most concentrated and complete records of our decision making on the suspension and efforts to secure a revised PPM that would enable us to lift the suspension and allow the project to resume.  I understand that we would prefer to release all of the responsive records at one time, however, the burden of producing everything may not be cost-effective to Anne Galloway's apparent interest.  With that in mind, I would want to negotiate with Anne for the production of those letters alone as they are readily available at little expense.  By comparison, the hundreds of pages of correspondence that partially repeat bits and pieces of what was ultimately included in those letters would require a very lengthy review and redaction for attorney-client privilege, trade secrets/confidential business information under 1 VSA 317(c)(9), and a few for executive privilege.  Predictably, the expense of reviewing all of those records would cost a few hundred dollars and I wouldn't support waiving the cost as requested by Anne Galloway.  We should discuss this option or a variation on the same theme – producing records clearly not requiring legal review for content that supports the withholding of the record.  Of course, if Anne wants to pay for everything, it will take a few days' time among those in the correspondence field identified and for me to review for privilege and confidentiality.

We need to discuss how we will manage the impact of the release of the records under this request.  You know my advice; however, some course of action should be determined soon – March 6 is uncomfortably close.

JK

**John W. Kessler**
General Counsel
Agency of Commerce and Community Development
National Life Bldg., 6th Floor
Montpelier, VT  05620
(802) 828-5202
Parking at National Life

**From:** Moulton, Pat
**Sent:** Monday, February 23, 2015 12:32 PM
**To:** Kessler, John
**Subject:** RE: Records Request on EB5 Suspension

Hi John,

USAO-EXEC00025409

I would like to discuss this with you.  Anne Galloway did not ask about federal investigations, but federal or state directives to stop marketing. The SEC has NOT told them to stop marketing so I am wondering WHY the SEC investigation has to come up at all unless we get asked that specifically?

I think it is fine we are asking but given the nature of the request, why would we bring up the SEC investigation?
Pat


Patricia Moulton, Secretary
Agency of Commerce and Community Development
One National Life Drive
Deane C. Davis Bldg., 6th Floor
Montpelier, VT  05620-0501
802-451-9578


**From:** Kessler, John
**Sent:** Monday, February 23, 2015 11:40 AM
**To:** Fuchs, Trisha Sindler; James, Brian T.
**Cc:** Moulton, Pat; Raymond, Brent; Humbert, Jacob
**Subject:** Records Request on EB5 Suspension


Trisha

As you requested, I have attached the public records request we just received seeking all correspondence related to any state or federal directive suspending any of the Jay Peak EB5 projects, including AnC Bio and Q Burke.  As you know, ACCD has written letters to the principals of AnC Bio suspending the marketing, spending of investor funds, and performance of any construction or construction related activities.  Also included in our correspondence has been mention of the SEC investigation.

Please advise how the SEC would want ACCD to treat the information on the existence of an SEC investigation of AnC Bio – confidential or public?

We have asked for, and automatically are granted, ten additional days to seek legal counsel from the Vermont AG's Office.  So, our response is due Friday, March 6.

Thank you for your assistance.

JK

*John W. Kessler*
General Counsel
Agency of Commerce and Community Development
National Life Bldg., 6th Floor
Montpelier, VT  05620

USAO-EXEC00025410

(802) 828-5202
Parking at National Life

USAO-EXEC00025411

**From:** Donegan, Susan [Susan.Donegan@state.vt.us]
**Sent:** Sunday, March 01, 2015 2:39 PM
**To:** Miller, Elizabeth
**Subject:** AnC Bio -- EXECUTIVE PRIVILEGE
**Attachments:** Feb 27 Draft to Primmer - Letter Agreement with DFR and Jay Peak.docx

Liz,
To keep you up to date about AnC Bio --- Primmer sent us another draft of the proposed agreement at the end of last week. Their proposal really went too far in trying to limit the scope of the audit (including not using the word audit – which I don't care. We settled on "financial review.") and wanting all of ACCD's "holds" lifted. Specifically, escrow of new funds was not to their liking. We discussed further here at DFR and agreed to several of their requests (including limiting the scope with conditions) but in the final analysis we have kept the new funds hold and require escrow (but lifted all other holds). I believe we have accommodated Primmer's requests to the extent we can and have been clear what our limits are (and what happens if concerns are discovered in the review). In fact, I added stronger confidentiality language than they had crafted. Also, there is no invitation for another round of negotiating from us. I have copied the cover message that Mike Piechiak sent with this version of the agreement so you see the particulars and the tone of our approach. I hope we get this signed and back from Primmer ASAP – they have been apprised of the document production date, as you know.
S.

**EMAIL TO PRIMMER FROM MIKE PIECIAK FOLLOWS:**

*Mark,*

*Thank you for your draft of the letter agreement. We appreciate your efforts to move this matter forward; like you, DFR is anxious to get this signed and get the financial review underway. Our revised draft is attached.*

*DFR agrees to accept your following comments: (1) limiting the scope of the audit to AnC Bio; obviously the scope must also include entities related by ownership and/or control who have received funds from AnC Bio and; (2) removing the IP condition.*

*In agreeing to the limited scope of the financial review, we have included a for cause provision allowing the scope to expand as appropriate if evidence of misuse/misappropriation is found.*

*Regarding the escrowing of new funds, the immigration risk is not practical as USCIS takes on average 14 months to approve an investors I-526 petition; however, we have included receiving such approval as a reason an individual investor's funds may be removed from escrow.*

*We do not agree with your general statement that a hold will discourage investment. We are confident your firm can come up with language to accurately describe the financial review to prospective investors that will provide them comfort a regulatory agency is confirming the project's representations – such government involvement is generally appreciated by foreign investors, in particular Chinese investors.*

*We agree to limit AnC's cooperation standard in connection with the financial review from full to reasonable; however, we included a cost shift mechanism to help ensure compliance with this reduced standard.*

*Regarding the SEC disclosure, DFR does not provide draft language, but as discussed, the disclosure must conform to the following three points:*
*- No reference to general SEC activities in the EB-5 industry;*
*- Do not characterize/define the scope of the SEC's involvement/interest in the projects; and*
*- Provide that it is unknown what further action the SEC may take at this time.*

*DFR has been flexible to accommodate your business and immigration concerns; however, this revised draft reflects the limits of our flexibility. We will entertain language tweaks and comments but please recognize the substance of the agreement is final from our perspective.*

*Apologies for only including a clean copy of the letter agreement. I am away from the office and couldn't product a redline. Thank you.*

*All the best,*
*Mike*

*Michael S. Pieciak*
*Deputy Commissioner of the Securities Division*
*Vermont Department of Financial Regulation*

Susan L. Donegan, Commissioner
Vermont Department of Financial Regulation
89 Main Street
Montpelier, Vermont 05620
USA
(+1) 802-828-3301
susan.donegan@state.vt.us

CONFIDENTIAL BUSINESS AGREEMENT - PRODUCED TO DEPARTMENT, NOT SUBJECT TO PUBLIC DISCLOSURE

## Letter Agreement

The parties to this Letter Agreement (the "Agreement"), the State of Vermont Department of Financial Regulation ("DFR") and AnC Bio VT, LLC, William Stenger, Ariel Quiros, and Ary Quiros (collectively "AnC") agree as follows:

1) On October 23, 2009 AnC and the State of Vermont Agency of Commerce and Community Development ("ACCD") entered into a memorandum of understanding, later revising it on October 5, 2012 (the "Memorandum of Understanding"), regarding an EB-5 project located in Newport, Vermont (the "Project").

2) The Project received EB-5 investment but did not fully subscribe during the term of the offering and the Project is in the process of extending the terms of the offering Private Placement Memorandum (the "PPM") as set forth in an Amended and Restated Private Placement Memorandum (the "ARPPM") provided to DFR for its review.

3) Further, until AnC extended the term of the Project offering and updated the PPM, ACCD imposed a hold on the Project regarding (i) construction (the "Construction Hold"); (ii) further use of subscribed investor proceeds (the "Use of Subscribed Proceeds Hold"); (iii) further marketing and/or acceptance of new subscriptions (the "Marketing Hold"); and (iv) further use of new investor proceeds (the "Use of New Proceeds Hold").

4) On December 22, 2014, ACCD entered into a memorandum of understanding with DFR under which DFR agreed to participate in the Vermont Regional Center by developing an EB-5 Compliance Program charged with reviewing applications and conducting on-going compliance (the "ACCD DFR MOU").

5) AnC provided DFR with a summary depicting the use of investor funds in the Project through the date of this Agreement.

6) AnC provided DFR with an Executive Summary of Frost & Sullivan's "Strategic Analysis of AnC Bio Products and Services: Evaluating Demand".

Accordingly, DFR and AnC enter into this Agreement to set out each other's duties and responsibilities going forward.

i.   The Construction Hold and Use of Subscribed Proceeds Hold shall be lifted upon execution of this Agreement.

ii.  Marketing Hold shall be lifted upon completion of the following:

a.   Evidence AnC established an escrow account for the Project (the "Escrow Account") and written certification from the AnC's members that all new investor funds (both principal and administrative fees) shall be maintained in the Escrow Account and only released to the Project upon successful completion of the Financial

1

*1949241.1*

CONFIDENTIAL BUSINESS AGREEMENT - PRODUCED TO DEPARTMENT, NOT SUBJECT TO PUBLIC DISCLOSURE

    Review or, on an investor-by-investor basis, upon I-526 petition approval by USCIS in order to put the funds "at risk".

    b.  Final approval by DFR of AnC's ARPPM.

iii.  The Use of New Proceeds Hold shall be lifted upon completion of a financial review (the "Financial Review").

    a.  DFR shall conduct the Financial Review and the results shall be to DFR's reasonable satisfaction.

    b.  Scope of Financial Review shall initially be limited to:

        1.  <u>Entities</u>. AnC and any entity or individual under common control or ownership of AnC that received funds from AnC.

        2.  <u>Time Frame</u>. The entire corporate history of AnC and any entity or individual under common control or ownership of AnC that received funds from AnC.

        3.  <u>Records</u>. Any financial records of AnC and any entity or individual under common control or ownership of AnC that received funds from AnC.

    c.  The scope of the Financial Review may be expanded to any entity or individual under common control or ownership with AnC upon evidence suggesting the misuse or misappropriation of funds.

    d.  AnC agrees to reasonably cooperate with DFR, and any DFR contractor, in completing the Financial Review, including making employees and financial records available in a timely manner upon request from DFR, and any DFR contractor.

    a.  DFR, and any DFR contractor, shall use their best efforts to complete the Financial Review in a timely fashion.

    e.  DFR shall be solely responsible for all of its costs and expenses in completing the Financial Review; including any third party fees. However, if DFR determines that AnC, its employees or members are not reasonably cooperative with DFR, or any DFR contractor, in completing the Financial Review, than AnC and its members shall be solely and jointly liable for all of its costs and expenses in completing the Financial Review; including any third party fees. If DFR determines AnC, its employees or members are not acting in a reasonably cooperative manner, than DFR shall provide AnC with notice to its counsel describing the uncooperative actions and giving AnC an opportunity to cure within three (3) days.

CONFIDENTIAL BUSINESS AGREEMENT - PRODUCED TO DEPARTMENT, NOT SUBJECT TO PUBLIC
DISCLOSURE

      f.   AnC asserts confidentiality over all financial records and other information disclosed to DFR in connection with the Financial Review pursuant 1 V.S.A. § 317(c)(9) and 8 V.S.A. § 22. DFR and any DFR contractor shall not disclose such materials and information to any third party to the extent possible under law.

iv.   The Memorandum of Understanding entered into by AnC and ACCD remains in full force and effect.

v.   Without limiting AnC's duty to reasonably cooperate with DFR in its continuing review of the Project under the general requirements of the Memorandum of Understanding and the ACCD DFR MOU, AnC agrees to provide DFR the following by March 15, 2015:

      a.   AnC shall supply DFR with the final market study prepared by Frost & Sullivan regarding the marketability of the products and services associated with the Project.

      b.   AnC through its legal counsel shall supply DFR with an explanation of investor funds deposited in and invested through Raymond James accounts, as verbally disclosed to ACCD in a December 19, 2014 meeting and as promised in the letter from William Stenger to ACCD Secretary Patricia Moulton dated January 23, 2015. Such explanations or summaries shall be to DFR's reasonable satisfaction.

      c.   AnC shall supply DFR with all vendor contracts in existence as of the date of this Agreement with whom investor funds have been or will be spent, or if such vendor contracts do not exist, a summary of the services that have been or will be provided by the vendor in connection with the Project, and as applicable invoices reflecting payments.

vi.   Each succeeding Friday following the execution of this Agreement, a representative of AnC shall inform DFR Deputy Commissioner Michael S. Pieciak via email at Michael.Pieciak@state.vt.us of any new investments received by the Project. Such reporting obligations shall cease upon successful completion of the Financial Review.

**The State of Vermont Department of Financial Regulation**

CONFIDENTIAL BUSINESS AGREEMENT - PRODUCED TO DEPARTMENT, NOT SUBJECT TO PUBLIC DISCLOSURE

Dated:_____

_____
**Susan Donegan, Commissioner**


**AnC Bio VT, LLC**

Dated:_____

BY: _____
**William Stenger, member**

Dated:_____

BY:_____
**Ariel Quiros, member**

Dated:_____

**Individually:**


_____
**William Stenger**
**Dated:**_____


_____
**Ariel Quiros**
**Dated:**_____


_____
**Ary Quiros**
Dated:_____

**From:** Donegan, Susan [Susan.Donegan@state.vt.us]
**Sent:** Friday, March 06, 2015 7:03 AM
**To:** London, Sarah
**CC:** Miller, Elizabeth
**Subject:** Re: Attached Image EXECUTIVE PRIVILEGE


Ok thanks.

Susan L. Donegan, Commissioner
Sent from my iPhone

On Mar 5, 2015, at 22:05, London, Sarah <Sarah.London@state.vt.us> wrote:

> Thanks, and Susan, just FYI: at this point the plan on the Anne Galloway PRA request of
> ACCD is for ACCD to send Anne the 6 or 7 formal letters from ACCD to Bill and co
> sometime mid-next week.  John Kessler will send the letters to Mark Scribner in advance
> of release advising of their likely disclosure, as per usual.  Anne will be narrowing her
> initial request of ACCD to avoid costs and 1000+ pages of records, but will do that based
> on the contents of the letters.  Nothing will be going out tomorrow.
>
> > **From:** Elizabeth Miller [mailto:elizabeth.hawkins.miller@gmail.com]
> > **Sent:** Thursday, March 05, 2015 7:46 PM
> > **To:** Donegan, Susan
> > **Cc:** London, Sarah
> > **Subject:** Re: Attached Image EXECUTIVE PRIVILEGE
> >
> > Agreed on all and thank you. I will not provide a response.
> >
> > Sent from my iPhone
> >
> > On Mar 5, 2015, at 7:14 PM, Donegan, Susan <Susan.Donegan@state.vt.us> wrote:
> >
> > > Thanks. We did receive Primmer's response late today which had more
> > > changes and objections despite our strong suggestion that we were
> > > done negotiating. The cover message from Primmer contained a long
> > > message from Bill Stenger (distinguished by color and italics) that was
> > > vehement in his insistence that anything short of approving his project
> > > would destroy Newport, the Kingdom, the State of VT and its EB 5
> > > program. Delays were cited.
> > > I have a meeting with my team tomorrow morning for us to review the
> > > Primmer letter and new draft. In terms of delay, we have been keeping
> > > track of the process since we first met with Primmer.  I can document
> > > that DFR has turned everything around within 24 hours but the project
> > > has been dragging its feet at every turn. Point of fact, we were told that
> > > we would have an answer to the latest draft/communication we sent
> > > last weekend on Monday.  Today is Thursday.  We have figured that the
> > > financial review would have already been completed or close to

1

completion if cooperation had been timely. None-the-less, we are committed to getting this agreement signed, maybe tomorrow. There are some items that are not negotiable, as you no doubt saw in our final proposed agreement. The more resistance we encounter, the more I have to scratch my head and wonder why we are not getting the type of cooperation Mr. Stenger indicated he was willing to give us. We are not on a witch hunt.  DFR is merely conducting the type of financial review that is required for this type of project.

I will let you know what our decisions are tomorrow.

S.

