**CONFIDENTIAL, EXECUTIVE AND ATTORNEY-CLIENT PRIVILEGE**

**DISCUSSION DOCUMENT**

Susan L. Donegan, Commissioner

Vermont Department of Financial Regulation (DFR)

Date: April 11, 201

This discussion document (in anticipation of enforcement, litigation and/or administrative actions) raises examples of potential violations of Vermont securities law in connection with certain EB-5 transactions related to Jay Peak, AnC Bio and Q Burke projects (collectively known as "Jay Peak") currently under financial review and securities investigation by DFR. Evidence points to possible violations under Title 9 of Vermont Statutes Annotated, Vermont Uniform Securities Act (VUSA), including, but not limited to, securities registration and exemption non-compliance, fraud with particularity including material misstatements and omissions, actual conflicts of interest, self-dealing, unjust enrichment, misuse of investor funds, breach of fiduciary duty, breach of contract and tax liability. The principals would be liable for direct liability with other parties subject to liability for aiding and abetting in the advancement of

_____.

Potential consequences for violations of law include restitution, rescission, disgorgement, fines/penalties ($ per), costs, assets frozen, injunctive relief, receivership/conservatorship and other relief requested by the commissioner. Actions may be brought administratively under the Vermont Administrative Procedures Act or in Washington County Superior Court.

The examples in this document are indicative of the type and severity of violations being uncovered by DFR in their analysis of Jay Peak EB-5 properties and projects. Although DFR is in the early stages of its investigation, it has identified accounting irregularities, contractual inconsistencies and significant conflicts of interest that point to potential violations of law.

The following four examples illustrate scenarios relating to Jay Peak Bio Medical Research Park, L.P. (AnC Bio) that DFR has uncovered supporting the decision to halt placing any new investor funds ($500,000 plus $50,000 application fee) at risk until it completes the financial review of that project.

1) <u>Relationship of Jay Construction Management, Inc. and Ariel I. Quiros</u>

The Amended and Restated Private Placement Memorandum states that Jay Peak Bio Medical Research Park, L. P. (the "Limited Partnership") entered into a Design, Procurement and Construction Management Services Agreement dated as of March 15, 2013 with Jay

1

**Exhibit 5**

Construction Management, Inc. ("JCM"), a Vermont corporation owned by Q-Resorts, Inc. (itself a Vermont corporation owned by Ariel Quiros). The agreement designates JCM as an agent of AnC Bio GP Services, LLC (the "General Partner") (the general partner of the Limited Partner whose members consist of Bill Stenger and Ariel Quiros), on behalf of the Limited Partnership, responsible for procuring equipment, intellectual property, licenses, industrial engineering, design/build and other goods and services integral to the project. According to the agreement, JCM is to receive $52,100,000 from the Limited Partnership over the course of the project in order to fulfill this role.

In 2015, Primmer (the project's Vermont law firm) provided the Department with a financial summary ("Financial Summary") highlighting the flow of monies thus far in connection with the AnC Bio Project. The Financial Summary indicates that the Limited Partnership raised $73,500,000 from 147 foreign investors, with $7,000,000 still in escrow. Of the $66,500,000, accessible o the LP, $47,000,000 has been transferred to JCM. Further, the Financial Summary indicates that out of $46,989,691 received by JCM thus far to procure intellectual property and equipment and pay architectural fees, $25,926,887 has been spent for these purposes and the outstanding $21,062,804 remains unspent in an unidentified JCM account. (**See Exhibit A**). Pursuant to the Amended PPM, JCM is still due to receive $4,700,000 from the LP.

The lack of documentation between JCM and AnC Bio Pharm is a concern to the Department. JCM's equipment procurements from AnC Bio Pharm alone totaled $40,000,000; however, counsel to the Project Principals were unable to produce a contract between JCM and AnC Bio Pharm, or any other project entity, for the equipment procurement. The only documentation produced by counsel to the Project Principals is a barebones Proforma Invoice between AnC Bio Pharm and AnC Bio Vt, LLC indicating $40,000,0000 will be paid to AnC Bio Pharm for certain equipment. (**See Exhibit B**). Further, counsel to the Project Principals has been unable to provide a reason for JCM's involvement in the $40,000,000 equipment procurement.

JCM's critical role as an intermediary between the Limited Partnership and project contractors, its access to considerable investor funds, and its status as a related party makes it an entity of particular interest to the Department. David Gordon, the attorney hired by Ariel Quiros to represent him before the U.S. Securities & Exchange Commission, seems to understand the state's concern regarding this final point when he insisted in a November 2014 letter to the Vermont Agency of Commerce and Community Development that "JCM was not a related party when the vast majority of money to it was paid. However, JCM became a related party in or about February 2014" (**See Exhibit C**). The implication of this statement is that Quiros' ownership of JCM (the company that touches over 78% of project money) should not concern state regulators because it did not commence until after most of the money was paid to JCM.

However, documents provided to the Department from the brokerage firm Raymond James (where margin accounts were opened by all Jay Peak projects) demonstrate that this statement is a misrepresentation. In August 2011, former JCM President Jong Weon Choi appointed Ariel Quiros as Power of Attorney for Jay Construction Management, giving Quiros full control over the company's finances. (**See Exhibit D**). Not only was this relationship disclosed to neither investors nor the Department in the project's initial Private Placement Memorandum but the letter from the Limited Partnership's representation suggests the LP made efforts to conceal it.

## 2)   Inconsistency Regarding Payments to Procure Equipment from Anc Bio Pharm

The Financial Summary indicates that JCM has spent approximately $14,500,000 out of a total of $40,000,000 to procure equipment from AnC Bio Pharm. The Department has received conflicting reasons for the partial payment to AnC Bio Pharm.

In a November 24, 2014 letter, David Gordon explains the partial payment is due to "delays in equipment purchases by AnC Bio Pharm, [therefore] JCM has elected to hold back payments due to AnC Bio Pharm temporarily." (**See Exhibit C**).

Contrast that to the March 11, 2015 document entitled "Legal and Business Rationales for Expenditures to Date" from Primmer to the Department that provides the following explanation for the partial payment "[t]he specialized nature of much of the equipment that would outfit the new facility mandated prepayment of substantial deposits before the designer and manufacturer of equipment would begin their work." (**See Exhibit E**).

Last, the explanations from the two law firms are inconsistent with the Proforma Invoice from AnC Bio Pharm to Ariel Quiros / AnC Bio VT LLC regarding the $40,000,000 in equipment. The Proforma Invoice provides that for eighteen months beginning in April 2013 the Project shall pay $1,000,0000 per month as deposits upon equipment to be ordered. Accordingly, under the Proforma Invoice, $9,000,000 should have been paid to AnC Bio Pharm with an additional $9,000,000 paid to AnC Bio Pharm in 2014. However, the Financial Summary indicates that only $500,000 was paid to AnC Bio Pharm in 2013, but over $14,000,000 was paid to AnC Bio Pharm in 2014. Accordingly, the parties actions are not consistent with the terms of their agreement and the explanations provided are in conflict, both with each other and with the actions of the entities.

Again, it is concerning that no formal contract was produced between AnC Bio Pharm and JCM, or any other entity, regarding the $40,000,000 of equipment that might shed light on the entities conflicting statements and actions. Further, Attorney Gordon has not provided any further explanation regarding the equipment delay since him November 24, 2014 letter, if Attorney Gordon's statements are correct, what is the current status of the equipment procurement, if Primmer is correct regarding the $14,500,000 as a down payment, than what

is the delivery time table. These questions remain unanswered while JCM controls approximately $21,000,000 of investor/project money allocated to equipment procurement.

### 3) Payments made to North East Contract Services, LLC

The General Partner, the Project Sponsor and North East Contract Services, LLC ("NECS") entered into an Agreement calling for NECS to procure and supervise certain construction contracts (the "Agreement"). The sole member of NECS is Bill Kelly. Under the Agreement, NECS is entitled to twenty percent (20%) of the value of the contracts procured as a fee for service and reimbursement of expenses ("NECS Compensation"). Under the Agreement, NECS Compensation is to be paid on a "schedule that will coincide with the payments made to all contracted . . . suppliers of products and services. . . " (**See Exhibit F**).

The November 30, 2012 Business Plan indicates approximately $63,000,000 of contracts were needed to be procured to construct the AnC Project Facility. Therefore, NECS is entitled to approximately $9,500,000 in supervision fees (representing 15% of the total of contracts procured) and approximately $3,100,000 in expense reimbursement (representing 5% of the total of contracts procured) (**See Exhibit G**). Accordingly, NECS was entitled to approximately $12,600,000 in fees and expenses, which under the Agreement, payments to NECS were to coincide with payments made to contracted suppliers of products and services.

The Financial Summary indicates that approximately $900,000 has been paid to Peak CM for construction and $14,500,000 has been paid to AnC Bio Pharm for fit out/equipment. (**See Exhibit A**). Accordingly, $15,400,000 out of a total of $63,000,000 has been spent under construction and fit out/equipment constructs. In other words approximately 24.4% of construction related expenses have been paid. Regarding NECS's payments, the Financial Summary indicates NECS has been paid $7,900,000 out of an approximate total of $12,600,000. In other words, NECS has been paid 62.7% of its fees although only 24.4% of payments have been made under contracts it is supervising. This represents an overpayment of approximately $4,800,000 to NESC.

Further, Primmer provided the Department a document entitled "Legal and Business Rationales for Expenditures to Date" that inaccurately provided "approximately $7.9MM out of $12.6MM budgeted and disclosed to investors has been paid to [NECS] *pursuant to the terms of the offering documents and the underlying contractual agreements*" (emphasis added) (**See Exhibit E**).

Further, the November 30, 2012 Private Placement Memorandum did not disclose that NECS had been contracted for construction supervision or was the relationship between Bill Kelly and the Project Principals disclosed.

Finally, it is unexplained as to why the NECS Compensation included the $40,000,000 equipment procurement, while such equipment is actually being procured by JCM.

## 4)  172 Bognor Road Real Estate Transaction

The Department has a number of concerns with the real estate transaction between the Limited Partner and GSI of Dade County, Inc. ("GSI").

i)  Lack of Disclosure Regarding Actual Conflicts of Interest

The real estate sale of 172 Bognor Drive from GSI to the Limited Partnership had an inherent conflict of interest. The General Partner is a limited liability company with two members (i) Bill Stenger and Ariel Quiros, while GSI has one shareholder – Ariel Quiros. Accordingly, Ariel Quiros was negotiating with himself on the land transaction and this fact was not adequately disclosed in the November 30, 2012 Private Placement Memorandum to investors.

ii)  Unsubstantiated Sale Price

GSI purchased 25 acres at 172 Bognor Drive in September 2011 for $3,150,000. In December 2012, GSI sold 7 of those acres to the Limited Partner for $6,000,000. The Private Placement Memorandum did not contain any justification for a $6,000,000 valuation. The Project Principals subsequently had the 7 acres appraised. (**See Exhibit H**). However, the appraisal does not support the valuation of $6,000,000 at the time of the sale to the Limited Partner; instead, the appraisal states that the property will be worth at least $6,000,000 *after* the $30,000,000 of improvements to the property are complete.

iii) Failure to Pass Title

Although the purchase and sale agreement is dated December 12, 2012 and two payments of $3,000,000 each were sent on December 12, 2012 and April 9, 2013 respectively, (**See Exhibit I**) title to the 7 acres at 172 Bognor Drive has not passed from GSI of Dade County, Inc. to the Limited Partnership. (**See Exhibit J**). The Project Principals have not provided an explanation for the failure of GSI of Dade County, Inc. to pass title despite its receipt of the full purchase price. This also raises tax liability questions for Vermont land transfer gains.

**QBURKE PROJECT --- EXECUTIVE PRIVILEGE, ATTY-CLIENT PRIVILEG, CONFIDENTIAL  DFR/4.13.15**

**QUESTION:**

QBurke is, I believe, the only EB5 project statewide to currently be under construction, with a substantial % complete. It also differs from AnC Bio in that it is a tangible/real project; the questions that have arisen in AnC Bio re: whether IP and FDA approvals and corporate relationships are (or ever will be) as represented are not present in the Burke situation, where the project is indeed underway and being built, and the questions center more on $ flow and costs and disclosures of same. How does/how should these distinctions between the projects affect the analysis and treatment?

**DFR ANSWER:**

Yes, there are differences between the AnC Bio and Q Burke projects. However, those differences do not and should not affect the analysis and treatment of QBurke. Three issues jump right out:

First, the project is not substantially complete, it is a 98 million project which has only raised 34 million.

Second, QBurke is not free of conflicts of interest regarding corporate relationships. The QBurke project has inherent conflicts between the general partner (as agent of the limited partnership) and the Resort in the land transaction and the General Partner (as agent to the limited partnership) and the hotel/facilities management company - these conflicts resulted in deals that were great for the project principals and awful for the investors, with minimum disclosure, which is similar to AnC Bio and the other 6 Jay Peak Projects.

Third, at this point, the issue is not project viability (the AnC bio project may very well produce revenue and eventually be successful, we have no idea) it is really about the fact a set of individuals fraudulently induced investment in what we believe to be eight cost-inflated projects for the direct benefit of themselves and to the detriment of the investors (i.e. building a 40 million dollar hotel for 100 million dollars and pocketing the difference).

QBurke cannot be carved out of Jay Peak. The SEC will not see the QBurke project as a standalone project and neither should DFR. The are 8 projects and 13+ various entities involved in the Jay Peak EB-5 initiatives, but there is one person from which every project begins and ends - Ariel Quiros. Bill Stenger, Ary Quiros, Joel Burstien and Bill Kelly have aided and continue to aid the effort. Every project appears to be involved in an array of deceptive practices. Every single additional penny of investor money that moves through the projects will invariably be lost for good. New investors most certainly will not be issued visas as the SEC will act long before the two year job creation period ends.

