UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO. 5:19-cr-00076 |
| v. | ) | |
| | ) | |
| WILLIAM STENGER | ) | |
| | ) | |

## MOTION TO UNSEAL DOCUMENTS

NOW COMES Defendant William Stenger, by and through undersigned counsel, and moves this Court for an order to unseal State documents subject to the Court's order dated May 27, 2021. Doc. 325. Defense counsel has contacted the United States Attorney's Office and the Vermont Attorney General's Office and asked them whether they had any objection to this motion.

The United States Attorney's Office indicated that it would not take a position on this motion. The Vermont Attorney General's Office indicated that "[t]he State does object to the wholesale unsealing and public disclosure of the documents identified in your prior filings."

### STATEMENT OF FACTS

#### Introduction

In early 2015, Vermont State officials charged with overseeing Jay Peak's EB-5 projects embarked on a two-track strategy. Publicly, those officials touted Vermont Governor Peter Shumlin's decision to engage the assistance of the State's Department of Financial Regulation (DFR) in the oversight of Jay Peak's AnC Bio VT and QBurke EB-5 projects, both of which remained on hold after the Agency of Commerce and Community Development (ACCD) reviewed those projects' Private Placement

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

1

Memoranda (PPM) in 2014. According to those officials, the State would only approve amended PPMs for the two stalled projects and authorize the marketing of these securities if the amended PPMs complied with state and federal securities laws that required, among other things, full disclosure of known risks associated with the projects.

Behind this public façade, by no later than June 2015, those same public officials had discovered that Ariel Quiros had turned Jay Peak's EB-5 projects into an unlawful Ponzi scheme that netted him tens of millions of dollars of investor funds that he used to pay for, among other things, the Jay Peak Ski Resort in 2008, the Burke Mountain Ski Resort in 2011, luxury condominiums in New York City, a Miami, Florida restaurant, expensive vehicles, and several homes in Lyndonville, Vermont. Rather than shut down Quiros' Ponzi scheme, DFR Commissioner Donegan approved the AnC Bio VT PPM in March 2015 and the QBurke PPM in July 2015, neither of which disclosed the existence of Quiros' Ponzi scheme, and authorized the sale of those securities to unwitting foreign investors.

By the time Commissioner Donegan approved the QBurke PPM in July 2015, State officials had already drafted a civil complaint detailing Quiros' Ponzi scheme. This draft complaint alleged numerous violations of state securities laws related to Jay Peak's EB-5 projects, including the misuse of QBurke investor funds dating back to 2013, and requested relief that would render investments in that project worthless. Meanwhile, DFR's Deputy Commissioner Michael Pieciak was preparing a PowerPoint presentation for State officials - but not for public disclosure - detailing Quiros' theft of EB-5 investor funds and the misuse of QBurke investor funds; this presentation to top State officials culminated in a final slide entitled "Immigration Impact to Investors" as of 8/14/2015, which indicated that the "Immigration Status [of every AnC Bio VT and QBurke investor

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

would be] Likely Negated." According to a timeline prepared by Deputy Commissioner Pieciak, Attorney General Sorrell was briefed on these issues on August 10, 2015, followed by a similar briefing of Governor Shumlin on September 10, 2015. [1] *Ex. 1.*

While reviewing the millions of pages of discovery provided by the United States Attorney's Office, defense counsel uncovered documents demonstrating the existence of the State's two-track strategy. Some of those documents were marked "privileged," others were not. On May 25, 2021, defense counsel filed a Catalog of State documents marked "privileged" with the Court, together with copies of the documents described in the Catalog, and asked permission to file those documents under seal. The Court granted the motion to seal. Doc. 325.

On June 7, 2021, Assistant Attorney General David Groff requested a copy of the documents subject to this sealing order. After receiving this request, defense counsel immediately provided copies of the documents subject to the Court's sealing order. *Ex. 2.* To date, the State has made no effort to retrieve these documents from defense counsel or take other steps to protect allegedly privileged material.

**July through December 2014 – ACCD's oversight of Jay Peak's EB-5 projects**

In July 2014, after learning that the United States Securities and Exchange Commission (SEC) had opened an investigation into Jay Peak's EB-5 projects, the Vermont Regional Center (VRC), the State agency responsible for the oversight of those projects, ordered Jay Peak personnel to stop marketing AnC Bio VT securities to foreign

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

---

[1] Both Attorney General Sorrell and Governor Shumlin confirmed that they had been briefed during a news conference held in April 2016 shortly after a federal judge in Miami, Florida appointed Attorney Michael Goldberg as the receiver who would take control of Jay Peak's EB-5 projects. *Burlington Free Press, 4/15/16, "VT, feds allege 'masive' fraud at Jay Peak Inc."*

investors until it approved an amended PPM that complied with state and federal securities law. Before the end of the year, the VRC instituted a similar hold on the marketing of QBurke securities to foreign investors.

On August 25, 2014 VRC officials met with Secretary of Administration Jeb Spaulding and Chief of Staff Elizabeth Miller to discuss Jay Peak's EB-5 projects. Meeting agenda items included: "Amend all MOUs[2] of projects that haven't received I-829 approval to require independent financial audit (individual financial audit in updated MOU)" and "Executive Role." *Ex. 3.*

On September 29, 2014, Governor Shumlin sent a letter to ACCD Secretary Moulton and DFR Commissioner Donegan asking them to provide recommendations about how the State could improve oversight of VCR's EB-5 projects. Specifically, Shumlin told Donegan and Moulton that it was his "hope that the securities and financial expertise of DFR staff can assist ACCD with the growing volume of work necessary to fulfill the Regional Center's mission, including review of potential projects, offerings, potential investors and securities records." *Ex. 4.*

During the fall of 2014, ACCD, together with the VRC, engaged the services of the Boston law firm, Edwards Wildman, whose fees would be paid for by Jay Peak, to review AnC Bio VT's proposed PPM in light of federal securities law. In their preliminary report sent to State regulators in November 2014, Edwards Wildman recommended that the AnC Bio VT PPM disclose, among other things, material risks related to "potential liabilities on account of prior sales, including the nature and

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

---

[2]  The VRC executed so-called Memoranda of Understanding (MOUs) with Jay Peak's developers that outlined the VRC's oversight role.

4

consequences of prior misstatements being corrected and the status of the SEC

investigation and possible consequences" and detailed information related to the current

status of the project, including disclosure of how all of the previously raised investment

money had been spent and "risks associated if sufficient capital is not raised, both from

the perspective of compliance with the EB-5 immigration requirements as well as

potential impact on any financial return on the investment." *Ex. 5.*[3] State officials refused

repeated requests to share the actual Edwards Wildman report with Jay Peak's attorneys.

