# Exhibit 5



EDWARDS WILDMAN PALMER LLP
111 HUNTINGTON AVENUE
BOSTON, MA 02199
+1 617 239 0100 main  +1 617 227 4420 fax
edwardswildman.com

**Via E-Mail**

| | |
|---|---|
| **To:** | Brent Raymond |
| | John Kessler |
| **CC:** | Stanley Keller |
| **From:** | Walter J. St. Onge III |
| **Date:** | November 3, 2014 |
| **Client-Matter No.:** | 223386-0003 |
| **Re:** | Amended and Restated Private Placement Memorandum ("PPM") for Jay Peak Biomedical Research Park L.P. ("Issuer") |

This memorandum summarizes issues that we have identified to date regarding the PPM prepared by the Issuer in connection with its proposed offering under the so-called EB-5 Program of the United States Citizenship and Immigration Services ("USCIS"). As you know, we had reviewed an earlier version of the PPM and based on that review, you had asked the Issuer to revise it to describe more clearly material information for potential investors.

As we have discussed, our review is not the equivalent of the typical diligence that would be performed by underwriter's counsel with respect to a transaction of this sort. Much more detailed review and analysis would be needed to satisfy that standard. We have reviewed the revised PPM and the accompanying exhibits that were included. Based upon that review of the materials sent to us, we have the following observations:

1. There have been significant changes made to the PPM, as evidenced by the extensive redlining in the version we received. Much of the information appears to be material and does not necessarily simply reflect more recent developments, but may call into question the accuracy and completeness of earlier documents.

    a. The PPM should describe risks relating to potential liabilities on account of prior sales, including the nature and consequences of prior misstatements being corrected and the status of SEC investigation and potential consequences.

    b. What are the Issuer's plans to provide this information to existing investors?

    c. Will existing investors be offered rescission rights?



BOSTON • CHICAGO • HARTFORD • HONG KONG • ISTANBUL • LONDON • LOS ANGELES • MIAMI • MORRISTOWN
NEW YORK • ORANGE COUNTY • PROVIDENCE • STAMFORD • TOKYO • WASHINGTON DC • WEST PALM BEACH



2. The PPM needs more clarity as to the current status of the project. Describe how the funds already raised (apparently $69.5 million, plus administrative fees from 139 investors of $6.95 million) have been applied, including amounts paid to interested or related parties, the amount of remaining funds and expected timing and use of such funds. Include discussion of the adequacy of the remaining funds and additional amounts to be raised to complete the project and the associated risks if sufficient capital is not raised, both from the perspective of compliance with the EB-5 immigration requirements as well as the potential impact on any financial return on the investment.

3. Without limiting the generality of the foregoing, the PPM should address all aspects of the project, including:

   a. total sources and uses of funds to date,

   b. all intended future uses of funds,

   c. provide a current GAAP balance sheet for the Issuer,

   d. status of design of project and expected construction schedule,

   e. status of permits and approvals needed for construction of the facility,

   f. status of and intentions regarding all rights pertaining to intellectual property, including:

      i. the source and nature of the intellectual property rights,

      ii. how such rights have been valued for purposes of the various related party transactions that have occurred or are planned, and

      iii. the steps taken to protect that property.

   g. the status of the Business Operation and Properties Transfer Agreement between AnC Bio, Inc, and AnC BioPharm:

      i. The price to be paid is stated to be determined at a later date. Has it been determined and, if so, what is the price and on what basis was it determined?

      ii. Is the project responsible in any way for paying that amount and, if not, how might that affect rights to the intellectual property purportedly transferred or licensed to AnC Bio VT LLC?

   h. description of all FDA and other regulatory approvals necessary to market the expected products and status of such approvals.



4. Describe in one place all the interested party transactions, including expected future transactions, if any, showing total amounts paid and payable to such parties and the relationships among such parties.

5. Describe clearly rights of holders of limited partnership interests and limitations on those rights, with references to the Limited Partnership Agreement.

6. Describe more clearly how the entity in which investors will have an interest will derive income and sources of value, including without limitation (a) the nature, expected operations, and anticipated financial results of the Joint Venture, (b) the Issuer's contributions to and interest in the Joint Venture and (c) the contributions to be made to the Joint Venture by ANC Bio USA, LLC (and how they will be valued if not in cash).

7. Describe clearly the management and control of the Joint Venture and the resulting position of the Issuer and its investors.

8. Describe the credentials, qualifications and capabilities of the sponsors and personnel to implement business plan, including reasons for believing in the efficacy of the science and status of and prospects for required licensing and approvals.

9. Indicate key assumptions underlying each item of the forecast in the Business Plan. The exhibits to the PPM include numerous letters of support for the project and some general information on the market for products such as those expected to be produced at the facility, but they do not appear to have been prepared specifically for this facility and may be outdated (2007 in one case and 2011 in another).

    a. The key financial projection is the Projected Income and Expenses table – 2 versions are shown – one for 2013-2018 and the other one for Year One – Year Five. Slightly different results are shown.

    b. Which projection is the current expected case? More importantly, the underlying assumptions used by management to make these projections should be detailed in the PPM, including, in particular, how sales projections may be affected by the current status of required regulatory approvals.

10. The PPM includes information regarding the prior Jay Peak EB-5 projects and their "success." Is this information accurate? In light of apparent investor complaints regarding earlier projects, if the earlier projects are being used to promote the latest one, then it seems that problems with the earlier ones also need to be disclosed, particularly since the problems appear to relate to the financial results rather than the immigration aspects of those projects. In addition, we note that photographs on the cover of the PPM appear to be of Korean facilities and this could be misleading. They should be clearly labeled.



11. You also asked us to consider possible issues concerning compliance with the Investment Company Act of 1940. The following questions relate to that compliance, though the issues may also overlap with other applicable federal and state securities laws:

    a. Will the Issuer continue to own the land and facility once complete? What compensation, if any, will be paid for its use? By which entity?

    b. Other than such real property, its interest in the Joint Venture and funds awaiting expenditure, what are and will be the Issuer's assets?

        i. Identify any equity in any entity (in addition to the Joint Venture) that has been or will be acquired by the Issuer and provide details of the entity's purpose and remaining ownership.

    c. How are the Issuer's funds invested pending expenditure?

        i. Provide specific descriptions of the Issuer's current and anticipated investments, e.g., deposit account, money market fund, short-term bond fund, with amounts for each.

    d. Will the Joint Venture acquire any equity or other interests in an entity?

12. In addition, we also believe you should ask who is handling the SEC investigation for the Issuer and project sponsors and ask that you, the Vermont AG's office or perhaps our Firm speak with them regarding the status and nature of that matter.

13. Have you or the Issuer had any discussions with the Vermont securities department or any other state securities law regulators regarding this project? If so, what have been the nature of those discussions?

14. Finally, you may also want to consider engaging an outside third party to conduct an independent records/background investigation, including the relevant parties in Korea.

AM 40235922.3