Susan L. Donegan, Commissioner
VT Dept. of Financial Regulation
Sent from my iPad

On Mar 5, 2015, at 18:48, Elizabeth Miller
<elizabeth.hawkins.miller@gmail.com> wrote:

> Fyi, I just received the below and have not responded. I am forwarding to my state account because for some reason Bill sent this to my personal account – he has never emailed me before so perhaps he just did not have the right address to use. Regardless, I wanted you to have this as soon as I received it. Let's chat tomorrow.
>
> Sent from my iPhone
>
> Begin forwarded message:
>
>> **From:** Bill Stenger
>> <bstenger@jaypeakresort.com>
>> **Date:** March 5, 2015 at 6:36:26 PM EST
>> **To:**
>> "elizabeth.hawkins.miller@gmail.com"
>> <elizabeth.hawkins.miller@gmail.com>
>> **Subject: FW: Attached Image**
>>
>> Liz, I wanted you to have this letter.  Thank you.  Bill Stenger
>>
>> _____
>>
>> **From:** JAYPEAK ADMIN
>> [mailto:scanners@raisedjay.com]
>> **Sent:** Thursday, March 05, 2015 6:20 PM
>> **To:** Bill Stenger
>> **Subject:** Attached Image

2

<1625_001.pdf>

**From:** Donegan, Susan [Susan.Donegan@state.vt.us]
**Sent:** Sunday, March 08, 2015 6:56 PM
**To:** Miller, Elizabeth
**Subject:** Re: DRAFT letter to Stenger EXECUTIVE PRIVILEGE

Thanks will review.

Susan L. Donegan, Commissioner
Sent from my iPhone

On Mar 8, 2015, at 17:59, Miller, Elizabeth <Elizabeth.Miller@state.vt.us> wrote:

> Looks great - suggestions embedded in all cap just so you can see them.  launch at
> your pleasure.  I added more than you may need; I recognize it is your letter so
> take or leave.  Liz
>
> Elizabeth H. Miller
> 802-522-3090, cell
> elizabeth.miller@state.vt.us
>
> On Mar 8, 2015, at 3:53 PM, Donegan, Susan <Susan.Donegan@state.vt.us>
> wrote:
>
>> no pride in authorship on my part...
>>
>>
>> Draft Letter to Bill Stenger
>>
>>
>> Dear Bill,
>>
>> When we spoke last month in my office, I pledged to you that I
>> would communicate directly if any issues arose that we needed to
>> resolve.  From our conversation I was very hopeful that not only
>> would we have a signed agreement but that by now, our financial
>> review might have been completed or in a final stage.  You
>> indicated full cooperation from your staff, attorneys and yourself. I
>> would like to rely on that offer and ask you to please execute the
>> agreement so that DFR can begin review immediately.
>>
>> I want to be very clear about the reasons for the financial review
>> and for the other deliverables indicated in the agreement.  It is
>> crucial for our regulatory due diligence and the integrity of your
>> project that there is evidence of proper use of proceeds, flow of
>> funds, material disclosures and project management.  This
>> necessarily requires that certain transactions, relationships,

1

contracts and accounts be examined.  For example, we need to understand how $41,500+ million has been spent before any ground has been broken.  For example, we need the AMENDED PPM to be accurate and address material items such as the SEC REVIEW and removal of Ary Quieros as a member (which just happened, apparently).  For example, we want to have a clear picture of certain relationships and the connection to funds, including all Raymond James accounts. ALL OF THESE ARE DESIGNED TO SHOW US THAT THE PROJECT HAS A SOUND PLAN FOR SUCCESS AND THAT PROPER DISCLOSURES WILL BE MADE TO THE INVESTORS FOR THEM TO DECIDE WHETHER TO PARTICIPATE.


WE ARE COMMITTED TO MAINTAINING VERMONT'S EB-5 REPUTATION THROUGH SUCCESSFUL PROJECTS.  Your recent letter to Governor Shumlin described the economic development impact if this project does not go forward as you planned. WE VERY MUCH WANT THIS PROJECT TO BE AMONG THE VERMONT EB-5 SUCCESS STORIES.  WE RECOGNIZE THE POSITIVE IMPACT A SUCCESSFUL PROJECT WOULD HAVE IN THE NORTHEAST KINGDOM AND THROUGHOUT OUR STATE.  BUT WE CANNOT SIMPLY TURN ASIDE OUR REVIEW.  As I told you previously, I am NOT GOING TO APPLY A DIFFERENT STANDARD TO THIS PROJECT THAN TO ANY OTHERS DFR HELPS REVIEW AND APPROVE. All entities that pass through DFR's door in search of a license or application approval go through this type of scrutiny.  If DFR RECOMMENDS CONTINUED APPROVAL OF AnC Bio, it will be because the project'S AMENDED PPM AND ASSOCIATED FINANCIAL REVIEW pass muster. That is good for everyone: Jay Peak, the Kingdom, YOUR investors, AND the State.

WHEN WE MET I TOLD YOU THAT DFR WOULD WORK TO REMOVE CONDITIONS THAT ARE PREVENTING THE PROJECT FROM MOVING FORWARD WITH SEEKING ADDITIONAL INVESTORS AND OTHER WORK, SO LONG AS A REASONABLE FINANCIAL REVIEW COULD OCCUR THAT WOULD HELP LEVEL-SET OUR UNDERSTANDING OF THE PROJECT AFTER IT HAS EXPENDED OVER $40 MILLION IN INVESTOR FUNDS.  I BELIEVED THAT PATH WAS REASONABLE WHEN WE MET, AND I CONTINUE TO BELIEVE IT IS REASONABLE TODAY, BUT I AM CONCERNED AT THE RESPONSE WE'VE RECEIVED TO

DATE FROM YOUR TEAM.  I know that Primmer asked for a meeting tomorrow but I propose that you and I meet DIRECTLY this week to talk about this situation. I am currently in Washington DC at a banking regulatory meeting.  I will be back in my office on Wednesday afternoon.  Is it possible for you to come to Montpelier then?  I am also free Thursday morning.


Sincerely.


SLD

Susan L. Donegan, Commissioner
VT Dept. of Financial Regulation
Sent from my iPad

**From:** Miller, Elizabeth [Elizabeth.Miller@state.vt.us]
**Sent:** Friday, April 03, 2015 5:38 PM
**To:** Donegan, Susan
**Subject:** Re: Update EB-5 EXECUTIVE PRIVILEGE

Tuesday at 11 works for the governor so plan on that. I am around this weekend if you want to talk. I can't believe the project is failing to fully represent the current status. I did read Bill Kelly's email regarding the Friday meeting. While he more or less captured correctly the terms of agreement that we were able to reach during the meeting, the joint press statement thing certainly did not come up while I was there, and as you know we subsequently declined to do any such thing, partly based upon the fact that they were not fully disclosing everything in their own press release from our point of view. Interesting times.

Sent from my iPhone

On Apr 3, 2015, at 3:45 PM, Donegan, Susan <Susan.Donegan@state.vt.us> wrote:

> Liz,
> A few things:
>     1. House Commerce has requested that Pat and I appear before them on Tuesday at 9.30 to discuss Jay Peak.
>     2. I had a meeting scheduled with Senator Leahy's staff in DC on April 22 (insurance issues). They have indicated to me that Senator Leahy wishes to talk to me then regarding EB-5.
>     3. We sent the first batch of a public records to Anne Galloway today. The documents were a small group of correspondence between DFR (mainly me) and Jay Peak relating to the decision to give clearance to the AnC Bio PPM and require escrow. One of the emails from Bill Kelly to me refers to the meeting in the Governor's office last Friday and names those in attendance. The next batch of documents we will provide will be a much broader group --- showing the back-and-forth between Primmer and our office over the PPM including the delays from them and the unwillingness to sign the letter Agreement for the financial review. I am going to inform Bill Kelly that we are completing a public records request.
>     4. I am sure you have heard that there is some kind of media event at Jay on Monday for a select group of reporters. I have few details. Most of the reporters know that there are restrictions on AnC Bio's use of new funds. Just got off the phone with the Free Press (Dan D), who asked me "how come Stenger is not talking about the escrow situation, isn't that important for potential investors to know?"
>     5. I also reminded Mr. Kelly in an email last night, that QBurke was not approved and that dissemination of that PPM was not permitted. I told him that our review had not concluded. He replied that he understood.
>     6. We received language for an escrow agreement today for AnC Bio and are reviewing it.
>     7. I am holding Tuesday at 11.00 for a meeting. If that is not going to work, please let me know as VPR has me scheduled a little before noon session with Jane

1

USAO-EXEC00025366
USAO-EXEC00025366

Lindholm (talking about insurance liability for 'the sharing economy') — I will change that interview if we are going to meet.

8.

Best,

Susan


Susan L. Donegan, Commissioner

Vermont Department of Financial Regulation

89 Main Street

Montpelier, Vermont 05620

USA

(+1) 802-828-3301

susan.donegan@state.vt.us

USAO-EXEC00025367
USAO-EXEC00025367

**From:** Donegan, Susan [Susan.Donegan@state.vt.us]
**Sent:** Monday, April 06, 2015 10:44 AM
**To:** Miller, Elizabeth; Moulton, Pat; London, Sarah
**Subject:** RE: EB-5 media --- EXECUTIVE PRIVILEGE

Understood.

**From:** Miller, Elizabeth
**Sent:** Monday, April 6, 2015 10:37 AM
**To:** Moulton, Pat; Donegan, Susan; London, Sarah
**Subject:** RE: EB-5 media --- EXECUTIVE PRIVILEGE

Thanks all – Susan, given that our story is out there accurately and fine, I'd be pretty circumspect about saying more – as you say, stick with the talking points and in particular the "this will apply to all projects going forward" and "Im not going to discuss the specifics of any project under review" – who knows what Stenger et al says to the media today and I don't want you put in a blind role of responding to reporters today without the benefit of knowing that. So lay as low as you can, I'd say.  Liz

**From:** Moulton, Pat
**Sent:** Monday, April 06, 2015 9:43 AM
**To:** Donegan, Susan; Miller, Elizabeth; London, Sarah
**Subject:** RE: EB-5 media --- EXECUTIVE PRIVILEGE

All I know about today is Bill has invited WCAX, VPR, Burl. Free Press and local press to come to Jay Peak for one on one interviews, not a press conference. The interviews are with Sullivan-Frost who did their market study, and that Ike and Jake Lee (no relationship) would be there. The topic is the products they will be manufacturing. Bill said he did not want to do a press conference "due to the technical nature of the discussion and the technical nature of the products."

I have a call from Emerson Lynn, not sure if it is about this topic.  I have not received other calls.
Pat


Patricia Moulton, Secretary
Agency of Commerce and Community Development
One National Life Drive
Deane C. Davis Bldg., 6th Floor
Montpelier, VT  05620-0501
802-451-9578

**From:** Donegan, Susan
**Sent:** Monday, April 06, 2015 9:18 AM
**To:** Miller, Elizabeth; London, Sarah; Moulton, Pat
**Subject:** EB-5 media --- EXECUTIVE PRIVILEGE

Good morning:

**From:** Moulton, Pat [Pat.Moulton@state.vt.us]
**Sent:** Monday, April 06, 2015 9:43 AM
**To:** Donegan, Susan; Miller, Elizabeth; London, Sarah
**Subject:** RE: EB-5 media --- EXECUTIVE PRIVILEGE

All I know about today is Bill has invited WCAX, VPR, Burl. Free Press and local press to come to Jay Peak for one on one interviews, not a press conference. The interviews are with Sullivan-Frost who did their market study, and that Ike and Jake Lee (no relationship) would be there. The topic is the products they will be manufacturing. Bill said he did not want to do a press conference "due to the technical nature of the discussion and the technical nature of the products."

I have a call from Emerson Lynn, not sure if it is about this topic.  I have not received other calls.
Pat


Patricia Moulton, Secretary
Agency of Commerce and Community Development
One National Life Drive
Deane C. Davis Bldg., 6th Floor
Montpelier, VT  05620-0501
802-451-9578


**From:** Donegan, Susan
**Sent:** Monday, April 06, 2015 9:18 AM
**To:** Miller, Elizabeth; London, Sarah; Moulton, Pat
**Subject:** EB-5 media --- EXECUTIVE PRIVILEGE

Good morning:
I have been getting calls already from media today who are on their way up to Jay Peak for that press conference event they are holding.  I have no real details other than what press have told me.  My Info Mgmt Officer said that WCAX and others s are asking for appointments with me this afternoon to talk about what DFR's role is in EB-5. I will continue with the same talking points.
Media beyond Vermont are also calling – a reporter from BEN (business environment network) is asking to talk as well as other financial and business outlets.  Vermont AP's story (which correctly quoted me about escrow and financial review) has been picked up and we are seeing blurbs running in various papers around the country  -- Tacoma  News Tribune, for example.
Susan

Susan L. Donegan, Commissioner
Vermont Department of Financial Regulation
89 Main Street
Montpelier, Vermont 05620
USA
(+1) 802-828-3301
susan.donegan@state.vt.us

**From:** Kessler, John [John.Kessler@state.vt.us]
**Sent:** Thursday, April 09, 2015 11:19 AM
**To:** Humbert, Jacob
**CC:** London, Sarah
**Subject:** FW: Public records request regarding AnC Bio Vermont, Jay Peak projects


Jacob

I have an attorney-client question.

Forwarded below is the latest public records request from Anne Galloway of VTDigger on EB5
projects. I intend to call Anne to see if we can better define the scope of records she is looking for –
hopefully narrow it down as well. However, regardless of the scope, I expect there will be
correspondence between ACCD and DFR with attorneys on both ends, or with an attorney on one end
but not the other. I'd like to be sure I'm asserting attorney-client privilege consistently with the
positions taken by the AG's Office in similar circumstances.

Here are the examples where the question of attorney-client privilege will arise and what I believe to be
the answers:

1. ACCD General Counsel to/from DFR General Counsel – **Yes,** *if* for purpose of advising state
   agencies, officials, and their staff
2. ACCD GC to DFR staff – **No,** *unless* providing advice, or DFR GC asked ACCD staff for purpose of
   advising
3. DFR staff to ACCD GC – **No,** *unless* seeking advice, or ACCD GC asked DFR staff for purpose of
   advising
4. DFR GC to ACCD staff – **No,** *unless* providing advice, or DFR GC asked ACCD staff for purpose of
   advising
5. ACCD GC to DFR staff who are attorneys, but not in an attorney position – **No,** *unless* same as #2
6. ACCD to DFR Commissioner/DFR GC to ACCD Secretary – **Yes,** *if* same as #1

I've printed a recent Law Review article on the attorney-client privilege in the government setting and
will look there for some additional guidance to what I know already. But please consider the above
examples and give me a call.

Thanks!

JK


*John W. Kessler*
General Counsel
Agency of Commerce and Community Development
National Life Bldg., 6th Floor
Montpelier, VT 05620
(802) 828-5202
Parking at National Life

**From:** Anne Galloway [mailto:agalloway@vtdigger.org]
**Sent:** Thursday, April 09, 2015 6:05 AM
**To:** Donegan, Susan; Moulton, Pat
**Cc:** Schaft, Dale; Kessler, John
**Subject:** Public records request regarding AnC Bio Vermont, Jay Peak projects

Dear Susan Donegan and Pat Moulton:

Pursuant to Vermont's Public Records Act, I am requesting information about Jay Peak, AnC Bio Vermont and
Q Burke projects.

Specifically, I am requesting communication, including attachments, from 12/1/14 to the present between and
among:

Susan Donegan, commissioner of DFR
Employees of the securities division of DFR
Pat Moulton, commissioner of ACCD
Brent Raymond, Vermont Regional EB-5 Center director
John Kessler, general counsel
Bill Kelly, counsel for Ariel Quiros
Ariel Quiros, developer of Jay Peak and AnC Bio Vermont
Bill Stenger, developer of Jay Peak and AnC Bio Vermont
Attorneys for the developers of Jay Peak and AnC Bio Vermont

Any other individual, whether a public or elected official or a private citizen, who has corresponded with any of
the above listed individuals regarding  the Jay Peak, AnC Bio Vermont and Q Burke projects.


Because this request is in the public interest, I request that you waive any fees for filling it. If fees are
assessed, please notify me before proceeding. If, after that conversation, fees are charged, please provide a
detailed receipt explaining the purpose of each fee charged.


If some of this material will take longer to provide than other portions, please provide any segments of the
requested information as soon as it is available. If this information is available in electronic format, please
provide it in that manner. If any or all of the information can be provided by email, please do so.