To look at QBurke from the point of view of saving jobs for current workers of a subcontractor or as a partially built endeavor is problematic. The fact that Burke is being built does not trump DFR's legal job of protecting investors and the State of Vermont, given all we know. Basically, the principals are the problem, and we have no reason to believe that they are behaving differently on Q Burke than they have on all the other projects.

# GENERAL STRATEGY:

How to Handle:

1) MAIN MESSAGE: The State, through the relationship between ACCD and DFR discovered irregularities and have acted upon them.
    a. When we tracked these irregularities we acted.
    b. Because of this relationship, Vermont is a safer investment because of the oversight by both agencies.

2) Be thoughtful in responding and show how much you care that jobs may be potentially lost.

3) Use the general: :"This is very disturbing to hear may be happening. But it was detected due to the relationship between ACCD and DFR. "

4) Use social media tools to tout the many good Vermont EB-5 stories to tell.

5) Stress Vermont's financial oversight (DFR and ACCD) as unparalleled and timely. Vermont is a "safe investment"

6) Be as transparent as we can be, but stick to our strengths – notably oversight works!  Remember Warren Buffet once said: "It takes 20 years to build a reputation and five minutes to ruin it. If you think about that, you'll do things differently."

# EB-5 Talking Points

Vermont EB-5 Regional Center:

1) Today's growing complexity of EB-5 projects require robust regulation and oversight.

2) As the program has grown, the level of oversight has increased, as it should.

3) This growing complexity can be seen in increased SEC surveillance as well as the most recent GAO in-depth look at how USCIS is administering the program.

4) We have stayed on top of and often ahead of USCIS responding to the need to incorporate best practices.

5) In February 2015, the Agency of Commerce & Economic Development (ACCD), responsible for Vermont's EB-5 Regional Center, announced its own independent response to the growing EB-5 market by establishing an oversight partnership with the Department of Financial Regulation (DFR).

6) Why did Vermont do this: because ACCD, a governmental unit of the State of Vermont, is charged with enhancing the Vermont business climate, marketing Vermont to businesses by facilitating, promoting and creating commercial and business opportunities within Vermont to contribute to the economic viability of and benefit the growth of the state.  This is in marked contrast to other for-profit regional centers.

7) Similarly, DFR, a governmental unit of the State of Vermont, is statutorily charged with supervising organizations that offer financial services and products to ensure the solvency, liquidity, stability and efficiency of all such organizations; protecting consumers against certain unfair and unlawful business practices; promoting reasonable and orderly competition; encouraging the development, expansion and availability of financial services and products advantageous to the public welfare; and maintaining close cooperation with other supervisory authorities.

8) This partnership reaffirms Vermont's dedication to first-rate regulation and exceptional oversight of all aspects of financial services.

9) For example, DFR has hired two additional staff members to assist with oversight and compliance of projects affiliated with the Regional Center.

10) EB-5 investors choose Vermont because it offers businesses unique advantages, such as: State oversight; pre-approval of projects; quarterly project reviews to monitor development progress; and, a long and credible track-record of success.

11) Equally important, Vermont's EB-5 programs has helped create jobs in some of most needy parts of the state, Northeast Kingdom, Windsor, Vergennes, Waitsfield, Dover, and more.

12) Since 2008, the EB-5 Immigrant Investor program has successfully stimulated the US economy through capital investments by foreign investors to create jobs.  In FY 2014, 10,928 EB-5 petitions were filed with the USCIS, 5,155 approved, and 12,453 pending, which translates to over 2.5B approved investment and an additional 6.2B in capital awaiting federal adjudication.  FY 2015 pace is expected to exceed that of 2014.

13) We have X I-526's approved and Y I-829's.
    a. We are not able to divulge the #'s of investors at individual projects.  We publish aggregate information only, on all EB5 projects.

14) If asked: We are actively monitoring all projects. Quarterly visits. Quarterly and weekly reports.
    a. We follow up on complaints appropriate to ACCD.  If there are questions about fraud or related to the PPM, we forward to DFR and/or encourage the person to file a formal complaint if appropriate.
    b. At present we are not investigating other projects because we do not see any indications of issues. No investor complaints and no irregularities in the projects that cause us any concern.
    c. Not at liberty to discuss evidence of irregularities projects due to pending mitigation.

15) Every new project is going thru an ACCD initial vetting then DFR review of PPM's
    a. **If asked**: We review the business plan, ask for 3rd party marketing study to back up assumptions. Review the principals and their background. Assure they are fully able to undertake the project in question. If it passes our initial review, we ask them to produce a PPM for DFR review. We collaborate with DFR on whether or not to approve.
    b. Yes, we have projects in the hopper. Not at liberty to discuss as we are still negotiating with them. Will discuss when we have a signed MOU.

### Specific to the RC:

16) We at the State of Vermont Regional Center are deeply dismayed that this has happened.

17) EB-5 program is a very useful and helpful economic development tool: especially in Vermont and the rural areas. And we understood the need for strong oversight.

18) We are in the unique position to have the Dept of Finance and Regulation investigate claims of misdeeds and proceed accordingly as they have in this case.

19) We will not tolerate actions that put the program at risk of not realizing the end goal: economic development.

20) We have other projects that are complying with our oversight. We are committed to continue to promote this regional center and eb5 projects within the state.

21) Job creation continues to be the key goal of the investments. This program has enabled tremendous opportunity for VT and elsewhere and as such the state will continue to promote this program for its enormous economic impact to the state. (See significant stats.)

22) The state cannot fully insure nor guaranty that the project developers will act in good faith or be assured of success. But we can and have stepped up surveillance and monitoring of current projects and going forward.

23) We cannot discuss ongoing federal and state 'litigation'?

USAO EXEC

00032827

AUTHOR : CANON
IR-ADV-C7270

To: Susan Donegan

From: Dave Cassetty

Re: EB-5 Litigation Management

Date: June 22, 201

**Potential Scenarios**

There are 3 potential scenarios: one in which the SEC files a comprehensive action, including asset freezes and receivership, as a result of which our action is stayed; one where the SEC files such an action, but ours is not stayed; and one in which the SEC does not file, or files an action without seeking receivership or injunctive relief, in which ours is not stayed.

1.      If the SEC takes comprehensive action, including seeking preliminary injunctive relief, the more likely outcome is that our action will be stayed pending the resolution of their action. This avoids duplication of effort by the courts, as well as potential waste of project assets in redundant litigation. Were this scenario to occur, there would be very little for us to manage, and our task would be to monitor the progress of the other action. Were there any unresolved issues at the conclusion of that action, we would then address those in our action.

2.      Were the SEC to take a comprehensive approach, including preliminary injunctive relief, but our action was not stayed, then we would litigate both cases simultaneously. While not likely, this scenario could occur. For the sake of efficiency, we would likely coordinate discovery with their case, in order to reduce duplication of effort and to ensure comprehensive results. One significant difference between the actions will be that federal civil procedure requires initial disclosures, prior to the start of discovery; however, we could tailor our initial requests to mirror the initial disclosure requirements of federal court, should we choose, to keep the actions on similar footing. Were this scenario to occur, we would be investing more attorney (and staff) time into the action, but certainly within our capacity. Motion practice, discovery and document management would take the most resources, and these are tasks for which we are prepared.

3.      Finally, if we are faced with the unlikely scenario where the SEC does not seek preliminary injunctive relief, or does not take any action at all, we have the authority to seek a freeze on the financial accounts and to request a receiver be appointed. Depending on resources, we could choose not to seek a receivor and only seek to freeze financial accounts. This could result in a bankruptcy filing (or filings), which would then stay our action under the bankruptcy code's automatic stay provision.

**Resources Needed**

1.      Under the first scenario, few resources would be needed. The complaint is drafted already, and it is likely that we would not have to litigate anything beyond a motion to dismiss prior to the action being stayed. This scenario could be staffed by myself and one attorney, with another attorney as backup if needed.

2.      The second scenario would not require much more than the first in resources.  In this instance, the backup attorney would be brought in to participate actively, but three attorneys should be sufficient.  We would call on staff, especially from the Securities Division, to help respond to discovery and to discuss technical questions, as well.

The litigation would be more intensive in motion practice, but we have the experience to manage such litigation.  I have tried several dozen cases to verdicts, have litigated over 120 appeals, and have participated in litigating probably two hundred other cases.  As a partner in a litigation firm, I also supervised associates in litigation routinely.  The two attorneys assigned to this litigation are both very talented writers, researchers and will be able to acquit themselves well in this case.  It is likely that I will argue any hearings we have, although there might be opportunities to get them some experience before the court in this case.

3.      Under the third scenario, considerable resources might be required.  The same 3 attorneys would be assigned, but in addition to the foregoing matters, we would need to litigate the preliminary injunctive relief.  The motion is currently being drafted, and would be ready by the time we file.  However, the evidentiary hearing for this would require considerable preparation time, and include much of the Securities staff as well as the attorneys.  We have identified most of the financial accounts at issue, for seeking a freeze, and can move to include others as we learn of them.  If we include a receivership, it is likely that we would have to bear that cost.  While our business manager informs me that Securities has considerable funds available from their intake, this would ultimately come out of the amount we remit to the General Fund.

While the Department has considerable experience running receiverships, normally we fund them out of the receivership's estate.  Accordingly, this case would present an extra expense to the Department (and ultimately, the General Fund).  So while this case would not present the extraordinary expense of the Ambassador Insurance receivership, in that instance Ambassador has funded the cost itself.  It is possible that we could request the court order us to be reimbursed these expenses, as taxable costs upon a successful conclusion, but the Department would need to bear the costs initially at least.

**From:** London, Sarah [Sarah.London@vermont.gov]
**Sent:** Friday, October 09, 2015 4:39 PM
**To:** Miller, Lawrence
**Subject:** Fwd: Current Employee Emails

The AGO-recommended search terms are below.

Sent from my iPad

Begin forwarded message:

> **From:** "Kline, Scot" <scot.kline@vermont.gov>
> **Date:** October 9, 2015 at 4:12:09 PM EDT
> **To:** "London, Sarah" <Sarah.London@vermont.gov>
> **Cc:** "Salembier, Shannon" <Shannon.Salembier@vermont.gov>
> **Subject:** FW: Current Employee Emails

Sarah:

Per your message that your office will facilitate the search of Lawrence Miller's electronic files, I am forwarding the email from Shannon with the requested search terms for his email and text messages.  Please call Shannon or me if you have any questions.

Thanks.

Scot

**From:** Salembier, Shannon
**Sent:** Friday, October 09, 2015 3:47 PM
**To:** Moulton, Pat; Goldstein, Joan; Fullam, Eugene; Kessler, John
**Cc:** Kline, Scot
**Subject:** Current Employee Emails

PRIVILEGED & CONFIDENTIAL

Hi Everyone,

Thank you so much for getting me ACCD's physical and electronic records so quickly.  The next step in this process is emails.  I know the volume of email is quite large, so we are trying to make this process as painless as possible.

We need all emails from <u>January 1, 2006 to the present</u> for every current employee at ACCD who may have emails relating to any of the search terms below. I am aware of the following employees, but please let me know if you think I've missed someone:

Pat Moulton
Joan Goldstein
Eugene Fullam
John Kessler

In order to prevent you from having to scroll through thousands of emails, we've come up with "categories" of emails based on the email's sender, recipient, and keywords. Our hope is that you will be able to search for all emails to and from William Stenger (for example), and drag the entire lot into a folder without having to review them. Please make sure to place each employees' emails into a separate, identifiable folder, with subfolders for each "category." We need the following emails:

All emails in which the sender or recipient is:
- William Stenger
- Ariel Quiros
- William Kelly
- Alex MacLean
- Primmer attorneys representing Jay Peak (Gary Karnedy, Ralphine O'Rourke, Mark Scribner)
- Joel Burstein
- Jong Weon Choi
- Fred Burgess
- Okcha Quiros
- Ary Quiros
- Louis Ruggiero
- Nicole Quiros
- Mark Bertolini
- Robert Chimileski

All emails containing the following keywords/phrases:
- Jay Peak and variations thereof (JP, Jay, etc.)
- ANC Bio and variations thereof (ANCbio, ANC, etc.)
- Penthouse suites
- Golf and mountain suites
- Lodge and Townhouses
- Stateside
- Q Burke
- Burke
- Biomedical research park
- Mont St. Sauveur International
- GSI of Dade County, Inc. (GSI)
- Raymond James
- Q Resorts

- Jay Construction Management (JCM)
- North East Contract Services (NECS)

Please do not hesitate to contact me with questions or concerns.  If you believe that I have missed critical senders/recipients or search terms, please let me know.  Additionally, please let me know if there are issues with retrieving emails dating back to 2006.  Ideally, I would like to pick up a thumb drive containing the emails by early next week, but let me know if that timeline is not feasible.

Thank you and have a great weekend.

Shannon

Shannon Salembier
Assistant Attorney General
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
Shannon.Salembier@Vermont.gov
(802) 828-5621

**From:** Cassetty, Dave [Dave.Cassetty@vermont.gov]
**Sent:** Friday, October 16, 2015 8:39 AM
**To:** London, Sarah
**Subject:** Draft Complaint 10 1 15 ATTORNEY CLIENT AND WORK PRODUCT PRIVILEGES
**Attachments:** Draft Complaint 10 1 15.pdf


Here is the most recent draft, although an army of people at AGO have been working on proposed changes, so it won't look like this for long.