Sometime in late 2014, the VRC obtained a copy of one of the early Raymond

James bank statements. Quiros had opened a number of accounts at Raymond James in

June 2008 so that he could exercise exclusive control over funds invested in Jay Peak's

EB-5 projects. The Raymond James statement provided to the VRC revealed that as of

August 29, 2008, Jay Peak's first EB-5 project, Jay Peak Hotel Suites LP 1, owed

$9,394,349.60 in margin loan debt. After reviewing this statement, VRC's executive

director, Brent Raymond, asked Jay Peak's developers to explain how this could have

happened. *Ex. 7.*

In response to the State's inquiry, Quiros sent Jay Peak's attorney, David Gordon,

to a meeting with ACCD officials in late December 2014. Attorney Gordon later

summarized Quiros' preposterous explanation for the existence of the margin loans in a

letter he sent to State regulators in February 2015. *Ex. 8.*[4]

---

[3] On May 27, 2021, during a hearing to consider the State's Motion to Quash Defendant
Stenger's subpoena for the Edwards Wildman report, the Court observed that "I think the
cat got out of the bag, you know, I think the [Edwards Wildman] report got out regardless
of privilege or the subpoena process through discovery." *Ex. 6.*

[4] That Quiros would provide a false explanation for the existence of the Raymond James
margin loans is consistent with the course of his conduct throughout the life of his Jay
Peak EB-5 Ponzi scheme. After all, in May 2014, when the SEC first quizzed Quiros

JARVIS, McARTHUR
& WILLIAMS

ATTORNEYS AT LAW

SUITE 2E – PARK PLAZA

95 ST. PAUL STREET

P. O. BOX 902

BURLINGTON, VT

05402-0902

802-658-9411

On December 22, 2014, the State notified the United States Citizenship and Immigration Services (USCIS) that the DFR and the ACCD had entered into an agreement that contemplated the DFR playing a greater role in the VRC's oversight of its EB-5 projects. DFR would be responsible for reviewing EB-5 project applications for "compliance with USCIS EB-5 regulations, U.S. immigration laws and regulations and federal and state securities laws and make a final determination to approve or deny the application." *Ex. 9, p. 2.*

In a press release announcing this decision, DFR Commissioner Donegan stated: "ACCD and DFR have very different functions when considering EB-5 projects, so working together we can both support Vermont's Regional Center as well as provide a broader range of supervision and oversight of selected projects." *Id.*

### January through March 2015 – DFR reviews and approves AnC Bio VT's amended PPM

The new year began with a secret meeting between Governor Peter Shumlin and Ponzi scheme director Ariel Quiros at the Governor's home located in a rural area near Montpelier, Vermont. According to both Shumlin and Quiros, the two met on January 1, 2015 and discussed issues related to State oversight of Jay Peak's EB-5 projects. Quiros told federal investigators the meeting lasted five hours. The Governor told the same investigators the meeting lasted 20 minutes. *Ex. 10, p. 9.*

The hold placed by ACCD on the marketing of AnC Bio VT and QBurke securities created problems for both men. For one it was personal; for the other, political.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

about the transfer of millions of dollars in investor funds to Jay Construction Management for equipment related to the AnC Bio VT project, Quiros and Kelly went to work and created false documents to cover their tracks, as evidenced by the allegation set forth in Count 10 of the Indictment and Kelly's guilty plea to that offense.

To fund his lavish lifestyle and backfill the money he had already stolen, Quiros depended on new money raised from unsuspecting investors. With the EB-5 spigot turned off, Quiros looked to other sources to satisfy his nearly insatiable need for new cash.

In late 2014 Quiros tried and failed to obtain a line of credit from Goldman Sachs after the firm asked for detailed information about AnC Bio VT, Jay Construction Management (the corporation Quiros created to coordinate the flow of EB-5 funds and siphon money for his personal use), QBurke, and a Florida corporation he and co-defendant William Kelly ran called Technology Tree USA, Inc.[5] *Ex. 11.*

In March 2015, Quiros obtained a $15 million line of credit from Citibank secured, in part, with $2.417 million of QBurke investor funds. Quiros apparently used $6,000,000 drawn from the Citibank line of credit to pay his 2014 federal income tax bill. *Catalog, §3, Project Overview prepared by Securities Division of the Department of Financial Regulation, Slide entitled "Collateral for Citibank Loan Transaction.*

Several months after Quiros secured the Citibank line of credit, Jay Peak's Chief Financial Officer, George Gulisano, was busy gathering information for Quiros' application for another $25 million line of credit, this time from Credit Suisse. *Ex. 14.*

For Governor Shumlin the unfinished QBurke hotel and conference center was quickly becoming a political quagmire because, in the words of Chief of Staff Miller, it

---

[5] Technology Tree International, Inc. was used by Quiros and Kelly to raise money for one of their earlier scams. According to publicly available information, Quiros was a "creative genius" who invented something he called "Techno Print," a braille printing process that allegedly used transparent epoxy automatic silk screening to place tactile dots on paper. *Ex. 12.*

Two Texas investors unsuccessfully sued Quiros and Kelly to recover their separate $130,000 investments in the company. *Ex. 13.*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

was an "economic pressure point." In her March 14, 2019 FBI interview, Miller indicated

that it got so bad that "the Governor could not go anywhere without a contractor saying

something." *Ex. 15, pp. 5-6.*[6]

DFR Commissioner Donegan confirmed that the unfinished Burke Mountain

project was a political headache for the Governor, telling federal investigators that

Shumlin was "receiving some intense pressure to include economic and political reasons.

The Governor was fixated on the QBurke project. The Governor was receiving calls from

both contractors and local representatives regarding the QBurke project." *Ex. 16, p. 3.*

In her FBI interview, Governor's Legal Counsel Sarah London confirmed that the

Governor was under pressure because contractors working on the unfinished QBurke

hotel were not being paid promptly. As a result of this pressure, the Governor's office

tried to work with Commissioner Donegan and Secretary Moulton regarding "the

logistics of getting Burke back on track, but also protecting the investors' money." *Ex.*

*42, p. 5.*[7]

When he met with the Governor on January 1, 2015, Quiros claims he told

Shumlin "about all of the problems at Jay Peak, about Stenger, about the cost overruns,

and about what they were doing. The Governor asked about a member of the Regional

Center getting arrested in China and about the Newport projects. The Governor said he

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

---

[6] During this interview, Assistant United States Attorney Paul Van de Graaf told Miller that "the state had waived attorney/client privilege in regard to Sara (sic) London." *Ex. 15, p. 1.*

The waiver was not reduced to writing and the State apparently made no effort to limit the scope of the waiver.

[7] During this interview, London advised federal investigators that "the Governor has waived executive privilege in regard to the Jay Peak matter." *Ex. 42, p. 5.*

knew about serious problems at Jay Peak. The Governor said to Quiros, 'Please promise me not to get lawyers involved.'"