Please let me know if you have any questions about this request. I would appreciate receiving those
questions by today via email. I trust you will respond to my request for the records within the timeframe
set out in the Public Records Act.


Should you deny access to any of the records I am requesting, please provide me with a list of those
records ("Vaughn index") indicating the specific exemption that applies to each record or portion of the
record being withheld. If a record has a portion that is exempt from disclosure, the law [1 VSA 318 (e)]
requires that only the exempt portion be redacted, and that a copy of the rest of the document be released,
together with a notation of the specific exemption that applies to the portion withheld. In that event,
please also indicate the name and title of the person responsible for the denial and, as the law requires,

please inform me of the appeal procedures available to me, and the name of the person to whom appeal may be made.


Thank you for your assistance.


Anne Galloway, editor of VTDigger


--
Anne Galloway
Editor, VTDigger.org
Executive Director, Vermont Journalism Trust
97 State St., Montpelier, VT 05602
cell 802-595-9159
office 802-225-6224
@GallowayVTD
http://vtdigger.org



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**MIAMI REGIONAL OFFICE**
SUITE 1800
801 BRICKELL AVENUE
MIAMI, FLORIDA 33131
Phone: (305) 982-6300
Facsimile: (305) 536-4146
Author's Direct Dial: (305) 982-6352

November 21, 2013

**SENT VIA UNITED PARCEL SERVICE**

Berkowitz, Pollack Brant Advisors and Accountants, LLP
515 E. Las Olas Blvd.
Ft. Lauderdale, FL 33301
Attn: Richard A. Berkowitz, CEO

     RE:    **Jay Peak, Inc. (FL-03815)**

Dear Mr. Berkowitz:

     The staff of the Securities and Exchange Commission ("Commission") is conducting an investigation in the matter identified above. The enclosed subpoena has been issued to Berkowitz, Pollack Brant Advisors and Accountants, LLP ("Berkowitz, Pollack") as part of this investigation. The subpoena requires it to produce documents.

     Please read the subpoena and this letter carefully. This letter answers some questions Berkowitz, Pollack may have about the subpoena. Berkowitz, Pollack should also read the enclosed SEC Form 1662. Berkowitz, Pollack must comply with the subpoena. Berkowitz, Pollack may be subject to a fine and/or imprisonment if it does not.

**Producing Documents**

*What materials do I have to produce?*

     The subpoena requires Berkowitz, Pollack to give us the documents described in the attachment to the subpoena. Berkowitz, Pollack must provide these documents by Tuesday, June 11, 2013. The attachment to the subpoena defines some terms (such as "document") before listing what Berkowitz, Pollack must provide. It also provides instructions for complying with the subpoena.

     Please note that if copies of a document differ in any way, they are considered separate documents and Berkowitz, Pollack must send each one. For example, if Berkowitz, Pollack has two copies of the same letter, but only one of them has handwritten notes on it, Berkowitz, Pollack must send both the clean copy and the one with notes.

     If Berkowitz, Pollack prefers, it may send us photocopies of the originals. The Commission cannot reimburse Berkowitz, Pollack for the copying costs. The copies must be identical to the originals, including even faint marks or print. If Berkowitz, Pollack chooses to

**From:** Donegan, Susan [Susan.Donegan@state.vt.us]
**Sent:** Saturday, April 11, 2015 10:31 PM
**To:** Miller, Elizabeth; London, Sarah
**Subject:** EB-5 Jay Peak Discussion Document -- EXEC PRIV, ATT-CLIENT PRIV, CONFIDENTIAL
**Attachments:** Justification%20for%20Hold%20AnC%20Bio%20PPM.doc

**Follow Up Flag:** Flag for follow up
**Flag Status:** Flagged

Dear Liz and Sarah,
Attached please find a discussion document for our meeting on Monday.  This document presents several examples of potential violations against AnC Bio that support my decision to halt any further raising of investor funds (adding the restriction to the $50,000 application fee) while DFR completes its review. There are no scenarios attributed to Q Burke in the discussion memo since Bill Kelly repeatedly communicated to me (as recently as Friday) that there is no interest from QBurke to escrow monies. Therefore, any restrictions that are going to remain in place for QBurke stem from the lack of cooperation from that project. I am not going to use the MOU's as a basis for any restrictions (or cancelling them) since we agree they are weak documents. My suggestion is that we accept QBurke's refusal to escrow money as a basis for not letting that project go forward and also indicate that AnC Bio is now required to escrow the $50k application fees along with the $500k since we have new concerns about that project based on our prelimary review. My goal is to buy time so that DFR can continue its review/investigation and hopefully take advantage of any federal strategy that might emerge.
I have not attached the exhibits to this discussion memo but will bring them with me to our meeting. I thought the memo itself would be a good beginning to explain the types and severity of potential violations we are seeing.
Thanks,
Susan

Susan L. Donegan, Esq.
Commissioner
VT Department of Financial Regulation

802-828-3301
susan.donegan@state.vt.us

1

**CONFIDENTIAL, EXECUTIVE AND ATTORNEY-CLIENT PRIVILEGE**

**DISCUSSION DOCUMENT**

Susan L. Donegan, Commissioner

Vermont Department of Financial Regulation (DFR)

Date: April 11, 201

This discussion document (in anticipation of enforcement, litigation and/or administrative actions) raises examples of potential violations of Vermont securities law in connection with certain EB-5 transactions related to Jay Peak, AnC Bio and Q Burke projects (collectively known as "Jay Peak") currently under financial review and securities investigation by DFR. Evidence points to possible violations under Title 9 of Vermont Statutes Annotated, Vermont Uniform Securities Act (VUSA), including, but not limited to, securities registration and exemption non-compliance, fraud with particularity including material misstatements and omissions, actual conflicts of interest, self-dealing, unjust enrichment, misuse of investor funds, breach of fiduciary duty, breach of contract and tax liability. The principals would be liable for direct liability with other parties subject to liability for aiding and abetting in the advancement of

—————.

Potential consequences for violations of law include restitution, rescission, disgorgement, fines/penalties ($ per), costs, assets frozen, injunctive relief, receivership/conservatorship and other relief requested by the commissioner. Actions may be brought administratively under the Vermont Administrative Procedures Act or in Washington County Superior Court.

The examples in this document are indicative of the type and severity of violations being uncovered by DFR in their analysis of Jay Peak EB-5 properties and projects. Although DFR is in the early stages of its investigation, it has identified accounting irregularities, contractual inconsistencies and significant conflicts of interest that point to potential violations of law.

The following four examples illustrate scenarios relating to Jay Peak Bio Medical Research Park, L.P. (AnC Bio) that DFR has uncovered supporting the decision to halt placing any new investor funds ($500,000 plus $50,000 application fee) at risk until it completes the financial review of that project.

## 1) <u>Relationship of Jay Construction Management, Inc. and Ariel I. Quiros</u>

The Amended and Restated Private Placement Memorandum states that Jay Peak Bio Medical Research Park, L. P. (the "Limited Partnership") entered into a Design, Procurement and Construction Management Services Agreement dated as of March 15, 2013 with Jay

Construction Management, Inc. ("JCM"), a Vermont corporation owned by Q-Resorts, Inc. (itself a Vermont corporation owned by Ariel Quiros). The agreement designates JCM as an agent of AnC Bio GP Services, LLC (the "General Partner") (the general partner of the Limited Partner whose members consist of Bill Stenger and Ariel Quiros), on behalf of the Limited Partnership, responsible for procuring equipment, intellectual property, licenses, industrial engineering, design/build and other goods and services integral to the project. According to the agreement, JCM is to receive $52,100,000 from the Limited Partnership over the course of the project in order to fulfill this role.

In 2015, Primmer (the project's Vermont law firm) provided the Department with a financial summary ("Financial Summary") highlighting the flow of monies thus far in connection with the AnC Bio Project. The Financial Summary indicates that the Limited Partnership raised $73,500,000 from 147 foreign investors, with $7,000,000 still in escrow. Of the $66,500,000, accessible o the LP, $47,000,000 has been transferred to JCM. Further, the Financial Summary indicates that out of $46,989,691 received by JCM thus far to procure intellectual property and equipment and pay architectural fees, $25,926,887 has been spent for these purposes and the outstanding $21,062,804 remains unspent in an unidentified JCM account. (**See Exhibit A**). Pursuant to the Amended PPM, JCM is still due to receive $4,700,000 from the LP.

The lack of documentation between JCM and AnC Bio Pharm is a concern to the Department. JCM's equipment procurements from AnC Bio Pharm alone totaled $40,000,000; however, counsel to the Project Principals were unable to produce a contract between JCM and AnC Bio Pharm, or any other project entity, for the equipment procurement. The only documentation produced by counsel to the Project Principals is a barebones Proforma Invoice between AnC Bio Pharm and AnC Bio Vt, LLC indicating $40,000,0000 will be paid to AnC Bio Pharm for certain equipment. (**See Exhibit B**). Further, counsel to the Project Principals has been unable to provide a reason for JCM's involvement in the $40,000,000 equipment procurement.

JCM's critical role as an intermediary between the Limited Partnership and project contractors, its access to considerable investor funds, and its status as a related party makes it an entity of particular interest to the Department. David Gordon, the attorney hired by Ariel Quiros to represent him before the U.S. Securities & Exchange Commission, seems to understand the state's concern regarding this final point when he insisted in a November 2014 letter to the Vermont Agency of Commerce and Community Development that "JCM was not a related party when the vast majority of money to it was paid. However, JCM became a related party in or about February 2014" (**See Exhibit C**). The implication of this statement is that Quiros' ownership of JCM (the company that touches over 78% of project money) should not concern state regulators because it did not commence until after most of the money was paid to JCM.

2

However, documents provided to the Department from the brokerage firm Raymond James (where margin accounts were opened by all Jay Peak projects) demonstrate that this statement is a misrepresentation. In August 2011, former JCM President Jong Weon Choi appointed Ariel Quiros as Power of Attorney for Jay Construction Management, giving Quiros full control over the company's finances. (**See Exhibit D**). Not only was this relationship disclosed to neither investors nor the Department in the project's initial Private Placement Memorandum but the letter from the Limited Partnership's representation suggests the LP made efforts to conceal it.

## 2) Inconsistency Regarding Payments to Procure Equipment from Anc Bio Pharm

The Financial Summary indicates that JCM has spent approximately $14,500,000 out of a total of $40,000,000 to procure equipment from AnC Bio Pharm. The Department has received conflicting reasons for the partial payment to AnC Bio Pharm.

In a November 24, 2014 letter, David Gordon explains the partial payment is due to "delays in equipment purchases by AnC Bio Pharm, [therefore] JCM has elected to hold back payments due to AnC Bio Pharm temporarily." (**See Exhibit C**).

Contrast that to the March 11, 2015 document entitled "Legal and Business Rationales for Expenditures to Date" from Primmer to the Department that provides the following explanation for the partial payment "[t]he specialized nature of much of the equipment that would outfit the new facility mandated prepayment of substantial deposits before the designer and manufacturer of equipment would begin their work." (**See Exhibit E**).

Last, the explanations from the two law firms are inconsistent with the Proforma Invoice from AnC Bio Pharm to Ariel Quiros / AnC Bio VT LLC regarding the $40,000,000 in equipment. The Proforma Invoice provides that for eighteen months beginning in April 2013 the Project shall pay $1,000,0000 per month as deposits upon equipment to be ordered. Accordingly, under the Proforma Invoice, $9,000,000 should have been paid to AnC Bio Pharm with an additional $9,000,000 paid to AnC Bio Pharm in 2014. However, the Financial Summary indicates that only $500,000 was paid to AnC Bio Pharm in 2013, but over $14,000,000 was paid to AnC Bio Pharm in 2014. Accordingly, the parties actions are not consistent with the terms of their agreement and the explanations provided are in conflict, both with each other and with the actions of the entities.

Again, it is concerning that no formal contract was produced between AnC Bio Pharm and JCM, or any other entity, regarding the $40,000,000 of equipment that might shed light on the entities conflicting statements and actions. Further, Attorney Gordon has not provided any further explanation regarding the equipment delay since him November 24, 2014 letter, if Attorney Gordon's statements are correct, what is the current status of the equipment procurement, if Primmer is correct regarding the $14,500,000 as a down payment, than what

is the delivery time table. These questions remain unanswered while JCM controls approximately $21,000,000 of investor/project money allocated to equipment procurement.

### 3) Payments made to North East Contract Services, LLC

The General Partner, the Project Sponsor and North East Contract Services, LLC ("NECS") entered into an Agreement calling for NECS to procure and supervise certain construction contracts (the "Agreement"). The sole member of NECS is Bill Kelly. Under the Agreement, NECS is entitled to twenty percent (20%) of the value of the contracts procured as a fee for service and reimbursement of expenses ("NECS Compensation"). Under the Agreement, NECS Compensation is to be paid on a "schedule that will coincide with the payments made to all contracted . . . suppliers of products and services. . . " (**See Exhibit F**).

The November 30, 2012 Business Plan indicates approximately $63,000,000 of contracts were needed to be procured to construct the AnC Project Facility. Therefore, NECS is entitled to approximately $9,500,000 in supervision fees (representing 15% of the total of contracts procured) and approximately $3,100,000 in expense reimbursement (representing 5% of the total of contracts procured) (**See Exhibit G**). Accordingly, NECS was entitled to approximately $12,600,000 in fees and expenses, which under the Agreement, payments to NECS were to coincide with payments made to contracted suppliers of products and services.

The Financial Summary indicates that approximately $900,000 has been paid to Peak CM for construction and $14,500,000 has been paid to AnC Bio Pharm for fit out/equipment. (**See Exhibit A**). Accordingly, $15,400,000 out of a total of $63,000,000 has been spent under construction and fit out/equipment constructs. In other words approximately 24.4% of construction related expenses have been paid. Regarding NECS's payments, the Financial Summary indicates NECS has been paid $7,900,000 out of an approximate total of $12,600,000. In other words, NECS has been paid 62.7% of its fees although only 24.4% of payments have been made under contracts it is supervising. This represents an overpayment of approximately $4,800,000 to NESC.

Further, Primmer provided the Department a document entitled "Legal and Business Rationales for Expenditures to Date" that inaccurately provided "approximately $7.9MM out of $12.6MM budgeted and disclosed to investors has been paid to [NECS] *pursuant to the terms of the offering documents and the underlying contractual agreements*" (emphasis added) (**See Exhibit E**).

Further, the November 30, 2012 Private Placement Memorandum did not disclose that NECS had been contracted for construction supervision or was the relationship between Bill Kelly and the Project Principals disclosed.

Finally, it is unexplained as to why the NECS Compensation included the $40,000,000 equipment procurement, while such equipment is actually being procured by JCM.

### 4) 172 Bognor Road Real Estate Transaction

The Department has a number of concerns with the real estate transaction between the Limited Partner and GSI of Dade County, Inc. ("GSI").

i)   Lack of Disclosure Regarding Actual Conflicts of Interest

The real estate sale of 172 Bognor Drive from GSI to the Limited Partnership had an inherent conflict of interest. The General Partner is a limited liability company with two members (i) Bill Stenger and Ariel Quiros, while GSI has one shareholder – Ariel Quiros. Accordingly, Ariel Quiros was negotiating with himself on the land transaction and this fact was not adequately disclosed in the November 30, 2012 Private Placement Memorandum to investors.

ii)  Unsubstantiated Sale Price

GSI purchased 25 acres at 172 Bognor Drive in September 2011 for $3,150,000. In December 2012, GSI sold 7 of those acres to the Limited Partner for $6,000,000. The Private Placement Memorandum did not contain any justification for a $6,000,000 valuation. The Project Principals subsequently had the 7 acres appraised. (**See Exhibit H**). However, the appraisal does not support the valuation of $6,000,000 at the time of the sale to the Limited Partner; instead, the appraisal states that the property will be worth at least $6,000,000 *after* the $30,000,000 of improvements to the property are complete.

iii) Failure to Pass Title

Although the purchase and sale agreement is dated December 12, 2012 and two payments of $3,000,000 each were sent on December 12, 2012 and April 9, 2013 respectively, (**See Exhibit I**) title to the 7 acres at 172 Bognor Drive has not passed from GSI of Dade County, Inc. to the Limited Partnership. (**See Exhibit J**). The Project Principals have not provided an explanation for the failure of GSI of Dade County, Inc. to pass title despite its receipt of the full purchase price. This also raises tax liability questions for Vermont land transfer gains.