CONFIDENTIAL ATTORNEY WORK PRODUCT

**STATE OF VERMONT**
**WASHINGTON COUNTY, SS**

| | |
|---|---|
| **SUSAN DONEGAN, IN HER** | ) |
| **OFFICIAL CAPACITY AS** | ) |
| **COMMISSIONER OF THE** | ) |
| **VERMONT DEPARTMENT OF** | ) |
| **FINANCIAL REGULATION,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )   **Washington County** |
| | )   **Docket No.** _____ |
| Ariel Quiros; William Stenger; | ) |
| William Kelly; Jay Peak Hotel Suites L.P.; | ) |
| Jay Peak Hotel Suites Phase II L.P.; | ) |
| Jay Peak Penthouse Suites L.P.; Jay Peak | ) |
| Golf and Mountain Suites L.P.; Jay Peak | ) |
| Lodge and Townhouses L.P.; Jay Peak | ) |
| Suites Stateside L.P.; Q Burke Mountain | ) |
| Resort, Hotel and Conference Center, L.P.; | ) |
| Jay Peak Biomedical Research Park, L.P. | ) |
| | ) |
| | ) |
|     **Defendants.** | ) |

> **Commented [EGK1]:** Re-caption with updated WC Civ Div caption

## COMPLAINT

Susan Donegan, in her official capacity as Commissioner of the Vermont Department of

Financial Regulation (the "Commissioner"), makes the following complaint against Ariel

Quiros; William Stenger; William Kelly; Jay Peak Hotel Suites L.P.; Jay Peak Hotel Suites

Phase II L.P.; Jay Peak Penthouse Suites L.P.; Jay Peak Golf and Mountain Suites L.P.l Jay Peak

Lodge and Townhouses L.P.; Jay Peak Suites Stateside L.P.; Q Burke Mountain Resort, Hotel

and Conference Center, L.P.; and Jay Peak Biomedical Research Park, L.P. (collectively,

"Defendants") for multiple violations of the Vermont Uniform Securities Act ("VUSA"),

Chapter 150 of Title 9, Vermont Statutes Annotated:

## SUMMARY

1

CONFIDENTIAL ATTORNEY WORK PRODUCT

1. Since 2008, Defendants Ariel Quiros ("Quiros") and William Stenger ("Stenger") have orchestrated a large scale investment scheme to defraud investors participating in the "EB-5 Program," a federal visa initiative designed to give foreign investors a legal path to obtain U.S. ~~S~~nited States residency. To date, Defendants have fraudulently solicited and raised at least $~~X~~ 402,500,000 ~~million~~ ~~through their sale of securities~~and to X investors and collected ~~at least $X~~ $40,250,000 ~~million~~ in additional fees. Defendants continue to solicit and raise investment funds for two ongoing EB-5 Projects.

   [Commented [EGK2]: Fill in]

2. Most of the direct victims of this fraud are foreign nationals seeking residency in the United States. Defendants solicited the investments, and claimed that funds would finance and build certain investment projects located within the Vermont Agency of Commerce and Community Development Regional Center ("Jay Peak EB-5 Projects"). The investments took the form of unregistered limited partnership interests (the "securities") offered in eight private placement memoranda ("PPMs"), all of which contained materially false and misleading statements and omissions of material facts. Defendants have convinced over 805 investors to wire a minimum of $500,000 apiece plus a $50,000 "administrative fee" to U.S. bank accounts for the eight projects.

3. However, rather than use the money solely for the projects and purposes for which it was purportedly raised, Defendants treated investor funds as an unrestricted pool of funds that could be spent between projects indiscriminately and used as a personal piggy bank. Using a complex web of financial accounts, Defendants have improperly commingled funds between EB-5 projects,

   [Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.75" + Indent at: 1"]

CONFIDENTIAL ATTORNEY WORK PRODUCT

~~misappropriated~~ millions in investor funds to enrich themselves, ~~misappropriated~~

~~investor funds for use in EB-5 projects unrelated to the project for which the~~

~~funds were specifically raised~~ used newly-raised investor funds to backfill

funding gaps from previous projects and to pay existing investors, and diverted

money to various corporate entities a number of self-interested transactions.

3.  ~~The PPMs made materially false and misleading statements and omissions of~~

~~material facts to solicit investors for the Jay Peak EB-5 projects.~~

4.  At all times material to this action, Quiros and/or Stenger controlled and made all

investment and expenditure decisions with respect to investor funds raised

through the Jay Peak EB-5 Projects.                       **Commented [EGK3]:** Move?

5.  By the conduct described herein, Defendants have violated the anti-fraud and

registration provisions of the VUSA. Through this action, the Commissioner

seeks to protect the interests of current and future investors, and requests

injunctive relief, an asset freeze and appointment of a receiver or conservator,

civil penalties, costs, and other appropriate relief.

## PARTIES

6.  Plaintiff is the Commissioner of a state agency charged with, *inter alia*, the

administration and enforcement of the securities laws of the State of Vermont.

7.  Defendant Ariel Quiros ("Quiros") is a resident of the State of Florida. Quiros

also maintains a residence in the State of Vermont.

8.  Defendant William Stenger ("Stenger") is a resident of the State of Vermont.

9.  Defendant William Kelly is a business associate of Quiros, and purportedly

counsel and/or advisor to Quiros and the Jay Peak Resort, AnC Bio VT LLC, and

3

CONFIDENTIAL ATTORNEY WORK PRODUCT

other entities affiliated with Quiros.  Kelly is a resident of the State of Florida and also maintains a residence in the State of Vermont.

10. Defendant Jay Peak Hotel Suites L.P. ("Phase I Limited Partnership") is a Vermont limited partnership.

11. Defendant Jay Peak Hotel Suites Phase II L.P. ("Phase II Limited Partnership") is a Vermont limited partnership.

12. Defendant Jay Peak Penthouse Suites L.P. ("Penthouse Suites Limited Partnership") is a Vermont limited partnership.

13. Defendant Jay Peak Golf and Mountain Suites L.P. ("Golf and Mountain Limited Partnership") is a Vermont limited partnership.

14. Defendant Jay Peak Lodge and Townhouses L.P. ("Lodge and Townhouses Limited Partnership") is a Vermont limited partnership.

15. Defendant Jay Peak Suites Stateside L.P. ("Stateside Limited Partnership") is a Vermont limited partnership.

16. Defendant Q Burke Mountain Resort, Hotel and Conference Center, L.P. ("Q Burke Limited Partnership") is a Vermont limited partnership.

17. Defendant Jay Peak Biomedical Research Park, L.P. ("ANC Bio Limited Partnership") is a Vermont limited partnership.

<u>RELATED PARTIES</u>

18. Ary Quiros is the son of Defendant Ariel Quiros, and the President and CEO of Q Burke Mountain. He is a resident of the State of Vermont.

> **Commented [EGK4]:** Which entity? Yes of Burke Mtn Operating Co in VT, but Burke Mtn Resort LLC in FL. shows Ariel.

CONFIDENTIAL ATTORNEY WORK PRODUCT

19. Joel Burnstein ("Burnstein") is a Florida resident and served as the account broker for Raymond James accounts associated with Quiros and the Jay Peak EB-5 projects. Burnstein is the former son in law of Quiros.

20. AnC Bio VT LLC ("ANC Bio Project Sponsor") is a Vermont Member-Managed Limited Liability Company whose members include Ariel Quiros and William Stenger.

21. AnC Bio Vermont GP Services, LLC ("ANC Bio General Partner") is a Vermont Member-Managed Limited Liability Company and agent of Jay Peak Limited Partnership whose members include Ariel Quiros and William Stenger.

22. Q Burke Mountain Resort GP Services, LLC ("Q Burke General Partner") is a Vermont Member-Managed Limited Liability Company and agent of Q Burke Limited Partnership whose members include Ariel Quiros and William Stenger.

23. Q Resorts, Inc. ("Q Resorts") is a Delaware corporation with a principal place of business in Florida. Ariel Quiros is the President, Shareholder, Treasurer, and Director of Q Resorts.  Q Resorts owns and operates two ski resorts in Vermont.

24. G.S.I. of Dade County, Inc. ("GSI") is a Florida corporation. Quiros is the President, Shareholder, Treasurer and Director of GSI.  GSI has purchased and sold land in Vermont in connection with the AnC Bio EB-5 project.

25. Jay Construction Management, Inc. ("JCM") is a Vermont corporation with a principal place of business in Florida.  Ariel Quiros is the President, Shareholder, Treasurer, and Director of JCM.

> **Commented [EGK5]:** Add paragraph for all GPs

CONFIDENTIAL ATTORNEY WORK PRODUCT

26. North East Contract Services, LLC ("NECS") is a Florida Limited Liability Company. Defendant Kelly is the managing member of NECS. NECS has contracted to provide services to the AnC Bio EB-5 project in Vermont.

### JURISDICTION AND VENUE

27. The Commissioner brings this action under the authority conferred upon her to enforce compliance with the VUSA by 9 V.S.A. § 5603(a).

28. The limited partnership interests offered and sold by Respondents are "securities," as defined in 9 V.S.A. § 5102(28).

29. The Washington Superior Court has jurisdiction over this action pursuant to 9 V.S.A. § 5603(a).

30. The Court has jurisdiction over the Defendants because the Defendants have engaged in the offering and sale of securities in Vermont.

   a. Investors are instructed to send their executed subscription agreements to an address within the State of Vermont.

   b. Investors are instructed to wire or mail their investment to a financial institution located within the State of Vermont.

   c. The EB-5 Projects are located in the State of Vermont.

   d. The originating issuers of the limited partnership interests offered in each PPM are located in the State of Vermont.

31. The Court has personal jurisdiction over Defendants named herein because each Defendant is an individual or entity that resides in, is formed under the laws of, conducts business in, has substantial and intentional business contacts with, and/or maintains operations in, the State of Vermont.

CONFIDENTIAL ATTORNEY WORK PRODUCT

<u>FACTS</u>

**Background**

*EB-5 Immigrant Investor Visa Program*

32. Congress created the employment-based fifth preference immigrant visa category ("EB-5 Program") for immigrant investors in 1990.

> **Commented [EGK6]:** Do we want to add that misuse funds put investor immigration status at risk?

33. The EB-5 Program is administered by the Department of Homeland Security's United States Citizenship and Immigration Services ("USCIS"). It provides that foreign nationals may qualify for a green card if the individuals invest $1,000,000 (or at least $500,000 in a "Targeted Employment Area," essentially an area that is rural or has high unemployment) in commercial enterprises in the United States, and that investment creates or preserves a certain number of full-time jobs for U.S. workers.

34. Through the EB-5 Program, cities, states, and other entities may apply to USCIS for approval as a "Regional Center," which then allows the entity to affiliate with or create "new commercial enterprises" that can accept investments from foreign nationals.

35. The State of Vermont Agency of Commerce and Community Development ("ACCD") was initially approved and designated as an EB-5 regional center by the United States Immigration and Naturalization Service in 1997. USCIS reaffirmed this approval, with amendments, in 2007, and again in 2009. The purpose of the ACCD Regional Center is to attract immigrant investor capital into the State of Vermont.

*Jay Peak Background and acquisition by Q-Resorts*

7

CONFIDENTIAL ATTORNEY WORK PRODUCT

36. Jay Peak, Inc. ("Jay Peak") was incorporated in 1955 and has operated the Jay
    Peak Resort (the "Resort"), located in Jay, Vermont, since 1957. The Resort is a
    four season resort with dining and lodging facilities, ski and snowboarding trails,
    an indoor waterpark, a golf course, and other amenities.

37. Mont St. Sauveur International Inc. ("MSSI"), a ski resort company based in St.-
    Sauveur, Quebec, purchased the Resort in 1978.

38. MSSI sold the Resort to Q Resorts on or about June 23, 2008 ("2008 sale") for
    approximately $24,000,000.

39. At the time of the 2008 sale, Ariel Quiros was a homeowner at the Resort, and
    Bill Stenger was the President and Chief Executive Officer of the Resort. Stenger
    continued in these roles after the sale.

40. At the time of the 2008 sale, two EB-5 projects were underway at the Resort that
    were initiated by MSSI and Stenger. The first project involved the construction of
    a 57-unit hotel ("Phase I"). Jay Peak raised approximately $17,500,000 from 35
    EB-5 investors for the development and construction of Phase I. The second
    project involved the construction of a 120-unit hotel ("Phase II"). Jay Peak raised
    approximately $75,000,000 from 146 EB-5 investors for the development and
    construction of Phase II.

41. The 2008 sale included the transfer of the ongoing Phase I and Phase II Jay Peak
    EB-5 Projects from MSSI to Q Resorts.

42. Approximately $11,000,000 in investor money raised for Phase I, and $7,000,000
    in investor money raised for Phase II, remained available to the respective
    projects at the time of the 2008 sale. In connection with the 2008 sale, MSSI

8

CONFIDENTIAL ATTORNEY WORK PRODUCT

transferred the remaining funds to accounts held at Raymond James Financial, Inc. ("Phase I account" and "Phase II account") at Quiros's request on or about June 16, 2008.

43. MSSI representatives communicated to Quiros and others prior to the transfer of investor funds to the Phase I account and Phase II account that the investor funds could not be used to purchase, or as collateral for purchase, the Resort. However, Quiros nonetheless proceeded to use the investor funds to purchase the Resort for himself.

44. On or about June 23, 2008, Quiros instructed Burnstein to retitle the Phase I and Phase II accounts to Q-Resorts. On June 23, 2008, Stenger transferred $7,600,000 from the Phase I account, and transferred $6,000,000 from the Phase II account, to a Q Resorts account held at Raymond James ("Q Resorts Account"), for a total of $13,600,000 in investor funds deposited into the Q Resorts account.

45. On that same day, June 23, 2008, Quiros transferred $13,544,346 from the Q Resorts Account to an agent for MSSI.

46. The $13,544,346 transfer was partial payment to MSSI for the purchase of the Resort, and it consisted entirely of EB-5 investor funds.