After learning about the secret New Year's Day meeting from Quiros, federal investigators re-interviewed Shumlin and Chief of Staff Miller, and quizzed them about that meeting. In her interview, Miller claimed that she did not "remember anything about the [New Year's Day] meeting." *Ex. 17, p. 3.* When asked why the New Year's Day meeting was not documented, Miller indicated that she "did not think there was a requirement to document this meeting, but is not certain. Meetings about state business were put in the calendar for transparency purposes." *Id.*

On April 29, 2021, Shumlin told investigators that Quiros had been concerned that the Burke project was "being slowed down. Quiros thought the governor could just get on the phone and call them off. Quiros misunderstood the governor's job. The governor empowers people to do their jobs." Shumlin then told Quiros that "'we are doing amazing things. Give them the information they need, it will protect us all. Give them what they want.' Quiros went home with that message." *Ex. 10, p. 9.*

On January 28, 2015, DFR Deputy Commissioner Pieciak and DFR General Counsel David Cassetty met with Jay Peak's attorneys from Primmer Piper. Prior to that meeting, Pieciak had become "aware of the existence of the Raymond James Margin loan … and [had] received approximately four pages of a Raymond James account statement from … an early EB-5 investor. In addition to the information received from [the foreign investor], Pieciak had limited conversations with [ACCD Secretary Moulton], where he also learned of the existence of the margin loan." *Ex. 18, ¶3; Ex. 19, p. 1.*

Based on this information, DFR asked Jay Peak's attorneys to explain why margin loans encumbered one of Jay Peak's EB-5 entities. Jay Peak's attorneys told the

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

9

DFR officials that they would look into the matter and get back to them with an explanation for the existence of the margin loan.

In a letter dated January 29, 2015, Deputy Commissioner Pieciak requested access to SEC's investigative files. On February 24, 2015, the SEC granted Pieciak's request for access to the agency's Jay Peak investigative files. *Ex. 20.*

On February 27, 2015, Attorney Gordon sent his letter explaining why Jay Peak's EB-5 accounts were encumbered by margin loans. *Ex. 8.* After receiving this letter, Deputy Commissioner Pieciak realized that DFR "needed to go directly to the source (i.e., Raymond James)" to find what was really going on. *Ex. 19, p. 4.*

On March 4, 2015, Deputy Commissioner Pieciak sent an email to his contact at Raymond James requesting that firm's documents related to Quiros and Jay Peak's EB-5 entities. *Ex. 21.*

On March 8, 2015, Commissioner Donegan sent Stenger an email (copies of which were sent to Pieciak and Attorney Mark Scribner, the Primmer attorney who represented Jay Peak) addressing issues related to DFR's review of the AnC Bio VT project and its amended PPM. Donegan concluded by stating that DFR was:

> not going to apply a different standard to this project than to others DFR helps review and approve. All entities that pass though DFR's door in search of a license or application approval go through this type of scrutiny. If DFR recommends continued approval of AnC Bio, it will be because the project's amended PPM and associated financial review passed muster. That is good for everyone: Jay Peak, the Kingdom, your investors, and the State. *Ex. 22.*

On March 10, 2015, Raymond James produced the first batch of documents Bates stamped Peak-VT-RJA 000001- Peak-VT-RJA 000615. *Ex. 23.* Those documents included the June 2008 Investment Account Summary for Jay Peak Hotel Suites LP 1

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

showing that the account was already encumbered by a margin loan totaling $10,992,080.94. *Ex. 23.*

On March 10, the SEC sent Deputy Commissioner Pieciak a letter requesting access to "the investigative and other non-public files of the State of Vermont, Department of Financial Regulation … This request is made in connection with an ongoing lawful investigation being conducted by the [SEC]." The letter indicated that DFR's files "may be transferred to criminal law enforcement authorities. We shall notify you of any such transfer and use our best efforts to obtain appropriate assurances of confidentiality." *Ex. 25.*

Sometime before March 27, 2015, Commissioner Donegan and Deputy Commissioner Pieciak briefed Governor Shumlin, Secretary Moulton, Chief of Staff Miller, and Governor's Legal Counsel London on the progress of DFR's investigation into Jay Peak's finances. Donegan told federal investigators that she told the Governor that "there was a problem … [and] went through a presentation [that highlighted] the various problems and potential violations." *Ex. 26, ¶19.*

On Friday, March 27, 2015, Governor Shumlin, Commissioner Donegan, Secretary Moulton, Chief of Staff Miller, and Governor's Legal Counsel London met with Jay Peak's developers, including Quiros, Kelly, and Stenger, to discuss how the State's holds on the marketing of the AnC Bio VT and QBurke projects could be resolved. *Ex. 26, ¶18.*

When they were interviewed by federal investigators, State officials provided only vague descriptions of what happened during that meeting. According to Chief of Staff Miller, the purpose of the meeting was to say "something, in front of the developer, to communicate that Donegan was in charge … The goal was to 'unstick' things. The

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

11

projects had a lot of scrutiny at the time. These sorts of meetings happen to help both sides to come to a decision and, in this case, to let [the developers] know who was in charge." *Ex. 15, p. 6.*

Secretary Moulton told federal investigators that she and Commissioner Donegan "were on the same page that there was a big problem" with Jay Peak's EB-5 projects and that they conveyed their misgivings to the Governor in the course of several "uncomfortable conversations" they had with him before March 27, 2015. With regard to the March 27th meeting itself, Moulton recalled that the Governor might have taken notes, but not much else, other than sharing an unusual story about Quiros and the Governor ducking into a private room after the meeting concluded. Moulton told investigators that Quiros had brought a manila folder to the meeting and that she "later learned that the file contained pictures Quiros wanted to show to the Governor." *Ex. 27, p. 8; Ex. 28, p. 2.*

Commissioner Donegan told federal investigators that William Kelly spoke on behalf of the developers and informed Shumlin that Donegan "was standing in the way of progress. In addition, [Jay Peak] contractors needed to be paid." *Ex. 16, p. 3.* Following this meeting, Donegan met privately with Shumlin, who, according to Donegan, "was trying to establish a work around that both parties could agree to." *Id.* Donegan told investigators that she and the Governor "disagreed with each other about how to proceed going forward with the JP EB-5 projects." *Id.*

Governor's Legal Counsel London "recalled it being called a 'breaking the log jam' meeting." *Ex. 42, p. 5.*

Governor Shumlin told federal investigators he felt that "he was dealing with two people [William Kelly and Susan Donegan] who really did not like each other" and that

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

12

"[t]he meeting was not particularly eventful." *Ex. 29, p. 6.* Shumlin claimed that the "details of the new arrangement were worked out between Stenger and Donegan after the meeting." *Id.*

A few hours after the March 27, 2015 meeting concluded, DFR Commissioner Donegan sent an email to Kelly indicating that DFR was lifting the hold placed on the marketing of AnC Bio VT and had approved the project's PPM, allowing Jay Peak personnel, including Defendant Stenger, to resume soliciting investment in the project around the world. *Ex. 30.* Notably, Commissioner Donegan did not insist that AnC Bio's amended PPM incorporate include any of the suggested disclosures outlined in the November 2015 Edwards Wildman report.