**From:** Miller, Elizabeth [Elizabeth.Miller@state.vt.us]
**Sent:** Sunday, April 26, 2015 10:54 AM
**To:** Donegan, Susan; London, Sarah
**Subject:** conf exec priv and A/C priv
**Attachments:** QBurke draft letter (Donegan)LIZ.doc.docx; ATT00001.txt

Hi susan - I took a significant editing stab at it based upon our convo yesterday - hope this helps.  Take a look and let's keep going...Liz

1

USAO-EXEC00027398

DRAFT --- EXECUTIVE PRIVILEGE, ATTORNEY-CLIENT PRIVILEGE, CONFIDENTIAL

Dear Mr. Kelly,

Thank you and Mr. Stenger for your recent letter and for meeting again to discuss the status of the QBurke project, its ongoing construction, and plans to complete the project by the end of the year. I appreciate your willingness to discuss various options relating to QBurke's plan to raise additional investor funds, in a manner that allows the project to continue construction while protecting new investors during the pendency of our financial review of the project now underway. The main issue we have been examining is how to provide protection for~~establish a "hold" on spending~~ new investor funds, similar to the escrow requirement placed on AnC Bio, until DFR completes a financial review and approves the project. As you have explained, unlike AnC Bio, QBurke is approximately 40% completed so a need exists to access new investor funds to support continued construction.

Among the possible solutions discussed, ~~it was suggested by~~ you have offered that during the review~~"hold"~~ period, new investor money would be released only for bona fide payments for direct construction costs reflected in the certifications of payment, remaining payments to the ~~the~~ project architect, and documented payments for furnishings, fixtures, and equipment reflected in the project plan. ~~to purchase fixtures [?].~~ No other payments including fees to the Developers (Mssrs. Stenger, ~~Airel and Ary~~ Quiros, Kelly) that would otherwise be paid as the project completion milestones are reached~~, you and [others]~~ would occur. You ~~further~~ pointed out that this solution should be acceptable because it would ensure that project funds are used to complete the essential asset of the project – the mountain resort complex – and the Developers ~~were~~ carrying the risk regarding new investor funds until the time any individual 526 approval is obtained from the federal government ~~of the project [need language]~~.

I appreciate these suggestions and agree we should implement them. However, ~~Since~~ I remain concerned~~lear~~ that a greater level of protection for new investors ~~and the State of Vermont~~ is needed in the period during our financial review. Therefore, I propose that DFR allow you to proceed to raise new investor funds and use them for the limited purposes described above ~~required, I have considered your suggestion and concluded that DFR is willing to let you proceed~~ under the following conditions~~ircumstances~~:

1. An amended Private Placement Memorandum (PPM) is completed and cleared for use by DFR. I appreciate that you accepted a number of our disclosure requests in your recent letter. We can further discuss which open items of the previous list I provided are still advisable, but the disclosure of DFR's financial review should be added.

2.  Until DFR completes a financial review to its satisfaction, QBurke will be restricted to applying new investor funds to bona fide expenses directly associated with a) construction; b) architect fees; and c) purchase of furnishings, fixtures, and equipment, as described above~~iture~~.  Any other payments related to QBurke ~~purchases~~ shall be made with non-investor money.  The Developers will hold back payments to themselves otherwise owed under the project documents and business plan.

3.  In order to assure that investor funds are used in the manner described above, DFR will engage the services of a third-party EB-5 consultant to review monthly certifications of payment and associated documentation regarding allowable expenses ~~ceive regular reports~~ and to monitor the receipt and use ~~flow~~ of investor funds to ~~and~~ certify to DFR that the terms of the review period are being met ~~"hold" period is met~~.  QBurke will agree to cooperate fully with the consultants including, but not limited to, allowing site visits and providing ~~,~~ access to financial account statements and staff. Pursuant to the QBurke MOU, the project will assume the costs of the consultant to be paid ~~and be paid~~ from the portion of funds/fees that would otherwise be owed to ~~have been paid to~~ the Developers.  Any investor money not utilized for approved expenses during the review period, including that portion of funds attributable to Developer payments withheld during the pendence of the review, shall be placed in an FDIC insured account (not a brokerage account) ~~All remaining investor money shall remain in an insured account (not a brokerage firm account)~~ until such time that DFR finishes its financial review and approves the project or USCIS requires individual investor money to be "at risk.~~"~~ after issuance of a 526 approval.

*[note: I do not have the MOU in front of me, but I recall that there was a provision that the State could hire other professionals at the expense/bill back of the project – need to check that out.]*

4.  I DO NOT BELIEVE THEY WILL AGREE THAT THIS APPLIES TO ANY INVESTOR REQUEST TO REFUND – THAT PRESENTLY ISN'T REQUIRED AND THERE COULD BE MANY REASONS AN INVESTOR MIGHT ASK FOR MONEY BACK – HAVE REWRITTEN TO TIE IT TO OUR REVIEW…:  In the event that DFR's financial review causes investors obtained during the period of review to be entitled to a return of investor funds, ~~a QBurke investor requests or is entitled to a refund,~~ the Developers will not satisfy that return of funds through the use of other investor funds ~~use non-investor money to satisfy the claim~~. *[note: something about hold the State harmless, again, there is some language like this in the MOU so we probably want to reference that document despite its obvious weaknesses.]*

Closing language re: difficult to balance need of already-underway project with several investors already obtained and significant construction completed with the need identified by the State to conduct additional review of this and other projects to promote adequate disclosures and review of finances in conformity with project

documents and legal requirements.  Appreciate willingness to work with us.  Take this very seriously etc. etc.

USAO-EXEC00027401

Elizabeth H. Miller
802-522-3090, cell
elizabeth.miller@state.vt.us

USAO-EXEC00027402

**From:** Springer, Darren [Darren.Springer@vermont.gov]
**Sent:** Tuesday, November 24, 2015 12:37 PM
**To:** London, Sarah
**Subject:** Fwd: Draft letter to Stenger -- ATTY CLIENT AND EXEC PRIV
**Attachments:** Stenger letter 11.24.15 ATTY CLIENT EXEC PRIV Draft DFR.docx; ATT00001.htm

Tone aside substance appears good.

We should add a line asking Stenger to reach out to Susan's assistant to schedule meeting.

Sent from my iPhone

Begin forwarded message:

> **From:** "Donegan, Susan" <Susan.Donegan@vermont.gov>
> **Date:** November 24, 2015 at 12:26:52 PM EST
> **To:** "London, Sarah" <Sarah.London@vermont.gov>, "Springer, Darren"
> <Darren.Springer@vermont.gov>, "Moulton, Pat" <Pat.Moulton@vermont.gov>
> **Cc:** "Cassetty, Dave" <Dave.Cassetty@vermont.gov>, "Griffin, Bill"
> <bill.griffin@vermont.gov>
> **Subject: Draft letter to Stenger  -- ATTY CLIENT AND EXEC PRIV**
>
> Dear All,
> Attached is a draft of a letter to go to Stenger later today setting up the possibility of a
> discussion about future payments beyond the July 13, 2015 letter.
> Please make changes as you see fit.
> The other letter from Cassetty to Gordon is still being assembled since there is quite of
> list of documents to itemize.
> Thanks,
> S.
>
>
> Susan L. Donegan, Commissioner
> Vermont Department of Financial Regulation
> 89 Main Street
> Montpelier, Vermont 05620
> USA
> (+1) 802-828-3301
> susan.donegan@vermont.gov
>
> NOTE: new email address is susan.donegan@vermont.gov

DRAFT --- ATTY CLIENT AND EXEC PRIV

DFR letterhead

Dear Mr. Stenger,

Pursuant to Secretary Mouton's email reply to you on November 23, 2015, I am writing to respond to your question regarding the possibility of the release of QWBurke investor funds to pay for certain equipment and other items relating to operations.

As you are well aware, Jay Peak's EB-5/SEC lawyer, David Gordon has been communicating with DFR's General Counsel, David Cassetty, concerning the production of financial documents in connection with DFR's financial review of Jay Peak EB-5 projects.  While DFR has received some documents for AnC Bio and QBurke responsive to our request, Mr. Gordon will receive a letter from Mr. Cassetty today identifying the documents that are still outstanding.  I trust that Mr. Gordon will speak to you about those items.

I would like to propose that a meeting be scheduled in the next week or so to begin a conversation concerning QBurke's progress.  This will be an opportunity for you to identify and explain the aspects of the project that remain to be completed.  Information such as potential reserved rooms, banked income and investor funds and personnel needs will be useful. The information is best understood when it is based on actual data not simply projections.  I consider this meeting to be an initial conversation and certainly, until the financial documents are produced to and reviewed by DFR, there will be no decision about the release of additional funds beyond the July 13, 2015 letter. Both David Cassetty and Bill Griffin from the Attorney General's office would attend the meeting.


Sincerely,



Susan L. Donegan

Commissioner

**From:** London, Sarah [Sarah.London@vermont.gov]
**Sent:** Monday, December 07, 2015 9:37 PM
**To:** Springer, Darren
**Subject:** FW: Attorney client privilege
**Attachments:** Untitled; Untitled

FYI – I was only able to open these on real computer.  Essentially: Brent warning Pat and John of recent (Dec 7) SEC complaint filed in CA against immigration attorneys Brent was familiar with, says they were involved with AnC investors.  The complaint says the attorneys acted as unlicensed brokers and defrauded clients by not revealing commissions they were receiving.  Complaint does not mention Vermont or AnC (or any particular EB-5 project as far as I can tell).

Complaint:
https://www.sec.gov/litigation/complaints/2015/comp23420.pdf

**SEC Charges New York-Based Immigration Lawyer and His Law Firm with Defrauding Immigrant Investors and Acting as Unregistered Brokers**

The SEC alleges that Hui Feng and his firm, Law Offices of Feng & Associates P.C., acted as unregistered brokers by selling EB-5 investments to over 100 foreign investors, who were also their legal clients, and that they, directly or indirectly, received over $1.1 million in commissions in connection with these sales and are contractually entitled to at least an additional $3.1 million in commissions.  The complaint also alleges that Feng and his firm defrauded their investor clients by failing to disclose their receipt of commissions on the investments in breach of their fiduciary and legal duties to their clients, and that they also defrauded some of the entities offering the EB-5 investments.

According to the SEC's complaint filed in the U.S. District Court for the Central District of California, since 2010, Feng and his firm have promoted EB-5 investments to potential investors and immigration law clients, many of whom were located in China.  In 2013, Feng opened four offices in China that were each staffed with an employee who was instructed to promote the Feng & Associates website, which was primarily focused on the EB-5 investment program.  The investors entered into retainer agreements with Feng & Associates, agreeing to pay a legal fee of between $10,000 and $15,000 for legal work associated with a petition for residency under the EB-5 program.  The clients made investments in EB-5 securities, which were offered pursuant to exemptions from the registration requirements of the U.S. securities laws, of either $1 million or $500,000 and expected to receive a return on their investments.  The complaint alleges that in addition to receiving legal fees, Feng and his firm also received undisclosed commissions from the entities whose EB-5 offerings they sold.  According to the complaint, when some of the entities selling EB-5 investments began to refuse to pay commissions to U.S.-based persons as part of an apparent effort to avoid running afoul of the broker registration requirements contained in the federal securities laws, Feng and his firm used Feng's overseas relatives as nominees to fraudulently receive commissions on their behalf.

The SEC's complaint charges Feng and Feng & Associates with violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.  They are also charged with violating Section 15(a) of the Exchange Act, the broker-dealer registration provision.  The SEC's complaint seeks disgorgement, prejudgment interest, and penalties, along with permanent injunctions.  The SEC's investigation was conducted by Megan Bergstrom and supervised by

Spencer Bendell. The litigation will be led by Donald Searles. The SEC appreciates the assistance of the USCIS.

---

**From:** Moulton, Pat
**Sent:** Monday, December 07, 2015 4:38 PM
**To:** Cassetty, Dave; Pieciak, Michael; Donegan, Susan; London, Sarah; Griffin, Bill; Young, Susanne
**Cc:** Kessler, John
**Subject:** Attorney client privilege

Subject to attorney client privilege:

Good afternoon,
The text captured in the photos attached came to me this afternoon from Brent Raymond, former Director of EB5 for the state. He is providing a "heads up" which I appreciated.  Emily and James from DFR were here meeting with Gene so I shared with them. But I wanted to be sure you saw this.  I do not know how relevant this is but I thought you should be aware.

Pat

USAO-EXEC00008836

**From:** Moulton, Pat [Pat.Moulton@vermont.gov]
**Sent:** Monday, December 07, 2015 4:30 PM
**To:** Moulton, Pat
**Subject:**



Patricia Moulton, Secretary
Agency of Commerce & Community Development
One National Life Drive
Dean C. Davis building, 6th Floor
Montpelier, Vermont 05620-0501
802-451-9578
Sent from my iPhone

**From:** Moulton, Pat [Pat.Moulton@vermont.gov]
**Sent:** Monday, December 07, 2015 4:30 PM
**To:** Moulton, Pat
**Subject:**



Patricia Moulton, Secretary
Agency of Commerce & Community Development
One National Life Drive
Dean C. Davis building, 6th Floor
Montpelier, Vermont 05620-0501
802-451-9578
Sent from my iPhone

**From:** London, Sarah [Sarah.London@vermont.gov]
**Sent:** Friday, April 08, 2016 4:53 PM
**To:** EXE
**Subject:** FW: Jay Peak Litigation Hold Notice
**Attachments:** 2015 10 9 Jay Peak Litigation Hold.pdf; ATT00001.htm

All, this is a friendly reminder about attached litigation hold notice from the Attorney General's Office. Please see attached. As always, happy to discuss if you have any questions. Thanks, Sarah

**From:** London, Sarah
**Sent:** Friday, October 09, 2015 5:03 PM
**To:** EXE <EXE@vermont.gov>
**Subject:** Fwd: Jay Peak Litigation Hold Notice

All, this is a litigation hold notice from the Attorney General's Office regarding Jay Peak EB-5 records. This applies to everyone in the office, though I expect the vast majority of records described in this memo will be with senior staff. If you have correspondence with the people listed in this memo or substantive correspondence about the topics listed in this memo that do not involve senior staff, please save them in a separate folder. Senior staff: please segregate any and all records you have into a separate folder. All staff should preserve the records described in this memo. Happy to discuss any questions. Thank you, Sarah

Sent from my iPad

Begin forwarded message:

> **From:** "Alexander, Jon" <jon.alexander@vermont.gov>
> **Date:** October 9, 2015 at 1:56:00 PM EDT
> **Subject: Jay Peak Litigation Hold Notice**
>
> Good afternoon-
>
> Please see the attached and contact me with any questions.
>
> Thanks, Jon
>
> Jon T. Alexander
> Assistant Attorney General
> Office of the Attorney General
> 109 State Street
> Montpelier, VT  05609-1001
> (802) 828-1299
> jon.alexander@vermont.gov (please note my new email address)

**WILLIAM H. SORRELL**
**ATTORNEY GENERAL**

**SUSANNE YOUNG**
**DEPUTY ATTORNEY**
**GENERAL**

**WILLIAM E. GRIFFIN**
**CHIEF ASST. ATTORNEY**
**GENERAL**



**TEL: (802) 828-3171**
**FAX: (802) 828-2154**
**TDD: (802) 828-3171**
**CIVIL RIGHTS: (802) 828-3657**
**WEBPAGE: www.atg.state.vt.us**

**STATE OF VERMONT**
**OFFICE OF THE ATTORNEY GENERAL**
**109 STATE STREET**
**MONTPELIER**
**05609-1001**

To:  Susan Donegan, Commissioner, Department of Financial Regulation

   Patricia Moulton, Secretary, Agency of Commerce and Community
   Development

   Sarah E.B. London, General Counsel, Office of the Governor

   Deputy Attorney General Susanne Young

From:  Jon T. Alexander, Assistant Attorney General

Re:  Request for preservation of documents –
   *Jay Peak EB-5 Litigation*

Date:  October 9, 2015
-------------------------------------------------------------------------------------

CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGED
ATTORNEY WORK PRODUCT

  This memorandum is to formally notify you that we are advising the
Department of Financial Regulation ("DFR"), Agency of Commerce and Community
Development ("ACCD"), the Office of Governor and the Office of the Vermont
Attorney General ("AGO") to preserve all documents related to possible litigation
concerning Jay Peak and Burke Mountain Projects in the "EB-5 Program," a federal
visa initiative designed to give foreign investors a legal path to obtain United States
residency.