47. The Q Resorts Account had a $0.00 balance prior to the June 23, 2008, deposit of the investor funds, and it received no other deposits prior to the transfer of the $13,544,346 to MSSI.

48. The Phase I and Phase II PPMs both specify the purposes for which investor funds will be used. Neither PPM identifies the purchase of the Resort as a purpose for which investor funds will be used.

9

CONFIDENTIAL ATTORNEY WORK PRODUCT

49. Although the entirety or a substantial portion of the purchase price for the Resort was paid using Phase I and Phase II investor funds, the investors were never informed of the use of their funds for the purchase and did not receive any ownership interests in the Resort. Instead, Quiros, through Q Resorts, obtained and retains ownership of the Resort.

Formatted: Indent: Left: 1", No bullets or numbering

42.

*Jay Peak EB-5 Projects*

43. 50.    Following Q Resort's acquisition of the Resort in 2008, Quiros and Stenger initiated six additional EB-5 projects through the AACD ACCD Regional Center that were/are financed through project-specific PPMs that outline how proceeds will be used.:

   a.  Jay Peak Penthouse Suites ("Penthouse Suites"), a completed real estate project initiated in [X year] by Quiros and Stenger, through the Penthouse Suites Limited Partnership, and completed in X, that raised $33,000,000 from 66 investors.

   b.  Jay Peak Golf & Mountain Suites ("Golf & Mountain")s, a completed real estate project initiated in [X year] by Quiros and Stenger, through the Golf and Mountain Limited Partnership, and completed in X, that raised $45,000,000 from 90 investors.

   c.  Jay Peak Lodge and Townhouses ("Lodge and Townhouses"), a completed real estate project initiated in [X year] by Quiros and Stenger, through the

10

CONFIDENTIAL ATTORNEY WORK PRODUCT

Lodge and Townhouses Limited Partnership, ~~and completed in X~~, that raised
$44,000,000 from 88 investors.

d.  Jay Peak Stateside ("Stateside"), a fully-subscribed real estate project initiated
~~in [X year]~~ by Quiros and Stenger, through the Stateside Limited Partnership,
that is currently under construction and raised $66,500,000 from 133
investors. It has $32,000,000 in outstanding construction obligations.

e.  Jay Peak Biomedical Research Park ("ANC Bio"), a biomedical project
initiated by Quiros and Stenger ~~in [X year]~~, through the ANC Bio Limited
Partnership, that is under development. To date, the project has raised at least
$73,500,000 from 147 investors, and seeks to raise an additional $36,500,000
for a total offering of $~~X~~110,000,000.

Commented [EGK7]: Update numbers

f.  Q Burke Mountain Resort, Hotel and Conference Center ("Q Burke"), a real
estate project initiated by Quiros and Stenger in 2013, through the Q Burke
Limited Partnership, that is currently under construction. To date, the project
has raised at least $17,500,000 from 35 investors, and seeks to raise an
additional $80,500,000 for a total offering of $98,000,000.

Commented [EGK8]: Update numbers

51. Each PPM offers to sell limited partnership interests in Limited Partnerships
formed to invest in specific EB-5 projects. Each Limited Partnership and EB-5
project was created, and is operated and ultimately controlled by, a General
Partner. Stenger is the President of the General Partners of the Phase I, Phase II,
Penthouse Suites, Golf and Mountain, Lodge and Townhouses, and Stateside
Limited Partnerships. Quiros and Stenger are the sole members of the General
Partners of the ANC Bio and Q Burke Limited Partnerships.

CONFIDENTIAL ATTORNEY WORK PRODUCT

44 52.   Stenger and Quiros each had a duty to ensure that the PPMs were accurate and updated as necessary, and that funds were spent in accordance with the PPMs.

> **Commented [EGK9]:** May want to expand on this fiduciary role.

53. Each PPM offering requires a minimum capital contribution of $500,000 to purchase a limited partnership interest in a Jay Peak EB-5 Project (as required by USCIS and explained in paragraph X), plus a nonrefundable payment of $50,000 in administrative fees, for a total minimum subscription price of $550,000 for each investor.

54. Each PPM should have fully disclosed all conflicts of interest and the principals' personal and/or familial interests in any contract entered into or expenditure made using investor funds.

45.

> **Formatted:** Indent: Left:  1",  No bullets or numbering

55. Each PPM sets forth specific representations regarding the purposes for which investor funds will be used, and any deviation from those specific representations should have been fully disclosed to investors.

46.

> **Formatted:** Indent: Left:  1",  No bullets or numbering

*Overview of Financial Accounts*

47 56.   Quiros and Stenger set up a complex web of financial accounts to further their scheme to divert funds and defraud investors. Investor money was frequently funneled through multiple accounts for no disclosed, legitimate purpose. Investor money flowed through at least 91 financial accounts at multiple financial institutions, and between at least 26 entities.

CONFIDENTIAL ATTORNEY WORK PRODUCT

48. 57.     The PPMs instruct ~~Investors~~ investors ~~were instructed~~ to wire or mail their

investments to project-specific accounts held at People's United Bank in Vermont

and controlled by Bill Stenger.

49. 58.     After an initial waiting period, investor funds were moved by Stenger

from the People's United Bank project accounts to brokerage accounts held at

Raymond James in Miami. The Raymond James accounts consisted of project

specific accounts, and other accounts held individually by project principals or

entities associated with the project principals. Quiros and Stenger used Burnstein

as the broker for the Raymond James accounts.

50. 59.     Once the investor funds were transferred into a Raymond James brokerage

account, the principals, through Burnstein, used the funds to purchase U.S.

Treasury bills.

60.  The U.S. Treasury bills were then used to secure a two Raymond James revolving

margin loans ("margin loans"). A cross collateralization agreement covered all

Raymond James accounts, which allowed the principals to operate accounts

without other assets or income to incur margin loans and transfer the proceeds to

various other accounts. The use of margin loans, which was never disclosed to

any of the investors, served no legitimate purpose other than to enable Defendants

in their scheme to defraud investors. Defendants used over $2,000,000 in investor

money to pay for interest and fees associated with the margin accounts.                    **Commented [EGK10]:** More detail re: margin logistics

51. 61.     **Add paragraph to account for banking logistics after RJ account**          **Formatted:** Font: Bold

**closure**                                                                              **Commented [EGK11]:** NB: add here

                                                                                         **Formatted:** Font: Bold
                                                                                         **Formatted:** Font: Bold
                                                                                         **Formatted:** Font: Bold

CONFIDENTIAL ATTORNEY WORK PRODUCT

**Defendants' ~~Misappropriation~~ Misuse of Investor Funds**

*Property and Personal Purchases using Investor Funds*

~~52. Defendant Quiros has misappropriated at least X million dollars in investor funds to purchase properties.~~

~~53.~~62.  As described in Paragraph X, above, ~~Defendant~~ Quiros used approximately $13,544,346 of Phase I and II investor funds to purchase the Jay Peak Resort for himself. ~~Approximately $11,000,000 in investor money raised for Phase I, and $7,000,000 in investor money raised for Phase II, remained available to the respective projects at the time of the 2008 sale. In connection with the 2008 sale, MSSI transferred the remaining funds to accounts held at Raymond James Financial, Inc. ("Phase I account" and "Phase II account") at Quiros's request on or about June 16, 2008. MSSI representatives communicated to Quiros and others prior to the transfer of investor funds to the Phase I account and Phase II account that the investor funds could not be used to purchase, or as collateral for purchase, the Resort. However, Quiros proceeded to use the investor funds to purchase the Resort. On or about June 23, 2008, Quiros instructed Burnstein to retitle the Phase I and Phase II accounts to Q-Resorts. On June 23, 2008, Stenger transferred $7,600,000 from the Phase I account, and transferred $6,000,000 from the Phase II account, to a Q Resorts account held at Raymond James ("Q Resorts Account"), for a total of $13,600,000 in investor funds deposited into the Q Resorts account. On that same day, June 23, 2008, Quiros transferred $13,544,346 from the Q Resorts Account to an agent for MSSI as partial payment for Resort. The $13,544,346 transfer consisted entirely of investor funds.~~

CONFIDENTIAL ATTORNEY WORK PRODUCT

54.63.    ~~Defendant~~ Quiros used investor funds to purchase the Burke Mountain

Resort for himself. In 2012, Q Burke Mountain Resort, LLC (a company owned

by Quiros) purchased approximately 1,211 acres of land at Burke Mountain

Resort in East Burke, Vermont for approximately $6,000,000.00. On or about    <span style="float:right">**Commented [EGK12]:** Confirm purchase price.</span>

May 31, 2012, Quiros directed that $7,000,000.00 from the Jay Peak Inc. margin

loan account be paid to an agent for the seller of the Resort. All margin loan funds

from that account were collateralized by, and eventually repaid with, investor

funds from various projects. Quiros later sold a 3.797 acre portion of the 1,211

acre parcel to the Q Burke Limited Partnership for the Q Burke project in 2014

for $2,470,000.00. Through this series of actions, Quiros used investor funds to

purchase the Burke Resort for himself, and then improperly profited again at the

expense of investors by selling a small portion of the Burke Resort to investors at

a substantial markup that is not justified by any appraisal.

55.64.    Quiros used investor funds to purchase land for himself that would later

become the site of the AnCBio project. On September 16, 2011, Quiros, through

GSI, purchased 25 acres at 172 Bogner Drive, Newport, Vermont, for

$3,1500,000. Beginning on September 14, 2011, Quiros directed a series of

transfers between financial accounts that shifted approximately $2,344,450.50

from the Q Resorts Raymond James account, through the GSI Raymond James

account, and on to an agent for the sellers. Upon information and belief, the

$2,344,450.50 consisted of investor funds. Quiros then further profited at the

expense of investors by selling 7 of the 25 acres to the ANC Bio Limited

CONFIDENTIAL ATTORNEY WORK PRODUCT

Partnership in December 2012 for $6,000,000, which is a significant markup that is not supported by any appraisal.

~~56.~~65.      In December, 2011, Quiros used $3,816,000 in investor funds to purchase a condominium at 400 Fifth Avenue in New York City. The funds were sourced from the Q-Resorts Raymond James account and then funneled through the GSI Raymond James account to a Raymond James account held by Quiros and his wife ~~Okeha~~, and then on to an agent for the seller.

~~57.~~66.      In December 2012, Quiros used $431,240.83 in investor funds to purchase a home and property at 4452 Darling Hill Road in Burke, Vermont. The funds were sourced from the Q-Resorts Raymond James account and then funneled through the GSI Raymond James account to a Raymond James account held by Quiros and his wife ~~Okeha~~, and then on to an agent for the seller.

~~58.~~67.      In July 2013, Quiros used $2,438,500 in investor funds to purchase a condominium at 220 Riverside Boulevard in New York City (also known as "Trump Place New York"). The funds were sourced from the Q-Resorts and the GSI Raymond James accounts.

~~59.~~68.      Quiros has ~~improperly used~~ misappropriated investor funds for numerous other examples of personal enrichment, including: purchase of a 1997 Range Rover Defender for ~~$69,452~~57,952; purchase of a 2013 Range Rover for $68,032; purchase of ~~an excavator for $67,000~~a 2012 single-engine airplane for $163,515.38; purchase of a 1942 Ford GPW for $17,500; ~~payments of $1,896.71 per month for a leased~~lease payments for a Porsche totaling at least $36,000; | Commented [EGK13]: For how long/total? |
attorney's fees, including $47,500 on a divorce attorney; condominium

16

CONFIDENTIAL ATTORNEY WORK PRODUCT

association and parking fees totaling over $150,000; credit card payments, including over $157,859 on American Express payments and over $23,500 on Capital One payments; $1,100,000429,500,000 to purchase the Tango Grill Restaurant in Miami, Florida; and at least $1,401,482.50 to purchase the properties in Newport, Vermont known as the "Renaissance Block."

*Use of Investor Funds for Improper ~~Payments~~Purposes*

60.69.  Defendants used investor funds to pay for Jay Peak Resort cash flow needs and for Resort Projects that were unaffiliated with EB-5 projects.

70. Defendants commingled investor funds and utilized a single margin loan to pay for ongoing EB-5 project expenditures using available funds raised from any project, even if the expenditure was entirely unrelated to the project for which the money had been pledged.

61.71.  Defendants accumulated margin loan debt and fee obligations in excess of loan repayments, and created a budget gap that Defendants have tried to backfill with funds raised from successive project offerings. To date, construction obligations exceed available funds and fundraising potential by over $59,000,000.

62.72.  Defendants used approximately $21 million in ANC Bio investor funds to pay off the outstanding margin loan debt in response to a Raymond James margin call for the margin loan account in March 2014. No amount of the margin loan debt was the result of disclosed, legitimate expenditures for the ANC Bio project. Instead, ANC Bio investor funds were used to pay off the margin loan debt incurred by the principals for expenditures related to other EB-5 projects, land purchases, and other improper purposes. The ANC Bio investors were not

17

CONFIDENTIAL ATTORNEY WORK PRODUCT

informed that their investments would be, or were, used to pay off the margin loan
debt.

73. Defendants represented to investors that $40 million in investor funds would be
paid to ANC Bio Korea for equipment, and documented payments as being made
for that purpose in periodic installments. However, ~~on information and belief,~~ $21
million of the investor money that was documented as paid to ANC Bio Korea for
equipment was never actually paid to ANC Bio Korea~~, . and was i~~Instead, the
money was held by JCM. In response to the margin call, the $21 million was sent
by JCM to Jay Peak, Inc., and then transferred to the margin loan account to pay
off a $19.2 million balance on March 5, 2014.

~~63.~~74.    Defendants used investor funds as collateral for millions of dollars in
loans obtained for GSI through Citibank in 2015, including a $6,000,000 loan that
was used to pay Ariel Quiros's personal tax liability on April 14, 2015, and a
$2,414,000 loan that was used to make dividend payments to investors in the
Penthouse Suites, Golf & Mountain, Lodge and Townhouses, and Stateside
projects.