DFR's approval of the amended PPM was contingent on the developer's agreement to hold any new investment in the AnC Bio VT project in escrow until either DFR approved its release or, on an investor-to-investor basis, USCIS approved the investor's I-526 petition. Deputy Commissioner Piekciak later told federal investigators that DFR's approval of the amended AnC Bio VT PPM "was 'academic' because DFR knew [the developers] would never be able to spend new money." *Ex. 19, p. 3.*

The DFR-approved AnC Bio PPM did not disclose DFR's discovery that Quiros had started stealing Jay Peak's EB-5 investor funds in June 2008 or other material disclosures related to the precarious finances of those projects. Nor did the DFR seek an additional amendment to the AnC Bio PPM requiring disclosure of Commissioner Donegan's opinion that that the project "was a fraud," and that she shared that opinion with the "governor's staff" shortly after the Vermont Attorney General's Office "got

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

13

involved, including [Attorney General] Sorrell and [Deputy Attorney General] Suzanne Young." *Ex. 26, ¶25[8].*

Commissioner Donegan's March 27, 2015 email to Kelly also addressed the Burke Mountain project. Donegan informed Kelly that the QBurke PPM would not be approved until after DFR completed its review of that project's finances and that the amended PPM for QBurke had to include "the same SEC disclosure as contained in the AnC Bio PPM."[9] Governor Shumlin told federal investigators that State officials concluded that, because the Burke hotel was "partially constructed, it was thought the investors would be better off if the building was completed – if all the money went into the project." *Id.*

---

[8]  According to Deputy Commissioner Pieciak's Timeline, Attorney General Sorrell was "updated" on August 10, 2015. *Ex. 1.* The draft complaint circulated by DFR in October 2015 that was prepared with the assistance of "an army of people at [the Attorney General's Office" has a completion date of July 2015 red-lined out. *Catalog, §4*

Taken together, these documents strongly suggest that the Vermont Attorney General's Office "got involved" in the State's Jay Peak investigation shortly after DFR approved AnC Bio's amended PPM and before DFR approved QBurke's amended PPM in July 2015.

[9]  At least two officials associated with the VRC were dismayed to learn about Donegan's decision to approve AnC Bio's amended PPM.

On March 31, 2015, ACCD General Counsel John Kessler, who was sidelined after DFR initiated its investigation into Jay Peak's EB-5 projects, sent an email to SEC attorney Trisha Fuchs-Sindler. Kessler advised her that the DFR had approved the amended PPM and that because he had not "been involved in or briefed on DFR's work" he was "unable to provide any details on the process or the outcome." *Ex. 31.*

When he was finally provided an opportunity to review AnC Bio VT's amended PPM in May 2015, VRC Executive Director Raymond informed Secretary Moulton that the new PPM put investors at risk: "The Regional Center has a moral obligation to ensure we do everything that we can to freeze any spending of investor $s that were obtained before whatever agreement was made for new investors' funds to escrow their money." *Ex. 32.*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

14

**April 2015 through August 2015 – DFR uncovers additional evidence related to Quiros' Ponzi scheme and starts developing a litigation strategy aimed at closing down Jay Peak's remaining EB-5 projects**

As it uncovered incontrovertible evidence that Quiros was systematically looting Jay Peak's EB-5 projects, DFR officials started to discuss steps the department could take to close down Jay Peak's EB-5 projects.

On April 11, 2015, in anticipation of a meeting with Governor's Legal Counsel Sarah London and Chief of Staff Miller, Commissioner Donegan distributed a discussion document in anticipation of enforcement actions related to the Jay Peak, AnC Bio, and Q Burke projects for possible violations of state securities law seeking, among other things, injunctive relief, asset seizure, and receivership. *Catalog of Material Produced by the State of Vermont Marked "Privileged" or "Confidential" (hereinafter, "Catalog"), §4.*

On May 3, 2015, Deputy Commissioner Pieciak traveled to Miami to meet with SEC investigators. *Ex. 1.* Sometime later that same month, the DFR sent a criminal referral to the FBI indicating that "DFR is currently investigating certain EB5 transactions related to JAY PEAK, AnC BIO, and Q BURKE projects. Evidence points to possible violations of securities registration and exemption noncompliance, material misstatements and omissions, conflicts of interest, self-dealing, unjust enrichment, misuse of investor funds, breach of fiduciary duty, breach of contract and tax liability. DFR has identified accounting irregularities, contractual inconsistencies and significant conflicts of interest." *Ex. 33.*

On June 22, 2015, DFR General Counsel Cassetty sent Commissioner Donegan a memo entitled "EB-5 Litigation Management: Possible Scenarios." In the memo, General Counsel Cassetty analyzed how the State could either react to an SEC enforcement action against Jay Peak's EB-5 entities or bring one on its own. In each of Cassetty's three

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

scenarios, if relief was granted by a court, investments made in Jay Peak's EB-5 projects would all but be wiped out. In fact, Cassetty's third scenario contemplated the possibility that the developers, in response to a State request to freeze EB-5 project assets, would file for bankruptcy. *Catalog, §5, Cassetty to Donegan, 6/22/201__.*

General Counsel Cassetty's memo specifically refers to a civil complaint that was already drafted and a motion for preliminary injunctive relief that was being drafted. On October 16, 2015, Cassetty sent a copy of a draft complaint with a redlined "July" date to Governor's Legal Counsel London. *Catalog, §4.* The draft complaint named the QBurke Mountain EB-5 limited partnership as a defendant and alleged a series of securities law violations including material misstatements and omissions to investors, comingling of investor funds, diversion of funds for self-enrichment, and use of funds in ways other than those specifically disclosed to investors. *Catalog, §4, Draft Complaint, ¶¶117-119.*

The allegations described in DFR's draft complaint are at odds with a statement made by one State official to federal investigators. On November 19, 2018, Deputy Commissioner Pieciak told investigators that the "Burke project was fundamentally different [from Jay Peak's other EB-5 projects]. [DFR's] investigation showed that the Burke project did not have the massive comingling and redirection of funds as was the case in AnC Bio Vermont." *Ex. 19, p. 3.*