  This type of notice is typically referred to as a "litigation hold" notice. In
certain circumstances, the courts require that steps be taken to preserve
documents, both paper and electronic, related to the subject matter of the litigation.
These requirements are serious and sobering. Harsh sanctions can be imposed by
the courts if documents are not retained.

1

DFR, ACCD, AGO and the Governor's Office should continue the "litigation hold" until any lawsuit involving the State and all appeals come to a close. It should be discontinued only after consultation with me and Susanne Young, Deputy Attorney General.

<u>Scope of request</u>

This request for preservation of documents relates to possible litigation relating to any Jay Peak and Burke Mountain projects in the EB-5 program. The request to preserve documents applies to all documents held by DFR, ACCD, AGO and the Governor's Office, including written documents and all electronically stored documents and information. The obligation to preserve electronically stored information applies to all aspects of DFR, ACCD, AGO and the Governor's Office's technology, and includes information held in their buildings, in storage facilities run by the Department of Public Records, and in any other off-site storage facility.

The documents retained should include all paper or electronic documents, as well as draft or final versions of internal and external correspondence (including e-mails and text messages), memoranda, notes and other documents referencing or relating to:

- Jay Peak or Burke Mountain EB-5 Projects;

- any of the following entities involved in the Jay Peak or Burke Mountain EB-5 Projects:
  Jay Peak Hotel Suites L.P.
  Jay Peak Hotel Suites Phase II L.P.
  Jay Peak Penthouse Suites L.P.
  Jay Peak Golf and Mountain Suites L.P.
  Jay Peak Lodge and Townhouses L.P.
  Jay Peak Suites Stateside L.P.
  Q Burke Mountain Resort, Hotel and Conference Center, L.P.
  Jay Peak Biomedical Research Park, L.P.;

- the Private Placement Memorandum (PPMs) for any of the Jay Peak or Burke Mountain EB-5 Projects;

- any of the following :

  Ariel Quiros
  William Stenger
  William Kelly
  Ary Quiros

2

Joel Burnstein
AnC Bio VT LLC
AnC Bio Vermont GP Services, LLC
Q Burke Mountain Resort GP Services, LLC
Q Resorts, Inc.
G.S.I. of Dade County, Inc.
Jay Construction Management, Inc.
North East Contract Services, LLC.

In addition, any documents created from now on related to any of the above-described related categories must also be preserved.  All information should be stored in original, unaltered form.  E-mails may be the most difficult category of information to preserve, so your personnel should work to identify relevant e-mails and prevent them from being lost or destroyed. They should be saved in an easily accessible electronic file; if that is not feasible then they should be printed and stored prior to deletion.  It is important to preserve e-mails and correspondence in your files related to this matter, even if they may eventually be protected from disclosure by a claim of privilege.  Please confer with your Information Technology personnel on the best way to preserve electronic documents in each person's individual possession or control relating to any of the above-described related categories.

Communication of Litigation Hold Request to Personnel

This request from State legal counsel must be communicated by you to all personnel in DFR, ACCD, AGO and the Governor's Office who have control of document or data systems and to all personnel who may have authored or received any documents related to the above-described related categories.  Documents of former employees should be similarly retained.

If, during the pendency of this litigation hold, other personnel who have e-mails or other electronic documents or information that pertain to the issues noted above leave their employment with DFR, ACCD, AGO or the Governor's Office, certain steps overseen by your respective Information Technology personnel should be taken to preserve those electronic documents and information.  Any relevant documents or information contained on the computer hard drives of these employees or on your shared drives or network servers should be retained, and their e-mails should be preserved. To the extent possible, such employees should be encouraged to identify relevant documents or information before they cease their employment.

In addition, any agency or department automatic or regular document destruction policy should be discontinued for the duration of this litigation hold.

If you have any questions about your obligations regarding preservation of documents, please contact me.

**From:** Moulton, Pat [Pat.Moulton@vermont.gov]
**Sent:** Monday, April 11, 2016 2:26 PM
**To:** Donegan, Susan; Coriell, Scott; London, Sarah; Griffin, Bill
**Subject:** Attorney client
**Attachments:** DRAFT q&a draft 4.11.16.docx

Susan,

Attached are changed Q&A based on the conversation with the Receiver this AM.  He made it clear he expects no job loss at Jay and will be telling all employees to return to work as usual. The exception will be anyone named Stenger or Quiros and anyone in the Sr. Mgmt. team that knew anything. IF they knew nothing, they will likely keep their job. If they did know, they may be replaced immediately by an management company employee. That will be decided case by case. So these changes hopefully reflect that.

Pat

PLEASE NOTE: my new email pat.moulton@vermont.gov
Patricia Moulton, Secretary
Agency of Commerce and Community Development
One National Life Drive
Deane C. Davis Bldg., 6th Floor
Montpelier, VT  05620-0501
802-451-9578

**From:** Donegan, Susan
**Sent:** Monday, April 11, 2016 12:25 PM
**To:** Coriell, Scott <Scott.Coriell@vermont.gov>; Springer, Darren <Darren.Springer@vermont.gov>; Moulton, Pat <Pat.Moulton@vermont.gov>
**Cc:** London, Sarah <Sarah.London@vermont.gov>
**Subject:** website changes

Here are the changes to text – the name of the case will be added when we know it.
If I could have any additional changes by 3 pm today that would be ideal since I have folks here ready to make adjustments before they turn it into final form (my tech geek person is out tomorrow so I need to get us ready to "push the button" by COB.)
Thanks,
S.

Susan L. Donegan, Commissioner
Vermont Department of Financial Regulation
89 Main Street
Montpelier, Vermont 05620
USA
(+1) 802-828-3301
susan.donegan@vermont.gov

NOTE: new email address is susan.donegan@vermont.gov

**EMPLOYEES AND CONTRACTORS**

**Q:  I am a subcontractor who is owed money on these projects, what do I do?**
A:  You should retain your own attorney to advise you appropriate legal action if any.

**Q:  I am employed at the Jay Peak resort. Will I keep my job?**
A:  Yes.  It is expected most everyone at the Jay Peak Resort will retain their job.  One of the objectives of the receiver put in place by the SEC and State of Vermont is to continue normal operations at the Resort.  All employees should continue to report to work as normal.

**Q:  I was due to work at the Q-Burke Hotel and Conference center, what is the status of my job?**
A:  As you know, Q-Burke laid off all seasonal and permanent workers in March.  It is too early to know now when the Hotel and Conference Center will be opened. The receiver put in place by the SEC and State of Vermont has as an objective to analyze how the Hotel and Conference Center can be opened as soon as feasible.  You should stay in touch with this web site and/or your supervisor to know when you may be reporting to work.

**Q: What will happen with the proposed Renaissance Project in downtown Newport?**
A: The proposed Renaissance project in downtown Newport is NOT an EB-5 project.  There is no foreign investment being raised for this project.  The "Spates Block" was demolished with an appropriate demolition permit indicating if construction on the project has not commenced by 2017, the site must be filled and turned in to a grassed park. The project may or may not continue beyond that stage.

**Q:  What will happen to the proposed Newport Hotel, Conference Center and Marina project?**
A:  This project is NOT an EB05 project.  There is no foreign investment being raised for this project.  The project had not commenced and may or may not proceed.

**INVESTORS:**

**Q:  I am an investor in these projects, will I obtain my green card?**
A: You are urged to consult an immigration attorney to understand your rights associated with these investments. That attorney can advise you best on your next steps and monitor Court proceedings to know your options. The EB-5 program maintains an e-mail account at USCIS Immigrationinvestorprogram@uscis.dhs.gov for external stakeholders to use when seeking general EB-5 program information, inquiring about the status of pending cases or requesting the expedite of a pending eb-5 case. **You should continue to pursue the appropriate immigration petition**. Please refer to the USCIS web site link on this web site for more information. You should continue to pursue information needed for your petition from the appropriate project. The receiver put in place should be able to provide that information to you.

**Q: Will the adjudication process change, in any way, given the most recent Jay Peak projects lawsuit?**
A: No, investors, whether I-526 or I-829, will continue to provide evidence per the petition stages with the eventual expectation that USCIS will adjudicate in a timely manner.

**From:** London, Sarah [Sarah.London@vermont.gov]
**Sent:** Tuesday, April 19, 2016 12:07 PM
**To:** Springer, Darren; Coriell, Scott
**Subject:** FW: ATTORNEY CLIENT PRIVILEGE

FYI, expect AGO will be weighing in

**From:** Moulton, Pat
**Sent:** Tuesday, April 19, 2016 11:42 AM
**To:** Donegan, Susan <Susan.Donegan@vermont.gov>; Miller, Lawrence
<Lawrence.Miller@vermont.gov>; Griffin, Bill <bill.griffin@vermont.gov>; London, Sarah
<Sarah.London@vermont.gov>
**Subject:** ATTORNEY CLIENT PRIVILEGE

Here is how I would respond:

Hillary,
Yes, we had concerns about the land valuation as well as the PPM.  In July, 2014 we suspended the
marketing of the AncBio project until a qualified securities attorney had opined the PPM contained
adequate disclosures.  Also, we asked for an appraisal of the former Bogner property.  We received that
appraisal but it was "as built" for when the clean rooms were built, not as the property sat then.  That
information was conveyed to DFR and remains a concern. **That transaction is part of the complaint filed
by SEC.** *(I admit, I have not read the entire complaint, is this true?)*

*As for the Lawrence question, I would say "no one "made that decision". The projects were not
regularly filing reports so we started pressing them more.  We put Jay Peak on a weekly report
requirement after we started hearing complaints. That continued until recently.*

**What do you think?**
**Pat**

PLEASE NOTE: my new email pat.moulton@vermont.gov
Patricia Moulton, Secretary
Agency of Commerce and Community Development
One National Life Drive
Deane C. Davis Bldg., 6th Floor
Montpelier, VT  05620-0501
802-451-9578

**From:** Hilary Niles [mailto:h@nilesmedia.com]
**Sent:** Monday, April 18, 2016 6:21 PM
**To:** Moulton, Pat <Pat.Moulton@vermont.gov>; Donegan, Susan <Susan.Donegan@vermont.gov>;
Miller, Lawrence <Lawrence.Miller@vermont.gov>
**Subject:** press inquiry on deadline -- EB-5 written quarterly reports?

**From:** London, Sarah [Sarah.London@vermont.gov]
**Sent:** Tuesday, May 03, 2016 5:10 PM
**To:** EXE
**Subject:** FW: State v Quiros/2nd Litigation Hold
**Attachments:** 2016 05 03 Jay Peak 2nd Litigation Hold.pdf

CONFIDENTIAL ATTORNEY CLIENT COMMUNICATION

All, we have received an updated litigation hold notice from the AGO. Please note that they have added additional search terms in bold on page 4 of the attached document. In addition to the listed terms, I recommend you search by jaypeakresort as well, as that is the email address associated with employees of Jay Peak. The current list of search terms from the AGO is re-printed below.

I will be meeting again with the AG's Office on Thursday regarding our litigation hold records.

Again, for emails, please place all emails into a separate EB-5 LITIGATION HOLD folder in your outlook account. Please advise me on Thursday regarding the rough volume of emails in your litigation hold folder. At this time my understanding is that the AGO would like all press clips in those folders as well.

I will be meeting with DII about sharing access to folders in outlook accounts this week.

We/DII has suspended all deletion from all of our accounts, so that no records are currently be deleted (even if you place them in the trash, and even if you think you have emptied your trash). That said, for now, it makes sense to avoid emptying your trash at the end of each day.

If you have records outside of your outlook account, please create a separate folder for those records as well, ideally in the Shared Drive. Let me know on Thursday about the location and contents of such folders so that I can direct the AGO accordingly.

Thanks very much all around,
Sarah

AGO search terms:

☐ Jay Peak or Burke Mountain EB-5 Projects;

Jay Peak Hotel Suites L.P.
Jay Peak Hotel Suites Phase II L.P.
Jay Peak Penthouse Suites L.P.
Jay Peak Golf and Mountain Suites L.P.
Jay Peak Lodge and Townhouses L.P.
Jay Peak Suites Stateside L.P.
Q Burke Mountain Resort, Hotel and Conference Center, L.P.
Jay Peak Biomedical Research Park, L.P.;
☐ the Private Placement Memorandum (PPMs) for any of the Jay Peak or
Burke Mountain EB-5 Projects;

Ariel Quiros
William Stenger
William Kelly
Ary Quiros
Joel Burstein
AnC Bio VT LLC

The entities listed on the following page in **bolded** type were not listed in
my original October 9, 2015 Litigation Hold memorandum.

AnC Bio Vermont GP Services, LLC
Q Burke Mountain Resort GP Services, LLC
Q Resorts, Inc.
G.S.I. of Dade County, Inc.
Jay Construction Management, Inc.
North East Contract Services, LLC
**Jay Peak, Inc.**
**Jay Peak Management, Inc.**
**Jay Peak GP Services, Inc.**
**Jay Peak GP Services Golf, Inc.**
**Jay Peak GP Services Lodge, Inc.**
**Jay Peak GP Services Stateside**
**Q-Burke Mountain Resort LLC**

---

**From:** Alexander, Jon
**Sent:** Tuesday, May 03, 2016 3:47 PM
**To:** London, Sarah
**Subject:** State v Quiros/2nd Litigation Hold

Sarah-

Now that suit has commenced, we are issuing a second litigation hold in this matter a) to include
additional agencies/departments that may have potentially relevant documents and b) to advise that
you preserve documents relevant to additional defendant entities (in bold type on p.4 of the attached
memo).

The Attorney General's Office also advises you to take the following specific steps, to the extent that you
have not already, in conjunction with DII and/or your agency, department or office's IT managers, to
collect and preserve documents potentially related to the EB-5 Litigation:

• Immediately suspend any automatic or routine document or electronically-stored information ("ESI")
    destruction, deletion or overwriting policies or practices that you may have;

• For each personal computer and server that may contain ESI related to the EB-5 Litigation, transfer all
    potentially relevant e-mails, computer files and other ESI into a separate designated folder on
    the hard drive or network drive to avoid accidental deletion or modification;

- Do not erase, reformat, overwrite, 'wipe' or 'scrub' computer hard drives or network servers, even if they are being abandoned, decommissioned, or reassigned;

- Do not discard, sell or return any computers or servers that may contain potentially relevant ESI;

- Search all your office and storage space for potentially relevant paper documents and collect them in a segregated and secure area for further review.

Finally, I suggest that we schedule a conference call or meeting in the near future to discuss the above matters and arrange for the Attorney General's Office to receive copies of all preserved documents . Thank you for your cooperation and assistance.

Jon

**WILLIAM H. SORRELL**
**ATTORNEY GENERAL**

**SUSANNE YOUNG**
**DEPUTY ATTORNEY**
**GENERAL**

**WILLIAM E. GRIFFIN**
**CHIEF ASST. ATTORNEY**
**GENERAL**



**TEL: (802) 828-3171**
**FAX: (802) 828-2154**
**TDD: (802) 828-3171**
**CIVIL RIGHTS: (802) 828-3657**
**WEBPAGE: www.atg.state.vt.us**

**STATE OF VERMONT**
**OFFICE OF THE ATTORNEY GENERAL**
**109 STATE STREET**
**MONTPELIER**
**05609-1001**

To:      Susan Donegan, Commissioner, Department of Financial Regulation

Patricia Moulton, Secretary, Agency of Commerce and Community Development

Sarah E.B. London, General Counsel, Office of the Governor

Deputy Attorney General Susanne Young

\*\*\*

Jo Bradley, Chief Executive Officer, Vermont Economic Development Authority

Dr. Harry Chen, Commissioner, Department of Health

Chris Cole, Secretary, Agency of Transportation

Keith Flynn, Commissioner, Department of Public Safety

Deb Markowitz, Secretary, Agency of Natural Resources

Annie Noonan, Commissioner, Department of Labor

Mary N. Peterson, Commissioner, Department of Taxes

Eugene Reid, Chair, District 7 Environmental Commission

Chuck Ross, Secretary, Agency of Agriculture, Food and Markets

Diane Snelling, Chair, Natural Resources Board

1

**Kessler, John**

| | |
|---|---|
| From: | Fullam, Eugene |
| Sent: | Wednesday, July 20, 2016 9:51 AM |
| To: | Pieciak, Michael; Moulton, Pat |
| Subject: | FOLLOWUP: CONFIDENTIAL ATTORNEY CLIENT |

Good Morning . . .