***Payments to Contractors and Use of Pass-through Entities***

~~64.~~75.    Defendants formed or contracted with a number of entities for the sole
purpose of using those entities to act as pass-throughs in order to obfuscate the
diversion and misuse of investor funds.

76. Excessive and unwarranted payments were made to companies formed by the
project principals or affiliated individuals for ~~"construction supervision"~~
"services" on each of the Jay Peak EB-5 projects.

CONFIDENTIAL ATTORNEY WORK PRODUCT

77. Any payment of expenses should have been for services actually rendered or costs actually incurred in supervising a project.

65.78.   In reality, various services and fees were built into the projects as a way to conceal the total amount of money that was actually being taken by the project principals. Oversight fees, costs, and contingencies have been treated by Quiros, Stenger, and Kelly as pure profit and taken at the outset of projects, or paid out to related companies and diverted back to Quiros and Stenger, despite the lack of any services actually being rendered. - For example:

a. The ANC Bio PPM discloses that the project will have construction supervision costs. The PPM states that 15% of total construction and fit-out costs (or $9,185,306) is budgeted for "supervision," and 5% of total construction and fit-out costs (or $3,161,789) is budgeted for "supervision expenses." The ANC Bio General Partner, the ANC Bio Project Sponsor, and NECS entered into an agreement calling for NECS to procure and supervise certain construction contracts in return for 20% of the value of the contracts procured, to be paid on a schedule that coincides with payments made to contracted suppliers. The sole member of NECS is Defendant Kelly, a friend of and purportedly counsel to Quiros. Upon information and belief, Kelly has no prior experience in construction supervision, and NECS has no employees other than Kelly.

b. Payments to NECS do not align with and far exceed the value of payments actually made to contracted suppliers.

19

CONFIDENTIAL ATTORNEY WORK PRODUCT

c. NECS received payments related to contracts even where the contracted suppliers were not actually paid and NECS provided no services.

d. Upon information and belief, NECS's practice is to retain a third of all payments received from the ANC Bio project, and then to remit the remaining two-thirds to various entities owned or controlled by Quiros at Quiros's direction. Some of these funds have been sent to GSI and/or retained by Quiros. These payments are not the result of any services or goods provided by GSI or Quiros.

e. The ANC Bio Limited Partnership also entered into an agreement with JCM (again, a company for which Quiros serves as President, Treasurer, Secretary, Shareholder, and/or Director) that designates JCM as an agent of the General Partners, on behalf of the Limited Partnership, responsible for procuring certain equipment and services. In reality, JCM has provided no design, procurement, or construction management services and is instead a sham company used by Quiros solely for the purpose of serving as a vehicle to divert investor funds. JCM has received and controls at least $47,000,000 in investor funds, but is unable to produce documentation of expenditures or contracts for services or equipment.

f. The ANC Bio Limited Partnership, through Defendants, entered into a Master Distribution Agreement to purchase certain distribution rights from ANC Bio Korea for $10,000,000, and a "Pro Forma invoice" to purchase equipment from ANC Bio Korea for $40,000,000 for the ANC Bio project. These supposed purchases were engineered by Defendants as a way to divert

20

CONFIDENTIAL ATTORNEY WORK PRODUCT

investor funds and to benefit themselves and Choi. Defendants are unable to
produce any documentation to explain or support the value of the distribution
rights or the equipment, payments made to ANC Bio Korea have not been
made in accordance with the terms of the two agreements, no equipment has
been manufactured or delivered, and, as described above, $21,000,000 of the
$40,000,000 payment for equipment was diverted to pay off the margin loan.

**Defendants' Material Misrepresentations and Omissions in the PPM**

66.79.    Defendants made materially false and misleading statements and
omissions of facts in the PPMs to solicit investors in each of the eight Jay Peak
EB-5 projects.

67.80.    Investors were not informed that their funds would be used in any way
other than for the purposes specifically identified in each PPM.

68.81.    Investors were not informed that their funds would be invested in Treasury
Bills, or that project expenses would be paid through a cross-collateralized margin
loan that would accumulate significant interest expenses and fees or used as
collateral for loans.

69.82.    Investors were not informed that their funds would flow through a
complex web of bank and brokerage accounts, be commingled with funds
invested in other projects, be used to pay for non-project expenses, or diverted to
project principals, related entities, and projects other than the one(s) specifically
invested in.

70.83.    As described in paragraph X, above, GSI sold 7 acres of land to the ANC
Bio Limited Partnership, through the ANC Bio General Partner, in December

| Formatted: Font: Bold |
|---|

21

CONFIDENTIAL ATTORNEY WORK PRODUCT

2012 for $6,000,000. Because Quiros is both a member of the ANC Bio General

Partner and the owner of GSI, he was negotiating with himself on this land

transaction and received a substantial profit from the sale. The fact that Quiros

was on both sides of this real estate sale was not adequately disclosed to investors.

84. The ANC Bio Limited Partnership entered into an agreement with JCM that

designates JCM as an agent of the General Partners, on behalf of the Limited

Partnership, responsible for procuring certain equipment and services for the

ANC Bio project. By virtue of this agreement, JCM has unfettered access to

substantial amounts of investor money. Q Resorts, itself a company owned by

Quiros, acquired JCM in February 2014. Prior to that acquisition, former JCM

President Jong Weon (Alex) Choi appointed Quiros in August 2011 as JCM's

power of attorney with full control over the company's finances. Quiros's role in

and relationship with JCM, and resultant access to and control over investor

funds, both before and after the acquisition, was not disclosed to investors.

85. As described in paragraph X, above, Defendants used $21 million of ANC Bio

investor funds to pay off the margin loan in March 2014. Defendants never

informed the ANC Bio investors that the funds were used for this purpose and not

to purchase equipment, despite having issued an amended PPM in 2015.

71.

72.86.    The Q Burke offering contains instances of self-dealing that are

fundamentally unfair to investors and not adequately disclosed. For instance, the

PPM fails to adequately disclose that the Q Burke Limited Partnership will use

investor funds to build commercial condominium units and then convey two of

22

CONFIDENTIAL ATTORNEY WORK PRODUCT

the units back to Q Burke Mountain Resort, LLC for no compensation.
Additionally, the offering documents contain conflicting and misleading
statements regarding the ownership and income distribution of the conference
center.

~~73.~~ 87.    Q Burke Mountain Resort, LLC (a company owned by Quiros) sold a
3.797 acre parcel of land to the Q Burke Limited Partnership in 2014 for the Q
Burke project. The fact that Quiros stood on both sides of the transaction, and
would substantially profit therefrom, was not adequately disclosed to investors.

~~74.~~ 88.    The biotechnology products that Defendants plan to produce at the ANC
Bio facility ("ANC Bio Products") are subject to US Food and Drug
Administration ("US FDA") regulation and require US FDA approval to
manufacture, distribute, and market. Defendants represented to investors through
the ANC Bio offering documents that the ANC Bio Products were "[c]urrently in
the process of US FDA approval." In fact, Defendants had not, and have never,
applied for US FDA approval for the ANC Bio Products.

**Unregistered sale of securities**

~~75.~~ 89.    Defendants offered at least [X] in unregistered securities in the form of limited
partnership interests to investors, and sold at least [X] in unregistered securities in the
form of limited partnership interests to investors.

> Commented [EGK14]: Fill in grand total

~~76.~~ 90.    The PPMs explain to investors that the limited partnership interests are not
registered under federal or state securities laws but are offered and sold in reliance on
exemptions from state and federal securities laws.

23

CONFIDENTIAL ATTORNEY WORK PRODUCT

77.91.  The limited partnership interests are not federal covered securities as defined by 9

V.S.A. § 5102(7), nor have they ever been.

78.92.  The limited partnership interests are not eligible for an exemption from

registration pursuant to any Vermont statute, rule or order, nor have they ever been.

79.93.  The limited partnership interests are not registered with the Securities Division of

the Department ("Securities Division"), nor have they ever been.

**Employment/Association with Unregistered Agents**

80.94.  Defendants have employed or associated with numerous individuals to serve as

agents to represent them in effecting or attempting to effect the purchase or sale of

securities in the form of limited partnership interests.

81.95.  The compensation paid by Defendants to these agents was made contingent upon

the actual purchase of securities by investors and subsequent USCIS approval of the

investor I-526 petitions.

82.96.  The agents are not registered with the Securities Division, nor have they ever

been.

83.97.  The agents are not exempt from registration pursuant to 9 V.S.A. § 5402(b).

84.98.  Defendants knew or should have known that the agents were not registered with

the Securities Division.

CLAIMS

**First Claim**
**Violations of Section 5501 of the VUSA**
**Defendants Quiros, Stenger, and Jay Peak Hotel Suites L.P.**

CONFIDENTIAL ATTORNEY WORK PRODUCT

~~85.~~99.   Paragraphs 1 through **X** of this Complaint are re-alleged and incorporated by

reference.

> Commented [EGK15]: Correct paragraphs for all.

~~86.~~100.     The limited partnership interests offered and sold by Defendants are

"securities," as defined in 9 V.S.A. § 5102(28).

~~87.~~101.        By misleading investors, including but not limited to engaging in the

conduct described above~~, including but not limited to the~~ related to the misuse of

Phase I investor funds to purchase the Resort, commingling of funds, and use of funds

in ways other than those specifically disclosed to investors, Defendants have violated

9 V.S.A. § 5501, which provides that it is unlawful for a person ~~is unlawful for a~~

~~person~~, in connection with the offer to sell, the offer to purchase, the sale, or the

purchase of a security, directly or indirectly: (1) to employ a device, scheme, or

artifice to defraud; (2) to make an untrue statement of a material fact or to omit to

state a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; or (3) to engage in an

act, practice, or course of business that operates or would operate as a fraud or deceit

upon another person.

**Second Claim**
**Violations of Section 5501 of the VUSA**
**Defendants Quiros, Stenger, and Jay Peak Hotel Suites Phase II L.P.**

~~88.~~102.     Paragraphs 1 through ~~78~~ **X** of this Complaint are re-alleged and

incorporated by reference.

~~89.~~103.       The limited partnership interests offered and sold by Defendants are

"securities," as defined in 9 V.S.A. § 5102(28).

CONFIDENTIAL ATTORNEY WORK PRODUCT

~~90.~~104.    By misleading investors, including but not limited to engaging in the

conduct described above~~, including but not limited to the~~ related to the misuse of

Phase II investor funds to purchase the Resort, commingling of funds, and use of

funds in ways other than those specifically disclosed to investors, Defendants have

violated 9 V.S.A. § 5501, which provides that it is unlawful for a person ~~is unlawful~~

~~for a person~~, in connection with the offer to sell, the offer to purchase, the sale, or the

purchase of a security, directly or indirectly: (1) to employ a device, scheme, or

artifice to defraud; (2) to make an untrue statement of a material fact or to omit to

state a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; or (3) to engage in an

act, practice, or course of business that operates or would operate as a fraud or deceit

upon another person.

**Third Claim**
**Violations of Section 5501 of the VUSA**
**Defendants Quiros, Stenger, and Jay Peak Penthouse Suites L.P.**

~~91.~~105.    Paragraphs 1 through ~~78~~ X of this Complaint are re-alleged and

incorporated by reference.

~~92.~~106.    The limited partnership interests offered and sold by Defendants are

"securities," as defined in 9 V.S.A. § 5102(28).

~~93.~~107.    By misleading investors, including but not limited to engaging in the

conduct described above~~, including but not limited~~ related to the commingling of

funds and use of funds in ways other than those specifically disclosed to investors,

Defendants have violated 9 V.S.A. § 5501, which provides that it is unlawful for a

person ~~is unlawful for a person~~, in connection with the offer to sell, the offer to

26

CONFIDENTIAL ATTORNEY WORK PRODUCT

purchase, the sale, or the purchase of a security, directly or indirectly: (1) to employ a

device, scheme, or artifice to defraud; (2) to make an untrue statement of a material

fact or to omit to state a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; or (3) to

engage in an act, practice, or course of business that operates or would operate as a

fraud or deceit upon another person.

**Fourth Claim**
**Violations of Section 5501 of the VUSA**
**Defendants Quiros, Stenger, and Jay Peak Golf and Mountain Suites L.P.**

94.108.        Paragraphs 1 through 78 X of this Complaint are re-alleged and

incorporated by reference.

95.109.        The limited partnership interests offered and sold by Defendants are

"securities," as defined in 9 V.S.A. § 5102(28).

96.110.        By misleading investors, including but not limited to engaging in the

conduct described above, including but not limited to related to the commingling of

funds and use of funds in ways other than those specifically disclosed to investors,

Defendants have violated 9 V.S.A. § 5501, which provides that it is unlawful for a

person is unlawful for a person, in connection with the offer to sell, the offer to

purchase, the sale, or the purchase of a security, directly or indirectly: (1) to employ a

device, scheme, or artifice to defraud; (2) to make an untrue statement of a material

fact or to omit to state a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; or (3) to

engage in an act, practice, or course of business that operates or would operate as a

fraud or deceit upon another person.

27

CONFIDENTIAL ATTORNEY WORK PRODUCT

**Fifth Claim**
**Violations of Section 5501 of the VUSA**
**Defendants Quiros, Stenger, and Jay Peak Lodge and Townhouses L.P.**

      97.111.     Paragraphs 1 through 78 X of this Complaint are re-alleged and

incorporated by reference.

      98.112.     The limited partnership interests offered and sold by Defendants are

"securities," as defined in 9 V.S.A. § 5102(28).