During the summer of 2015, Deputy Commission Pieciak started preparing a PowerPoint presentation based on DFR's review of Jay Peak's EB-5 bank records and other material he would later show to top State officials, including Governor Shumlin and Attorney General William Sorrell. *Catalog, §3, DFR Project Overview, 136 pages.* Pieciak's PowerPoint presentation showed how Quiros' stole EB-5 investor funds and

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

used those funds to fund his lavish lifestyle, including the purchase of two New York

City apartments, a Miami restaurant, and a number of expensive vehicles.[10]

     Contrary to his later assertion to federal investigators that funds invested in the

Burke project were not diverted for Quiros' use, or otherwise commingled, Pieciak's

PowerPoint presentation included a slide indicating that on March 13, 2015 Quiros

funneled $2,417,000 in QBurke funds to Jay Construction Management so that it could

be used as collateral for a $15,000,000 loan from Citibank. *Catalog, §3, DFR Project

Overview, Slide entitled "Collateral for Citibank Loan Transaction."*

     The last PowerPoint slide in Pieciak's presentation is entitled "Immigration

Impact to Investors," as of August 14, 2015. The final entry in the chart indicates that

DFR expected that every foreign investor in the AnC Bio VT and Burke Mountain

projects was have their "Immigration Status Likely Negated." *Ex. 5.* After reaching this

---

[10] In his FBI interview, General Counsel Kessler indicated that "around July or August
[2015]" Pieciak "gave a Powerpoint presentation that included a 'spaghetti chart'." *Ex.
35, p. 7.* The "spaghetti chart" showed how Quiros moved investor money through
different accounts as he coordinated various aspects of his Ponzi scheme.

The Catalog includes the PowerPoint presentations prepared by Pieciak that defense
counsel was able to locate in the discovery provided by the United States Attorney's
Office. The 136-page document entitled "Project Overview prepared by the Securities
Division of the Department of Financial Regulation" is the only one that included the
"spaghetti chart."

In her FBI interview, Secretary Moulton told federal investigators that she "got called
into a meeting to go over the 'spaghetti chart.' She remembers the blood draining from
her face. The Governor had the same reaction. Finally, they had all the evidence." *Ex. 28,
p. 8.*

In her IRS interview, Donegan informed federal investigators that "DFR told Governor
Shumlin about irregularities in accounting, transactions that didn't make any sense, and
purchases of property and luxury items. They showed the governor an abbreviated
'spaghetti map' which displayed the flow of many banks, bank accounts, and entities
involved." *Ex. 26, ¶24.*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

17

conclusion, DFR took no steps requiring amendments to the AnC Bio VT and Burke

Mountain PPMs warning potential investors that DFR predicted that their immigration

status would be "negated."[11]

In a separate PowerPoint Presentation entitled "QBurke Mountain Resort and

Conference Center: Overview of Evidence," Deputy Commissioner Pieciak described

how funds invested in the Burke Mountain project had been used "to pay an invoice for

another project." *Catalog, §3, QBurke Mountain Resort, Overview of Evidence, Slide*

*entitled "Use of QBurke investor funds to pay an invoice for another project."* This slide

indicates that on April 16, 2014, Quiros diverted $1,213,626 in QBurke investor funds to

Jay Construction Management to pay a DEW invoice related to the construction of the

Jay Peak Lodge & Townhouses and Jay Peak Hotel Suites.

### DFR approves QBurke's amended PPM and authorizes the sale of that security to unwitting foreign investors

In a letter dated July 13, 2015, Commissioner Donegan approved QBurke's

amended PPM and lifted the hold on the marketing of the Burke Mountain PPM,

allowing Jay Peak's developers, including Stenger, to resume soliciting EB-5 investment

in that project. *Ex. 37*. DFR approved the following paragraph that purportedly described

the risks related to any further investment in the Burke project:

### SEC Review and Inquiry and DFR Review

The SEC is conducting a review of all Jay Peak EB-5 Projects and other related
EB-5 Projects. The SEC has interviewed the principals of the Jay Peak EB-5
Projects and other related EB-5 Projects who are also principals of the General
Partner in this Project. The SEC periodically communicates through counsel with
additional questions and requests for additional documents. The project sponsors

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

---

[11] In a recent deposition, ACCD Secretary Moulton recalled seeing this PowerPoint slide.
*Ex. 36, p. 279.*

of the Jay Peak EB-5 Projects and other related EB-5 Projects have provided financial information as requested by the SEC and will continue to provide information if so requested. The General Partner does not know if any action may be required or taken by the SEC in connection with the Project. The Vermont Department of Financial Regulation ("DFR") has taken over certain responsibilities from ACCD in running the Vermont Regional Center, including ensuring that all immigration and securities laws are being complied with and conducting a financial review of all EB-5 projects within the Vermont Regional Center, including this Project. *Ex. 38.*

Despite having uncovered evidence proving that Quiros had been systematically diverting EB-5 investor funds from the moment he had access to them in June 2008 when he purchased Jay Peak with EB-5 investor funds, DFR did not require the PPM to include any of the following information:

- Quiros had previously diverted EB-5 investor funds to purchase the Burke Mountain Ski Resort
- Quiros had diverted EB-5 funds invested in the QBurke project to pay invoices for two other Jay Peak EB-5 projects
- Quiros had diverted EB-5 funds invested in the QBurke project to be used as collateral for a $15 million loan from Citibank in March 2015
- DFR was developing a litigation strategy that would, if successful, lead to the takeover of all of Jay Peak's EB-5 entities, including QBurke, and render further investment in that project worthless
- DFR had drafted a complaint alleging a number of serious securities violations related to the QBurke project and requested relief that would render further investment in that project worthless
- DFR had prepared a PowerPoint presentation that would show that the immigration status of all QBurke investors would "likely be negated"

Commissioner Donegan's approval of the amended QBurke PPM required that new investor funds remain in an escrow account and would be only used to pay for "specific expenses" related to "the construction of the hotel and conference center, architect fees, State permits and fixtures/furnishings. Funds shall be released to pay such expenses only upon approval by DFR through its third party construction project consultant." *Ex. 37.*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

On January 25, 2019, Donegan told federal investigators that Vermont's Deputy Attorney General, Bill Griffin, "got involved and had to approve any disbursements of Q-Burke money." *Ex. 16, p. 4.* About a year later, on January 24, 2020, in an interview with an IRS agent and other federal investigators, Donegan indicated that "The second way [QBurke] funds could be released from escrow was through DFR approval. [DFR's General Counsel] David Cassidy (sic) worked with Bill Griffin, Deputy Attorney General, to approve billables to contractors." *Ex. 26, ¶22.*

According to a spreadsheet created by DFR, between July 14, 2015 and December 24, 2015, $12.5 million raised from 25 foreign investors was transferred to QBurke's EB-5 partnership account to pay for the construction of Burke Mountain's unfinished hotel and conference center. *Ex. 45.*