. Another observation to share related to yesterday's email by David Cassetty (see below) . . .

v) Per "they have yet to establish that the offering period was extended . . . ".   I would like to better understand David's thinking on the nexus of extending the offering period and its particular relevancy to an existing PPM, its intended updating, and conclusive actions by SA as evidenced by its submittal of the First Amendment Supplement (to the PPM) in SA's letter dated May 12.

   i)   An extended offering period is typically associated with IPO offerings, either debt or equity.  The corporate bond market uses "shelf registrations" up to two-years in advance of an actual offering to permit flexibility to better market time anticipated economic, financial, political developments.

   ii)   During a extended offering a "black out" period ensues where financial information is typically subject to the 135-day rule.  And, all information must be current and comply with 10b-5 standards.

So, it is not clear to me the relevancy of the "extended offering period" reference as it relates to the question of "updating" an existing PPM; whether the proposed change(s) is / are "material ";   the instituting of a "quiet period" pursuant to the clear intention to modify;  and, what is permissible marketing (physical and oral) during said "quiet period".

Gene

**From:** Fullam, Eugene
**Sent:** Tuesday, July 19, 2016 1:19 PM
**To:** Pieciak, Michael <Michael.Pieciak@vermont.gov>; Moulton, Pat <Pat.Moulton@vermont.gov>
**Subject:** Re: CONFIDENTIAL attorney client

P + M :

Several observations per Cassetty note:

i) It's not just the providing of literature but also oral representations made by SA at this time period. The fact that SA has penned an amended PPM (Supement) with explicit intentions to eliminate escrow is evidentiary; coupled with discussions with NES, of same intent, is conclusive of SA efforts to make "material changes" to

USAO-EXEC 000 16395-16491

**From:** Springer, Darren [Darren.Springer@vermont.gov]
**Sent:** Monday, July 25, 2016 2:35 PM
**To:** London, Sarah; Allen, Susan
**CC:** Miller, Lawrence
**Subject:** RE: CONFIDENTIAL attorney client

How about this, Sarah please let me know if any part is not accurate.

DRAFT STATEMENT:
"As with anything, hindsight can be 20/20. As the Governor said when the state and federal governments filed the complaints in this matter, we all wish we could have caught the alleged fraud earlier. However, no one should forget that it is because of state and federal investigations that this alleged fraud was discovered and that filings were made. It is because of state oversight that the expenditures for the Burke hotel were rigorously examined and that ANC BIO investor funds were placed in escrow where they remain to this day. Many folks have been harmed by the alleged fraud in the Northeast Kingdom, including subcontractors and investors and entire communities.

As to the questions you raise, the Agency of Commerce and Community Development did raise questions back in 2012 to the projects within the scope of the limited statutory powers we have to investigate. It is because ultimately the projects were not as responsive as was necessary that the decision was made to add oversight responsibilities to the Department of Financial Regulation, which has more expansive authority in these matters. Their investigation, which included looking into official investor complaints first formally received in 2015, led to unraveling the complicated web of alleged fraud we have here. Investors who previously had concerns may have expressed them in the press or in communications with ACCD, but did not file complaints with DFR. While individuals such as Douglas Hulme may have raised questions previously, his credibility in raising those concerns was marred by his ties to the projects. For example, he was reminded many times to cease activity in which he incorrectly marketed himself as the Vermont Regional Center.

**Darren M. Springer**
*Chief of Staff*, **Office of the Governor**
(802) 522-2082 (cell)
Darren.Springer@vermont.gov

Please note: My email address has changed to Darren.Springer@vermont.gov.

---

**From:** London, Sarah
**Sent:** Monday, July 25, 2016 1:25 PM
**To:** Springer, Darren <Darren.Springer@vermont.gov>; Allen, Susan <Susan.Allen@vermont.gov>
**Cc:** Miller, Lawrence <Lawrence.Miller@vermont.gov>
**Subject:** FW: CONFIDENTIAL attorney client
**Importance:** High

Here is what we have.

**From:** Moulton, Pat
**Sent:** Monday, July 25, 2016 1:10 PM
**To:** London, Sarah <Sarah.London@vermont.gov>; Pieciak, Michael <Michael.Pieciak@vermont.gov>; Kessler, John <John.Kessler@vermont.gov>
**Subject:** CONFIDENTIAL attorney client
**Importance:** High

Sarah, here is what I am thinking for a statement.  We are on a public records exemption for any more details out to Anne. So the details she has is what she will get.  I do not see a need to drag in who said what when but rather keep this high level.

Also, I do not recall the May 4 conference call having anything to do with any allegations, it was about Hulme stopping marketing himself as the Vermont Regional Center.  My memory may be vague on this.

DRAFT STATEMENT:
"The Agency of Commerce and Community Development undertook the degree of investigation they could given limited statutory powers to investigate and subpoena.  We added the Dept. of Financial Regulation in to the Vermont Regional Center for exactly this reason. They have more investigative powers and staff to unravel what was we learned in the end, was an extremely complicated web of alleged violations.  We as a government were and remain VERY interested in getting investigating any allegations and we have systems in place at DFR for these purposes.  The proper place to direct investors who felt they had a complaint was to legal counsel or to file a complaint with DFR.  DFR discovered the complexity of this alleged fraud after they were brought in.

AND could add someplace:  "ACCD had ascertained the Limited Partnership at Jay Peak was within their authority to transfer equity to debt. Jay Peak should have done a much better job communicating with investors at the time. We now know there was more going on then. But we did not know that then nor could we have without the involvement of DFR and the 13 months of detailed investigation in to over 350 daily transaction and over 800,000 pages of documentation."

AND could add someplace:
"Douglas Hulme was also someone on ACCD's radar as incorrectly marketing himself as the Vermont Regional Center. He was reminded many times to cease from that activity and change his web site.  His credibility was in question due to those activities. It appeared as sour grapes give the lack of other evidence to suggest something more."

Those are some thoughts.
PAT

PLEASE NOTE: my new email pat.moulton@vermont.gov
Patricia Moulton, Secretary
Agency of Commerce and Community Development
One National Life Drive
Deane C. Davis Bldg., 6th Floor
Montpelier, VT  05620-0501
802-451-9578

**From:** London, Sarah [Sarah.London@vermont.gov]
**Sent:** Monday, July 25, 2016 3:03 PM
**To:** Springer, Darren; Allen, Susan
**CC:** Miller, Lawrence
**Subject:** RE: CONFIDENTIAL attorney client

Looks accurate, I added "formal" in front of investor complaint and otherwise minor word edits.  Will send to Pat and Mike P for final sign off and then this goes from Pat, correct?

---

**From:** Springer, Darren
**Sent:** Monday, July 25, 2016 2:35 PM
**To:** London, Sarah <Sarah.London@vermont.gov>; Allen, Susan <Susan.Allen@vermont.gov>
**Cc:** Miller, Lawrence <Lawrence.Miller@vermont.gov>
**Subject:** RE: CONFIDENTIAL attorney client

How about this, Sarah please let me know if any part is not accurate.

DRAFT STATEMENT:
"As with anything, hindsight can be 20/20. As the Governor said when the state and federal governments filed the complaints in this matter, we all wish we could have caught the alleged fraud earlier. However, no one should forget that it is because of state and federal investigations that this alleged fraud was discovered and that filings were made. It is because of state oversight that the expenditures for the Burke hotel were rigorously examined and ANC BIO investor funds were placed in escrow where they remain to this day. Many folks have been harmed by the alleged fraud in the Northeast Kingdom, including subcontractors and investors and entire communities.

As to the questions you raise, the Agency of Commerce and Community Development did raise questions back in 2012 to the projects within the scope of the limited statutory powers we have to investigate. It is because the projects were not as responsive as was necessary that the decision was made to add oversight responsibilities to the Department of Financial Regulation, which has more expansive authority in these matters. Their investigation, which included looking into official investor complaints first formally received in 2015, led to unraveling the complicated web of alleged fraud we have here. Investors who previously had concerns may have expressed them in the press or in communications with ACCD, but did not file formal complaints with DFR. While individuals such as Douglas Hulme may have raised questions previously, his credibility in raising those concerns was marred by his ties to the projects. For example, he was reminded many times to cease activity in which he incorrectly marketed himself as the Vermont Regional Center.


**Darren M. Springer**
*Chief of Staff*, **Office of the Governor**
(802) 522-2082 (cell)
Darren.Springer@vermont.gov

Please note: My email address has changed to Darren.Springer@vermont.gov.

**From:** London, Sarah
**Sent:** Monday, July 25, 2016 1:25 PM
**To:** Springer, Darren <Darren.Springer@vermont.gov>; Allen, Susan <Susan.Allen@vermont.gov>
**Cc:** Miller, Lawrence <Lawrence.Miller@vermont.gov>
**Subject:** FW: CONFIDENTIAL attorney client
**Importance:** High

Here is what we have.

**From:** Moulton, Pat
**Sent:** Monday, July 25, 2016 1:10 PM
**To:** London, Sarah <Sarah.London@vermont.gov>; Pieciak, Michael <Michael.Pieciak@vermont.gov>;
Kessler, John <John.Kessler@vermont.gov>
**Subject:** CONFIDENTIAL attorney client
**Importance:** High

Sarah, here is what I am thinking for a statement.  We are on a public records exemption for any more
details out to Anne. So the details she has is what she will get.  I do not see a need to drag in who said
what when but rather keep this high level.

Also, I do not recall the May 4 conference call having anything to do with any allegations, it was about
Hulme stopping marketing himself as the Vermont Regional Center.  My memory may be vague on this.

DRAFT STATEMENT:
"The Agency of Commerce and Community Development undertook the degree of investigation they
could given limited statutory powers to investigate and subpoena. We added the Dept. of Financial
Regulation in to the Vermont Regional Center for exactly this reason. They have more investigative
powers and staff to unravel what was we learned in the end, was an extremely complicated web of
alleged violations.  We as a government were and remain VERY interested in getting investigating any
allegations and we have systems in place at DFR for these purposes.  The proper place to direct investors
who felt they had a complaint was to legal counsel or to file a complaint with DFR.  DFR discovered the
complexity of this alleged fraud after they were brought in.

AND could add someplace:  "ACCD had ascertained the Limited Partnership at Jay Peak was within their
authority to transfer equity to debt. Jay Peak should have done a much better job communicating with
investors at the time. We now know there was more going on then. But we did not know that then nor
could we have without the involvement of DFR and the 13 months of detailed investigation in to over
350 daily transaction and over 800,000 pages of documentation."

AND could add someplace:
"Douglas Hulme was also someone on ACCD's radar as incorrectly marketing himself as the Vermont
Regional Center. He was reminded many times to cease from that activity and change his web site.  His
credibility was in question due to those activities. It appeared as sour grapes give the lack of other
evidence to suggest something more."

Those are some thoughts.
PAT

PLEASE NOTE: my new email pat.moulton@vermont.gov
Patricia Moulton, Secretary
Agency of Commerce and Community Development
One National Life Drive
Deane C. Davis Bldg., 6th Floor
Montpelier, VT  05620-0501
802-451-9578

---

**From:** London, Sarah
**Sent:** Monday, July 25, 2016 12:31 PM
**To:** Moulton, Pat <Pat.Moulton@vermont.gov>; Pieciak, Michael <Michael.Pieciak@vermont.gov>
**Subject:** FW: request for comment re: story about conference call with Lawrence Miller and Douglas Hulme in 2012

Thank you.  Pat, thank you for ACCD taking a first crack at a statement on below regarding Regional Center actions at the time.  Mike, see below.  ACCD need may assistance in the 2012 timeline with communications with John Cronin.  Understanding of folks here is that DFR did not receive a formal complaint from any investor with respect to these projects until 2015.  Would like DFR to confirm, and make sure ACCD and DFR are on same page for statement below regarding relevant period in 2012.  Thank you both very much,
Sarah

---

**From:** Moulton, Pat
**Sent:** Monday, July 25, 2016 12:26 PM
**To:** London, Sarah <Sarah.London@vermont.gov>
**Subject:** Fwd: request for comment re: story about conference call with Lawrence Miller and Douglas Hulme in 2012


Patricia Moulton, Secretary
Agency of Commerce and Community Development
One National Life Dr.
Deane C Davis Bldg., 6floor
Montpelier, VT 05620-0501
ACCD.Vermont.gov
802-451-9578


---------- Forwarded message ----------
From: **"Anne Galloway"** <agalloway@vtdigger.org>
Date: Mon, Jul 25, 2016 at 12:00 PM -0400
Subject: request for comment re: story about conference call with Lawrence Miller and Douglas Hulme in 2012
To: "Moulton, Pat" <Pat.Moulton@vermont.gov>

Dear Pat,

I am writing to request comment about a conference call you had with Douglas Hulme and Lawrence Miller in 2012. The story will be published later today. My deadline is 5 p.m.

These are excerpts from the story:

When the Tram Haus investors found out about the details of the IOU in May 2014, they reached out to state officials for help and complained they had been defrauded by Stenger and Quiros. But instead of acting on investors' concerns, Raymond, at the regional center, pushed back, and Moulton, who had replaced Miller as commerce secretary in June 2014, defended Stenger. In a commentary submitted later that year, Moulton insisted that a story by VTDigger was inaccurate and that "Stenger's action was not in conflict with any federal law or regulations enacted for the EB5 program."

In correspondence, Moulton told investors that the developers had not violated partnership agreements and there was nothing the state could do to help. She recommended the investors seek recourse in the courts.

Sutton says the investors chose not to pursue a legal challenge because "it would be heard in Stenger's backyard."

At the same time, Moulton asked Sutton to provide proof of the investors' allegations. A month later, Sutton sent bank statements to the state that showed loans secured against investor funds and transfers of Tram Haus money to Q Resorts, one of Quiros' companies. Moulton never responded, according to Sutton.

"The whole time, they were just defending Jay Peak," Sutton says. "There was never a point where I was thinking they're actually going to take us seriously and carry out an investigation."

####

In advance of the conference call, an attorney for Hulme explained to Candido by email that Rapid USA had concerns about "the expenditure and use of funds by the limited partnerships and reconciliation of accounts, including the transfer of funds."

The attorney, Eugene Lindsey, had asked Stenger in February 2012 for balance sheets, bank statements, wire transfers, and source and use of funds reports for the Jay Peak projects, according to email correspondence provided by the state. He also specifically asked Stenger to verify that he had not used investor monies to obtain margin loans — one of the SEC's accusations — and that the developer provide Rapid USA with written assurances from legal counsel that the projects were in compliance with federal and state law. Stenger apparently did not provide the assurances Hulme requested, and on Feb. 28, Rapid USA terminated all business dealings with Jay Peak.

The scheduled phone meeting among Hulme, Miller and Patricia Moulton, who was then deputy commerce secretary, took place May 4, 2012, email correspondence shows. It is unclear what happened or what was said at the meeting. None of the participants in the meeting has responded to VTDigger's requests for comment. No meeting notes were released to VTDigger as part of a public records request made in 2015. In October 2015, Vermont Attorney General William Sorrell put state communication regarding Jay Peak on litigation hold, blocking public access.

The next communication after the meeting was between Stenger and Miller.

"James briefed me somewhat on the Hulme call," Stenger wrote May 17, 2012. "I wanted to ask your perspective on it and if you want anything from me. I have a paper trail on all our interaction. If you would like that or anything else please let me know."

Miller replied: "I don't feel a need for any further information at this point Bill. Everyone is fully consistent with each other."

LATER IN THE STORY, COMMENTS FROM TONY SUTTON

Sutton says the state has not taken responsibility for its lack of oversight and willful disregard of facts about the fraud brought to light four years ago — even after the Securities and Exchange Commission sued Stenger and Quiros on 52 counts of fraud.

"From what I've seen on redacted emails that we've had access to, it's completely clear that Lawrence Miller, especially, was very involved in the discussion between Bill Stenger and Douglas Hulme," Sutton added. "From my point of view, looking at that information, it seems very clear to me that Miller, particularly, knew a lot more and did nothing, which from my point of view, had he acted at that point, he could have saved our hotel from being seized."

"I don't want to speculate on the potential motivation they might have had," Sutton says. "You'd like to believe they had the best of intentions and the whole project from their point of view was of great benefit to the state of Vermont. But that's not what they were paid to do. The offices they held meant they had an obligation to really find out if there was a problem or not."