      99.113.     By misleading investors, including but not limited to engaging in the

conduct described above, including but not limited to related to the commingling of

funds and use of funds in ways other than those specifically disclosed to investors,

Defendants have violated 9 V.S.A. § 5501, which provides that it is unlawful for a

person is unlawful for a person, in connection with the offer to sell, the offer to

purchase, the sale, or the purchase of a security, directly or indirectly: (1) to employ a

device, scheme, or artifice to defraud; (2) to make an untrue statement of a material

fact or to omit to state a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; or (3) to

engage in an act, practice, or course of business that operates or would operate as a

fraud or deceit upon another person.

**Sixth Claim**
**Violations of Section 5501 of the VUSA**
**Defendants Quiros, Stenger, and Jay Peak Suites Stateside L.P.**

      100.114.     Paragraphs 1 through 78 X of this Complaint are re-alleged and

incorporated by reference.

      101.115.     The limited partnership interests offered and sold by Defendants are

"securities," as defined in 9 V.S.A. § 5102(28).

28

CONFIDENTIAL ATTORNEY WORK PRODUCT

~~102.~~ 116.    By misleading investors, including but not limited to engaging in the

conduct described above, ~~including but not limited to~~ related to the commingling of

funds and use of funds in ways other than those specifically disclosed to investors,

Defendants have violated 9 V.S.A. § 5501, which provides that it is unlawful for a

person ~~is unlawful for a person~~, in connection with the offer to sell, the offer to

purchase, the sale, or the purchase of a security, directly or indirectly: (1) to employ a

device, scheme, or artifice to defraud; (2) to make an untrue statement of a material

fact or to omit to state a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; or (3) to

engage in an act, practice, or course of business that operates or would operate as a

fraud or deceit upon another person.

**Seventh Claim**
**Violations of Section 5501 of the VUSA**
**Defendants Quiros, Stenger, Ary Quiros, and Q Burke Mountain Resort, Hotel and**
**Conference Center, L.P.**

~~103.~~ 117.    Paragraphs 1 through **78** of this Complaint are re-alleged and incorporated

by reference.

~~104.~~ 118.    The limited partnership interests offered and sold by Defendants are

"securities," as defined in 9 V.S.A. § 5102(28).

~~105.~~ 119.    By misleading investors, including but not limited to engaging in the

conduct described above, ~~including but not limited to~~ related to the making of

material omissions and misstatements to investors, commingling of funds, diversion

of funds for improper purposes and self-enrichment, and use of funds in ways other

than those specifically disclosed to investors, Defendants have violated 9 V.S.A. §

29

CONFIDENTIAL ATTORNEY WORK PRODUCT

5501, which provides that it is unlawful for a person ~~is unlawful for a person~~, in connection with the offer to sell, the offer to purchase, the sale, or the purchase of a security, directly or indirectly: (1) to employ a device, scheme, or artifice to defraud; (2) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

**Eighth Claim**
**Violations of Section 5501 of the VUSA**
**Defendants Quiros, Stenger, Kelly, and Jay Peak Biomedical Research Park, L.P.**

~~106.~~ 120.       Paragraphs 1 through ~~78~~ X of this Complaint are re-alleged and incorporated by reference.

~~107.~~ 121.       The limited partnership interests offered and sold by Defendants are "securities," as defined in 9 V.S.A. § 5102(28).

~~108.~~ 122.       By misleading investors, including but not limited to engaging in the conduct described above, ~~including but not limited~~related to the making of material omissions and misstatements to investors, commingling of funds, diversion of funds for improper purposes and self-enrichment, and use of funds in ways other than those specifically disclosed to investors, Defendants have violated 9 V.S.A. § 5501, which provides that it is unlawful for a person ~~is unlawful for a person~~, in connection with the offer to sell, the offer to purchase, the sale, or the purchase of a security, directly or indirectly: (1) to employ a device, scheme, or artifice to defraud; (2) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were

30

CONFIDENTIAL ATTORNEY WORK PRODUCT

made, not misleading; or (3) to engage in an act, practice, or course of business that

operates or would operate as a fraud or deceit upon another person.

**Ninth Claim**
**Violations of Section 5301 of the VUSA**
**Defendants Quiros, Stenger, Jay Peak Hotel Suites L.P.**

109.123.    Paragraphs 1 through 78 X of this Complaint are re-alleged and

incorporated by reference.

110.124.    The limited partnership interests offered and sold by Defendants are

"securities," as defined in 9 V.S.A. § 5102(28).

111.125.    By selling unregistered securities, including but not limited to engaging in

the conduct described above, Defendants has have violated 9 V.S.A. § 5301, which

provides that it is unlawful for a person to offer or sell a security in this state unless:

(1) the security is a federal covered security; (2) the security, transaction, or offer is

exempted from registration; or (3) the security is registered.

**Tenth Claim**
**Violations of Section 5301 of the VUSA**
**Defendants Quiros, Stenger, and Jay Peak Hotel Suites Phase II L.P.**

112.126.    Paragraphs 1 through 78 X of this Complaint are re-alleged and

incorporated by reference.

113.127.    The limited partnership interests offered and sold by Defendant are

"securities," as defined in 9 V.S.A. § 5102(28).

114.128.    By selling unregistered securities, including but not limited to engaging in

the conduct described above, Defendants has have violated 9 V.S.A. § 5301, which

provides that it is unlawful for a person to offer or sell a security in this state unless:

31

CONFIDENTIAL ATTORNEY WORK PRODUCT

(1) the security is a federal covered security; (2) the security, transaction, or offer is

exempted from registration; or (3) the security is registered.

**Eleventh Claim**
**Violations of Section 5301 of the VUSA**
**Defendants Quiros, Stenger, and Jay Peak Penthouse Suites L.P.**

115.129.     Paragraphs 1 through 78 X of this Complaint are re-alleged and

incorporated by reference.

116.130.     The limited partnership interests offered and sold by Defendants are

"securities," as defined in 9 V.S.A. § 5102(28).

117.131.     By selling unregistered securities, including but not limited to engaging in

the conduct described above, Defendants has have violated 9 V.S.A. § 5301, which

provides that it is unlawful for a person to offer or sell a security in this state unless:

(1) the security is a federal covered security; (2) the security, transaction, or offer is

exempted from registration; or (3) the security is registered.

**Twelfth Claim**
**Violations of Section 5301 of the VUSA**
**Defendants Quiros, Stenger, and Jay Peak Golf and Mountain Suites L.P.**

118.132.     Paragraphs 1 through 78 X of this Complaint are re-alleged and

incorporated by reference.

119.133.     The limited partnership interests offered and sold by Defendants are

"securities," as defined in 9 V.S.A. § 5102(28).

120.134.     By selling unregistered securities, including but not limited to engaging in

the conduct described above, Defendants has have violated 9 V.S.A. § 5301, which

provides that it is unlawful for a person to offer or sell a security in this state unless:

32

CONFIDENTIAL ATTORNEY WORK PRODUCT

(1) the security is a federal covered security; (2) the security, transaction, or offer is exempted from registration; or (3) the security is registered.

**Thirteenth Claim**
**Violations of Section 5301 of the VUSA**
**Defendants Quiros, Stenger, and Jay Peak Lodge and Townhouses L.P.**

121.135.    Paragraphs 1 through 78 **X** of this Complaint are re-alleged and incorporated by reference.

122.136.    The limited partnership interests offered and sold by Defendants are "securities," as defined in 9 V.S.A. § 5102(28).

123.137.    By selling unregistered securities, including but not limited to engaging in the conduct described above, Defendants has have violated 9 V.S.A. § 5301, which provides that it is unlawful for a person to offer or sell a security in this state unless: (1) the security is a federal covered security; (2) the security, transaction, or offer is exempted from registration; or (3) the security is registered.

**Fourteenth Claim**
**Violations of Section 5301 of the VUSA**
**Defendants Quiros, Stenger, and Jay Peak Suites Stateside L.P.**

124.138.    Paragraphs 1 through 78 of this Complaint are re-alleged and incorporated by reference.

125.139.    The limited partnership interests offered and sold by Defendants are "securities," as defined in 9 V.S.A. § 5102(28).

126.140.    By selling unregistered securities, including but not limited to engaging in the conduct described above, Defendants has have violated 9 V.S.A. § 5301, which provides that it is unlawful for a person to offer or sell a security in this state unless:

33

CONFIDENTIAL ATTORNEY WORK PRODUCT

(1) the security is a federal covered security; (2) the security, transaction, or offer is

exempted from registration; or (3) the security is registered.

**Fifteenth Claim**
**Violations of Section 5301 of the VUSA**
**Defendants Quiros, Stenger, and Q Burke Mountain Resort, Hotel and Conference Center,**
**L.P.**

127.141.    Paragraphs 1 through **78** of this Complaint are re-alleged and incorporated

by reference.

128.142.    The limited partnership interests offered and sold by Defendants are

"securities," as defined in 9 V.S.A. § 5102(28).

129.143.    By selling unregistered securities, including but not limited to engaging in

the conduct described above, Defendants has have violated 9 V.S.A. § 5301, which

provides that it is unlawful for a person to offer or sell a security in this state unless:

(1) the security is a federal covered security; (2) the security, transaction, or offer is

exempted from registration; or (3) the security is registered.

**Sixteenth Claim**
**Violations of Section 5301 of the VUSA**
**Defendants Quiros, Stenger, and Jay Peak Biomedical Research Park, L.P.**

130.144.    Paragraphs 1 through **78** of this Complaint are re-alleged and incorporated

by reference.

131.145.    The limited partnership interests offered and sold by Defendants are

"securities," as defined in 9 V.S.A. § 5102(28).

132.146.    By selling unregistered securities, including but not limited to engaging in

the conduct described above, Defendants has have violated 9 V.S.A. § 5301, which

provides that it is unlawful for a person to offer or sell a security in this state unless:

34

CONFIDENTIAL ATTORNEY WORK PRODUCT

(1) the security is a federal covered security; (2) the security, transaction, or offer is exempted from registration; or (3) the security is registered.

**Seventeenth Claim**
**Violation of Sections 5501 of the VUSA**
**Defendant Kelly**

133.147.    Paragraphs 1 through 78 X of this Complaint are re-alleged and incorporated by reference.

134.148.    Pursuant to 9 V.S.A. § 5603(a), the Commissioner may maintain an action in this Court when she believes that a person has, is, or is about to engage in an act, practice, or course of business that materially aids a violation of the VUSA to enjoin the act, practice, or course of business and to enforce compliance with the VUSA.

135.149.    By engaging in the conduct described above, including but not limited to [insert paragraphs], Kelly has materially aided, and continues to materially aid, in the fraudulent offering and sale of securities in this state in violation of 9 V.S.A. § 5501.

> **Commented [EGK16]:** Paragraphs, or description?

**Eighteenth Claim**
**Violation of Section 5402 of the VUSA**
**Name DefendantsFill in Offering Defendants**

136.150.    Paragraphs 1 through 78 X of this Complaint are re-alleged and incorporated by reference.

137.151.    By engaging in the conduct described above, [**OFFERING DEFENDANTS**] have violated 9 V.S.A. § 5402(d), which provides that it is unlawful for an issuer engaged in offering, selling, or purchasing securities in this State to employ or associate with an agent who transacts business in this State on behalf of issuers unless the agent is registered with the Securities Division or exempt from registration.

> **Formatted:** Font: Bold

35

CONFIDENTIAL ATTORNEY WORK PRODUCT

<u>RELIEF REQUESTED</u>

The Commissioner respectfully requests that this Court:

1) Issue findings of fact and conclusions of law that Defendants committed the violated charged and alleged herein;

2) Enter an order temporarily, preliminarily, and permanently restraining and enjoining Defendants, and, as appropriate, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from future violations of Sections 5501 and 5301 of the VUSA and from soliciting or accepting funds from any person or entity for any investment in any unregistered offering of securities;

3) Enter an order freezing the assets of Defendants;

4) Enter an order requiring Defendants to prepare a sworn accounting of all the money they have obtained from investors, including (1) a report on the disposition and current location of investor funds, and (2) disclosure of all bank and brokerage account numbers where money was deposited;

5) Enter an order prohibiting the movement, alteration, and destruction of books and records;

6) Enter an order appointing the Commissioner as a receiver or conservator;

7) Enter an order directing Defendants to disgorge an amount equal to the funds and benefits they obtained illegally as a result of violations alleged, plus prejudgment interest on that amount;

8) Award investigative and litigation costs and fees to the State of Vermont;

36

CONFIDENTIAL ATTORNEY WORK PRODUCT

9) Enter an order as to each Defendant ordering Defendants to pay civil penalties of

   $15,000 for each violation, to the aggregate maximum allowed by law, pursuant to 9

   V.S.A § 5603(b)(2)(C); and

10) Such further relief in law or equity that this Court may deem just and proper.

Dated at Montpelier, Vermont on this X day of July[Month], 2015.

**Susan Donegan, in her official capacity as the**
**Commissioner of the Vermont Department of**
**Financial Regulation.**

By: _____

David Cassetty
General Counsel **and Special Assistant Attorney**
**General**
Department of Financial Regulation
89 Main Street
Montpelier, VT 05620-3101
(802) 828-3301

Emily Kisicki
Assistant General Counsel **and Special Assistant**
**Attorney General**
Department of Financial Regulation
89 Main Street
Montpelier, VT 05620-3101
(802) 828-3301

37

CONFIDENTIAL ATTORNEY WORK PRODUCT

**From:** London, Sarah [Sarah.London@vermont.gov]
**Sent:** Tuesday, October 27, 2015 5:00 PM
**To:** Miller, Lawrence
**Subject:** RE: Current Employee Emails

Yes great, if you have another copy on thumb drive I will take.  Thanks.

---

**From:** Miller, Lawrence
**Sent:** Tuesday, October 27, 2015 2:13 PM
**To:** London, Sarah
**Subject:** RE: Current Employee Emails

Do you want a copy to put somewhere?