### September 2015 through April 2016

On September 4, 2015, according to a timeline compiled by now-DFR Commissioner Pieciak indicates that DFR officials "informed" the "U.S. Attorney, FBI and IRS." *Ex. 1.* Pieciak's timeline indicates that officials from DFR were in regular contact with representatives of those agencies through December 3, 2015. *Id.*

Consistent with the DFR's two-track strategy, Assistant Attorney General Jon Alexander distributed a "Jay Peak Litigation Hold Notice" to Commissioner Donegan, Secretary Moulton, Governor's Counsel London, and Deputy Attorney General Suzanne Young. *Catalog, §1.* The notice informed the recipients of the message that State agencies needed to preserve "all documents related to possible litigation concerning Jay Peak and Burke Mountain Projects in the 'EB-5 Program,' a federal visa initiative designed to give foreign investors a legal path to obtain United States residency." *Id.*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

On October 16, 2015, DFR General Counsel David Cassetty sent Governor's Legal Counsel London a copy of a draft complaint that was being prepared by "an army of people" at the Vermont Attorney General's Office. The draft complaint listed the QBurke Mountain EB-5 limited partnership as a defendant. Paragraph 119 of the draft complaint reflected the misuse of Burke's EB-5 investor funds as described in Pieciak's PowerPoint presentation, and alleged that Burke Mountain project funds had been co-mingled with funds from other Jay Peak EB-5 projects and otherwise diverted for "improper purposes and self-enrichment." *Catalog, §4.* Notably, the PowerPoint presentation did not suggest, or point to any evidence, that Stenger stole any investor money.[12]

In a Memo to File dated December 18, 2015, Deputy Commissioner Pieciak analyzed Quiros' use of the Raymond James Margin loans. *Ex. 34.* Pieciak's Memo indicates that "Ariel I. Quiros ('Quiros') was the sole authorized signatory for all four accounts" and "as the individual margin account analysis will illustrate, it does appear Quiros used the margin accounts as vehicles to launder money between accounts and projects." *Ex. 34, pp. 1, 3.* The Memo included the following chart and finding:

| JCM (AnC Bio Investor Funds) | $ 21,490,210.97 |
| Lodge and Townhouses Investor Funds | $ 3,960,000 |
| Account 72 | $ (11,960,000) |
| Burke Mountain Resort Purchase | $ (7,010,000) |
| Stateside Accounts | $ (5,780,000) |

---

[12] The draft complaint also refers to Quiros' acquisition of the New York City apartments, a Miami restaurant, expensive vehicles, and other property with "<u>misappropriated</u> investor funds." (emphasis in the original). *Catalog, §4, Draft Complaint, ¶¶65-68.* As noted above, several slides in the PowerPoint presentation shown to State officials in August and September 2015 refer to Quiros' purchase of the same property.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

Accordingly, AnC Bio investor funds, through JCM are laundered through Account 89 to cover the following debts: (i) $5,780,000 carry over debt from Account 26; (ii) $7,010,000 at acquire the Burke Mountain Resort; and (iii) $8,000,000 to Q Resorts. *Ex. 34, p. 8.*

DFR did not require amendments to either the AnCBio VT PPM or the QBurke PPM to disclose Pieciak's stunning conclusion that "Quiros used the margin accounts as vehicles to launder money between accounts and projects" and that "AnC Bio investor funds, through JCM [were] laundered … to cover" a number of debts incurred by Quiros. Nor did DFR make any effort to notify Stenger that his business partner had used his Raymond James margin accounts to launder money.

On April 5, 2016, General Counsel Cassetty sent Assistant Attorney General Scott Kline and Governor's Legal Counsel London drafts of two "QBurke affidavits." General Counsel Cassetty's email described the two affidavits: "Here are 2 drafts, one Mike[13] did which omits any substantive evidence from QBurke, and a more robust one." *Ex. 39.* The more "robust" draft affidavit included this statement:

> Instead of simply paying QBurke project expenses, investor funds were used as follows: $1,213,626 was used to pay for project expenses of [two other Jay Peak EB-5 projects]; at least $4,887,000 was used to secure a personal line of credit for Quiros, and additional sums were used to repay margin debt incurred through margin accounts in the name of other projects. *Ex. 39, Second draft affidavit,* ¶11.[14]

The affidavit drafted by Deputy Commissioner Pieciak omitted any mention of inappropriate misuse of QBurke investor funds. *Ex. 39, ¶¶9-13, First draft affidavit.*

---

[13]  The only "Mike" on the DFR team responsible for investigating Jay Peak's EB-5 entities was Deputy Commissioner Michael Pieciak. *Ex. 26, ¶6.*

[14]  "Mike's" robust affidavit drafted in April 2016 is inconsistent with his November 19, 2019 statement to federal investigators that "[t]he Burke project was fundamentally different [from Jay Peak's previous EB-5 projects]. [DFR's] investigation showed that the Burke project did not have the massive co-mingling and redirection of funds as was the case in AnC Bio Vermont." *Ex. 19, p. 3.*

JARVIS, McARTHUR
& WILLIAMS

ATTORNEYS AT LAW

SUITE 2E – PARK PLAZA

95 ST. PAUL STREET

P. O. BOX 902

BURLINGTON, VT

05402-0902

802-658-9411

On April 7, 2016, Emily Kisicki sent Commissioner Donegan, General Counsel Cassetty, Assistant Attorney General Kline, and others a "revised version of the [Jay Peak] complaint. Two documents are included: an annotated copy that reflects changes to the last version, and a clean copy for ease of reading." *Catalog, §5, Kisicki to Donegan, 4/7/16, 4:28 pm.*

Ten minutes after receiving Kisicki's email, Commissioner Donegan forwarded the email and the revised version of the complaint to Governor's Counsel London. *Catalog, §5, Donegan to London, 4/7/16, 4:38 pm.*

The April 7th revised (i.e., "red and blue-lined") version of the complaint crossed-out QBurke's EB-5 entity as a defendant and struck the claim for relief related to the misappropriation and misuse of QBurke investor funds that had been featured in the draft complaint General Counsel sent to Governor's Counsel London in October 2015. *Catalog, §5 (April 7, 2016 draft complaint).*[15]

On April 14, 2016, the Vermont Attorney General's Office filed a civil complaint in the Vermont Superior Court alleging that Quiros, Defendant Stenger, and Jay Peak's EB-5 projects had violated Vermont's securities law. *Ex. 43.* The Complaint does not name the QBurke EB-5 limited partnership as a defendant or allege any misconduct related to the Burke Mountain project. *Id.*[16]

---

[15] Only two pages of the 68-page red-lined version of the revised complaint are included in the Catalog. Defense counsel has reviewed the entire document and can confirm that the "Seventh Claim" as set forth in the October draft complaint was red-lined in the April 7, 2016 version of that document.