--
Anne Galloway
Editor, VTDigger.org
Executive Director, Vermont Journalism Trust
97 State St., Montpelier, VT 05602
cell 802-595-9159
@GallowayVTD
http://vtdigger.org

If you like our reporting, support our work with a donation.

**From:** London, Sarah [Sarah.London@vermont.gov]
**Sent:** Thursday, July 28, 2016 4:11 PM
**To:** GPS; EXE - SrStaff
**Subject:** FW: EB-5 Investor case against filed DFR
**Attachments:** 2016-07-20 Complaint.pdf

**Importance:** High

FYI, attached is a complaint from two Chinese investors in Q Burke (siblings) against Ariel Quiros, Stenger, Charles Leamy (a lawyer), Raymond James Inc, Joel Burstein, DFR, Peak CM, White and Burke, Q Burke Resorts, and "John Does." No state entity other than DFR is named. Lawyer is Pietro Lynn, and two lawyers from California. Investors claim:

- They were not provided with the updated Q Burke PPM that disclosed the SEC investigation
- The State through DFR wrongfully released their money from escrow to allow the hotel to be built (highlighting a warning from Brent Raymond to Susan Donegan)
- Quiros, Stenger, Leamy, and Q Burke violated VT Securities law, committed various forms of fraud, violated the Consumer Protection Act, and breached fiduciaries duties through misrepresentations and concealments
- Raymond James, Burstein, and White and Burke aided and abetted the fraud
- DFR is the defendant in one count of negligence
- Peak CM wrongfully pocketed $1M
- Defendants other than DFR committed "civil conspiracy"

They ask for return of approximately $1M, and triple damages under the Consumer Fraud Act, and attorneys fees

**From:** Shafritz, Megan J.
**Sent:** Thursday, July 28, 2016 3:10 PM
**To:** London, Sarah <Sarah.London@vermont.gov>
**Subject:** FW: EB-5 Investor case against filed DFR
**Importance:** High

ATTORNEY/CLIENT PRIVILEGED

Hi Sarah,

Bill ask me to give you a heads up regarding this case, which was just served yesterday. We haven't yet assigned the litigation team that will handle the matter, so if you have any questions, please feel free to contact me.

Regards, Megan

Megan J. Shafritz, Esq.
Assistant Attorney General, Civil Division Chief
Office of the Attorney General

109 State Street, 3rd Floor
Montpelier, Vermont 05609-1001
Phone:  802-828-5527
Fax:  802-828-1500

The information contained in this transmission may contain privileged and confidential information.  It is intended
only for the use of the person(s) named above.  If you are not the intended recipient, you are hereby notified that
any review, dissemination, distribution or duplication of this communication is strictly prohibited.  If you are not
the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:** Shafritz, Megan J.
**Sent:** Thursday, July 28, 2016 2:43 PM
**To:** Sorrell, Bill <bill.sorrell@vermont.gov>; Griffin, Bill <bill.griffin@vermont.gov>; Young, Susanne
<susanne.young@vermont.gov>; Kline, Scot <scot.kline@vermont.gov>
**Cc:** Alexander, Jon <jon.alexander@vermont.gov>; Salembier, Shannon
<Shannon.Salembier@vermont.gov>
**Subject:** EB-5 Investor case against filed DFR
**Importance:** High

Hi Folks,

Late yesterday afternoon (at 4:15 p.m.), the State was served by sheriff with the attached EB-5
investor lawsuit, which was filed against many defendants, including all those you would
expect.  Despite a 45-page complaint, there appears to be only one (seemingly weak) claim
against DFR for negligence.  See Count X at page 39.  The Complaint alleges that DFR owed a
duty of care to potential investors in Q Burke and breached that duty by permitting Q Burke to
solicit new investors in July 2015.  Our response is due on August 16, 2016.

Bill, FYI, in case there are press inquiries.  To my knowledge, we have not received any yet.

MJS

**From:** Lord, Peggy
**Sent:** Thursday, July 28, 2016 2:28 PM
**To:** Shafritz, Megan J. <megan.shafritz@vermont.gov>
**Subject:** Service by Sheriff 7/27/16 - Wei and Wei v. Quiros, et al., 602-7-16 Cncv

Hi Megan,

Please see the attached was served via sheriff yesterday (7/27/16). The answer is
due 8/16/16. This has been added to Law Manager (2016-05899) and the
documents have been added to M-Files.

Thanks,
P
*Peggy Lord*

Docket Clerk / Paralegal Technician II
Office of the Attorney General | Civil Division
109 State Street, 3rd Floor
Montpelier, VT 05609-1001
Tel. 802-828-3176
Fax. 802-828-1500
Email: peggy.lord@vermont.gov

**Please note my new email address is: <u>peggy.lord@vermont.gov</u>**

*This email message may contain privileged and/or confidential information. If you are not the intended recipient(s), you are hereby notified that any dissemination, distribution, or copying of this email message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this message from your computer.*



COPY

**STATE OF VERMONT**

**SUPERIOR COURT**
**CHITTENDEN UNIT**

**CIVIL DIVISION**
**DOCKET NO.** 002-7-16 cncv

MINGGAN WEI and ZHAO WEI,

Plaintiffs,

—against—

ARIEL QUIROS; WILLIAM STENGER;
CHARLES LEAMY; RAYMOND JAMES
& ASSOCIATES, INC.; JOEL
BURSTEIN; STATE OF VERMONT
DEPARTMENT OF FINANCIAL
REGULATION; PEAK CM, LLC;
GARDNER KILCOYNE ARCHITECTS,
P.C.; WHITE + BURKE REAL ESTATE
INVESTMENT ADVISORS, INC.; Q
BURKE MOUNTAIN RESORT, HOTEL
and CONFERENCE CENTER, L.P.; and
JOHN DOES #1 THROUGH 10,

Defendants.

**COMPLAINT**

VERMONT SUPERIOR COURT

JUL 2 0 2016

Chittenden Unit

Minggan Wei and Zhao Wei (collectively, "the Weis") make the following complaint
against Ariel Quiros; William Stenger; Charles Leamy; Raymond James & Associates, Inc.; Joel
Burstein; the State of Vermont Department of Financial Regulation; Peak CM, LLC; Gardner
Kilcoyne Architects, P.C.; White + Burke Real Estate Investment Advisors, Inc.; Q Burke
Mountain Resort, Hotel and Conference Center, L.P.; and John Does Number One through Ten
(collectively, "Defendants") to recover the $1,040,000.00 that they were defrauded by defendants
into investing in a scheme which they were told would qualify them to receive EB-5 visas, but
instead, left their savings depleted, their invested assets locked up in a court-ordered receivership
established by the Securities and Exchange Commission ("SEC") and their prospects to receive

1

visas for permanent residency in serious doubt. The Weis also seek the return of $20,000 that they paid to defendant Charles Leamy for so-called "attorneys' fees." Unless otherwise stated, the allegations set forth below are pleaded upon information and belief.

## SUMMARY

1. Minggan Wei and Zhao Wei are Chinese national siblings who came to the United States to pursue their education. Seeking to enjoy permanent residency in the United States, the Weis sought an investment opportunity that would entitle them to receive permanent resident status (a "green card") through the EB-5 immigrant investor program (the "EB-5 Program").

2. The EB-5 Program provides a method of obtaining a green card for foreign nationals who invest money to promote economic development in the United States. The program, which is administered by the United States Citizenship and Immigration Services, provides green cards to individuals like the Weis who invest at least $500,000 in a high-unemployment or rural area that then creates or preserves at least ten jobs for U.S. workers. Investors also receive returns on their investment in successful projects.

3. William Stenger and Charles Leamy induced the Weis to invest $520,000 each to become limited partners in Q Burke Mountain Resort, Hotel and Conference Center, L.P. ("Q Burke"). Leamy, an attorney licensed to practice law in New York, falsely told the Weis that the EB-5 projects that the group has run at the Jay Peak Resort, located on Jay Peak in the Green Mountains of Vermont, "are among the most successful in the U.S."

4. This representation was a grave lie and omission. The Weis were not told that Stenger and Ariel Quiros had been misusing, commingling and stealing investors' money for seven years, and that they were under intense scrutiny by the SEC and the Vermont government.

5. Raymond James and Associates, Inc. ("Raymond James") and its broker Joel Burstein – who was Quiros' son-in-law – designed the financial account structure that enabled the fraudulent scheme to flourish.

2

**From:** Moulton, Pat [Pat.Moulton@vermont.gov]
**Sent:** Friday, August 26, 2016 9:58 AM
**To:** London, Sarah; Griffin, Bill
**Subject:** Confidential Attorney Client privilege.
**Attachments:** 1163_001.pdf

Good morning Sarah and Bill,
Attached please find our response to the RFI from USCIS.  There could be one change, I noticed the MOU between DFR and ACCD on attachment A is not the final signed copy so we will be sending the final signed to USCIS.
Pat


PLEASE NOTE: my new email pat.moulton@vermont.gov
Patricia Moulton, Secretary
Agency of Commerce and Community Development
One National Life Drive
Deane C. Davis Bldg., 6th Floor
Montpelier, VT  05620-0501
802-451-9578

---

**From:** O'Neil, Allison [mailto:Allison.ONeil@lockelord.com]
**Sent:** Thursday, August 25, 2016 2:03 PM
**To:** Kessler, John <John.Kessler@vermont.gov>; St. Onge, Walter <Walter.StOnge@lockelord.com>; Moulton, Pat <Pat.Moulton@vermont.gov>; Goldstein, Joan <Joan.Goldstein@vermont.gov>; Leriche, Lucy <Lucy.Leriche@vermont.gov>; Pieciak, Michael <Michael.Pieciak@vermont.gov>; Purinton, Tyler <Tyler.Purinton@vermont.gov>; John W. Kessler - State of Vermont (jk67vt@gmail.com) <jk67vt@gmail.com>; Whitehouse, James <James.Whitehouse@vermont.gov>; Keller, Stanley <Stanley.Keller@lockelord.com>
**Subject:** Final version with attachments

Hi everyone,
Our hand delivery is ready to go.  Attached is the final version with attachments.  Please let me know if you have any changes in the next few minutes.
Thanks,
Allison

**Allison O'Neil**
Partner
**Locke Lord LLP**
617.239.0729 Direct

Atlanta | Austin | Boston | Chicago | Cincinnati | Dallas | Hartford | Hong Kong | Houston | Istanbul | London | Los Angeles | Miami | Morristown | New Orleans | New York | Providence | Sacramento | San Francisco | Stamford | Tokyo | Washington DC | West Palm Beach

For more information visit www.lockelord.com

CONFIDENTIALITY NOTICE:
This e-mail and any attached files from Locke Lord LLP may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this e-mail by accident, please notify the sender immediately and destroy this e-mail and all copies of it. We may scan and or monitor emails sent to and from our servers to ensure regulatory compliance to protect our clients and business.

USAO-EXEC00007837

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services                                    Notice of Action

| A# | Application/Petition |
|---|---|
| | I-924A, Supplement to Form I-924A |
| **Receipt #** | **Applicant/Petitioner** |
| RCW1536353984 | Patricia Lynn Moulton |
| | Vermont Agency of Commerce & Community |
| | Development (VACCD) Regional Center |
| **Notice Date** / **Page** | **Beneficiary** |
| July 8, 2016 / 1 of 7 | |

Patricia Lynn Moulton
Vermont Agency of Commerce &
Community Development (VACCD)
Regional Center
1 National Life Dr.
Deane C. Davis Bldg., 6th Floor
Montpelier, VT 05620

Request for Information

IMPORTANT: WHEN YOU HAVE COMPLIED WITH THE
INSTRUCTIONS ON THIS FORM, RESUBMIT THIS NOTICE
ON TOP OF ALL REQUESTED DOCUMENTS AND /OR
INFORMATION TO THE ADDRESS BELOW. THIS OFFICE
HAS RETAINED YOUR PETITION/APPLICATION WITH
SUPPORTING DOCUMENTS.

THE INFORMATION REQUESTED BELOW MUST BE RECEIVED
BY THIS OFFICE NO LATER THAN FORTY-FIVE(45) DAYS FROM
THE DATE OF THIS NOTICE.

CSC _____ WS _____ DIV I

# RETURN THIS NOTICE ON <u>TOP</u> OF THE REQUESTED INFORMATION LISTED ON THE ATTACHED SHEET.

<u>Note</u>: You are given until _____ August 25, 2016 _____ in which to submit the information requested.

For more information, visit our website at <u>www.uscis.gov</u>

Or call us at **1-800-375-5283**

Telephone service for the hearing impaired: 1-800-767-1833

You will be notified separately about any other applications or petitions you filed. Save a photocopy of this notice. Please enclose a copy of it if you write to us about this case, or if you file another application based on this decision. Our address is:

USAO-EXEC00007838

WAC 13 903 59498
Page 2 of 2

| | |
|---|---|
| U.S. CITIZENSHIP AND IMMIGRATION SERVICES<br>IMMIGRANT INVESTOR PROGRAM<br>131 M STREET, NE<br>MAILSTOP 2235<br>WASHINGTON, DC 20529 | |

Form I-797 (1/00)                                      Please see additional information on the back.

USAO-EXEC00007839

Vermont Agency of Commerce and Community Development Regional
Center/RCW1536353984/ID1031910148
Page 2

## Form I-924A, Supplement to Form I-924; Request for Information

### I.   Background

Vermont Agency of Commerce and Community Development (VACCD) ("the Regional
Center") applied for designation as a regional center on June 26, 1997 pursuant to section 610 of
the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies
Appropriations Act, 1993, Pub. L. No. 102-395.[1]  On June 11, 2007, USCIS designated VACCD
as a regional center and authorized its participation in the Immigrant Investor Program (the
"Program").

According to 8 C.F.R. § 204.6(m)(6), regional centers must provide USCIS with updated
information to demonstrate the regional center is continuing to promote economic growth,
improved regional productivity, job creation, or increased domestic capital investment in the
approved geographic area. The form that is used to demonstrate a regional center's continued
eligibility for regional center designation is the Form I-924A, Supplement to Form I-924 ("Form
I-924A").

On December 24, 2015, the Regional Center submitted the Form I-924A for fiscal year 2015
(RCW1536353984).

In the course of reviewing your FY 2015 I-924A and through publicly available information which
has come out since that form was filed, issues have come to our attention that require additional
information or evidence in order to demonstrate that your Regional Center is continuing to promote
economic growth pursuant to 8 C.F.R. § 204.6(m)(6), including the ability to effectively administer
the Regional Center.

We have reviewed the April 12, 2016 complaint[2] filed by the U.S. Securities and Exchange
Commission (the "SEC complaint") and the April 14, 2016 complaint[3] filed by the State of
Vermont (the "Vermont complaint"), regarding activities relating to the Regional Center.  The 17
defendants in each complaint are:

---

[1] Section 610 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies
Appropriations Act, 1993, Pub. L. No. 102-395, as amended by section 116 of Pub. L. No. 105-119, 111 Stat. 2440
(1997); section 402 of Pub. L. No. 106-396, 114 Stat. 1637 (2000); section 11037 of Pub. L. No. 107-273, 116 Stat.
1758 (2002); section 4 of Pub. L. No. 108-156, 117 Stat. 1944 (2003); section 1 of Pub. L. No. 112-176, 126 Stat.
1325 (2012); and section 575 of Pub. L. No. 114-113 (2015) (hereinafter "Appropriations Act").
[2] See http://www.sec.gov/litigation/complaints/2016/comp-pr2016-69.pdf.
[3] See
http://www.dfr.vermont.gov/sites/default/ext/sl/dev/docs/State%20v.%20Quiros%20et.%20al.%20COMPLAINT%2
0SIGNED%20&%20FILED.pdf.