Please Note: From November 5 to 13 access to and from I-89 Southbound at Montpelier will be closed. For detour and other information see http://vtrans.vermont.gov/projects/exit8

--
Lawrence Miller
Senior Advisor, Chief of Health Care Reform
Office of the Governor, State of Vermont
Mobile: (802) 989-0569
lawrence.miller@vermont.gov

---

**From:** London, Sarah
**Sent:** Tuesday, October 27, 2015 2:07 PM
**To:** Miller, Lawrence
**Subject:** RE: Current Employee Emails

Thank you again

---

**From:** Miller, Lawrence
**Sent:** Tuesday, October 27, 2015 1:57 PM
**To:** Salembier, Shannon; London, Sarah
**Subject:** RE: Current Employee Emails

Easy enough for me to drop at AGO reception.

Names of the folders are the search term for that folder.

I started the slow way, and did not make folders for ones that did not turn up so will pass you my note page.  After I switched to setting search folders to run overnight there are folders and in those that had no responsive emails you will just see Sarah's email to me with that term in it.

FYI ANC as a search term returned thousands and thousands of non-relevant documents.  I excluded that, but did search both ANC Bio and ANCBio.  Obviously not deleting anything related.

Please Note: From November 5 to 13 access to and from I-89 Southbound at Montpelier will be closed. For detour and other information see http://vtrans.vermont.gov/projects/exit8

--
Lawrence Miller
Senior Advisor, Chief of Health Care Reform
Office of the Governor, State of Vermont
Mobile: (802) 989-0569
lawrence.miller@vermont.gov

**From:** Salembier, Shannon
**Sent:** Tuesday, October 27, 2015 1:51 PM
**To:** Miller, Lawrence; London, Sarah
**Subject:** RE: Current Employee Emails

No problem. I know this is a pain!

If you leave the thumb drive with the front desk, I can come up and grab it. (Or you can drop it off at AGO reception – whatever is easiest.)

**From:** Miller, Lawrence
**Sent:** Tuesday, October 27, 2015 1:48 PM
**To:** London, Sarah <Sarah.London@vermont.gov>; Salembier, Shannon
<Shannon.Salembier@vermont.gov>; Kline, Scot <scot.kline@vermont.gov>
**Subject:** RE: Current Employee Emails

Sorry this got away from me. I have everything on a thumb drive. I have not stripped out non-relevant material, just did the searches and categorized them by search term.

I could go through and delete non-relevant, but with the risk that I inadvertently delete something responsive.

Please Note: From November 5 to 13 access to and from I-89 Southbound at Montpelier will be closed. For detour and other information see http://vtrans.vermont.gov/projects/exit8

--
Lawrence Miller
Senior Advisor, Chief of Health Care Reform
Office of the Governor, State of Vermont
Mobile: (802) 989-0569
lawrence.miller@vermont.gov

**From:** London, Sarah
**Sent:** Friday, October 09, 2015 4:39 PM
**To:** Miller, Lawrence
**Subject:** Fwd: Current Employee Emails

The AGO-recommended search terms are below.

Sent from my iPad

Begin forwarded message:

> **From:** "Kline, Scot" <scot.kline@vermont.gov>
> **Date:** October 9, 2015 at 4:12:09 PM EDT
> **To:** "London, Sarah" <Sarah.London@vermont.gov>
> **Cc:** "Salembier, Shannon" <Shannon.Salembier@vermont.gov>
> **Subject: FW: Current Employee Emails**

> Sarah:

> Per your message that your office will facilitate the search of Lawrence Miller's electronic files, I am forwarding the email from Shannon with the requested search terms for his email and text messages.  Please call Shannon or me if you have any questions.

> Thanks.

> Scot

> **From:** Salembier, Shannon
> **Sent:** Friday, October 09, 2015 3:47 PM
> **To:** Moulton, Pat; Goldstein, Joan; Fullam, Eugene; Kessler, John
> **Cc:** Kline, Scot
> **Subject:** Current Employee Emails

> PRIVILEGED & CONFIDENTIAL

> Hi Everyone,

> Thank you so much for getting me ACCD's physical and electronic records so quickly.  The next step in this process is emails.  I know the volume of email is quite large, so we are trying to make this process as painless as possible.

> We need all emails from January 1, 2006 to the present for every current employee at ACCD who may have emails relating to any of the search terms below.  I am aware of the following employees, but please let me know if you think I've missed someone:

> Pat Moulton
> Joan Goldstein
> Eugene Fullam
> John Kessler

**From:** Donegan, Susan [Susan.Donegan@vermont.gov]
**Sent:** Thursday, April 07, 2016 4:38 PM
**To:** London, Sarah
**Subject:** FW: Revised Complaint
**Attachments:** Draft Complaint 4.7.16.docx; Draft Complaint 4.7.16 CLEAN.docx


Susan L. Donegan, Commissioner
Vermont Department of Financial Regulation
89 Main Street
Montpelier, Vermont 05620
USA
(+1) 802-828-3301
susan.donegan@vermont.gov

NOTE: new email address is susan.donegan@vermont.gov

---

**From:** Kisicki, Emily G.
**Sent:** Thursday, April 7, 2016 4:28 PM
**To:** Donegan, Susan <Susan.Donegan@vermont.gov>; Cassetty, Dave <Dave.Cassetty@vermont.gov>; Kline, Scot <scot.kline@vermont.gov>; Salembier, Shannon <Shannon.Salembier@vermont.gov>
**Subject:** Revised Complaint

A revised version of the complaint is attached. Two documents are included: an annotated copy that reflects changes to the last version, and a clean copy for ease of reading. This does not reflect any comments or edits from the AGO to the last version of the complaint (I have not received any).

Please excuse any typographical or formatting errors – I am sending this now in the interest of time. The GPs have been added as parties, but have not been incorporated into the counts section yet.

Thanks,

Emily Kisicki
Assistant General Counsel
Vermont Department of Financial Regulation
89 Main Street
Montpelier, VT 05620-3101
(802) 828-2904

CONFIDENTIAL
ATTORNEY WORK PRODUCT

**STATE OF VERMONT**

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **WASHINGTON UNIT** | **DOCKET NO.** |

**SUSAN DONEGAN,** )
**IN HER** )
**OFFICIAL CAPACITY AS** )
**COMMISSIONER OF THE** )
**VERMONT DEPARTMENT OF** )
**FINANCIAL REGULATION,** )
)
**and** )
)
**STATE OF VERMONT,** )
**THROUGH** )
**ATTORNEY GENERAL** )
**WILLIAM H. SORRELL** )
)
      **Plaintiffs,** )
)
**v.** )
)
Ariel Quiros; William Stenger; )
~~William Kelly;~~ Q Resorts, Inc.; Jay Peak, )
Inc.; Jay Peak  Hotel Suites L.P.; Jay Peak )
Hotel Suites Phase II L.P.; Jay Peak )
Management, Inc., Jay Peak Penthouse )
Suites L.P.; Jay Peak GP Services, Inc.; )
Jay Peak Golf and Mountain Suites L.P.; )
Jay Peak GP Services Golf, Inc.; Jay Peak )
Lodge and Townhouses L.P.; Jay Peak GP )
Services Lodge, Inc.; Jay Peak Suites )
Stateside L.P.; Jay Peak GP Services )
Stateside, Inc.; Jay Peak Biomedical )
Research Park, L.P.; and AnC Bio )
Vermont GP Services, LLC~~-~~ )
~~Q Burke Mountain Resort, Hotel~~ )
~~and Conference Center, L.P.~~ )

      **Defendants.**

1

CONFIDENTIAL
ATTORNEY WORK PRODUCT

**COMPLAINT**

Susan Donegan, in her official capacity as Commissioner of the Vermont Department of

Financial Regulation (the "Commissioner") and the State of Vermont, through Attorney General

William H. Sorrell, (the "Attorney General") (together, "Plaintiffs"), make the following

complaint against Ariel Quiros; William Stenger; ~~William Kelly;~~ Q Resorts, Inc.; Jay Peak, Inc.;

Jay Peak Hotel Suites L.P.; Jay Peak Hotel Suites Phase II L.P.; Jay Peak Management, Inc.; Jay

Peak Penthouse Suites L.P.; Jay Peak GP Services, Inc.; Jay Peak Golf and Mountain Suites

L.P.; Jay Peak GP Services Golf, Inc.; Jay Peak Lodge and Townhouses L.P.; Jay Peak GP

Services Lodge, Inc.; Jay Peak Suites Stateside L.P.; Jay Peak GP Services Stateside, Inc.; Jay

Peak Biomedical Research Park, L.P; and AnC Bio Vermont GP Services, LLC.~~; and Q Burke~~

~~Mountain Resort, Hotel and Conference Center, L.P.~~ (collectively, "Defendants") for multiple

violations of the Vermont Uniform Securities Act ("VUSA"), Chapter 150 of Title 9, and

Consumer Protection Act ("CPA"), Chapter 63 of Title 9, Vermont Statutes Annotated:

SUMMARY

1.      Since 2008, Defendants Ariel Quiros ("Quiros") and William Stenger ("Stenger")

(together, the "Individual Defendants"[EGK1]) have orchestrated a large-scale

investment scheme to defraud investors participating in the "EB-5 Program," a

federal visa initiative designed to give foreign investors a legal path to obtain United

States residency. The Individual Defendants used multiple limited partnerships,

limited liability companies, and corporate entities to assist in carrying out the

fraudulent scheme. To date, as part of the fraudulent scheme, Defendants have

solicited and raised at least $40~~2~~350~~,500,000~~ million in investment funds ~~and~~

~~collected at least $40,250,000 in additional fees~~. Of that amount, Defendants have

From:      Jon T. Alexander, Assistant Attorney General

Re:        Second Request for preservation of documents –
           *Jay Peak EB-5 Litigation*

Date:      May 3, 2016
------------------------------------------------------------------------------------------------

### CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGED
### ATTORNEY WORK PRODUCT

My October 9, 2015 memorandum advised the Department of Financial
Regulation ("DFR"), Agency of Commerce and Community Development ("ACCD"),
the Office of Governor and the Office of the Vermont Attorney General ("AGO") to
preserve all documents related to possible civil litigation concerning Jay Peak and
Burke Mountain Projects in the "EB-5 Program," a federal visa initiative designed
to give foreign investors a legal path to obtain United States residency.

This memorandum is to advise that (1) the State has recently commenced
this previously contemplated lawsuit styled as *State v. Quiros, et al.*, Docket
Number 217-4-16 Wncv in the Washington Superior Court, as reflected in the
attached Complaint; and that (2) the Department of Taxes ("DOT"), the Vermont
Economic Development Authority ("VEDA"), the Agency of Transportation ("AOT"),
the Department of Public Safety ("DPS"), the Department of Labor ("DOL"), the
Department of Health ("DOH"), the Agency of Natural Resources ("ANR"), the
Agency of Agriculture, Food and Markets ("AAFM"), the District 7 Environmental
Commission, and the Natural Resources Board ("NRB") should also preserve all
documents related to the State's lawsuit concerning Jay Peak and Burke Mountain
Projects in the "EB-5 Program."

This type of notice is typically referred to as a "litigation hold" notice.  In
certain circumstances, the courts require that steps be taken to preserve
documents, both paper and electronic, related to the subject matter of the litigation.
These requirements are serious and sobering.  Harsh sanctions can be imposed by
the courts if documents are not retained.

The above-listed State entities should continue the "litigation hold" until the
State's lawsuit and all appeals come to a close.  It should be discontinued only after
consultation with me and Susanne Young, Deputy Attorney General.

2

<u>Scope of request</u>

This request for preservation of documents relates to recently-commenced litigation relating to any Jay Peak and Burke Mountain projects in the EB-5 program. The request to preserve documents applies to all documents held by the above-listed State entities, including written documents and all electronically stored documents and information. The obligation to preserve electronically stored information applies to all aspects of the above-listed State entities' technology, and includes information held in their buildings, in storage facilities run by the Department of Public Records, and in any other off-site storage facility.

The documents retained should include all paper or electronic documents, as well as draft or final versions of internal and external correspondence (including e-mails and text messages), memoranda, notes and other documents referencing or relating to:

- Jay Peak or Burke Mountain EB-5 Projects;

- any of the following entities involved in the Jay Peak or Burke Mountain EB-5 Projects:

        Jay Peak Hotel Suites L.P.
        Jay Peak Hotel Suites Phase II L.P.
        Jay Peak Penthouse Suites L.P.
        Jay Peak Golf and Mountain Suites L.P.
        Jay Peak Lodge and Townhouses L.P.
        Jay Peak Suites Stateside L.P.
        Q Burke Mountain Resort, Hotel and Conference Center, L.P.
        Jay Peak Biomedical Research Park, L.P.;

- the Private Placement Memorandum (PPMs) for any of the Jay Peak or Burke Mountain EB-5 Projects;

- any of the following:[1]

        Ariel Quiros
        William Stenger
        William Kelly
        Ary Quiros
        Joel Burstein
        AnC Bio VT LLC

---

[1] N.B. The entities listed on the following page in **bolded** type were not listed in my original October 9, 2015 Litigation Hold memorandum.