[16] Over the last 18 months, USCIS has denied many of the QBurke investors' immigration petitions. In addition to some having their immigration status "negated," it is counsels' understanding that QBurke's foreign investors have yet to recoup any of the money they invested in that project.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

**July through August 2016: The State's response to USCIS's request for information related to the VRC's oversight of Jay Peak's EB-5 projects**

On July 8, 2016, USCIS served Secretary Moulton with a "Notice of Action: Request for Information," that included a series of questions related to VRC's oversight of Jay Peak's EB-5 projects. *Ex. 40.*

On August 26, 2016, ACCD Secretary Moulton circulated the final draft of a report responding to USCIS's July 8th Request for Information to Governor's Counsel London and Deputy Attorney General Griffin. *Catalog, §2, Moulton to Sarah London and Bill Griffin, 8/26/16.*[17] Moulton's report included the following false and misleading statement:

> Prior to clearing Burke's revised PPM in July 2015, DFR's investigation confirmed that previously raised Burke EB-5 monies had been properly used for project purposes. *Ex. 41, p. 20.*

On August 29, 2016, Governor's Counsel London forwarded Moulton's 8/26/16 email to the Governor's Chief of Staff Darren Springer and Press Secretary Susan Allen telling them it was "critical to highlight (again) that Burke is not a defendant in this case, as in done in written answers as opposed to the questions." *Catalog, §2, London to Springer and Allen, 8/29/16.*

Defense counsel has been unable to locate any evidence that State officials alerted William Stenger that his Miami-based business partner, Ariel Quiros, was running a

---

[17] The report was apparently prepared with assistance of the Boston law firm of Locke Lord, the successor firm to Edwards Wildman that prepared the draft report addressing issues related to the amended AnC Bio VT PPM in November 2014.

On August 25, 2016, Attorney Allison O'Neil forwarded the firm's final report responding to USCIS's July 8, 2016 "Notice of Action: Request for Information" to the following State officials: ACCD General Counsel John Kessler, DFR Commissioner Michael Pieciak, ACCD Secretary Pat Moulton, Joan Goldstein, Lucy Leriche, Tyler Purington, and James Whitehouse. *Catalog, §2, Moulton to London and Pieciak, 8/26/16.*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
05402-0902
BURLINGTON, VT
802-658-9411

Ponzi scheme and misappropriating tens of millions of dollars of EB-5 investor money to fund his lavish lifestyle. State officials certainly knew this before approving the QBurke's amended PPM in July 2015, thus authorizing Stenger to solicit further investment in that project from unsuspecting foreign investors. We also now know that when she responded to USCIS's July 2016 Request for Information Secretary Moulton falsely reported that "[p]rior to clearing Burke's revised PPM in July 2015, DFR's investigation confirmed that previously raised Burke EB-5 monies had been properly used for project purposes."

## MEMORANDUM OF LAW

**1. The documents currently filed under seal are relevant to issues that will be explored during the sentencing phase of this case**

Defendant Stenger entered a guilty plea to one count of providing false documents to the VRC in January 2015. The Court has scheduled an evidentiary hearing in October 2021 so that the parties may present evidence relevant to determining Stenger's offense level under the Sentencing Guidelines, including loss calculations, restitution amounts, and §3553(a) factors. *See United States v. Goodrich*, __ F.3d ___ (2d Cir. 2021), slip op. 9/1/21 (The MVRA authorizes restitution only for losses 'directly and proximately caused by a covered 'offense' of conviction").

The State documents filed under seal will demonstrate that Stenger (a) did not control Jay Peak's EB-5 entities' operating accounts; (b) did not steal any investor funds; and, (c) was not made aware of the State's discovery in 2015 that his crooked Miami-based business partner was operating a Ponzi scheme.

The State documents filed under seal will also help put Stenger's offense conduct, i.e., filing the false documents in January 2015, into perspective and provide context to

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

the State's decision to approve AnC Bio VT's and QBurke's amended PPMs later that year.

In addition, the State's approval of those amended PPMs reinforced Stenger's good-faith belief that the projects were in full compliance with state and federal securities law and that his conduct in marketing those securities in 2015 was entirely lawful. The State's decision to authorize Stenger personally to resume marketing the AnC Bio and QBurke PPMs in 2015 demonstrates that State regulators did not believe Stenger participated in Quiros' theft of investor funds. On the other hand, the State's requirement that new investment in those projects had to remain in escrow was, in part, to protect investors from Quiros' criminal conduct.

The documents under seal also support the defense theory that had State officials knew that if they had disclosed Quiros' unlawful conduct to Stenger, he would have ceased his fund-raising activities, and turned his attention to making things right with the investors who Quiros had systematically victimized.

**2. The State has waived privilege in documents voluntarily provided to federal investigators**

When a party voluntarily discloses or consents to disclosure of otherwise privileged material, that party waives its claim to privilege. *Rueger v. Natural Resources Board*, 191 Vt. 429 (2012); V.R.E. 510(a) ("A person upon whom these rules confer a privilege against disclosure waives the privilege if that person or the person's predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter"); Fed. R. Evid. 502(a) ("When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

communication or information in a federal or state proceeding only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness be considered together").

In this case, the State of Vermont appears to have voluntarily provided documents clearly marked "privileged" to federal investigators reviewing Jay Peak's EB-5 projects. We know that then-Deputy Commissioner Pieciak agreed to provide access to the State's investigative files and that the SEC specifically warned Pieciak that State files "may be transferred to criminal law enforcement authorities." *Ex. 25.* A federal grand jury subpoena was served on the State for the production of documents related to Jay Peak's EB-5 entities and the State apparently complied with that subpoena. *Ex. 18, ¶1.*

In addition, former Deputy Attorney General Griffin forwarded documents directly to the United States Attorney's Office, including three marked "Attorney Client Privilege," including Deputy Commssioner Pieciak's Powerpoint presentation entitled "Q Burke Mountain Resort and Conference Center LP: Overview of Evidence," a document that was included in Section 3 of the Catalog and is the subject of this motion to unseal. *Ex. 43.*[18]

All of the documents that are the subject of this motion to unseal were provided to defense counsel by the United States Attorney's Office in discovery. It is counsels' understanding that the State did not prepare or serve any privilege logs when it produced the documents that are the subject of this motion to unseal. Nor is there any written agreement between the State and federal investigators requiring that those documents

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

---

[18] Defense counsel did not have access to Griffin's 9/12/19 email until August 2021.

remain confidential or otherwise protect them disclosure as required by Fed. R. Crim Pro. 16 or this Court's Local Rules.