ATTACHMENT TO I-797

USAO-EXEC00007840

Vermont Agency of Commerce and Community Development Regional
Center/RCW1536353984/ID1031910148
Page 3

> Ariel Quiros; William Stenger; Jay Peak, Inc.; Q Resorts, Inc.; Jay Peak Hotel Suites,
> L.P.; Jay Peak Hotel Suites Phase II, L.P.; Jay Peak Management, Inc.; Jay Peak
> Penthouse Suites, L.P.; Jay Peak GP Services, Inc.; Jay Peak Golf and Mountain Suites,
> L.P.; Jay Peak GP Services Golf, Inc.; Jay Peak Lodge and Townhouses, L.P.; Jay Peak
> GP Services Lodge, Inc.; Jay Peak Hotel Suites Stateside, L.P.; Jay Peak GP Services
> Stateside, Inc.; Jay Peak Biomedical Research Park, L.P.; and ANC Bio Vermont GP
> Services, LLC.[4]

The SEC complaint alleges that "among other things, Quiros, Stenger, and the companies they run
that have overseen the development and construction of the Jay Peak resort have misused more than
$200 million – more than half of all money raised by investors."[5]  The Vermont complaint notes
that "since 2008, Quiros has misappropriated at least $50 million of investor funds to, among other
things: (1) purchase Jay Peak Resort; (2) purchase Burke Mountain Resort; (3) back a personal line
of credit to pay his personal income taxes; (4) pay taxes for an unrelated company Quiros owns; and
(5) purchase a luxury condominium in Trump Place New York.  Quiros also improperly used
investor funds to pay for margin loan interest and fees ($2.5 million) and to pay down and off
margin loan debts".[6]  In addition, funds originally earmarked for certain projects were allegedly
improperly used for other projects.[7]

With regards to the biomedical facility project associated with Jay Peak Biomedical Research Park
L.P. (JPBRP), the SEC and Vermont complaints allege that (1) JPBRP had raised $83 million from
166 investors and seeks to raise an additional $27 million from 54 investors[8], (2) at least some of the
funds raised had been diverted for other purposes unrelated to this project[9], and (3) the Private
Placement Memorandum for this project states that the ANC Bio Products were 'currently in the
process of FDA approval' but that, in reality, Defendants had never applied for FDA approval for
the ANC Bio Products despite stating the project was set to commence in October, 2014, without
also including the material contingency that commencement of the project was dependent on FDA
approval, and without disclosing the risk that the FDA might not approve the ANC Bio Products.[10]
In addition, the SEC complaint alleges that "although the Defendants have raised almost three-
quarters of the money for the research facility, they have done almost no work on it other than site

---

[4] See page 1 of the SEC and Vermont complaints.
[5] See http://www.sec.gov/litigation/complaints/2016/comp-pr2016-69.pdf, p. 2.
[6] See
http://www.dfr.vermont.gov/sites/default/ext/sl/dev/docs/State%20v.%20Quiros%20et.%20al.%COMPLAINT%2
0SIGNED%20&%20FILED.pdf, p. 3-4.
[7] This is noted throughout the SEC and Vermont complaints.
[8] See http://www.sec.gov/litigation/complaints/2016/comp-pr2016-69.pdf., p. 7.
[9] See
http://www.dfr.vermont.gov/sites/default/ext/sl/dev/docs/State%20v.%20Quiros%20et.%20al.%COMPLAINT%2
0SIGNED%20&%20FILED.pdf, p. 33.
[10] Ibid., p. 34.

ATTACHMENT TO I-797

USAO-EXEC00007841

Vermont Agency of Commerce and Community Development Regional
Center/RCW1536353984/ID1031910148
Page 4

preparation and ground-breaking, and are years behind their original construction and revenue
schedule".[11]

Additionally, according to the SEC complaint, "between October 2011 and December 2012,
Stateside Phase VI (i.e., the NCE, Jay Peak Hotel Suites Stateside L.P.) raised $67 million from 134
investors through an EB-5 offering of limited partnership interests to build an 84-unit hotel, 84
vacation rental cottages, a guest recreation center, and a medical center. Although the Stateside
Phase VI offering was fully subscribed, the Defendants have only built the hotel. A small amount
of work has been done on building the cottages and work has not yet begun on the recreation and
medical centers."[12]

In addition, a recent press report mentioned that on May 19, 2016 a Plainfield, VT "woman (Linda
West) obtained a default judgement against her former employer, Seldon Technologies, in a lawsuit
she filed alleging that the Windsor water filtration device maker fired her over objecting to financial
irregularities stemming from the company's participation in a federal government's program
awarding visas to foreign investors in exchange for helping to bankroll job creation."[13] The article
also noted that Ms. West, "who worked as an accountant at Seldon from 2003 to 2012, sued the
company in Vermont Superior Court in Woodstock (in) 2013, alleging that she was fired after she
complained that Seldon used EB-5 funds to pay for a company officer's purchase of Seldon stock in
addition to his federal and state income taxes and deferred income allocation."[14] The judge ruled
Seldon liable with damages to be determined by a jury at a later date.[15] In fact, according to another
article, on June 30, 2016 a Vermont state superior court jury awarded West $400,000 in
compensatory damages against Seldon, comprised of $325,623 in lost back pay and $74,377 in lost
future pay.[16]

After conducting our review, USCIS has determined that additional information is required to
ensure that the Regional Center is continuing to promote economic growth pursuant to 8 C.F.R. §
204.6(m)(6).

## II.    **Request for Information**

According to 8 C.F.R. § 204.6(m)(6),

---

[11]See http://www.sec.gov/litigation/complaints/2016/comp-pr2016-69.pdf., p. 3.
[12]Ibid., p. 7.
[13] See http://www.vnews.com/Seldon-Technologies-lawsuit-claims-EB-5-via-program-financial-mismanagement-at-former-water-filtration-device-maker-2468881.
[14] Ibid.
[15] Ibid.
[16] See http://www.vnews.com/Jury-awards-former-Seldon-Technologies-employee-$400-000-in-malfeasance-lawsuit-3201629.

USAO-EXEC00007842

Vermont Agency of Commerce and Community Development Regional
Center/RCW1536353984/ID1031910148
Page 5

> [t]o ensure that regional centers continue to meet the requirements of section
> 610(a) of the Appropriations Act, a regional center must provide USCIS with
> updated information to demonstrate the regional center is continuing to promote
> economic growth, improved regional productivity, job creation, or increased
> domestic capital investment in the approved geographic area.  Such information
> must be submitted to USCIS on an annual basis, on a cumulative basis, and/or as
> otherwise requested by USCIS, using a form designated for this purpose.  USCIS
> will issue a notice of intent to terminate the participation of a regional center in
> the [Program] if a regional center fails to submit the required information or upon
> a determination that the regional center no longer serves the purpose of promoting
> economic growth, including increased export sales, improved regional
> productivity, job creation, and increased domestic capital investment.

As explained in the Form I-924A instructions, the information collected through the Form I-
924A permits USCIS to determine whether a regional center continues to serve the purposes of
the Program.  The regulations, as well as the I-924A form instructions, further indicate that
USCIS may request more information or evidence.  Accordingly, USCIS issues this request.  In
response to this notice, while not required, it may be helpful to provide a cover letter that acts
as an executive summary, followed by a table of contents with sections that are tabbed at the
bottom of the page.

Thus, please provide the following information and responses to these questions:

- ▪ In light of the new information that has come out since your FY2015 I-924A was submitted,
  please provide corrections, if needed, to the information supplied on that form by submitting
  a new FY2015 I-924A with the corrected information.  (The corrected information should
  be highlighted and anything previously incorrect should be identified.)  For example, your I-
  924A states that EB-5 investors invested $17.5 million in ANC Bio Vermont GP Services,
  LLC.  However, the Vermont complaint claims that EB-5 funds were transferred away from
  this entity for other purposes, including Ariel Quiros misusing and misappropriating some
  funds.[17]  Thus, should this $17.5 million figure be corrected, and is any explanation needed
  in the I-924A with regards to this?

  In addition, if any of the I-924A Forms prior to FY2015 need to be corrected, please supply
  them in a similar fashion.
- ▪ In light of the new information that has come out since your FY2015 I-924A was submitted,
  please provide an interim I-924A *for the period from December 24, 2015 (i.e., when that
  form was supplied to us) – Present.*

---

[17] See
http://www.dfr.vermont.gov/sites/default/ext/sl/dev/docs/State%20v.%20Quiros%20et.%20al.%20COMPLAINT%2
0SIGNED%20&%20FILED.pdf, p. 33.

ATTACHMENT TO I-797

USAO-EXEC00007843

Vermont Agency of Commerce and Community Development Regional
Center/RCW1536353984/ID1031910148
Page 6

- The prior section (page 3) mentioned how the SEC and Vermont complaints allege various ways in which over $250 million of EB-5 investors' funds were misued and/or misappropriated. Thus, how much of EB-5 investors' capital (i.e., each one contributed $500,000) is now unavailable for actual EB-5 projects? Please delineate the source/components of the total. For any such capital now unavailable for actual EB-5 projects, are there any New Commercial Enterprises (NCEs) and projects which consequently now have a shortage of funds? If so, (1) please name them, (2) what is the amount of the shortage for each, and (3) what is the total project cost for each project with such a shortage?

- Please provide financial information which demonstrates whether each of the following entities have the ability (and resources) to ensure the Regional Center can continue to promote economic growth (including effectively run its affairs), particularly in light of the information that has been made public through the SEC and Vermont complaints: (1) the VACCD, and (2) all NCEs and Job Creating Entities (JCEs) associated with any projects connected to your regional center that have not yet been completed. (This would *inter alia* include any projects that are planned, but have not yet gotten underway, such as the facility associated with Jay Peak Biomedical Research Park, L.P.) If available, your response should include financial and/or bank statements, plus any other information which will address this.

- With regards to the biomedical facility project associated with Jay Peak Biomedical Research Park, L.P., the previous section mentioned the SEC and Vermont complaints' allegations that the project had incurred various misrepresentations, funding issues, and schedule problems. (See p. 3-4 above.) Given these alleged misrepresentations and funding and schedule problems, do you realistically expect this project to proceed and be undertaken? Please provide sufficient detail with regards to your response. Also, do you still intend to raise additional funds for this project and if so, why, and how much?

- As noted above in the Background section, the SEC complaint mentioned that the Stateside Phase VI (EB-5) offering was fully subscribed, but the Defendants have only built the hotel. Given that the full EB-5 funding was obtained, but much work remains to be done (i.e., on the vacation rental cottages, a guest recreation center, and a medical center), do you realistically anticipate the hotel to open for operations and the other facilities to be built? Do you expect there to be sufficient job creation to support Form I-829 (i.e., permanent residence status) approvals for all the EB-5 investors, or if not, for how many? How many jobs do you expect this project to create (i.e., for EB-5 job creation purposes)?

- The prior section also discussed recent court judgments in favor of Linda West against Seldon Technologies. (See page 4.) If you have any further information on this beyond what is noted in the articles referred to above, please provide that. In terms of her claims and the judgments mentioned in the articles, do you believe that EB-5 funds at Seldon were indeed used for purposes other than job creation, and if so, how much? Please explain.

According to USCIS records, 7 EB-5 investors in this project are currently awaiting our adjudication of their Form I-829 petitions for permanent residence status, 2 I-829s have been

USAO-EXEC00007844

Vermont Agency of Commerce and Community Development Regional
Center/RCW1536353984/ID1031910148
Page 7

approved, and 1 EB-5 investor has not yet submitted his/her I-829 Form yet (although his/her I-526 Form was approved). Given that (1) Seldon has shut down, as noted in your FY 2015 I-924A submission[18], and (2) these court decisions, how many jobs were created by this project (i.e., for EB-5 job creation purposes)? Please explain with sufficient detail so that we can understand your view.

- With regards to all EB-5 investors whose funds were alleged to be misused or misappropriated (as described in detail above), have they been informed of this by VACCD, the Receiver (Michael Goldberg), or anyone else connected to your regional center? If so, by whom and when?

- According to our records with regards to your regional center, USCIS received the most recent Form I-526 petitions filed by alien investors under Jay Peak Biomedical Research Park, L.P. and Q Burke Mountain Resort, Hotel and Conference Center, L.P. on April 18, 2016 and May 24, 2016, respectively. Please indicate when the Regional Center became aware of the alleged diversion of investors' funds in relation to (1) any investigative action(s) taken[19], and (2) the Regional Center's marketing activities for the projects. Please provide evidence regarding what steps, if any, the Regional Center takes to engage in monitoring and oversight of the projects that it sponsors.

- Additionally, in light of the SEC and Vermont complaints and other information that has come out since your FY2015 I-924A was submitted, please provide evidence regarding what new steps, if any, the Regional Center has taken or plans to take in monitoring and oversight of the projects that are subject of the complaints discussed above.

- Are there any other problems and issues, in addition to those noted above, that could adversely affect your Regional Center's ability to continue to promote economic growth and create jobs, as well as effectively administer the Regional Center's affairs (including monitoring the NCEs, JCEs, and financial flows involved)?

## III.   Conclusion

USCIS requests that the Regional Center provide the additional information and evidence specified above. If the Regional Center fails to submit such additional information and evidence, USCIS will issue a notice of intent to terminate the Regional Center's participation in the Program.

Thank you for your time.

---

[18] With regards to the Seldon Technologies (SWCP, LP) project, your FY15 I-924A reads, "On September 28, 2015, Seldon underwent an orderly shutdown of all its operations. Consequently, all employees were laid-off indefinitely and an auction of intellectual and personal property followed."

[19] This includes, but is not limited to, actions by law enforcement and regulatory agencies, to include the Vermont Department of Financial Regulation.

ATTACHMENT TO I-797

USAO-EXEC00007845

**From:** London, Sarah [Sarah.London@vermont.gov]
**Sent:** Monday, August 29, 2016 2:21 PM
**To:** Springer, Darren; Allen, Susan
**Subject:** Confidential Attorney Client privilege
**Attachments:** 1163_001.pdf

Apologies for length of this document, but as I get through I realize you two should probably see as well. This is the USCIS request of our Regional Center for more information in light of various filings and public information regarding both Jay Peak and Seldon projects. The lawyers are meeting tomorrow. So far there is an initial determination that the USCIS request for information may be public. I expect it will be misleading to release only the questions and not some of the answers. For example, it is critical to highlight (again) that Burke is not a defendant in the case, as in done in the written answers as opposed to the questions. The lawyers are meeting tomorrow afternoon on this, and our public records deadline for both the press and project (Stowe Aviation) asking for this document is Friday. Happy to chat at any point. Likely helpful for me to connect with one or both of you before the afternoon meeting tomorrow. Thanks very much.

---

**From:** Moulton, Pat
**Sent:** Friday, August 26, 2016 9:58 AM
**To:** London, Sarah <Sarah.London@vermont.gov>; Griffin, Bill <bill.griffin@vermont.gov>
**Subject:** Confidential Attorney Client privilege.

Good morning Sarah and Bill,
Attached please find our response to the RFI from USCIS. There could be one change, I noticed the MOU between DFR and ACCD on attachment A is not the final signed copy so we will be sending the final signed to USCIS.
Pat

PLEASE NOTE: my new email pat.moulton@vermont.gov
Patricia Moulton, Secretary
Agency of Commerce and Community Development
One National Life Drive
Deane C. Davis Bldg., 6th Floor
Montpelier, VT  05620-0501
802-451-9578

---

**From:** O'Neil, Allison [mailto:Allison.ONeil@lockelord.com]
**Sent:** Thursday, August 25, 2016 2:03 PM
**To:** Kessler, John <John.Kessler@vermont.gov>; St. Onge, Walter <Walter.StOnge@lockelord.com>; Moulton, Pat <Pat.Moulton@vermont.gov>; Goldstein, Joan <Joan.Goldstein@vermont.gov>; Leriche, Lucy <Lucy.Leriche@vermont.gov>; Pieciak, Michael <Michael.Pieciak@vermont.gov>; Purinton, Tyler <Tyler.Purinton@vermont.gov>; John W. Kessler - State of Vermont (jk67vt@gmail.com) <jk67vt@gmail.com>; Whitehouse, James <James.Whitehouse@vermont.gov>; Keller, Stanley <Stanley.Keller@lockelord.com>
**Subject:** Final version with attachments

Hi everyone,
Our hand delivery is ready to go.  Attached is the final version with attachments.  Please let me know if you have any changes in the next few minutes.
Thanks,
Allison

**Allison O'Neil**
Partner
**Locke Lord LLP**
617.239.0729 Direct



Atlanta | Austin | Boston | Chicago | Cincinnati | Dallas | Hartford | Hong Kong | Houston | Istanbul | London | Los Angeles | Miami | Morristown | New Orleans | New York | Providence | Sacramento | San Francisco | Stamford | Tokyo | Washington DC | West Palm Beach

For more information visit www.lockelord.com

CONFIDENTIALITY NOTICE:
This e-mail and any attached files from Locke Lord LLP may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this e-mail by accident, please notify the sender immediately and destroy this e-mail and all copies of it. We may scan and or monitor emails sent to and from our servers to ensure regulatory compliance to protect our clients and business.