3

> AnC Bio Vermont GP Services, LLC
> Q Burke Mountain Resort GP Services, LLC
> Q Resorts, Inc.
> G.S.I. of Dade County, Inc.
> Jay Construction Management, Inc.
> North East Contract Services, LLC
> **Jay Peak, Inc.**
> **Jay Peak Management, Inc.**
> **Jay Peak GP Services, Inc.**
> **Jay Peak GP Services Golf, Inc.**
> **Jay Peak GP Services Lodge, Inc.**
> **Jay Peak GP Services Stateside**
> **Q-Burke Mountain Resort LLC**

In addition, any documents created from now on related to any of the above-described related categories must also be preserved. All information should be stored in original, unaltered form. E-mails may be the most difficult category of information to preserve, so your personnel should work to identify relevant e-mails and prevent them from being lost or destroyed. They should be saved in an easily accessible electronic file; if that is not feasible then they should be printed and stored prior to deletion. It is important to preserve e-mails and correspondence in your files related to this matter, even if they may eventually be protected from disclosure by a claim of privilege. Please confer with your Information Technology personnel on the best way to preserve electronic documents in each person's individual possession or control relating to any of the above-described related categories.

Communication of Litigation Hold Request to Personnel

This request from State legal counsel must be communicated by you to all personnel of the above-listed State entities who have control of document or data systems and to all personnel who may have authored or received any documents related to the above-described related categories. Documents of former employees should be similarly retained.

If, during the pendency of this litigation hold, other personnel who have e-mails or other electronic documents or information that pertain to the issues noted above leave their employment with the above-listed State entities, certain steps overseen by your respective Information Technology personnel should be taken to preserve those electronic documents and information. Any relevant documents or information contained on the computer hard drives of these employees or on your shared drives or network servers should be retained, and their e-mails should be preserved. To the extent possible, such employees should be encouraged to identify relevant documents or information before they cease their employment.

4

In addition, any above-listed State entity's automatic or regular document destruction policies should be discontinued for the duration of this litigation hold.

If you have any questions about your obligations regarding preservation of documents, please contact me.

**From:** Pieciak, Michael [Michael.Pieciak@vermont.gov]
**Sent:** Wednesday, June 15, 2016 5:15 PM
**To:** London, Sarah
**Subject:** FW: State v. Quiros et. al. Amended Complaint
**Attachments:** Amended Complaint (State v. Quiros) FILED.pdf; Certificate of Service for Amended Complaint (State v. Quiros)FILED.pdf

Hi Sarah –

Attached please find the amended Jay Peak complaint filed by the AG this afternoon. Please let me know if you have any questions. Many thanks.

All the best,
Mike

**From:** Kline, Scot
**Sent:** Wednesday, June 15, 2016 4:37 PM
**To:** Pieciak, Michael <Michael.Pieciak@vermont.gov>
**Subject:** FW: State v. Quiros et. al. Amended Complaint

**From:** Salembier, Shannon
**Sent:** Wednesday, June 15, 2016 3:11 PM
**To:** michael.goldberg@akerman.com
**Cc:** Kline, Scot <scot.kline@vermont.gov>; Alexander, Jon <jon.alexander@vermont.gov>
**Subject:** State v. Quiros et. al. Amended Complaint

Mike,

Attached please find a copy of the Amended Complaint we filed today in the Washington Superior Court, along with the Certificate of Service, in the case of State v. Quiros et. al. Copies of these documents have also been sent via U.S. mail.

Thank you,
Shannon

Shannon Salembier
Assistant Attorney General
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
Shannon.Salembier@Vermont.gov
(802) 828-5621

STATE OF VERMONT

**SUPERIOR COURT**
**WASHINGTON UNIT**

2016 JUN 15  P

**CIVIL DIVISION**
**DOCKET NO. 217-4-16 Wncv**

STATE OF VERMONT,                          )
                                           )
THROUGH SUSAN L. DONEGAN,                  )
IN HER OFFICIAL CAPACITY                   )
AS COMMISSIONER OF THE                     )
VERMONT DEPARTMENT OF                      )
FINANCIAL REGULATION,                      )
                                           )
and                                        )
                                           )
ATTORNEY GENERAL                           )
WILLIAM H. SORRELL,                        )
                                           )
        Plaintiffs,                        )
                                           )
v.                                         )          **AMENDED COMPLAINT**
                                           )
ARIEL QUIROS; WILLIAM STENGER;             )
Q RESORTS, INC.; JAY PEAK, INC.;           )
JAY PEAK HOTEL SUITES L.P.; JAY            )
PEAK HOTEL SUITES PHASE II L.P.;           )
JAY PEAK MANAGEMENT, INC.;                 )
JAY PEAK PENTHOUSE SUITES L.P.;            )
JAY PEAK GP SERVICES, INC.;                )
JAY PEAK GOLF AND MOUNTAIN                 )
SUITES L.P.; JAY PEAK GP SERVICES          )
GOLF, INC.; JAY PEAK LODGE AND             )
TOWNHOUSES L.P.; JAY PEAK GP               )
SERVICES LODGE, INC.; JAY PEAK             )
SUITES STATESIDE L.P.; JAY PEAK            )
GP SERVICES STATESIDE, INC.;               )
JAY PEAK BIOMEDICAL RESEARCH               )
PARK, L.P.; and ANC BIO VERMONT            )
GP SERVICES, LLC                           )
                                           )
        Defendants.                        )

## TABLE OF CONTENTS

SUMMARY ................................................................................................................ 2

PARTIES ................................................................................................................... 6

RELATED PERSONS AND ENTITIES................................................................... 8

STATUTORY AUTHORITY, JURISDICTION, AND VENUE ............................... 10

FACTS ...................................................................................................................... 11

    I.   EB-5 Immigrant Investor Visa Program ..................................................... 11

    II.  Fraudulent Use of Funds to Finance Quiros' Purchase of Jay Peak .................................. 12

    III. Subsequent EB-5 Projects Initiated by Quiros and Stenger........................... 17

    IV. Financial Accounts and Defendants' Improper Use of Margin Accounts ......................... 21

    V.  Misappropriations, Misuses, and Material Misrepresentations and Omissions ................ 24

        a.   Phase I ....................................................................................... 27

        b.   Phase II....................................................................................... 28

        c.   Penthouse Suites........................................................................ 30

        d.   Golf and Mountain .................................................................... 31

        e.   Lodge and Townhouses............................................................. 33

        f.   Stateside ..................................................................................... 35

        g.   AnC Bio...................................................................................... 38

    VI. Continued Fundraising.............................................................................. 44

COUNTS................................................................................................................... 44

RELIEF SOUGHT .................................................................................................... 56

1

**From:** London, Sarah [Sarah.London@vermont.gov]
**Sent:** Thursday, July 28, 2016 4:11 PM
**To:** GPS; EXE - SrStaff
**Subject:** FW: EB-5 Investor case against filed DFR
**Attachments:** 2016-07-20 Complaint.pdf

**Importance:** High

FYI, attached is a complaint from two Chinese investors in Q Burke (siblings) against Ariel Quiros, Stenger, Charles Leamy (a lawyer), Raymond James Inc, Joel Burstein, DFR, Peak CM, White and Burke, Q Burke Resorts, and "John Does." No state entity other than DFR is named. Lawyer is Pietro Lynn, and two lawyers from California. Investors claim:

- They were not provided with the updated Q Burke PPM that disclosed the SEC investigation
- The State through DFR wrongfully released their money from escrow to allow the hotel to be built (highlighting a warning from Brent Raymond to Susan Donegan)
- Quiros, Stenger, Leamy, and Q Burke violated VT Securities law, committed various forms of fraud, violated the Consumer Protection Act, and breached fiduciaries duties through misrepresentations and concealments
- Raymond James, Burstein, and White and Burke aided and abetted the fraud
- DFR is the defendant in one count of negligence
- Peak CM wrongfully pocketed $1M
- Defendants other than DFR committed "civil conspiracy"

They ask for return of approximately $1M, and triple damages under the Consumer Fraud Act, and attorneys fees

**From:** Shafritz, Megan J.
**Sent:** Thursday, July 28, 2016 3:10 PM
**To:** London, Sarah <Sarah.London@vermont.gov>
**Subject:** FW: EB-5 Investor case against filed DFR
**Importance:** High

ATTORNEY/CLIENT PRIVILEGED

Hi Sarah,

Bill ask me to give you a heads up regarding this case, which was just served yesterday. We haven't yet assigned the litigation team that will handle the matter, so if you have any questions, please feel free to contact me.

Regards, Megan

Megan J. Shafritz, Esq.
Assistant Attorney General, Civil Division Chief
Office of the Attorney General

109 State Street, 3rd Floor
Montpelier, Vermont 05609-1001
Phone:  802-828-5527
Fax:  802-828-1500

The information contained in this transmission may contain privileged and confidential information.  It is intended only for the use of the person(s) named above.  If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:** Shafritz, Megan J.
**Sent:** Thursday, July 28, 2016 2:43 PM
**To:** Sorrell, Bill <bill.sorrell@vermont.gov>; Griffin, Bill <bill.griffin@vermont.gov>; Young, Susanne <susanne.young@vermont.gov>; Kline, Scot <scot.kline@vermont.gov>
**Cc:** Alexander, Jon <jon.alexander@vermont.gov>; Salembier, Shannon <Shannon.Salembier@vermont.gov>
**Subject:** EB-5 Investor case against filed DFR
**Importance:** High

Hi Folks,

Late yesterday afternoon (at 4:15 p.m.), the State was served by sheriff with the attached EB-5 investor lawsuit, which was filed against many defendants, including all those you would expect.  Despite a 45-page complaint, there appears to be only one (seemingly weak) claim against DFR for negligence.  See Count X at page 39.  The Complaint alleges that DFR owed a duty of care to potential investors in Q Burke and breached that duty by permitting Q Burke to solicit new investors in July 2015.  Our response is due on August 16, 2016.

Bill, FYI, in case there are press inquiries.  To my knowledge, we have not received any yet.

MJS

**From:** Lord, Peggy
**Sent:** Thursday, July 28, 2016 2:28 PM
**To:** Shafritz, Megan J. <megan.shafritz@vermont.gov>
**Subject:** Service by Sheriff 7/27/16 - Wei and Wei v. Quiros, et al., 602-7-16 Cncv

Hi Megan,

Please see the attached was served via sheriff yesterday (7/27/16). The answer is due 8/16/16. This has been added to Law Manager (2016-05899) and the documents have been added to M-Files.

Thanks,
P
*Peggy Lord*

Docket Clerk / Paralegal Technician II
Office of the Attorney General | Civil Division
109 State Street, 3rd Floor
Montpelier, VT 05609-1001
Tel. 802-828-3176
Fax. 802-828-1500
Email: peggy.lord@vermont.gov

**Please note my new email address is: peggy.lord@vermont.gov**

*This email message may contain privileged and/or confidential information.  If you are not the intended recipient(s), you are hereby notified that any dissemination, distribution, or copying of this email message is strictly prohibited.  If you have received this message in error, please immediately notify the sender and delete this message from your computer.*

**From:** Pieciak, Michael [Michael.Pieciak@vermont.gov]
**Sent:** Thursday, September 01, 2016 6:53 PM
**To:** London, Sarah
**Subject:** FW: SEC v. Quiros, Filings
**Attachments:** DE 206 Motion for Permanent Injunction against William Stenger.pdf

Sarah – FYI, attached is the SEC settlement with Stenger. Please let me know if you have any questions.

**From:** Kline, Scot
**Sent:** Thursday, September 1, 2016 4:49 PM
**To:** Young, Susanne <susanne.young@vermont.gov>; Griffin, Bill <bill.griffin@vermont.gov>; Pieciak, Michael <Michael.Pieciak@vermont.gov>
**Subject:** FW: SEC v. Quiros, Filings

Just received.

**From:** Graves, My-Lanh
**Sent:** Thursday, September 01, 2016 4:47 PM
**To:** Kline, Scot <scot.kline@vermont.gov>; Salembier, Shannon <Shannon.Salembier@vermont.gov>
**Subject:** FW: SEC v. Quiros, Filings

**From:** Almonte, Ilonka M. [mailto:AlmonteI@SEC.GOV]
**Sent:** Thursday, September 01, 2016 4:42 PM
**To:** Graves, My-Lanh <MyLanh.Graves@vermont.gov>
**Subject:** SEC v. Quiros, Filings

Hello My-Lanh,  please find attached another filing in the Quiros matter. I will be out of the office tomorrow.  Have a great Labor Day weekend!

Thanks,
**ILONKA ALMONTE**
Paralegal Specialist
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, FL 33131
Telephone:  305-982-6351
Facsimile:  305-536-4154
Email: almontei@sec.gov

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 16-CV-21301-GAYLES

SECURITIES AND EXCHANGE COMMISSION,

                         **Plaintiff,**

v.

**ARIEL QUIROS,**
**WILLIAM STENGER,**
**JAY PEAK, INC., et al.,**

                    **Defendants, and**

**JAY CONSTRUCTION MANAGEMENT, INC.,**
**GSI OF DADE COUNTY, INC.,**
**NORTH EAST CONTRACT SERVICES, INC.,**
**Q BURKE MOUNTAIN RESORT, LLC,**

                  **Relief Defendants.**

_____/

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION UNOPPOSED MOTION FOR ENTRY OF JUDGMENT OF PERMANENT INJUNCTION AND OTHER RELIEF AGAINST DEFENDANT WILLIAM STENGER

Plaintiff Securities and Exchange Commission hereby moves for entry of Judgment of Permanent Injunction and Other Relief against Defendant William Stenger ("Judgment"). By the attached Consent, Stenger has consented to the entry of the attached Judgment. Accordingly, the Commission requests that the Court enter the attached Judgment, which is solely against Stenger.

                        Respectfully submitted,

September 1, 2016

                        By:s/ Christopher E. Martin
                        Christopher E. Martin, Esq.
                        Senior Trial Counsel
                        SD Fla. Bar No. A5500747
                        Direct Dial: (305) 982-6386
                        Email: martinc@sec.gov

                        By: s/Robert K. Levenson

Robert K. Levenson, Esq.
Senior Trial Counsel
Florida Bar No. 0089771
Direct Dial:  (305) 982-6341
Email:  levensonr@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154