Because it is unclear (a) who provided copies of the State documents marked "privileged" to federal investigators (other than the documents Griffin forwarded directly to the United States Attorney's Office on 9/12/19); (b) the circumstances related to the production of those documents to federal investigators; and, (c) whether the communications are subject to any claimed privilege, the Court needs to schedule an evidentiary hearing to resolve these factual issues before consideration of the scope of the State's waiver of any privilege it may now claim in those documents. *Upjohn Co. v. United* States, 449 U.S. 383 (1981) (whether communications are subject to attorney-client privilege is determined on case-by-case basis); *In re Erie* County, 473 F.3d 413, 418 (2d Cir. 2007) (Second Circuit "construes the [attorney-client] privilege narrowly because it renders relevant information undiscoverable; we apply it only where necessary to achieve its purpose"); *Baisley v. Missisquoi Cemetery Association,* 167 Vt. 473 (1998) (application of *Upjohn* test to determine whether communication was privileged); *State v. Kennison*, 149 Vt. 643 (1987) (person claiming attorney-client privilege has burden to demonstrate that communications are privileged).

### 3. The State has waived attorney-client privilege in regard to Governor's Legal Counsel Sarah London

According to Assistant United States Attorney Paul Van de Graaf, the State waived attorney-client privilege in regard to Governor Shumlin's Legal Counsel Sarah London. After reviewing the discovery provided by the United States Attorney's Office, it is unclear to defense counsel who waived the privilege, whether there is a written or

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

28

oral waiver of the privilege, and the scope of the waiver of the attorney-client privilege. *Ex. 15.*

Vermont's governor is in charge of the Executive Branch of the government of the State of Vermont. Vermont Constitution, Chap. II, §20. ("The Governor is also to take care that the laws be faithfully executed"). In that regard, State officials who run various State agencies (agency secretaries, department commissioners, etc.) are appointed by the governor and report directly to the governor.

In her capacity as Legal Counsel to Governor Shumlin, Sarah London regularly communicated with State officials who were responsible for overseeing Jay Peak's EB-5 projects, including AnC Bio VT, and offered her advice about how to proceed. In her FBI interview, London described her activities in this regard in great detail, including the advice she provided to ACCD General Counsel John Kessler and DFR General Counsel David Cassetty. London acknowledged that she "was aware that Locke Lord (the law firm) was in the mix." *Ex. 42, p. 5.*

Because it will be necessary to identify (a) the scope of the State's waiver of attorney-client privilege as to Sarah London; (b) who waived the privilege and whether the waiver was reduced to writing; (c) the communications that are subject to that waiver; and, (d) whether London's disclosure of her discussions with ACCD Secretary Moulton, DFR Commissioner Donegan, Chief of Staff Miller, ACCD General Counsel Kessler, DFR General Counsel Cassetty, and other executive branch officials to federal investigators further waived privilege in those communications, the Court needs to schedule an evidentiary hearing to resolve these factual issues before consideration of the scope of the State's waiver of attorney-client privilege. *Upjohn Co. v. United* States, 449

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

U.S. 383 (1981) (whether communications are subject to attorney-client privilege is determined on case-by-case basis).

### 4. Governor Shumlin has waived any claim the State may have had to executive privilege

In her FBI interview, Governor Shumlin's Legal Counsel Sarah London informed federal investigators that "the Governor has waived executive privilege." *Ex. 42, p. 5.*

As noted above, a number of documents provided to federal investigators by the State of Vermont are marked "Attorney-Client Privilege and Executive Privilege Communication." To determine whether privileges that might otherwise have protected the confidentiality of these communications, Court needs to schedule an evidentiary hearing to resolve these factual issues before consideration of the scope of the State's waiver of executive privilege. *Upjohn Co. v. United* States, 449 U.S. 383 (1981) (whether communications are subject to attorney-client privilege is determined on case-by-case basis).

### 5. Crime/fraud exception to attorney-client privilege

By June 2015, DFR knew that Quiros was operating a Ponzi scheme and had misappropriated tens of millions of dollars invested in Jay Peak's EB-5 projects to purchase two ski resorts, two luxury NYC apartments, a home on Darling Hill Road in Lyndonville, Vermont, a Miami restaurant, a block of buildings in downtown Newport, Vermont, and at least four vehicles, including a Porsche sports car. In addition, Quiros had used investor funds to pay for his daughter's divorce lawyer, more than $150,000 in condominium association fees, and $157,000 in credit card expenses.

Nevertheless, DFR, which was responsible for insuring compliance with federal and state securities laws, decided that the AnC Bio VT and QBurke PPMs did not have to

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

disclose to potential investors that the State had uncovered Quiros' Ponzi scheme or that the immigration status of investors in those projects would "likely be negated."

Had DFR insisted that the AnC Bio VT and QBurke PPMs contained such material disclosures, it is highly unlikely that anyone would have invested any money in either of those projects after June 2015. And without the additional infusion of foreign investment, the local contractors working on Burke Mountain's hotel and conference center would not have been paid and the project could not have been completed.

After reviewing evidence related to the final 18 months of State oversight of those two projects, one may conclude that State officials knowingly facilitated and then participated in a scheme to defraud the EB-5 investors who purchased shares in the AnC Bio VT and QBurke projects after the State re-authorized the sale of those securities in 2015.

The communications of State officials related to the apparent scheme to defraud QBurke's EB-5 investors are not privileged. *United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1997) ("The crime-fraud exception removes from the privilege those attorney-client communications that are 'relate[d] to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct'").

To determine whether the crime/fraud exception applies to attorney-client communications, a court goes through a two-part process. "First the proposed factual basis must strike a 'prudent person' as constituting a 'reasonable basis to suspect the perpetration or attempted perpetration of a crime or a fraud, and that the communications were in furtherance thereof.' Once there is a showing of a factual basis, the decision whether to engage in an *in camera* review of the evidence lies in the discretion of the district court." *United States v. Jacobs*, 117 F.3d at 87.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

31

In this case, the communications at issue have already been filed with the Court. The facts set forth in this memorandum and the documents filed by defense counsel under seal demonstrate that there is "probable cause to believe that" State officials facilitated and then participated in securities fraud to raise at least $12.5 million between July 2015 and December 2015 in an effort to complete a hotel that was, in DFR Commissioner Donegan's words, at the root of "some intense pressure to include economic and political reasons."

Because the crime-fraud exception removes the privilege from attorney-client communications related to the approval of the AnC Bio VT and QBurke amended PPMs in 2015, the Court should grant Defendant Stenger's motion to unseal those documents. *United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1997)

## CONCLUSION

For the reasons advanced above, the Court should grant this motion to unseal the documents that are subject to this Court's May 27, 2021 order.

DATED at Burlington, Vermont this 8th day of September, 2021.

> /s/David J. Williams
> David J. Williams, Esq.
> Jarvis, McArthur & Williams
>
> Attorney for Defendant, William Stenger

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411