UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2021 SEP 20  PM 4: 57**

CLERK

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA,  )

v.  )  Docket No. 5:19-cr-76-4

WILLIAM STENGER,  )
Defendant.  )

## GOVERNMENT'S BRIEF REGARDING
## WILLIAM STENGER'S RELEVANT CONDUCT

William Stenger has admitted that he submitted materially false information to the Vermont EB-5 Regional Center (VRC) about the AnC Vermont EB-5 project. The issue of Stenger's guilt is resolved. The remaining question for the Court is the scope of Stenger's relevant conduct for sentencing purposes. The facts show that Stenger was not just a bystander to the fraud that occurred, but an integral part of the sweeping fraud scheme, which could not have happened without his involvement.

On August 13, 2021, Stenger pleaded guilty to Count 14 of the indictment, charging him with knowingly and willfully submitting a false document to the VRC. As agreed by Stenger in Paragraph 6 of the Plea Agreement (Doc. 350) and discussed during his change of plea hearing, the United States will offer evidence of the broader wire fraud conspiracy alleged in the indictment as relevant conduct for sentencing purposes, and the Court can and will consider that evidence in calculating Stenger's advisory sentencing guidelines. The parties have agreed to an evidentiary hearing regarding offense conduct prior to the preparation of the Presentence Report, and the Court has scheduled the hearing to begin on October 12,

1

2021.  Pursuant to agreement by the parties, the government files this submission[1] in advance of the hearing, with the understanding that the defense will file any response by October 4, 2021.

While the defendant is not entitled to an evidentiary hearing regarding factual disputes at sentencing, *see, e.g., United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir. 1990), the parties agree that an evidentiary hearing is appropriate here.  The hearing is pursuant to Federal Rule of Criminal Procedure 32(i) and U.S. Sentencing Guidelines Section 6A1.3.  *See also United States v. Fatico*, 579 F.2d 707, 713 (2d Cir. 1978).  In connection with this sentencing, "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. §6A1.3.

---

[1] This submission provides a factual overview of Stenger's relevant conduct.  The government reserves the right to raise, and will raise, additional facts at the upcoming offense conduct hearing.  The government will address sentencing guidelines and other legal issues in future submissions and proceedings.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Introduction and Summary | 4 |
| II. | Background on the EB-5 Projects | 6 |
| III. | The Jobs and Financial Projections Deceit | 9 |
| | A. | The Initial Vision for the AnC Vermont Project | 10 |
| | B. | Stenger's Unsuccessful FDA Attempt | 12 |
| | C. | Devising the Projections for the Offering Materials | 14 |
| | D. | The Three Lines of Business | 20 |
| | | 1. The Clean Rooms Mirage | 21 |
| | | 2. The AnC Vermont Project Had No Stem Cell Product | 23 |
| | | 3. The Artificial Organs Would Require Years and Millions of Dollars to Commercialize | 24 |
| | E. | Sticking to the Party Line | 26 |
| | | 1. Stenger's Deflection of Early Questions and Recognition of Their Lack of Plan | 26 |
| | | 2. Rounds of Questions from VRC, CIS, SEC, and Investors | 27 |
| | | 3. Marketing the Same Party Line in 2015 and 2016 | 38 |
| IV. | The Misuse of Investor Funds | 39 |
| | A. | The Purchase of the Resort in 2008 | 40 |
| | B. | Cost Overruns on Phase 1 | 46 |
| | C. | Stenger's Knowledge About the Raymond James Margin Loans in 2008 | 47 |
| | D. | Cost Overruns on Phase 2 and Accounting for the Phase 1 Cost Overruns | 50 |
| | E. | JCM as a Vehicle to Commingle Funds | 54 |
| | F. | The Hulme Separation and Its Aftermath | 56 |
| | G. | The Stateside Shortfall | 63 |
| | H. | The AnC Vermont Budget | 65 |
| | I. | The Misapplication of AnC Investor Funds | 68 |
| | | 1. The 2014 Raymond James Margin Loan Payoff | 71 |
| | | 2. The Citibank Line of Credit | 75 |
| | J. | Financial Misrepresentations to the SEC | 78 |
| | K. | Financial Misrepresentations to the VRC | 80 |
| V. | Other Marketing Misrepresentations | 84 |
| | A. | Misrepresentations about the Number of Current Investors | 85 |
| | B. | Deceit about VRC Oversight | 86 |
| | C. | Misleading Statements about AnC Construction Timeline | 92 |
| | D. | The Misleading Narrative about the SEC Investigation | 95 |
| VI. | Conclusion | 98 |

I.      Introduction and Summary

This is a case about greed, glory, and desperation.  Bill Stenger had visions of grand expansions at the Jay Peak Resort and in his town of Newport, Vermont based on EB-5 money.  He found a businessman, Ariel Quiros, willing to embrace those visions in hopes of large profits.  Those visions were crippled, however, by huge debts that proved difficult to cover.  Those debts arose from Quiros and Stenger's purchase of the resort with loans backed by other people's money and by Stenger's multimillion dollar cost overruns on the first two EB-5 projects.  The handling of those debts ultimately led to Stenger and Quiros losing control of the resort and the EB-5 projects in 2016.

The first project in the Newport phase of Stenger's vision was a biotechnology business, AnC Vermont.  Stenger, Quiros, and William Kelly have admitted guilt in connection with the marketing and financial management of the AnC project.  Quiros and Kelly have pleaded guilty to conspiring to engage in a fraud scheme hatched even before they began finding investors for the AnC Vermont project.  These two men have admitted to participating in two key aspects of the fraud: generating and promoting false job numbers based on false financial projections, and secretly misapplying investor funds based on hidden profits in the project and using AnC investor funds to cover debts associated with other projects.  During the scheme, the Securities and Exchange Commission (SEC) and the VRC investigated whether the defendants were engaging in fraud.  As they have admitted, the defendants made misrepresentations to the VRC to keep the AnC project moving forward.  They also tried to deceive the SEC.

There is no dispute that a fraud occurred.  The key dispute for the Court to resolve is the extent of Stenger's role in that fraud.  Stenger has so far already admitted to submitting

false documents in order to get the project back into the market in early 2015. That admission represents just one example of Stenger knowingly participating in the charged fraud scheme. This memorandum summarizes evidence proving that Stenger's offense conduct—his participation in the fraud—was much broader. The government will present further evidence at the scheduled hearing.

Like Quiros and Kelly, Stenger knowingly participated in the AnC scheme before the first investor's money was received. Stenger participated in promoting the false financial and jobs projections part of the scheme from 2012. He participated in the secret misapplication of investor funds from at least 2011. Specifically, he commingled investor funds that further infected the AnC project in various ways. Further, Stenger crafted misrepresentations to the investors about the success of the resort projects, the success of AnC fundraising, the scope of state monitoring, and the seriousness of the SEC investigation.

The Court should reject any suggestion that Stenger was duped by his co-defendants, or that he was powerless to uncover answers to essential questions about the handling of investor money or the plans for the AnC Vermont business. Throughout the life of the scheme, Stenger held himself out as a knowledgeable businessman in control of the EB-5 projects. He traded on the trust that people had in him. The Jay Peak EB-5 projects simply could not have happened without Stenger. Even if he did not have answers to questions about the money, or about the AnC project, he had the power to demand them. When Stenger failed to seek or provide answers, it was because he knew the answers would jeopardize his EB-5 fundraising.

Stenger had multimillion dollar financial stakes in the success of the scheme. The SEC suit, however, extinguished his hope for financial rewards beyond the high salary he had

5

enjoyed for years. Stenger's most obvious motive, though, was ego. The Vermont EB-5 projects grew from his vision. It was a vision built on a flawed foundation. Stenger wanted to be the savior of Jay Peak and the Northeast Kingdom. He could not fail. He became desperate to keep the projects going forward. Even when he knew he was in the wrong, he furthered the fraud, to keep his place on the high pedestal of public perception.

II.     Background on the EB-5 Projects

The EB-5 Immigrant Investor Program was created by Congress in 1990 to boost the United States economy through job creation. EB-5 immigrant investors had the opportunity to become lawful permanent residents of the United States by investing in job-creating enterprises in the country. Specifically, EB-5 immigrant investors who invested $500,000 in a commercial enterprise approved by the VRC and by U.S. Citizenship and Immigration Services (CIS) could qualify for permanent resident status, commonly known as obtaining a green card. In order to obtain a green card, each investor would need to demonstrate to CIS that his or her investment had created, or would create within a few years, ten jobs.[2]

Stenger spearheaded eight EB-5 projects in Vermont's Northeast Kingdom between 2006 and 2016. Over this time, Stenger raised over $400 million from over 800 immigrant investors hoping to achieve a lawful path to United States citizenship. Stenger, who had been President and manager of the Jay Peak Resort for many years, worked on this effort alongside Quiros. Quiros was a businessman from Miami, Florida who Stenger convinced to purchase the Jay Peak Resort in 2008. Kelly, a longtime business advisor to Quiros, assisted the two men. In April 2016, after a multi-year investigation, the SEC filed suit against Stenger,

---

[2] The CIS process occurred in two steps: first investors submitted applications (called I-526s) for conditional green cards, and two years later the investors submitted applications (I-829s) to remove the conditions.

Quiros, and numerous entities associated with the EB-5 projects. The court granted the SEC's request for appointment of a Receiver to assume control of the Jay Peak Resort and EB-5 projects and accounts, bringing an end to the defendants' fundraising efforts.

Stenger worked with state and federal politicians to create the VRC, a federally-designated regional center originally approved by CIS in 1997. The VRC had the authority to approve and monitor EB-5 projects in Vermont, and assisted CIS in the regulation and administration of the EB-5 investment program. When the VRC approved an EB-5 project, it would enter into a memorandum of understanding (MOU) with the project sponsor setting forth the Regional Center's and project sponsor's roles and responsibilities. The VRC was part of the Vermont Agency of Commerce and Community Development (ACCD) until late 2014, when the Vermont Department of Financial Regulation (DFR) joined ACCD as a partner in VRC.

Stenger's first six EB-5 projects raised funds for development projects at the Jay Peak Resort. In total, these projects raised $282 million from 564 investors. These EB-5 investors signed limited partnership agreements with their project's general partner entity, which gave the general partner control over the use of partnership funds. For each of the first six Jay Peak EB-5 projects, Stenger was the sole person in charge of the general partner entity. This means, in effect, that these investors entrusted Stenger with the management of their $282 million.

The final two EB-5 projects that were underway before the SEC shut down Stenger's fundraising efforts moved beyond the Jay Peak Resort to elsewhere in northern Vermont. Stenger had an expansive vision for numerous EB-5 projects totaling $600 million that he wanted to bring to fruition, which he dubbed the "Northeast Kingdom Economic Development Initiative." Not all of the projects that Stenger wanted to implement got off the

ground, but he did receive VRC approval and raise millions in investor funds for two of them: the Jay Peak Biomedical Research Park (AnC Vermont) project, and a new hotel and other facilities at Burke Mountain.

According to the offering documents and other written materials assembled by Stenger, the AnC Vermont limited partnership was supposed to construct and own a biotechnology facility, purchase distribution rights for certain medical products from a Korean company owned by co-defendant Alex Choi, and participate in operations at the AnC Vermont facility. The revenues from the project would come from three lines of business: sales of artificial organs, sales of stem cell products, and rentals of clean rooms. The general partner entity for the AnC Vermont project consisted of both Stenger and Quiros. In addition, AnC Vermont had a "project sponsor" entity called AnC Bio VT LLC, which originally included Stenger, Quiros, and Quiros's son, but eventually included just Stenger and Quiros. As described below, although AnC Vermont was initially envisioned as a $50 million project, it was revamped to raise $110 million from immigrant investors by the time Stenger began fundraising in 2012.

In addition, in 2013, Stenger and Quiros started an EB-5 project to raise money for development at Burke Mountain, which Quiros had purchased in 2012. The Burke project was supposed to raise $110 million. Stenger and Quiros were both members of the general partner entity for the Burke project.

The AnC Vermont and Burke projects were not fully subscribed—meaning, not all the investor funds had been raised—by the time the SEC filed suit in 2016. Before the defendants lost control of the projects, Stenger had raised approximately $85 million from 169 investors for the AnC project, and approximately $53 million from 107 investors for the Burke project.

III.     The Jobs and Financial Projections Deceit

The AnC Vermont project was unlike all of the defendants' prior EB-5 projects, which had focused on construction of hotels and amenities at Jay Peak. In contrast, AnC Vermont involved the design and the construction of a sophisticated biomedical facility; the development, approval, and sale of medical devices and stem cells products; and the operation of a first-of-its-kind clean room rental business. This project not only ventured into a new-to-Stenger industry, but also turned out to be the first EB-5 project that the defendants brought into the market without the assistance of Douglas Hulme, an accountant who created the offering materials for the six resort projects, and who, as described below, severed his business relationship with the defendants in early 2012.

The cornerstone of the AnC Vermont project, like all EB-5 projects, was job creation. Stenger knew that in order to sell the AnC Vermont project, the primary objective was to convince investors, the VRC, and ultimately CIS that the project would soon create the requisite number of jobs. As discussed below, this proved challenging for a number of reasons including the significant capital needs of the biomedical project and defendants as well as the lack of any real prospect of the project generating revenue in the near term; biotechnology startups do not generate revenue quickly. To fill the gap, Stenger intentionally obtained and used a jobs forecast based on inflated financial projections to ensure that the project would get permission to raise the money that he and Quiros needed. Stenger then vigorously defended the fabricated financial and jobs projections until the SEC filed suit in 2016. Stenger's submission of materially false documents to the VRC in January 2015—the crime he has admitted committing—is just one example of years of his deceit about the AnC

9

Vermont project. The lies in the January 2015 documents, about the financial projections and product commercialization timeline, were central to the fraud scheme.

A.    The Initial Vision for the AnC Vermont Project

Stenger came up with the notion of the AnC Vermont project and began to implement the idea by 2009. He had attended the grand opening of Choi's biomedical facility in Korea in 2006 and wanted to establish a research center in the Northeast Kingdom funded by EB-5 investors. (Ex. 1.) Stenger initially envisioned this as a $40 to $50 million project, with the investors coming from Korea. From the beginning, Stenger appreciated the importance of FDA approval to the project's timing and legitimacy. (Exs. 2, 196.) Quiros's son's notes from a July 2009 meeting with Stenger state "[w]e need to show that this project has the potential to obtain [FDA] approval. We would not be able to develop this project if there is no potential to success." As these notes reflect, Stenger also appreciated the selling power of portraying *potential*, as opposed to *actual*, success.

Although the project was still little more than an idea at the time, Stenger pushed to announce it during a fall 2009 visit to Choi's Korean facility with James Douglas, the governor of the State of Vermont. Indeed, in October 2009, while Governor Douglas was visiting Korea, Stenger signed an MOU with the VRC for the AnC Vermont project. During that same trip, Stenger and Quiros signed an MOU with Choi's Korean company, which was witnessed by Governor Douglas, setting forth "the basic understanding of the strategic partnership between AnC Bio Vermont LLC and AnC Bio Inc. and the necessary support by the State of Vermont in encouraging the import of these advanced technologies into the state." (Ex. 3.) Stenger ensured that the Vermont press covered this event. (Ex. 4.)

Refinement of the project was largely on hold between 2009 and 2012, though the defendants increased the amount they wanted to raise to $100 million in 2011. They also purchased the property where AnC was to be located. Stenger had planned to purchase the property in Newport where the Bogner ski clothing facility was located at the time he first floated the idea for the project in 2009. (Ex. 2.) After delays, Stenger finally convinced Quiros to buy the 26-acre Bogner property for $3.2 million in July 2011. (Quiros used investor funds from earlier projects to pay for the land.) (Exs. 5, 6.) At the time, a Newport social service organization was renting the newer part of the existing structure, which was later demolished to make way for the never-constructed AnC facility.[3] The older part of the existing structure had housed the ski clothing manufacturing and warehouse operation.[4]

Triggered by the Bogner land purchase, Stenger organized a well-attended August 2011 press conference launching the AnC project even though there was no serious plan for this $100 million project.[5] Stenger had no evidence that he could create the requisite jobs, and had no budget. His strategy of getting the public and the politicians behind the *idea* of a project played a key role in his marketing of AnC. The idea of the project was more important to the defendants, including Stenger, than the plans needed to create a viable, properly approved project.

---

[3] Ironically, Stenger's purchase of the Bogner facility drove jobs out of Newport.

[4] For a time, the defendants hoped that a German window manufacturer, Menck, would use the older part of the building. The Menck deal fell apart.

[5] In September 2011, Choi sent Quiros and his son a new budget for AnC that doubled the project to $100 million. Quiros's son responded "we cannot double the price. We will send out red flags to everyone in Vermont." (Ex. 8.) By that point, however, Stenger had already adopted the $100 million plan.

B.    Stenger's Unsuccessful FDA Attempt

The project did not progress quickly after the announcement and MOU signing in Korea. Stenger, knowing that obtaining FDA approval to sell the products would be necessary—and that the appearance of FDA progress was also critical—took the lead on trying to move the regulatory process forward. In mid-2010, Stenger attempted to use his federal political connections to make inroads at the FDA. He provided paperwork regarding one of the contemplated medical devices, called the T-PLS, to the FDA and asked how to get it approved. In response, FDA representatives sent him form-type primers on the FDA's medical device classifications, regulatory requirements, and requirements for submitting materials and requesting meetings. (Ex. 7.) As Stenger correctly observed to Quiros in July 2010, and reiterated in substance many times in the following years, "I really need advice from someone technical as I can't answer many of these [FDA] directives. I . . . need someone like Ike Lee or another tech advisor to help."

Despite the obvious need for technical and regulatory leadership for the project, none of the scientists involved ever made an effort to seek FDA approval.[6] Instead, in January 2011, Stenger took it upon himself to attempt to obtain "510-K classification" for the T-PLS.[7] (Ex. 9.) Stenger sent a letter to the FDA attaching "significant documents that I feel will be helpful" and requested a meeting in the following two weeks. Unsurprisingly, Stenger's meager and uninformed effort failed. The FDA responded to him the following month and explained that the requested approval "will require bench, animal and clinical studies, prior

---

[6] As discussed below, in reality, the products needed significant development before they would be ready for submission to the FDA. The scientists, who knew this, avoided FDA engagement.

[7] There are two main regulatory paths for artificial organs to get approval: Premarket Approval (PMA), which requires clinical trials, or 510(k) approval, which requires a showing that the device is substantially equivalent to an already-approved device. If the FDA grants 510(k) approval, clinical trials are not required, so this path is faster.

to submission of a Premarket Approval Application (PMA)," with a brief description of the steps and FDA submissions necessary to undertake this process. (Ex. 10.) In the alternative, the FDA noted, the T-PLS might qualify for the quicker 510(k) approval if the proposed use for the device was narrowed. The FDA advised Stenger "[i]f you have never submitted a 510(k) before, you might want to consider hiring a consultant with this kind of experience." Like Stenger, the FDA recognized him as out of his depth. In conclusion, the FDA noted that it was closing out Stenger's T-PLS submission until he identified which regulatory route he wished to follow. Stenger forwarded the email to Quiros, stating "it seems they want some studies" and asking some questions about potential next steps. Then in March 2011, Choi told Stenger which product he hoped the FDA would view as substantially equivalent to the T-PLS, permitting 510(k) approval, but concluded his email with two fundamental questions he "would like to learn" about whether the FDA would view the product as substantially equivalent despite having different mechanisms and components than the T-PLS. (Ex. 11.) An objective review of Choi's email raises significant doubt about whether the T-PLS could obtain the FDA's faster 510(k) approval, and emphasizes that the defendants would need someone with United States regulatory expertise to manage the FDA process. Nonetheless, in May 2011, Stenger wrote another brief letter to the FDA stating he planned to pursue the 510(k) process for T-PLS. (Ex. 12.) This was the final correspondence that anyone from the AnC Vermont team ever submitted to the FDA about the T-PLS or any other AnC Vermont technologies.

Despite this, Stenger repeatedly lied to investors and VRC regarding FDA progress. For example, the offering memorandum, as well as promotional materials that Stenger assembled, include a portion of a presentation put together by Choi that states that the T-PLS

is "[c]urrently under process of US FDA approval (2012)" and the C-PAK is "[c]urrently under progress of US FDA approval (2013)." (Ex. 20 at 5720220, 5720222; Ex. 23 at 5514057.40, 5514057.42.) In response to a January 2013 email from a potential investor asking if they had received FDA approval, Stenger replied "Yes for the building." (Ex. 14.) This was false: the FDA had not approved the building (which, incidentally, had not been designed), and Stenger knew it.

C.     Devising the Projections for the Offering Materials

In 2012, Kelly and Stenger took the lead on putting together the AnC Vermont offering materials so they could begin raising money from investors. The process of drafting the offering materials was essentially an exercise in concocting figures to justify the ends—meaning fundraising—that they wanted to achieve. The materials were finalized in late 2012. In October 2012, in the leadup to the project hitting the market, Stenger and Quiros signed an updated MOU with the VRC.

The written materials about the AnC Vermont project, which were provided to investors, the VRC, and CIS, included a business plan. The foundation of this business plan came from Choi.[8] Choi created slide presentations and spreadsheets about the AnC Vermont project beginning in 2009, and shared multiple versions with Quiros and others over the following years. Choi's early plans for the AnC Vermont project envisioned revenue from only two lines of business: sales of medical devices and sales of stem cell products. (*E.g.*, Ex. 15.) Then, in 2012, Choi added a third line of business called "GMP Lease," for which Choi projected revenue from clean rooms, equipment, and labor. (Ex. 16.)

---

[8] The business plan was amended in Spring 2014 in order to respond to a Request for Evidence (RFE) from CIS. Relevant changes to the business plan are discussed herein.

14

Stenger received a copy of Choi's projections in May 2012, when Kelly asked Gulisano to use Choi's plan to create "a display of the financials." (*Id.*) Notably, the projections that Stenger received revealed other significant data points about Choi's plan: he did not envision any sales occurring until 2015, after three years of construction; and he envisioned employing a total of 104 people in the facility once the project was fully operational, in 2017.

Gulisano used Choi's documents to create a "Projected Income and Expenses" table that was included in the offering materials:

| Description | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | TOTAL |
|---|---|---|---|---|---|---|---|
| **ANC Bio Vt LLC** Projected Income and Expenses 2013- 2018 | | | | | | | |
| **REVENUE** | | | | | | | |
| Clean room fees, equipment rental and ancillary services | $      - | $      - | $14,000,040 | $20,500,080 | $24,600,072 | $ 27,500,016 | $ 86,600,208 |
| Stem cells | - | 1,825,000 | 7,300,000 | 30,000,000 | 90,000,000 | 150,000,000 | 279,125,000 |
| Artificial organs | - | 375,000 | 21,150,000 | 52,750,000 | 90,850,000 | 128,950,000 | 294,075,000 |
| **TOTAL REVENUE** | | 2,200,000 | 42,450,040 | 103,250,080 | 205,450,072 | 306,450,016 | 659,800,208 |
| **COST OF GOODS SOLD** | | 867,750 | 12,830,000 | 36,025,000 | 75,935,000 | 115,845,000 | 241,502,750 |
| **PRODUCTION LABOR** | | | | | | | |
| Clean room ( see assumptions) | - | - | - | - | - | - | - |
| Artificial organs | - | 121,500 | 1,610,000 | 6,500,000 | 19,500,000 | 32,500,000 | 60,231,500 |
| Stem cells | - | 114,750 | 4,230,000 | 10,550,000 | 18,170,000 | 25,790,000 | 58,854,750 |
| **TOTAL PRODUCTION LABOR** | - | 236,250 | 5,840,000 | 17,050,000 | 37,670,000 | 58,290,000 | 119,086,250 |
| **GROSS PROFIT** | | 1,096,000 | 23,780,040 | 50,175,080 | 91,845,072 | 132,315,016 | 298,211,208 |
| **SELLING, GENERAL AND ADMINISTRATIVE** | 618,800 | 1,714,053 | 2,948,390 | 3,457,951 | 4,299,991 | 5,129,190 | 18,168,374 |
| **INCOME (LOSS) BEFORE TAX, AND DEPRECIATION** | $  (618,800) | $  (618,053) | $20,831,650 | $46,717,129 | $87,545,081 | $127,185,826 | $ 281,042,834 |

(Ex. 20. at 5720052.) These financial projections represented that the project would begin generating revenue in 2014, contrary to Choi's plan. Nonetheless, Stenger provided the project materials with these projections to investors, VRC, and CIS, and kept providing them until mid-2014, when they were updated.

Although not included in the offering materials, Gulisano's spreadsheet also included additional tabs with underlying calculations, which were shared with Stenger. (Ex. 17.) As Stenger has already admitted, the financial projections were important to investors because

15

they impacted both business revenues that would justify an exit plan repaying their investments, and CIS approval based on job creation. Yet, before the project was even in the market, Stenger recognized that the projections were inflated. In August 2012, Stenger emailed Quiros and Kelly seeking information to support the exit strategy for the project. He wrote:

> What are the sales prospects for the products planned to be sold in the US from the manufacturing done here. ? . . . Second is What kinds of stem cell research will be done at the facility and vacsine produced and what kind of profit is in the vacsine production business. Again this is to answer the question of how will income be produced and how much demand is there in the market for this kind of product. Lastly the 'clean rooms'. I'm told by all that there is a shortage of this kind of facility in the world and especially in North America. If true, is there any third party article or document that states this. . . . So all three elements of the exit strategy need a bit of rounding out and frankly embellishing to get the sale made.

(Ex. 18.)

Notably, even when Choi added "GMP Lease" to his plans, he envisioned that the project would involve a total of 10 clean rooms with revenue of $500,000 each (*i.e.*, $5 million total) annually. Stenger was copied on Kelly's instruction to Gulisano to increase the number of clean rooms from 10 to 40 with revenue of $300,000 each (*i.e.*, $12 million total) annually. Soon thereafter, the number of clean rooms was further increased to 50 for the projections.[9] As Kelly explained to Quiros in a subsequent email, they needed to increase the number of clean rooms "so that we could increase operating revenues so that we could create more jobs. With the increased number of clean rooms, we are now showing 1400+ jobs for USCIS review, or approx. $70 mm Budget. I believe that we will be able to show approx. 1800 jobs or $90 mm Budget with a little more tweaking." (Ex. 19.) In short, the defendants were

---

[9] As discussed below, the defendants never had a design plan for a building with 50 clean rooms.

seeking to increase the amount of money they would raise (and therefore the number of EB-5 investors) for the project, but were struggling to come up with the required number of jobs to support the number of investors they wanted. They increased clean rooms as a way to bridge the gap.

Because Hulme was gone, Stenger and Kelly took the lead on obtaining the job creation projections for the AnC Vermont project. In June 2012, Stenger hired Lisa Petraglia, an economist who had previously done EB-5 jobs analyses for Hulme, to create the job impact analysis report for the project. In summer 2012, Kelly sent Petraglia the still-evolving AnC revenue projections. Because the project was seeking $110 million from 220 investors, Stenger, Kelly, and Quiros needed to convince CIS that the project would create 2,200 jobs.

Petraglia's AnC Vermont jobs report was finalized around December 4, 2012 and included in the project offering materials.[10] (Ex. 20 at 5720155.) The overall number of jobs that Petraglia calculated that the project would create were totaled from two separate phases of the project: (1) the development or construction phase, meaning while the facility was being built, and (2) the operations phase, meaning after the facility was completed and operational. The construction phase jobs figures were calculated, using economic modeling software, from the amounts of money that Kelly and Stenger told Petraglia would be spent on construction, equipment, and infrastructure. The operations phase jobs figures were based on two different inputs: the specific number of people that Stenger told Petraglia would be hired by the new business, and economic modeling predictions using the business's anticipated payroll and materials expenditures, which were based on the revenue projections. For each phase,

---

[10] This jobs report was updated several times over the course of the AnC project, primarily to address questions raised by CIS. Relevant changes are discussed herein.

Petraglia's analysis included not only the number of people expected to be directly employed because of the project (for example, construction workers who built the facility or laboratory technicians who worked in the facility), but also downstream jobs anticipated because of increased spending in the community (for example, restaurant workers and dry cleaners). These "economic impact" figures were calculated using an economic modeling program.

Stenger successfully obtained a jobs analysis that reflected the requisite number of jobs for the $110 million the defendants wanted to raise. The December 4, 2012 report predicted that the AnC project would create a total of 1,081 development phase jobs in Vermont over two years of construction, and 1,728 jobs during the first three years of operations (1,209 jobs during the first two years). After revisions, Petraglia's amended jobs report for the project, finalized around May 9, 2014, predicted 860 construction-phase jobs over two years, and 1,670 operational jobs over the first three years that the facility was functioning. (Ex. 13 at 5020212.213.)

Stenger knew that both the construction and operations phase job calculations were overstated and inaccurate. For example, the development phase figures included $12 million in "construction supervision costs," which, as discussed below, were simply built-in profits to enrich the defendants and help them fix the financial hole they had created. To put it bluntly, this money was not going to create jobs in Vermont, and Stenger knew it. Nonetheless, Stenger and Kelly had Petraglia use the amount that would be paid for construction supervision in the jobs analysis, and ultimately CIS credited this $12 million for the creation of 236 jobs. (Ex. 21.)

For the operations phase calculations, Stenger's central role in inflating the jobs creation numbers is obvious from the documentary evidence. In an email exchange with

18

Petraglia in August 2012, after Petraglia told Stenger that they would not hit the requisite job number within two years, Stenger wrote to Petraglia:

> I am looking at the building usage and see direct jobs for AncBio at about 250 and in the clean rooms another 250. Thus 500 direct. If that is correct what would our construction and indirect [jobs] and induced [jobs] be if the direct [jobs] are at 500. I am trying to get us to the highest defensible level we can. Sales levels are flexible at this point but need to be defensible but could go upward if this helps.

(Ex. 22.) In response to Petraglia's follow-up question about whether the business would support so many jobs before 2016, Stenger then confirmed that they would have 507 jobs in the first year of operations, which he identified as 2014, and that this figure would remain consistent for 2015 and 2016. Remarkably, Stenger wrote these emails to Petraglia about a week after he had implored Quiros and Kelly to help him "round[] out" the sales prospects he was touting for the project. (*See* Ex. 18.) Petraglia confirmed that this level of hiring would clearly result in the requisite number of jobs within two years, assuming they also counted construction jobs. Stenger responded, copying Kelly, and stated "I would like to proceed as this scenario is logical operationally and is getting us where we want to be." Later, as Stenger and Kelly were trying to finalize the offering materials in November 2012, Kelly confirmed for Petraglia that when the clean rooms were at 100% occupancy, the new business would hire 250 clean room employees. Ultimately, Petraglia's initial jobs report assumed 370 jobs in the first year of operations, 250 of which would be clean room employees. In other words, the jobs analysis was based on the assumption that the developers would be able to rent the

inflated 50 clean rooms with six people working in each room[11] beginning immediately when the facility opened for business.

Stenger assembled and disseminated marketing materials for AnC Vermont throughout the entire 2012 to 2016 timeframe, and they repeatedly emphasized the inflated job and financial projection numbers. For example, a set of marketing materials dated September 2012 opened with a memo signed by Stenger that addressed "four major questions every investor is interested in knowing answers to[,]" each of which addressed obtaining CIS approval and financial outcomes for the investors. (Ex. 23.) Stenger, who had baselessly told Petraglia to assume that the facility would employ over 500 employees beginning the day it opened, nonetheless told investors that when they petitioned CIS to remove their green card conditions (*i.e.*, two years after obtaining their conditional green cards), "manufacturing, sales and investor proceeds will . . . be fully underway. Meeting the removal of conditions criteria will go successfully as it has for all Jay Peak projects. Jay Peak projects have 100% success rates at the [conditional green card] and [removal of conditions] stages." Stenger, who knew that he made up a key employment number for the job creation report, nonetheless promised investors that CIS would approve the jobs numbers for the project.

D.    The Three Lines of Business

The operational jobs forecast for the AnC Vermont project depended on revenue streams from three lines of business:  artificial organs, stem cells, and rental of clean rooms. The revenue projections for each of these business lines were unattainable in the timeframes necessary for obtaining CIS approval.

---

[11] To avoid potential CIS concerns about which clean room jobs counted, the defendants said that, of the six people they claimed would work in each clean room, five would be employed by the AnC company, and one employed by the tenant renting the room. They did not include the one tenant employee in their jobs figures.

1.    *The Clean Rooms Mirage*

The income projections in the original business plan include a total of over $86 million in revenue over four years, beginning with $14 million in 2015, for the rental clean rooms. As discussed above, the clean rooms played a prominent role in the job creation figures to ensure the project hit the requisite numbers. The assumption that Stenger decreed and reiterated to Petraglia, that AnC Vermont would rent 50 clean rooms as soon as it opened, was faulty for a number of reasons. First, it was inconsistent with the financial projections in the original offering memorandum, which—still optimistically but more realistically—anticipated that only half of the clean rooms would be rented the first year, which was forecasted to be 2015.[12] (Ex. 17.) According to these projections, eventually occupancy would ramp up to 90% in 2018. In 2014, when the defendants updated the business plan in response to a series of RFE questions from CIS, they made the clean room revenue projections more consistent with Stenger's 2012 assertion that all 50 would be rented from day one. Rather than a revenue ramp-up over time, the 2014 amended business plan forecasted $32 million in revenue for every year beginning when the facility opened. While this was more consistent with the assumptions in the job creation analysis, it was not based on any serious analysis and was not realistic.

Second, the actual plan for the AnC Vermont facility never had 50 clean rooms. To the extent anyone was actually attempting to design a plan for the business, it was Choi, and his original plan did not envision clean room rentals at all. As described above, when Choi did add "GMP Lease" to the plan, he only contemplated 10 clean rooms. A Choi email to

---

[12] Although Gulisano had prepared financial projections for a facility with 50 clean rooms pursuant to Kelly's request, the projections that ended up in the original offering memorandum were based on only 40 clean rooms. This is just one of many inconsistencies and errors within the figures in the offering documents, likely due to the lack of a legitimate plan or knowledgeable project leader.

Quiros in October 2012 attaching a writeup about the AnC Vermont project confirmed that the "50 clean rooms" talking point was devised solely to support the jobs projections: ". . . in this paper, it introduce[s] 50 clean rooms, which I remember you want me to put this statement for some political reasons, even though we are going to follow the original plan, which is 10 clean rooms and artificial organ manufacturing facility." (Ex. 24.) Indeed, the engineering designs for the AnC Vermont building only ever had less than 30 clean rooms, so Kelly, Quiros, and Choi tried to obscure the actual number of clean rooms by using labels like "Clean Rooms and Support" and "Clean Room Stations." (Exs. 25, 197.)

Third, the clean room rental concept promoted by Stenger was not a viable business idea. There was no market for rental clean rooms. The scientists involved in the project had a different vision than the clean room rental concept that Stenger repeatedly touted. Throughout 2013 and 2014, Stenger posed questions to Ike Lee, a Korean scientist who was held out as the CEO of the AnC Vermont business. Lee responded with written summaries that discussed a contract manufacturing organization (CMO) business. (*E.g.*, Exs. 26, 198.) Lee's explanations blended the clean room rental and stem cell lines of business together into a single discussion of CMO for cell therapy companies.

Then, during an audio-recorded fall 2014 meeting with Frost & Sullivan that Stenger hosted and attended, Lee explained that expecting academic institutions to rent the AnC Vermont clean rooms was "a little bit of a far-fetched dream" and academic institutions were unlikely to want to use the facility because they have their own.[13]  This completely contradicted one of Stenger's talking points: that universities would be a key customer of the rental clean rooms, particularly because of AnC Vermont's proximity to academic institutions

---

[13] The government will submit excerpts of this recording at the offense conduct hearing.

in Canada and the United States. Frost & Sullivan also explained to Stenger and his team that there were two types of stem cell manufacturing facilities, "hotel model" and CMO, which must be kept separate. (Ex. 27.) The rental clean room concept Stenger that promoted more resembled the "hotel model," which Frost & Sullivan advised "will not generate sufficient revenue to sustain operations."

Indeed, the defendants never even entered into any preliminary negotiations with any prospective clean room tenants, nor did they have a model clean room rental contract to share with potential customers. In 2013, CIS asked for an example clean room rental contract, so Kelly drafted a one-page document about "Contract Research Operations" and "Contract Manufacturing Operations" for Stenger to include in the materials for investors to submit to CIS. (Ex. 28.) The document fell far short of a contract, and underscored how nascent the defendants' clean room rental plans were. When the SEC asked for documents supporting the defendants' clean room rental optimism, the only materials that Kelly could pull together included a small handful of letters or emails expressing enthusiasm about biotechnology or possible scientific collaboration, but not a single expression of interest from any third party about renting the clean rooms. (*See* Exs. 29, 199, 200.)

## 2. *The AnC Vermont Project Had No Stem Cell Product*

The revenue projections in the business plan anticipated over $279 million from selling stem cell therapy over five years, beginning in 2014. The underlying spreadsheets prepared by Gulisano, based on Choi's plans, attributed this income to "Stem Cell 1" and "Stem Cell 2." (Ex. 17.) The description of the purported stem cell business in the business plan was vague and brief, stating that AnC Vermont would do "stem cell processing, therapy,

manufacturing and development" with a paragraph about heart muscle cell regeneration. (Ex. 20 at 5720049.)

The reality is, the AnC Vermont project had no stem cell products. The heart muscle product described in the business plan is actually a product called Myocell belonging to a company called Bioheart. Although Bioheart previously had a connection to AnC Korea, it had severed ties with AnC Korea by approximately 2011. In addition, the Myocell product was not commercially viable. This is why, when Stenger asked Ike Lee for promotional materials or answers to questions that had been raised by third parties, Lee's responses blended the clean room and stem cell business lines into a single concept. As Stenger admitted when he pleaded guilty, the lack of stem cell products was clear to him by late 2014, when he was working with the consulting firm Frost & Sullivan to address questions raised by VRC. During the audio-recorded fall 2014 meeting with Frost & Sullivan, Ike Lee clearly stated more than once that they did not have a cell therapy to bring to market, and that they needed to look for potential CMO client companies. At one point, Stenger specifically asked Lee about Bioheart and its heart regenerative program, and Lee explained that Bioheart did not get approval and was still running clinical trials, mostly outside of the United States. The reality is, even if AnC Vermont did have the Myocell or any other stem cell product, it was still years away from FDA approval, and Stenger knew this.

        3.     *The Artificial Organs Would Require Years and Millions of Dollars to Commercialize*

According to the project business plan, AnC Vermont was also going to develop and manufacture three types of artificial organs (also known as medical devices): the T-PLS, an artificial heart-lung machine; the C-PAK, a portable hemodialysis machine; and the E-Liver, an artificial liver device. The income projections in the original business plan forecasted a

24

total of over $294 million in revenue from the artificial organs over five years, beginning in 2014, with over $21 million predicted for 2015. These figures remained consistent in the amended business plan, except the initial year of revenue was pushed back to 2016, with over $21 million predicted for 2017. Gulisano's calculations underlying the revenue chart in the business plan, which were shared with Stenger in 2012, show that these figures were based on the assumptions that the T-PLS would be sold in the first year of operations, and all three devices would be sold in the second year.

In reality, although a version of the T-PLS was used clinically in Korea and elsewhere in Asia, the number of uses was small (approximately 500), and included clinical trials. Jake Lee, the AnC Vermont scientist most focused on artificial organs, told Stenger this in June 2014. (Ex. 30.) Moreover, the T-PLS needed to be updated before it could be marketed due to complaints from customers. Jake Lee stated this during the fall 2014 meeting with Frost & Sullivan. During the same meeting, Stenger made statements about "this generation of T-PLS" compared with the one in Korea, establishing that he knew the device needed to be updated before it could be commercialized by AnC Vermont.

The C-PAK and E-Liver were even further behind: both were still in development and, although they had been used in several dozen animal studies, they had never been used in clinical cases. Jake Lee's June 2014 email to Stenger included this information as well.

As Stenger admitted during his plea hearing, the fall 2014 process with Frost & Sullivan made clear to him that the artificial organs in the AnC Vermont business plan either did not exist yet or required updating. Stenger also admitted that he knew that the FDA approval process was potentially a lengthy one, that obtaining FDA approval would require assistance from someone with regulatory expertise, and that no one associated with the AnC

Vermont project had communicated with the FDA about any of the AnC Vermont business line ideas since Stenger exchanged letters with the FDA about the T-PLS in 2011.

E.      Sticking to the Party Line

As discussed above, the narrative that the AnC Project would generate revenue and jobs based on the three lines of business was false when initially developed, and it became even more false as the years went by. Similarly, Stenger knew in 2012 that the plan needed "rounding out and frankly embellishing" to sell to investors, and his knowledge that the plan was false became even more definite over the years. Meanwhile, throughout the entirety of the AnC Vermont project, various third parties including community members, potential investors, regulators, and the media raised valid and prescient questions about the project. Nonetheless, Stenger continued to promote the project as initially conceived to investors, and to defend it to anyone who inquired, up until the SEC filed suit in April 2016. When questions were raised, Stenger's reactions generally consisted of some combination of deflecting the issues, calling the motivations of the third party into question, or providing cursory answers.

1.      *Stenger's Deflection of Early Questions and Recognition of Their Lack of Plan*

Among the questions posed by third parties about the AnC Vermont project early on was a 21-page report authored by a nurse in Newport in January 2013 that was submitted to a state senator and ultimately routed to ACCD and Stenger. (Ex. 31.) Among other things, the report, which contained citations to dozens of publicly available sources, pointed out questionable financial transactions involving Choi, Quiros, and Kelly; noted that research was still underway for the T-PLS and C-PAK; and described Bioheart's large financial deficit and apparent breakup with Quiros. Stenger's response, after receiving the report, was to tell ACCD "[t]he product we are focusing on in Newport is the TPLS pump which was favorably mentioned in the research. The c-pac is still in research and testing. The cosmetic line planned

26

is protein based and not stem cell based. The clean rooms are meant to meet market demand of the growing bio science industry. I can't speak for the other 'stuff' of Bio Heart but know what we are doing and the business is sound."[14]  (Ex. 32.)  This email nicely encapsulates Stenger's role in the fraud scheme: he posed as the trusted and knowledgeable voice of the project, while in fact he knew that the guarantees he was making were untrue.

### 2.    *Rounds of Questions from VRC, CIS, SEC, and Investors*

Throughout the entirety of the project, whenever Stenger asked the Koreans about how to move forward on FDA approval, they deferred retaining FDA advisors until they actually had a concrete product or prototype.  And in reality, no development was going to take place until they found funds to invest in the products and finished the facility.[15]

For example, in October 2013, Stenger faced difficult questions about the project from both CIS and VRC.  CIS issued the first of two RFEs for the AnC Vermont project because it had determined that the business plan and jobs report did not demonstrate that the project would create the requisite jobs.  (Ex. 33.)  Among other things, CIS asked for data or analysis to support the "market analysis" for the TPLS and C-PAK.  Around the same time, the VRC asked questions about topics that Stenger has admitted lying about in his January 2015 submission to the VRC: the financial projections for the project, and the timeline for commercialization for the products.  (Ex. 34.)  The evidence shows that Stenger knew that the financial projections were fraudulent, and that no progress was being made on the FDA process, even before these 2013 questions.

---

[14] The emails, text messages, and other documentary evidence quoted herein are not altered for spelling, capitalization, or other errors unless otherwise noted.

[15] The defendants eventually started paying for Jake Lee to have a UVM lab space in late 2014, but the never provided funding for Lee to actually work on developing the products in the lab.  The lab sat essentially empty and unused until the SEC suit in 2016.

These questions prompted Stenger to ask Choi what the plan was for moving the products and project forward. In response, Stenger received from Choi and Ike Lee a combination of things, including information that contradicted the party line he was touting, and pushback on the idea of moving forward in the near term. (*E.g.*, Ex. 35.) Choi sent Stenger an August 2012 business plan (Ex. 36), noting "the time schedule in this business plan didn't apply the current delay of situation. Do you want me to update time schedule in this plan according to the current situation?" This schedule—which Choi told Stenger needed to be pushed back because of delays—contemplated final inspections of the facility at the end of 2015, and no sales occurring until 2016. (The plan also called for just over 100 employees in the facility when it was fully operational, in 2018.) In sum, Choi's plan anticipated much later revenue, and far fewer employees, than the projections in the business plan that Stenger was actively promoting.

Stenger responded to Choi's email:

I will look at the market analysis again and simply need to know if it is the most recent data and are there any other more recent studies showing the worldwide market demand for the products and clean room services we are going to offer. Also what will the FDA protocol be for each product. By that I mean timelines for approval and how we are going to manage that. Ike should weigh in on this . Do we need a consultant? If so we need to hire one soon as the State of Vermont wants comfort that we are doing something forward moving on our products. These two things are very important and are the ones I need most help on. Third party endorsements are also very important regarding market demand. The growing diabetic issues worldwide and the heart disease issues worldwide speak to the need of these products. Third party statements to these effects will greatly help.

Stenger went on to actively discourage Choi from providing further input on hiring numbers:

"Don't spend time on Job creation as we have that all set."

Choi responded with another FDA time schedule that envisioned opening the facility in March 2016, launching the medical devices in mid-2016 to mid-2017, and launching the

stem cell therapies in late 2017.  (Ex. 37.)  This schedule, like those in Choi's other plans, contained five prominent boxes with red text stating "Need to consult with FDA or experts in FDA's regulation"[16]:



The medical device timelines assumed that they would qualify for 510(k) approval, but red text at the top noted that the "artificial organ products will be classified either in Class II [meaning 510(k), the faster regulatory path] or III [Premarket Approval, meaning clinical studies would be required]."  Choi agreed in the cover email that engaging a regulatory expert would be important "because it takes a lot of time and efforts to get to the goal."[17]

---

[16] This is the text that Stenger admitted removing from the FDA timeline that he provided to VRC in January 2015.

[17] The timeline also falsely represented that the defendants were in the process of developing the AnC products.

Stenger reviewed Choi's schedule and questioned why they would wait until mid-2014

to start interacting with the FDA rather than

> start the FDA interaction now so we are approved by the time we open the
> facility. Also I am thinking that Ike and Jake can help select the consultant to
> guide us. I know a lot of things but selecting an FDA consultant is not one of
> them. I want this to be efficient and suspect Ike knows the road map from his
> time in Boston. Please advise . I am prepared to move fast on this and seek
> UVM help but not sure we want them to be too involved.

(Ex. 38.) Choi responded, agreeing that they needed to "begin FDA interacting now to reach

our goal in 2014." Choi pushed the task of finding an FDA consultant back to Stenger: "I

asked you to find consultant for FDA guide, because I remember you told us that we could

be helped to get introduction by somebody in Senator's office, who knows FDA people. Ike

and Jake can select the right person from the recommendation by them, I meant. Please

discuss this with Ike and Jake."[18]

Ike Lee chimed in to Stenger and Choi's discussion with a description of a CMO

business, as described above. (Ex. 198.) Stenger responded, again asking for

> [T]he FDA plan for each product. I know each has different timelines but it is
> very important we have a strategy and a plan in place to implement that
> strategy. If we need consultant help to get us there we need to get this going. If
> we have a building built and no FDA approvals it will sit empty. Now is the
> time to push the GO! Button on getting the FDA approvals going. I've copied
> the Team on this because all copied need to be on board with this. The State
> of Vermont also wants to know what we are doing for FDA as well and they
> are our biggest partner in this . So if you could layout the timeline needed for
> each of our products that will help a great deal. Ike it's time to move to
> Vermont as I really need a quarterback on this technical stuff .. Please try to
> give me a basic outline by end of your day Friday.

---

[18] Although Stenger did seek referrals for FDA consultants, and ultimately contacted a company called Biologics
in late 2014, he did not ask them to do any work on the AnC Vermont project until late 2015. Even then,
Biologics was not able to meaningfully assist with the FDA process because the plans for the building were still
not finalized and there was uncertainty about what would be happening in the building. (Ex. 39.)

(Ex. 35.) Lee's response acknowledged the importance of FDA approval, but sidestepped Stenger's request to move forward immediately and cryptically cautioned the team about working with third party FDA consultants.

Stenger, undeterred, provided investors an RFE response for CIS that kept the same timetable for revenue and job creation that Stenger had started promoting in 2012. Although Stenger told CIS that the start of construction would be delayed slightly, he maintained that "[o]ver the next three years, the [project's entity] at the[] new Bioscience Research Center will create over 3500 jobs for Vermont." (Ex. 40.)

In December 2013, Stenger again asked the Koreans to "confirm an FDA interface plan to get us on track for FDA approvals. I'm constantly asked about FDA approvals and don't have an answer. These things take time and we need to have a plan now." (Ex. 41.) Ike Lee responded describing the types of regulatory affairs experts they would need to hire, but noted that Jake Lee's work developing the products was necessary prior to even hiring a regulatory expert for medical devices. Stenger acknowledged that he understood and proposed setting up a cosmetics division in the facility because he believed cosmetics products would allow them to avoid FDA approval. Choi and Ike Lee responded positively about a cosmetics business, but Choi noted that even cosmetics require FDA approval and urged Stenger to discuss the cosmetics with the Koreans "ASAP." Of course, cosmetics was not part of the AnC Vermont business plan that Stenger was selling to investors, and nothing ever came of the cosmetics sales idea.

In a February 2014 memo drafted in response to concerns raised by a Chinese investor, which was shared with ACCD, Stenger wrote "we are confident that the medical devices will receive FDA approval as these devices are based on technologies developed over the course

31

of many years at the AnC Bio Korea facility. However, in the worst case scenario if all of the devices were denied FDA approval AnC Bio would still distribute these technologies internationally." (Ex. 42.) This fallback explanation about selling the products internationally was one of Stenger's many deflection strategies when people raised legitimate questions about the commercial viability of these products.

Then in spring 2014, CIS issued a second RFE for the project. The RFE questioned two main topics: inconsistencies between Petraglia's analysis and the original business plan, and justification for the "significant, exponential increases" in the business plan's revenue projections. The process of responding to the RFE generated many emails and discussions about the revenue and jobs projections. For example, in early May 2014, Ike Lee circulated two revenue projection documents to a number of recipients including Stenger. (Ex. 43.) One of the revenue projection documents showed the projected sales underlying the original business plan projections, and the other showed the "launching forecast" projections created by a Korean scientist working for Choi, Cavin Jang, who was leading the building design effort for AnC Vermont. To the extent that anyone was thinking carefully and realistically about what would be happening in the building and when it would happen, it was Jang. A comparison of the two attachments to Lee's email shows that the party line revenue projection was much more aggressive both in terms of first year of sales (2014 vs. 2017), and volume of sales (for example, 200 C-PAKs sold in year 2 vs. 20 C-PAKs sold in year 2). Lee, somewhat obliquely, referenced the timing discrepancy in his cover email, describing the "launching year" in the original business plan as "optimistic." In response to a follow-up question several days later, Lee said the "Employment Projection [meaning the figures in the business plan] is an aggressive projection for the maximum capacity when everything including the market

32

environment and technology development all go well as we wish." (Ex. 44.) Lee noted that the Korean design team had set a goal of 200 jobs in total, which is, of course, far lower than the number of jobs in the facility that Stenger had told Petraglia.

In response to the RFE, the defendants submitted an updated business plan that replaced actual years with "Yr One," "Yr Two," etc., but elsewhere in the document stated that revenue was anticipated to begin in 2016. (Ex. 13 at 5020212.080.) Although the defendants pushed back the revenue projections two years, they still forecasted anticipated $2.2 million in revenue in 2016, primarily from stem cell products:

| AnC Projected Income and Expenses Year One  Year Five | | | | | | |
|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | |
| Clean room fees, equipment rental and ancillary services | $  - | $   32,000,040 | $   32,000,040 | $   32,000,040 | $   32,000,040 | $ 128,000,160 |
| Stem cells | 1,825,000 | 7,300,000 | 30,000,000 | 90,000,000 | 150,000,000 | 279,125,000 |
| Artificial organs | 375,000 | 21,150,000 | 52,750,000 | 90,850,000 | 128,950,000 | 294,075,000 |
| **TOTAL REVENUE** | 2,200,000 | 60,450,040 | 114,750,040 | 212,850,040 | 310,950,040 | 701,200,160 |
| **COST OF GOODS SOLD** | 867,750 | 12,830,000 | 36,025,000 | 75,935,000 | 115,845,000 | 241,502,750 |
| **PRODUCTION LABOR** | | | | | | |
| Clean rooms | - | 14,909,925 | 14,909,925 | 14,909,925 | 14,909,925 | 59,639,700 |
| Artificial organs | 121,500 | 4,230,000 | 10,550,000 | 18,170,000 | 25,790,000 | 58,861,500 |
| Administrative | 549,113 | 677,700 | 677,700 | 677,700 | 677,700 | |
| Stem cells | 114,750 | 1,460,000 | 6,000,000 | 18,000,000 | 30,000,000 | 55,574,750 |
| **TOTAL LABOR EXPENSES FOR ICI** | 785,363 | 21,277,625 | 32,137,625 | 51,757,625 | 71,377,625 | 174,075,950 |
| **GROSS PROFIT** | 546,887 | 26,342,415 | 46,587,415 | 85,157,415 | 123,727,415 | 285,621,460 |
| **SELLING, GENERAL AND ADMINISTRATIVE** | 1,157,457 | 2,240,759 | 2,666,475 | 3,274,201 | 3,859,630 | 13,197,522 |
| **INCOME (LOSS) BEFORE TAX, AND DEPRECIATION** | $   (610,570) | $   24,101,656 | $   43,920,940 | $   81,883,214 | $   119,868,785 | $ 272,423,538 |
| revison to "EBITD"===== | 0.0% | 0.7% | 1.2% | 1.9% | 2.2% | 1.8% |

The updated projections also increased the clean room revenue to $32M each year beginning the first full year of operations (2017), rather than ramping up from $14M to $28M over the course of four years. The revenue spreadsheet was also updated to contemplate paying clean room employee salaries, since CIS had figured out that AnC was counting jobs from clean room employees but not allocating any funding to pay for them.

As part of the SEC's ongoing investigation, Stenger responded to investigator questions under oath in in May 2014. After the interview, Stenger texted Kelly about their misrepresentations about the FDA process:

> Bill lots of ANC questions in pm session. One was questioning the marketing portion of the offering on tpls and c-PAC that says we are pending FDA approval. Don't think we are formally. Did AncBio Korea begin any FDA initiatives because if we own the technology then perhaps we have the benefit of the work they did with FDA. If not we need to change that language in the offering to be less aggressive visa vi FDA approval. Call me if you can. . . . Just to clarify I really don't want to have to retract the offering because given the chance many might bail given the delays. Ari thought that Sean Choi might have info on outreach done to FDA by Korea on behalf of products we now have rights to. This would be great as it would be more substantive than my cursory contact with ms Abazi. She was simply the gate keeper for FDA and in 2010 we had limited details to review and Leahys team strongly recommended a third party consultant to assist besides their staffer assigned to us. As you know in the FDA world the term pending has many meanings. Just want to correct the English and keep going. . . . I don't feel good about sending the offering out until the pending language is settled. Sean hopefully can be helpful. I know you understand how important this is. I'm reaching out to Leahys team to see where we are on the approval.

(Exs. 45, 139.) Stenger knew, however, that no one had submitted anything to the FDA for review, so asking Senator Leahy's team about the approval would be fruitless. Although Stenger did remove the "pending" notation from the offering materials themselves, he continued to misrepresent the status of FDA progress to investors and VRC in many ways, including the January 2015 false document that was the subject of his guilty plea.

As described further below, in the end of June 2014, the VRC required Stenger to stop marketing the AnC Vermont project. By late 2014, Stenger understood that he needed to provide answers to the VRC's questions about a number of topics, including the financial projections and the FDA timeline, in order to be permitted to promote the AnC Vermont project again. Stenger pushed hard to convince the VRC to let him back into the market, and made a number of submissions. In early January, he explained his plan in a memo to Quiros,

Kelly, and others. (Ex. 47.) Stenger knew VRC wanted a "[m]arketing study to be in hand so they can verify that the projections in the PPM are getting better," so he "requested a summary letter from Frost Sullivan that will state clearly the market analysis that forms the basis for the sales projections in our offer being reasonable. This letter will be available by Wednesday and should satisfy ACCD on the sales potential of the AnC Bio Project." Stenger also knew that the VRC needed an "FDA approval timeline for products and the building as well as construction timeline," so he "recast the dates for AnC Bio Vermont construction of the facility and the FDA timeline for the facility and products approvals as well."

Stenger's submission about which he has admitted guilt, provided to VRC on January 9, 2015, consisted of a cover letter (dated January 8, 2015) with a number of attachments. (Ex. 48.) The submission addressed, among other things, the AnC Vermont financial projections and the timeline for commercialization of the products.

As Stenger has admitted, the representation in the January 9 submission that the consulting firm Frost & Sullivan had analyzed the financial projections and determined that they were reasonable was false. After various unsuccessful efforts to have individuals associated with the AnC Vermont project address the VRC's questions about the financial projections, Stenger had engaged Frost & Sullivan in October 2014. Stenger asked Frost & Sullivan to conduct a market demand study to analyze the potential market size of the AnC Vermont products and services, if the products and services were developed and FDA approved. Throughout the rest of 2014, Frost & Sullivan, which spent many hours working on the market demand analysis and had regular update meetings with Stenger and his team, was never asked to review, analyze, or opine on the project's financial projections. Instead, Stenger has admitted that the process of working with Frost & Sullivan made clear to him

that the AnC Vermont project had no stem cell products, and that the artificial organs either did not exist yet or required updating.

For example, as explained above, Ike Lee emphasized to Frost & Sullivan that they had no stem cell product. Jake Lee told Frost & Sullivan during the fall 2014 recorded meeting that the T-PLS needed to be updated based on complaints from customers, and they did not even have prototypes for the C-PAK or E-Liver yet. Then, in early November 2014, Jake Lee emailed Stenger that "[T]he detailed plan for T-PLS renewal is being prepared." (Ex. 46.) Lee said he planned to finalize the "Direct Renewal Phase" of the updated T-PLS within 18 months, and that the "FDA Preparation Phase" would last 6 to 12 months. Lee did not even estimate the length of time to obtain FDA approval, instead writing "TBD[.]" Stenger therefore knew in late 2014 that even if artificial organ development began immediately, nothing would be submitted to the FDA for approval until late 2016 at the earliest; Lee's email also underscored the project's lack of FDA expertise and plan. He nonetheless continued to represent to investors, VRC, and CIS that the project would have 2016 income from artificial organs until the SEC filed suit.

In the waning days of December 2014 and beginning of January 2015, Stenger asked Frost & Sullivan's project lead, Debbie Wong, to write a letter stating that the AnC Vermont project's business projections were reasonable. (*E.g.*, Ex. 49.) On New Year's Eve 2014, Stenger wrote

> I'm working with the state on our new offering memorandum and because there is such demand for the document we are pressing them for approval. One of the things that you are assisting with is determining the market demand for the products and services Anc/Bio is proposing to offer. I know the final report will not be ready til late January but wondered if you were comfortable with giving me a letter based on your interim report that points out that there is significant market demand in the three areas of our involvement, medical devices, stem cell product lines and clean rooms to meet our business

objectives?. They want comfort that market depth exists sufficient to meet our sales objectives. Obviously we can't guarantee anything nor can you but assuming we build the cutting edge facility we are, run it well and have top marketing and sales teams for each element we offer then our projections are reasonable. Much of the results depend on our efforts as they should but the State wants third party comfort. Thus this request. I know the final report will address this in detail but a snapshot would be very helpful asap if you can.

Wong initially resisted Stenger's request by providing a letter that opined in the first paragraph "Our current research findings show significant products and services demand based on 2013 market size and forecasted growth rates. And this, in turn, represents tremendous opportunity for AnC Bio VT." (Exs. 50, 201.) Stenger, however, knew that he needed a stronger third party endorsement of the (fraudulent) financial projections. So he asked Wong to add another sentence to the end of her first paragraph: "Based upon our analysis the financial projections in the AnC Bio Vermont Business Plan appear reasonable." (Ex. 51.) Wong made one minor addition to this sentence ("Based upon our market analysis, . . .") and signed the letter. (Ex. 48 at 5322095.)

Stenger fully understood that he had never asked Frost & Sullivan to actually assess the AnC project's financial projections, and that they had never done so. Nonetheless, he submitted Wong's letter to VRC. In March 2015, he obtained an "executive summary" from Frost & Sullivan that contained the same statement about the reasonableness of the financial projections. (Ex. 52 at 5332963.03.) Throughout the remainder of the fraud scheme, Stenger often touted the Frost & Sullivan study as confirming that the revenue projections were reasonable. Stenger repeatedly emphasized Frost & Sullivan's executive summary with VRC officials, he included it in the amended offering package, and he sent it to prospective investors, politicians, and anyone who asked questions about the project. In late 2015, Stenger created a 17-page document responding to allegations that had been raised by Chinese

bloggers and VTDigger. In that document, Stenger said Frost & Sullivan's study "verifies the market demand and product value of the AnC Bio VT business plan and its limitless and promising business future." (Ex. 53.) He knew it did no such thing. The Court should find that he knew the projections were false.

3.     *Marketing the Same Party Line in 2015 and 2016*

In early April 2015, following a lengthy and critical article by VTDigger, and just as VRC was allowing the AnC Vermont project to go back into the market, Stenger convened a press conference to tout the anticipated successes of the AnC Vermont project. Stenger, Ike Lee, Jake Lee, and a Frost & Sullivan representative presented. The documents leading up to the event show that Stenger used the press conference to continue to tout the three prongs of the false business plan. Stenger sent an email to Ike Lee and Jake Lee setting forth his narrative about the topics he anticipated the event to cover, which was contrary to information he had heard directly from both Lees previously. (Ex. 54.) Regarding timing of the devices, Stenger wrote "I have said the technology AnC Bio Vt owns the rights to was developed in Korea and Japan and now will be finally produced and marketed in North America thru the FDA certified AnC Bio Facility in Vermont." Regarding the clean room vs. stem cell issue, Stenger says "The three areas we have stressed are medical devices, with TPLS the closest to market ready, stem cell therapy's and how that product line is created and marketed, and lastly the clean room products and services."

In August 2015, Stenger sent a letter to an attorney for existing and potential AnC Vermont investors stating "[t]he project is underway and will be completed in late 2016, and it will open with its facilities booked immediately yielding financial results." (Ex. 55.) At that point, Stenger was trying to distance the AnC Vermont project from AnC Korea because

word had gotten out about Choi's legal problems and AnC Korea's financial problems, so Stenger downplayed the medical device aspect of the business plan, stating "Stem Cell products and clean room rental make up the majority of the program."

In sum, Stenger played an integral role in fabricating and perpetuating the false narrative of the AnC Vermont illusion. Stenger strived to create the appearance of success and progress, but in reality Stenger and his co-defendants did not have a building design, viable products, or a plan to create a functional business, and Stenger knew it. As explained below, Stenger knew that he needed the AnC Vermont fundraising to be a success because of the financial problems he and Quiros had created years before.

IV.    The Misuse of Investor Funds

Between 2008 and 2016, Stenger also actively assisted Quiros and Kelly in the misuse of investor funds. As the evidence will demonstrate, the defendants used funds designated for one project to pay expenses associated with a different project. This misuse of funds was driven by four problems.    First, Stenger and Quiros purchased Jay Peak with debt collateralized by investor funds from the first two EB-5 projects: Tram House Lodge and Hotel Jay/Waterpark. That debt needed to be paid off. Second, Stenger caused multimillion dollar cost overruns on these first two Jay Peak projects for which the owners were responsible, leading to even more owner debt. Third, despite the need for project profits to pay these owner obligations, Stenger authorized Quiros to receive and personally use his "profits" from various projects, including AnC Vermont. Fourth, the defendants dedicated project "profits" to various other obligations, from the resort's operational losses and capital needs to purchases of land for future projects. Despite the eight EB-5 projects' substantial

"profits," the defendants lacked the funds to build AnC Vermont or finish Stateside without funds from even more projects, none of which were approved.

The government's evidence undercuts Stenger's longtime narrative that he had no financial stake in the scheme and that he was unaware of the financial problems until 2015. While Stenger was neither the leader of the financial fraud nor involved in all of its details, he knowingly participated in the financial fraud from the very beginning.

The misapplication of investor funds, even during earlier projects, defrauded the AnC investors in a variety of ways. To begin with, the defendants concealed and misrepresented the use of AnC investors funds to pay off prior debts. Moreover, the defendants concealed and misrepresented the use of AnC investor funds from the VRC, which had the duty to monitor and oversee projects. Regarding the misuse of investor funds from earlier projects, the defendants misrepresented to AnC investors the "success" of the earlier Jay Peak projects. Rather than being EB-5 success stories, Stenger had caused a blight in project funding that would lead to the SEC and State of Vermont civil suits revealing the Jay Peak EB-5 projects as a massive fraud. Stenger knew about this house of cards even before crafting the AnC marketing narrative, which continued to tout his great "success" with EB-5 projects at the resort.

A.   The Purchase of the Resort in 2008

In 2008, Stenger helped orchestrate the sale of the Jay Peak resort from a Canadian company, MSSI, to QResorts, a Quiros-controlled company. Stenger was to have a 20% stake in QResorts, meaning he would become an owner rather than resort employee, and stood to build significant personal wealth from the transaction. The sale price ended up being approximately \$23.5 million, meaning that Stenger was to get an almost \$5 million stake in

the resort. As described below, Stenger and Quiros did not have the money to purchase the resort. Instead, Quiros arranged with Raymond James, a Florida financial institution, for a margin loan backed by short-term government bonds purchased with investor funds that Stenger sent to Raymond James. These investor funds were earmarked for the EB-5 projects, not any other use. Stenger, without authority to do so, transferred the investor funds prior to the closing so that Quiros could use the funds to finance the purchase. The evidence shows that Stenger knowingly participated in this financing of the purchase using investor funds. Quiros and Stenger planned that the loans would be repaid by owner "profits" or by funds from Korea, since both Quiros and Stenger understood that Alex Choi, Quiros's long-time business partner, was a silent partner in the resort. As described below, however, the "profits" were used for other purposes, the Korean funds never came, and the $23.5 million margin loan was repaid in February 2012 with similarly-earmarked investor funds from later projects.

By 2007, Stenger was deep into his plans for using EB-5 "patient capital" to expand Jay Peak. He and Douglas Hulme were raising $17.5 million for Phase 1, the Tram House Lodge project. Stenger had been searching for new owners to purchase Jay Peak for years. He and Quiros hatched a plan to purchase the resort from MSSI, the Canadian company that employed Stenger.

The 2007 plan was based on work by Quiros and Choi that turned on financing from a Korean corporation, Taihan Electric. In a letter dated November 16, 2007, Quiros offered to buy Jay Peak for $15 million and the assumption of certain debt, which ended up amounting to approximately $8.5 million. MSSI tentatively accepted the offer. (Ex. 56.) The defendants planned that Jay Peak would be purchased by an entity called Vermont Mountain Trust. At the same time, the defendants were negotiating with Taihan Electric to buy a 70%

41

interest in Vermont Mountain Trust for $30 million. (Ex. 57.) The parties understood that certain due diligence would proceed over several weeks but hoped for a closing before the end of the year. Stenger wrote a memo to MSSI documenting that that he was "being offered shares in the new company for being its President and CEO," thus receiving millions of dollars in equity in Jay Peak for getting the sale through and for his continued stewardship of the resort and its EB-5 plans. (Ex. 58.)

The due diligence review took longer than first proposed, and by late January 2008, Taihan Electric was backing out of the deal. Quiros, Kelly, and Stenger discussed Taihan Electric's reluctance, and Quiros and Kelly drove to Montreal to meet with the Canadian owners of MSSI. Quiros at this point wanted to go forward on the purchase even if Taihan backed out; he hoped to get alternative financing through Choi or from other sources. Quiros and the Canadian owners signed a Term Sheet dated February 4, 2008, outlining the $23.5 million price for the resort. (Ex. 59.) Per the Term Sheet, Quiros was supposed to deposit $15 million in Chittenden Bank within 7 days. That did not happen; Quiros could not come up with $15 million in a week. Instead, the parties extended the deadline for 45 days until March 27, 2008. In a conference call on February 15, 2008 attended by Quiros, Stenger, and Kelly, Quiros outlined two different potential sources of funds, "the Kor Group" or "one of his partner[s]." (Ex. 60.)

By early March 2008, the defendants had changed the name of the potential purchaser from Vermont Mountain Trust to QResorts. (Ex. 61.) Meanwhile, Stenger had raised the $17.5 million from EB-5 investors for Phase 1 and had received millions of dollars in potential investments in Phase 2, Hotel Jay/Waterpark, even though the project offering documents had not been completed. (Ex. 62.) Nevertheless, over $7 million of potential Phase 2 investor

funds sat in a Chittenden Bank account controlled by Stenger, the general partner for Phases 1 and 2. (Ex. 63.) Stenger had grand plans for EB-5 projects beyond these two initial projects. Throughout the negotiation process, Stenger had emphasized to Quiros that there would be substantial owner "profits" in the EB-5 projects, principally from "supervision fees" and land sales, that could pay off any debt.

By late March, Quiros still had not come up with the $15 million. Quiros reached out to his son-in-law, Joel Burstein, an employee at Raymond James, about Raymond James' ability to finance the purchase of Jay Peak. It soon became clear that the only financing vehicle available through Raymond James would be a margin loan backed by government bonds purchased with ready funds. The only "ready" funds were from the investors in Phase 1 and Phase 2. In late March 2008, Burstein prepared a PowerPoint for Quiros, Stenger, and Choi, outlining the lending facility, which included assumptions about "cash flow" from the EB-5 projects. (Ex. 64.)

On April 2, 2008, Stenger sent Quiros an appraisal for Jay Peak created several years before as well as a list of "valuable additions" to the resort. (Ex. 65.) In early April, the defendants proposed an important change in the contract for QResorts' purchase of MSSI (the Stock Transfer Agreement or STA). The revised STA now required that MSSI transfer the Jay Peak assets prior to the actual closing of the resort sale. On April 16, 2008, Stenger sent Quiros a "cash flow analysis of the EB-5 programs I and II at Jay Peak," (Ex. 66), which Quiros forwarded to Burstein, (Ex. 67.).

In May, the defendants convinced the MSSI owners that they should transfer the investor funds from Chittenden Bank to Raymond James. The Canadians agreed but made clear to Burstein, and the other participants in the sale, that they—not Stenger—retained

control over those funds until the closing. (Ex. 68.) By this point, the Canadians had already instructed that the investor funds at Raymond James could not be "used as a basis or security for any line of credit or margin account or other form of borrowing." (Ex. 69.) Quiros and Stenger had still not come up with the $15 million deposit.

The closing was scheduled for June 23, 2008. On June 18, 2008, the attorney for the Canadians wrote a letter to Burstein, copied to all three defendants, outlining her understanding of the financing. She confirmed her understanding that "Raymond James is lending QResorts Inc. the funds necessary for the purchase of the Jay Peak Resort." Thus, by June, Quiros had represented to the parties that he would be borrowing funds for the closing from Raymond James. Further, the MSSI attorney emphasized that it was improper to use the investor funds in the two Raymond James accounts then controlled by the Canadians "in any manner, including as collateral or a guarantee, to fund the purchase of the Jay Peak Resort." (Ex. 70.) That same day, the attorney asked Stenger about the Phase 2 subscription agreements. Stenger confirmed that he had signed them but "nothing has been done with them nor will be done until after the closing." (Ex. 71.) Thus, Stenger understood that the partnership matters remained under Canadian control until after the closing.

Despite his assurance, Stenger played the critical role in assisting QResorts' purchase of Jay Peak by transferring the EB-5 investor funds prior to closing, violating his acknowledged duty to protect these funds. On June 23, 2008, on the day of the closing and before QResorts had provided funds to its counsel for the closing, a letter signed Stenger was faxed directing Burstein to transfer the assets of Jay Peak to QResorts. (Ex. 72.) In the same letter, Stenger also directed the transfer of the investor funds from the Raymond James accounts controlled by the Canadians to new Raymond James accounts controlled by Quiros.

44

Thus, Stenger handed over control of the investor funds to Quiros prior to Quiros's purchase of the resort despite having been expressly told that he lacked the authority to make that transfer.

Stenger's transfer of the investor funds allowed Quiros and Burstein to transfer the money to QResorts and then send the money to QResorts' attorney, to be paid to MSSI. Stenger knew that Quiros needed to borrow money from Raymond James to buy the resort, he knew about the possibility of margin lending, and he improperly transferred the funds to permit Quiros to purchase the resort. In a July 2008 letter to Phase 2 investors, Stenger claimed responsibility for the successful sale:

> I have over the past nine months been negotiating with the parent company MSSI in Quebec to purchase Jay Peak. I have assembled a small group of very successful investors and together we have purchased the Resort, effective June 23rd, 2008.

(Ex. 73.) Stenger knew that in reality there was no such group of successful investors. He and Stenger had misappropriated the Phase 1 and Phase 2 immigrant investor funds to purchase the resort and begin their scheme. In September 2008, Quiros and Stenger entered into an agreement in which Stenger became a 15% owner of QResorts, with a chance to increase that percentage to 20%. (Ex. 74.) This meant that Stenger had a $3.5 million stake in the resort, with the chance to increase his share to closer to $5 million.

As part of the SEC investigation, an SEC accountant prepared a declaration detailing the precise financial transactions used for the closing in June 2008 as well as payments to MSSI later in 2008 to complete the sale. Quiros and Stenger bought the resort for $23.5 million, which was almost entirely funded by the Raymond James margin loan secured with EB-5 investor funds. (Ex. 75.)

B.     Cost Overruns on Phase 1

Quiros and Kelly will testify that at the time of the purchase, Stenger did not tell them that the Phase 1 Tram House Lodge project would likely cost millions more than the $17.5 million he and Hulme had raised for the project. Stenger had learned about the problem prior to the purchase of the resort, and therefore knew that the new owners would be in the hole on the EB-5 projects from the start, even if they did not repurpose the EB-5 investor funds for the purchase.

In early June 2008, prior to QResorts' purchase of the resort, Jake Webster, who oversaw construction for the resort EB-5 projects at Stenger's direction, emailed the Canadian owners an update on the Phase 1 construction budget, which showed a cost overrun of approximately $5 million. (Ex. 76.) Webster noted the possibility of lowering costs, but his email makes clear that the project would cost well over $17.5 million. The next day, the Canadians held an Executive Committee meeting and directed Stenger as follows:

> Dear Bill:
>
> Following the Executive Committee Meeting of June 4th, it was decided that we must respect the budget of $17,500,000 as presented in the Private Offering Memorandum [for Phase 1]:
>
> To meet the above, we have three options:
>
> - Review the design
> - Eliminate one commercial floor
> - Search for more investors
>
> We will have to delay the beginning of the project to meet the above amount and a new budget will have to submitted and approved by the Executive Committee Members.

(Ex. 77.) This first cost overrun problem, and MSSI's reaction to it, highlights how imperative it was for Stenger to find a new buyer willing to allow him to try to implement his vision for development at Jay Peak and beyond, no matter the cost.

Less than a week after this direction from the Canadians and about two weeks before he transferred control of the investor funds to Quiros, Stenger told DEW, the construction company that would build the Tram House Lodge, that Jay Peak was moving forward with the current plans, meaning the plans that would result in a multimillion dollar cost overrun. (Ex. 78.)  That same day, Stenger provided comments on the disclosure schedules listing material matters relating to the sale of the resort and failed to disclose this significant financial problem.  (Ex. 79.)  From the time of the purchase in 2008 until mid-2011, Stenger actively managed the EB-5 marketing and construction at Jay Peak, including the funding for construction.  In his July 2008 letter celebrating his purchase of the resort, Stenger also bragged about beginning construction for Phase 1, without disclosing his knowledge that Phase 1 investor funds had been used for the purchase or that the project was well over-budget.

C.     Stenger's Knowledge About the Raymond James Margin Loans in 2008

Stenger has repeatedly denied knowing that Quiros bought the resort with margin loan funds borrowed from Raymond James.[19] As noted above, Quiros's testimony that Stenger knew about the Raymond James margin loan funding is corroborated by Stenger's involvement in the purchase.  But it is further corroborated by how Stenger reacted to disclosures about the margin loan debt after the purchase.  At the time of the purchase, Raymond James created a margin loan for each of the two EB-5 investor accounts: one loan associated with the Phase 1 account and a second associated with the Phase 2 account.  (Ex. 75.)  The loan balances appeared on the 2008 Raymond James monthly account statements, which Stenger received.

---

[19] Stenger has acknowledged to the VRC that he knew that Quiros's Raymond James investor funds accounts had associated margin loans but falsely claimed that his knowledge was limited to the margin being used only for liquidity.

Quiros will testify that Stenger was provided with monthly statements. In addition, Stenger signed a letter dated in May 2008, in which he acknowledged Quiros's use of the investor funds to support a margin loan at Raymond James. (Ex. 82.) The letter states that Stenger is to receive monthly statements from Raymond James. The only copy of the signed letter found by the government was faxed from Stenger to Quiros in June 2013, after the SEC began asking questions about Quiros's purchase of the resort. It appears that the letter was drafted by Kelly for Stenger to sign in 2013. Whether Stenger signed the letter in 2008 or 2013, the letter shows that Stenger knew about the margin loan and that he received monthly statements about the margin loan.

Stenger hired Michael Dupont as the new Chief Financial Officer of Jay Peak soon after the June 2008 closing. MSSI had handled most of the accounting for Jay Peak prior to the sale, so Dupont had to put together the accounting department for a multimillion company. (Ex. 80.) Along the way, he encountered the Raymond James accounts for the EB-5 investor funds. In a January 2009 email to Stenger, Dupont asked Stenger pointed questions about the margin loan balances on the account statements. (Ex. 81.) First, Dupont noted that he had repeatedly asked for Raymond James statements to understand the status of the EB-5 accounts. Dupont eventually received statements for October and November 2008. In the email, he noted the multimillion-dollar loan balances in these accounts and highlighted for Stenger, "there appear to be Ready Access Margin Loans that I have no idea as to what they pertain to," along with a table showing almost $10 million in "Margin Loans." The email also states that Dupont had been told by Stenger that the Phase 1 cost overruns were being funded by a Raymond James line of credit "not collateralized by EB-5 funds." Dupont reiterated his request for documentation about this borrowing as well.

The next day, Dupont wrote a follow-up email to Quiros and Stenger, repeating his questions about the Raymond James loan balances. (Ex. 83.) At around the same time, the CFO of DEW Construction, which was hired to build Tram House Lodge, asked for bank statements demonstrating that Jay Peak could afford to build the hotel. (Ex. 84.) Quiros had Burstein adjust the margin loans immediately after Dupont's emails. Raymond James agreed to open a new margin loan, consolidating the two balances from the Phase 1 and Phase 2 accounts into a new debit account cross-collateralized by the two EB-5 accounts, and removing the margin debt from the account statements for the partnership accounts.[20]

In March 2009, Dupont told Hulme about his questions, forwarding the January email that he had sent to Stenger. (Ex. 85.) At the same time, Dupont was preparing year-end statements for 2008, which he sent to both Stenger and Hulme. (Ex. 86.) Those year-end statements represent that QResorts had "borrowed" almost $16 million from the Phase 1 project and $8.6 million from Phase 2 project. Dupont urged Stenger to review the balance sheets reflecting his understanding that QResorts had "borrowed" investor funds. Moreover, at least by this point, Hulme was aware of the margin debt and cost overruns.

Dupont left Jay Peak in the summer of 2009, about a year after starting. Stenger then hired John Carpenter to be "Controller" at Jay Peak, but Carpenter apparently was not told about the QResorts "borrowing" from the projects or the margin loans. (Ex. 87.) Quiros and Stenger swept that under the rug.

A Stenger email from April 2011 further confirms his knowledge about the Raymond James margin loan. At that point, Stenger needed to pay QResorts $4.2 million for the Phase

---

[20] This cross-collateralization of margin debt based on EB-5 investor funds continued until 2014, with newer investor funds replacing the old as collateral.

2 land.[21] Quiros and Stenger had developed a payment system in which Stenger requested funds each month for EB-5 construction or for other funds that were needed at Jay Peak. Typically, Quiros moved funds from the existing margin loan to QResorts and later "repaid" the margin loan from other EB-funds. In an email to Quiros requesting the funds, Stenger noted that the funds sent by Quiros should come from the "margin" instead of directly from Golf and Mountain investor funds. (Ex. 88.) Put plainly, Stenger requested that Quiros wash investor funds through the margin loan so that the margin loan would hide that Golf and Mountain (Phase 4) investor funds would be used to pay for costs associated with the earlier Phase 2 project.

D.      Cost Overruns on Phase 2 and Accounting for the Phase 1 Cost Overruns

Stenger's development plans envisioned constructing Phase 2 (Hotel Jay, the ice arena, and the waterpark) immediately after the Tram House Lodge. Despite the greatly increased size of Phase 2, which raised $75 million from investors, Stenger knew that there would be cost overruns for this project as well. These overruns, like those in Phase 1, needed to be funded by Jay Peak's owners—Stenger, Quiros, and Choi. On January 9, 2009, Webster wrote to Stenger that "to implement your vision (EB-5 requirements aside) – we need more investors – needs are in the $20M (40 investors) range."[22] (Ex. 89.) As it turned out, the cost overruns on Phase 2 were more like $40 million.

As the costs were rising on both projects, Quiros hired a Miami accountant, David Rosenbaum, and his firm, Mallah Furman, to assist him with Jay Peak accounting. In early

---

[21] As discussed below, land costs due to Quiros were built into the EB-5 projects as additional "owner profits" beyond the management fees he and Stenger earned for each project.

[22] Stenger consulted with Hulme and Ed Carroll, one of the lawyers helping Jay Peak on immigration issues, about whether Jay Peak could expand the offering. Stenger was told that such a step would constitute a "material change" to the project, requiring resubmission to CIS for the earlier investors. Stenger declined to go down that road.

2010, Mallah Furman sent George Gulisano, a staff accountant with the firm, to conduct a review of Jay Peak's accounting systems. The Mallah Furman review exposed the cost overruns and the need for more robust accounting processes. (Ex. 90.)

By May 2010, Hulme was heavily involved in Jay Peak accounting, focusing in part on a "Phase 1 cost overrun solution." (Ex. 91.) In August 2010, Hulme proposed his solution to Carpenter, Rosenbaum, Quiros, and Stenger. (Ex. 92.) By this point, the cost overrun on Phase 1 was approximately $7.5 million. In substance, Hulme recommended that the owners fund the Phase 1 cost overrun with land prices (due from the limited partners to Jay Peak) of $1.8 million for Phase 1 land and $4.2 million for Phase 2 land combined with $1.5 million in "supervision fees" (owner "profits"). He also counseled that the owners take Class B "stock" in the partnership that could be repaid with a successful "exit strategy" that would entail raising $25 million ($17.5 million to pay off investors and $7.5 million to pay back the owners). Quiros and Stenger eventually agreed to this solution, which meant in substance that the "owner profits" could not be used to pay down the margin loan used to buy the resort, so that debt remained outstanding.[23]

Hulme's solution did not address the ballooning Phase 2 cost overruns. Hulme implemented a partial solution with the marketing of a third EB-5 project called Penthouse Suites, which involved raising $32.5 million from immigrant investors to build another floor onto Hotel Jay as well as a Mountain Learning Center. This new project included some costs that had originally been part of the Phase 2 budget. But Penthouse Suites could not rectify all of the Phase 2 cost overruns that had risen on Stenger's watch.

---

[23] Throughout the scheme, the defendants avoided careful documentation about the precise use of owner profits and other money moving through QResorts. Even though the Hulme Phase 1 plan contemplated that the Phase 2 land sale would be used for Phase 1 cost overruns, Stenger paid QResorts the $4.2 million in April 2011 long after the Phase 1 costs had been paid.

Carpenter, who provided a declaration in the SEC investigation, stated under oath that he repeatedly asked Stenger about how the Phase 2 cost overruns would be handled. (Ex. 93.) Consistent with Hulme's plan, Stenger told Carpenter that they would use owner "profits" from future projects. By late 2010, Hulme and Stenger were ready to market Golf and Mountain Suites, a $45 million project, which would be followed immediately by Lodge and Townhouse, another $45 million project. Both projects involved additional housing construction and various amenities at the resort.

Carpenter became uncomfortable with the accounting at Jay Peak and resigned in early 2011. At this same time, Quiros concluded that he needed a CFO who reported more directly to him in Miami. He and Stenger decided to hire the Mallah Furman accountant George Gulisano as the new CFO in March 2011. At this time, Gulisano drafted a letter to Quiros and Stenger outlining his goals, which included addressing cost overruns. (Ex. 94.)

In the spring of 2011, the massive scope of the Phase 2 cost overrun Stenger had created was coming into clearer view. A meeting was set in Miami for May 19 and 20, 2011. Stenger prepared an agenda for the meeting. (Ex. 95.) He proposed discussions about his planned future EB-5 projects, including Golf and Mountain, Lodge and Townhouse (designated respectively as Phases 3A and 3B), AnC Vermont (already in works), Newport,[24] and Village at Jay Peak.[25] The participants discussed the cost overrun issues. Quiros blamed Stenger for the cost overrun problem, and Stenger accepted responsibility. On May 23, 2011, Stenger sent Quiros an email explaining his position:

---

[24] Stenger hoped to create two EB-5 projects in downtown Newport: one involved a new building on property that Quiros purchased known as the Spates Block, and the other involved a property (never purchased) on the Lake Memphremagog shoreline.

[25] Quiros had purchased land in the town of Jay that he hoped to develop into a more commercial town center.

Thank you for your time and ideas on the issues we are dealing with at Jay Peak. The issue of funds for our projects fortunately has a solution and much of the funds are already in our possession. The phase III a [Golf and Mountain] & b [Lodge and Townhouse] projects will produce enough revenue to backfill our needs. What I am heartbroken about is the need to have to do this. I know I need to focus 1000% on getting the capital and getting it DONE. I was aware we needed backfill capital but until quite recently didn't have a full picture on the exact amount. George has been a great help on quantifying this. I am so glad he is with us. I am going to meet with the contractors right away to explore what we might do to constrict and reduce the need. I know we can succeed at this and greatly appreciate your realization that we need to get it done and play this out to a successful conclusion. We will set a course that gets the cost extras back for Jay Peak. This we all recognized is one of our top priorities. Ari, I have two major goals that are clear, create the backfill capital, and get operating budgets on a schedule that shows the 10 to 15% profit that we want and can attain.

(Ex. 96.)

Two other developments flowed out of this meeting. First, as Stenger noted in his email, Stenger would focus more on marketing future projects than on managing the finances for EB-5 construction. Second, the group agreed to create Jay Construction Management, Inc. (JCM) to help solve the cost overruns. At this point, the margin loan debt was approximately $23.5 million, the cost overrun from Phase 1 was $7.5 million, and the cost overrun for Phase 2 was anticipated to be approximately $38 million. In short, the resort purchase and cost overruns had created a financial hole of almost $70 million. Stenger and the others were not successful at getting Jay Peak to generate substantial operational profits. Thus, the financial hole was going to require substantial "backfill capital" and many future projects. The debt helped drive the need for future projects.[26]

---

[26] As part of Stenger's penitence for causing the unapproved cost overruns, Quiros told Stenger that he was "taking away" Stenger's ownership in QResorts. Quiros told Stenger, however, that he could regain this multimillion-dollar asset after they worked together to fix the financial problems, which required Stenger raising sufficient "backfill capital." Throughout the scheme, Stenger held himself out as a part owner of Jay Peak. In 2015, Stenger expressed concern about documenting his and Quiros's understanding that Stenger would be a partner in the proceeds from any future sale of Jay Peak. (Ex. 97.) Quiros worked on that documentation in early 2016, but the deal was interrupted by the SEC/Vermont lawsuits.

E.    JCM as a Vehicle to Commingle Funds

The need for additional funds to pay for the Phase 2 cost overruns was immediate. DEW was building Hotel Jay and the waterpark. Stenger wanted these facilities open as soon as possible, but the defendants lacked project funds to pay for the construction. To address this problem, they did three things. First, they got DEW to agree to delay construction payments. Second, they used JCM to funnel money raised for the Golf and Mountain (Phase 4) and Lodge and Townhouse (Phase 5) projects to pay for Phase 2 construction costs, as well as Penthouse Suites (Phase 3) construction costs, since they were already using Penthouse Suites funds to pay for Phase 2 costs. Thus, Stenger, Quiros, and Kelly set in motion what the SEC later described as the "Ponzi" scheme of misusing money from a later project as "backfill capital" to make up for previously misused funds. JCM allowed the defendants to hide this backfilling. Third, they agreed to overcharge the investors for construction costs, creating JCM "profit" to be used as additional backfill capital.[27] In short, the owners were getting not only the "supervision fees" documented in the offering materials but also additional profits by having JCM charge more than the actual construction costs.[28]

The defendants tried to make JCM look like an independent entity, when it was no more than another bank account or slush fund controlled by the defendants. Quiros designated Choi as the "owner" of JCM, but it was controlled by Quiros, Kelly, and Gulisano. It had no employees. Stenger opened a post office box for JCM in Montpelier, so that JCM could masquerade as a construction management firm in Vermont. (Ex. 98.) Quiros and

---

[27] Stenger told Carpenter well before May 2011 that he planned to inflate future construction as a way to cover the Phase 1 and 2 cost overruns. (Ex. 87.)

[28] These inflated construction costs also translated into a fraud on CIS job creation for the investors. Much of the job creation for these projects came from construction expenses. Inflating the construction costs amounted to inflating the job creation.

Kelly will testify that when JCM was created, they hoped that "owner profits" as well as "JCM profits" would be sufficient to cover the cost overruns with what was by then three additional projects at Jay Peak: Golf and Mountain, Lodge and Townhouse, and Stateside. On July 2, 2011, Stenger emailed Quiros, "The golf and mt suites is fully subscribed. Perhaps you might share this with Alex Choi as a sign that we are indeed on the path of balancing everything." (Ex. 99.) Stenger was a full participant in the fraudulent plan.

Stenger exercised responsibility as the general partner authorizing the payment of investor funds. As general partner, Stenger had a fiduciary duty to the limited partners not to misuse their funds. Quiros, Kelly, Stenger, and Gulisano all understood that they were not authorized to commingle or loan funds from one project to another. Hulme repeatedly told them that commingling funds was improper. (*E.g.*, Exs. 100, 202.)[29] But that is exactly what JCM allowed Stenger and Quiros to secretly do. Moreover, Stenger had the fiduciary obligation to enter contracts that benefited the partners (immigrant investors) and not just the owners (Quiros and Stenger). By agreeing to pay JCM more than the actual construction costs, Stenger was putting money in his own pocket, as owner, at the expense of the investors.

In the fall of 2011, the defendants began to use JCM to cover the cost overruns. They did this by sending "construction deposits" of Golf and Mountain and Lodge and Townhouse funds to JCM, even though those projects did not need the funds for construction. The funds moved in a contorted path. Quiros sent investor funds from a Raymond James partnership account—used as collateral for the margin loan—to the partnership's operating account, which Stenger controlled at Chittenden Bank (later People's United). Stenger then authorized

---

[29] Hulme and Rosenbaum had a disagreement over the accounting relating to the Jay Peak audits and tax returns. Hulme opposed consolidating the EB-5 projects into the audit of Jay Peak, while Rosenbaum thought it necessary. Hulme was concerned that a full audit might reveal the cost overrun problems. (Ex. 100.)

the payment from the partnership's operating account to JCM based on a JCM "invoice" listing construction deposit.[30]  Quiros and Gulisano then laundered the JCM funds through QResorts, creating a huge debt that QResorts owed to JCM.[31]  The funds moved through QResorts back to Jay Peak to pay DEW and other construction vendors.  (*E.g.*, Ex. 101.)  This laundering made it look like QResorts had paid for the cost overruns, when in fact Quiros and Stenger were using other people's money.  At the same time, Stenger was also authorizing payments of "owner profits" for land sales and "supervision fees." By the end of 2011, Stenger paid out tens of millions in funds from Golf and Mountain and Lodge and Townhouse in order to begin paying the cost overruns.  While Stenger was not involved in the details of JCM transactions, he knew what JCM was for, authorized the payments to JCM, and saw how the money was used when it travelled back from QResorts to pay for the cost overruns.[32]

## F.    The Hulme Separation and Its Aftermath

As noted above, Hulme had long been a critical participant in the marketing and accounting for the Jay Peak EB-5 projects.  He created the business plans for the six Jay Peak projects.  He prepared the project materials for investors to submit to CIS submission, both for I526 and I829 approval.  He and Stenger marketed the projects to foreign investors, as well as to their attorneys and representatives.  His firm, Rapid Visa, received millions of dollars from Jay Peak for its work.  Indeed, while Hulme worked with Stenger the bulk of the administrative fees charged to investors went to Rapid Visa.

---

[30] Each Stenger authorization, drafted by Gulisano, stated that the payment was based on a contract between the partnership and JCM, even though contracts had not been created.  In any event, these contracts were largely fictions since the same parties controlled both sides of the contracts.

[31] This QResorts debt grew to over $60 million in 2012.

[32] Quiros will testify that he advised Stenger about the financial plans. Quiros's testimony is corroborated by emails like the one Stenger sent in October 2011 referencing his conversation with Quiros about "the third traunch of wires."  (Ex. 102.)

Hulme helped the defendants formulate the plan to use JCM cover the cost overruns. Nevertheless, in late 2011, Hulme began expressing discomfort about how the defendants were using JCM. In substance, Hulme complained that they could not pay construction supervision fees before construction and that they should not send "construction deposits" to JCM, especially during a year in which no construction was planned. Hulme demanded that the defendants repay Golf and Mountain and Lodge and Townhouse tens of millions of dollars. (Ex. 103.)

The defendants did not have ready access to all the money Hulme thought should be repaid. Before the end of 2011, the defendants refunded the partnerships certain management fees and $7 million in Golf and Mountain construction deposits paid in November 2011. In early January, Stenger was working closely with Hulme to satisfy all of Hulme's concerns. (Ex. 104.) One problem was that Hulme wanted additional repayments of approximately $16 million, which was not available prior to the end of the year. Kelly made clear to Stenger that they did not have the money to repay these funds, most of which were Lodge and Townhouse "construction deposits." (Ex. 105.) To placate Hulme, Gulisano and Kelly orchestrated a movement of funds that made it falsely appear that Lodge and Townhouse had been repaid the $16 million in 2011. (Ex. 106.) The financial transactions included the rebilling in 2012 of the funds repaid in December 2011 and the use of the 2012 money on January 12, 2012 to repay the Lodge and Townhouse investors. (Ex. 107.) Gulisano and Kelly then falsely asserted in the accounting records that the Lodge and Townhouse funds were "in transit" as of the end of 2011.

A meeting among the key players—Hulme, Quiros, Stenger, Kelly, and Gulisano—took place at Quiros's Miami office on January 30, 2012. During 2011, conflicts had

57

developed between Gulisano and Hulme. Before Gulisano was hired, Hulme had managed EB-5 accounting for the projects. Gulisano saw it as his role to control accounting. One of the topics on the agenda for the January 30 meeting was the future handling of the cost overruns. (Ex. 108.) At the January meeting, Hulme and Gulisano disagreed about accounting issues. By this point, Quiros had also developed concerns about Hulme and his relationship with Stenger. At the same time, Quiros understood that Hulme played a critical role in project development and marketing. Quiros will describe how he tried to support Stenger's EB-5 management.

A week later, Hulme sent an email to the others at the Miami meeting stating that, beginning immediately, his company was "going to refer all relevant incoming correspondence from immigration attorneys and interested parties" to Stenger. (Ex. 109.) Stenger, who was in Florida, immediately drove to Naples, Florida, where Hulme lived. Apparently, they did not meet. Stenger desperately wanted Hulme to stay involved. The next day Stenger sent Hulme an email explaining Stenger's role as "captain" of the EB-5 program:

> I'm flying back to Vt and am on the 6am flight. Back by noon. I am very dismayed about what had happened. I have been trying to understand the reason. I was planning to talk with you on this trip about the unwarranted comments in last weeks meeting made mostly by George and some by Bill kelly. I explained to Ari that they showed ignorance of what we do and need to do going forward. What Ari and I concluded was George is to play NO roll in eb5 dealings going forward. I was embarrassed by his behavior as was Ari. I hope you noted my objective support and appreciation for you and Nick. I should have taken more control of this meeting as is was to be constructive realignment of how structure and billing would take place And new project discussion. Instead it was two days of fatigue jousting. And 30 minutes of productivity. There can only be two leaders of this effort. Me and you. Everyone else needs to yield to our knowledge and experience. I was to share this with you when I saw you. I know how much goes into what each of us do to make the outcomes a success. Unless one has done it one can't know the complexity. I have gone above and beyond to assist in selling this program and know you appreciate this. You and team have provided ideas and service to clients and lawyers that is first in class. We make a great team and there is

none better.  I pulled the Vt regional center together and it is a program asset not to be diminished.  There are great ideas out there you and I have spoken about.  They are worth doing but only if they can be done correctly.  What I surmised happened after or last week meeting was you felt a lack of respect for how things needed to be handled and that my authority was slipping.  I spoke with Ari at some length about how there is one architect Douglas and one Jay Peak captain and that is me.  He as owner partner gets this.  Understands to be productive this is the frontline team and ALL others are secondary and must act accordingly.  Over the past 6 years we both have learned much.  We have grown to the best team in the business creating a momentum envied by all.  The positives in our relationship should be continued and the distractions cut off or out of our efforts.  These thoughts are supported by Ari fully.  I'm sorry we have not spoken.  I hope you and I can have a private talk.  Doug this breakup does not need to happen.  The unproductive people need to be put on the bench and we need to control the Game.  I am committed to this and Ari fully understands this requirement.  I hope you will read this with the knowledge I am dedicated to this proper outcome.  An outcome of program success and administrative harmony.  We have done so much together and for each other that it is a shame to throw this aside.  Please give this some thought.  I really don't want to have to communicate thru a Miami lawyer.  You and I are friends and have high regard for one another let's talk this out.  If we can't resolve it then you and I will work thru the transition.  But let's talk you and I privately. I know Ari wants to speak to you as he shares my sentiments.  I know when I call your cell you know it is me.  Please pick up and let's get two friends talking. We have done to much good together to see things go this way.  Best as always.

(Ex. 110.)  Hulme did not respond.  Stenger followed up on February 13, 2012, with another email to Hulme begging to talk.  (Ex. 111.)  Earlier that same day, a Jay Peak accountant asked Hulme's son a project question.  Hulme wrote to Stenger that Rapid Visa "has terminated its relationship with Jay Peak Inc."  (Ex. 112.)

As was typical, Kelly stepped in to advise Stenger and Quiros about how to handle the Hulme situation.  Stenger made another attempt on February 14 to meet with Hulme with a letter drafted by Kelly.  (Ex. 113.)  Hulme told Stenger that he would meet with Stenger on February 22 at the office of his new lawyer, Gene Lindsey.  Hulme asked whether Stenger would have lawyer present.  (Ex. 114.)  Kelly advised Stenger that he did not need to go with an attorney.  Stenger met with Hulme and Lindsey on February 22.  (Ex. 114.)

The next day, Lindsey wrote Stenger and Kelly a letter documenting various requests made by Rapid Visa at the meeting, including account records for the partnerships, various bank records, and "written assurances from Jay Peak's counsel and accountants, on behalf of all limited partnerships, that said partnerships are being operated in compliance with federal and state law . . . and that both Jay Peak and the appropriate general partner has made full disclosure of all activities of the partnerships and financial transactions to date." (Ex. 115.) As noted above, Hulme already knew about the margin loan facilities and the cost overruns. On February 22, 2012, the Raymond James margin loan still stood at over $23 million, because the debt from the purchase of the resort by Stenger and Quiros had never been paid off. Lindsey requested "verification that there are no encumbrances or margin loan facilities, used or unused, existing on any partnership bank accounts other partnership assets (as represented by Mr. Stenger)." In other words, Stenger falsely denied the existence of the margin loan to Hulme and Lindsey. At the time, Lindsey opined that the Jay Peak projects would be shut down by the SEC because of the defendants' financial misconduct.

Kelly drafted a quick response to Lindsey's letter for Stenger's signature, noting Stenger's hope that the breach was being healed and that "[o]ur accounting team is collecting and completing the data requested." (Ex. 116.) Kelly also drafted a more detailed response for Stenger to send to Lindsey. Among other things, Stenger represented that "[a]s President of Jay Peak Inc. and General Partner of all the limited partnerships at interest here, I attest to the very best of my knowledge, and I will provide written verification, that there are no encumbrances or margin loan facilities, used or unused, existing on any partnership bank account or other partnership assets." (Ex. 116.) That same day, before the letter was sent, Quiros paid off and closed the existing margin loan. He used investor funds to cover the loan:

over $16 million from the Raymond James Lodge and Townhouse account (the same figure that he had repaid to Lodge and Townhouse in January to repay the "construction deposits" Hulme had complained about) and almost $6 million from the Raymond James Stateside account. (Ex. 117.)  On February 27, Stenger sent Lindsey another letter saying that he expected "the data will be completed by tomorrow." (Ex. 118.)  On February 28, 2012, Lindsey emailed Stenger and Kelly that Stenger's "various correspondence . . . fail to adequately address the issues discussed" and that Rapid Visa "confirms its termination of services." (Ex. 119.)

In the meantime, Quiros was busy working with Raymond James to cover up the Hulme concerns.  Burstein prepared a letter dated February 29, 2012, addressed to Stenger stating that "as of February 27th, 2012, there are no encumbrances on any of the Jay Peak Partnership accounts." (Ex. 120.)  At the same time, Burstein had prepared new margin loan documents with an account in the name of Jay Peak[33] that would be collateralized by the partnership accounts.  Immediately after the Jay Peak margin loan account was opened, Quiros paid back the Stateside investor funds, but never paid back the Lodge and Townhouse investor funds.  This decision made Quiros's handling of the funds consistent with the JCM records, because the JCM accounting showed that Lodge and Townhouse had paid JCM the $16 million in 2011 and that much of this money had been loaned to QResorts.  QResorts had returned the $16 million to the Raymond James Lodge and Townhouse account directly in January.  The payoff of the old margin loan allowed QResorts to get that money back—that

---

[33] The defendants never had this loan listed on Jay Peak's books, though the loan was in the corporation's name. Quiros did not consider it a corporate debt, but rather his and Choi's debt, just like the original margin loans.

is, to go into Quiros's slush fund. The money, however, was used not to pay down the cost overruns but instead to pay down the purchase debt.

While Quiros, Kelly, and Stenger were trying to get Lindsey the requested data, Rapid Visas sent a letter, dated February 28, 2012, to numerous immigration lawyers documenting its termination with Jay Peak. (Ex. 121.) The letter explained that the reason for the termination was that Rapid Visas "no longer has confidence in the accuracy of representations made by Jay Peak, Inc. or in the financial status of and disclosures made by the various limited partnerships."

Hulme's letter had an immediate negative impact on the defendants and their EB-5 plans. It called into question Stenger's oft-repeated marketing representation that the Jay Peak projects were successful. As described above, the projects were not "successful" because the defendants were in fact misusing investor funds to cover debts that Quiros and Stenger could not pay. The defendants were hiding a house of cards from the investors and their representatives. Hulme's letter vaguely called out the problem without offering a detailed explanation.

The defendants understood the need to cover up the problem. Kelly drafted letters for Stenger's signature to Lindsey and Hulme demanding that they stop damaging Jay Peak, as well as a letter to investor attorneys "explaining that everything is fine." (Ex. 122.) All three defendants participated in this critical lie to investors. Everything was not fine, but Stenger had to maintain the fiction to keep raising funds for future projects. This lie became one of the touchstones of the defendants' financial misrepresentations over the following four years.

Stenger's misrepresentations to James Candido, the ACCD employee leading the VRC in early 2012, provides a prime example of this cover-up. After the VRC learned about

the Hulme separation, Candido and ACCD Commissioner Lawrence Miller asked Stenger about Hulme's allegation that there was some problem with the Jay Peak EB-5 projects. It was obvious that the VRC and current and potential investors would have wanted to understand the project debts and the misuse of investor funds. Stenger took the lead in hiding the truth, denying that there were any financial issues with the Jay Peak projects. (Ex. 123.) In connection with the Hulme separation, Gulisano prepared financial documents showing the state of the partnerships as of year-end 2011, which Stenger showed to ACCD to alleviate their concerns. (Ex. 124.) These records, which falsely captured a snapshot in time based on the return of millions of dollars to limited partnership accounts in an attempt to appease Hulme, covered up how the defendants had misused—and would continue to misuse—investor funds.

G.   The Stateside Shortfall

While Quiros, Kelly, and Gulisano handled the day-to-day financial operations of JCM without consulting Stenger, Stenger was kept abreast of key financial developments. Stenger was also managing the relationship with DEW and other Jay Peak project vendors. Thus, he personally authorized the payments to JCM and monitored the payments for Jay Peak construction. He could see that money going into JCM from one project was being used to pay for other projects.

As Stenger was falsely representing to the VRC and the EB-5 community that Hulme was wrong and that everything was fine, he and the other defendants went right back to using JCM to misapply funds. In 2012, Stenger sent tens of millions of dollars in Stateside investor funds to JCM as "construction deposits" to pay for the shortfalls on Golf and Mountain and

Lodge and Townhouse construction, because the funds from those investors had been misapplied. (Ex. 125.) No Stateside construction occurred in 2012.

As noted above, in mid-2011, the defendants had hoped that the various project "profits" from Golf and Mountain, Lodge and Townhouse, and Stateside would cover the prior cost overruns. Because of the misuse of $16 million in Lodge and Townhouse funds to pay down the Jay Peak purchase debt associated with the margin loan as well as other spending, the defendants realized in mid-2012 that they lacked "profits" available from the resort projects to complete Stateside. All three defendants discussed this problem during a September 2012 meeting.

On September 4, 2012, Stenger met with Quiros, Kelly and Gulisano in Miami. Gulisano was monitoring the project budgets, keeping an eye on the availability of funds to finish the EB-5 resort projects, particularly Stateside, the last resort project. Gulisano prepared minutes of the meeting, which he shared with the participants. (Ex. 126.) Gulisano documented that he explained his data with the defendants and that "[u]pon review of the data presented by the CFO, which was handed to you at the meeting, it was determined that we will be approximately $22 million underfunded and that these funds must come primarily from redesign/cost savings and other sources in order to allow us to for the timely completion of these [resort] projects." Gulisano also noted the future need for certain Jay Peak capital costs that would also require funding. The minutes state that Stenger proposed a partial solution based on various cost savings associated with the Stateside and Lodge and Townhouse projects. Stenger's cost saving proposal was not fully realized. By 2014, the defendants had run out of Jay Peak EB-5 funds and needed to turn to the next project, AnC, to pay for Stateside construction. Stenger was well aware of the shortfall.

H.     The AnC Vermont Budget

As noted above, Stenger came up with the idea for AnC Vermont as a $50 million project in 2009, and by 2011 it had turned into a $100 million project.

Kelly, along with Quiros and Stenger, had a strong financial motive for moving AnC forward.  Quiros had agreed that a company owned by Kelly, North East Construction Services (NECS), would receive the "construction supervision" fees associated with the project, which were later budgeted at over $12 million.  The $12 million would be split between Kelly and the "project sponsor," a company owned by Stenger and Quiros (with Choi having a secret share).  Stenger had two financial stakes in AnC Vermont: his share of the supervision fees, which was over $1 million, and his share of potential profits from AnC Vermont, should it ever become profitable.[34]  (Ex. 127.)

As noted above, Stenger and Kelly worked together on the jobs numbers for AnC in 2012, but Stenger largely ignored details about the AnC project budget.  Instead, Kelly and Quiros worked with Choi to fashion a budget and the "sources and uses of funds" chart in the AnC business plan.  Between 2009 and 2012, Choi had been the only participant proposing costs for the project.  When Kelly began work on the budget in 2012, he had to work with Choi (through Quiros) to design the budget.  Two key parts of the budget were construction costs, to be paid to Peak CM, the construction company retained to build the AnC facility, and equipment costs, to be paid to AnC Korea, which would order and validate the equipment to be placed into the AnC Vermont facility.  The creation of these budget figures illustrates the defendants' disregard for serious project planning.  In 2012, the defendants hoped, without

---

[34] The defendants structured the AnC project as a joint venture between the limited partners and the sponsor entity (owned by Quiros and Stenger) with the sponsor entity receiving the much larger share of potential profits.

serious research, that they could build the Vermont facility based largely on the design plans for the Korean facility, which Choi reported had cost less than $20 million to build. Kelly did not trust that figure but did little to determine a more precise estimate. In 2010, Choi had estimated the equipment cost at approximately $14 million, and when the defendants doubled the size of the project in 2011, Choi simply doubled the equipment cost. (Ex. 128.) At the time, Choi's plan envisioned only 10 clean rooms. Choi also wanted tens of millions for the "technology transfers and marketing rights" of the supposed "products" AnC Korea was granting to AnC Vermont. As described above, there were no such market-ready products.

Between March and November 2012, Kelly massaged the budget numbers into the sources and uses of funds chart that they put into the business plan:

**Jay Peak Biomedical Research & Development Center L.P.**
**Projected Sources and Uses of Funds**
**220- EB5 Investors $110,000,000**

**Biomedical Research Facility, Medical Device, Manufacturing,**
**Medical Device Distribution, Biomedical Clean Rooms**

**$118m Project Financed By**
**$110m From EB-5 Investors  and $8m From AnC Bio Vermont, LLC**

| Description | | | | Cost per Offering |
|---|---|---|---|---|
| **OWNED BY L.P.** | Square | Cost Per | | |
| Land | | | $ | 6,000,000 |
| **Biomedical Research Clean Rooms** | Footage | Sq. Ft. | | |
| Construction Clean Rooms | 30,000 | $        560 | $ | 16,800,000 |
| Construction Clean Rooms Support Areas | 15,000 | $        140 | $ | 2,100,000 |
| Construction & Fit Out/Furniture | | | $ | 250,000 |
| Construction Manufacturing & Distribution Areas | 15,000 | $        175 | $ | 2,625,000 |
| Construction Mechanical Floor | 7,500 | $        190 | $ | 1,425,000 |
| Construction & Fit Out/ Equipment | | | $ | 40,035,370 |
| | TOTAL CONSTRUCTION | | $ | 63,235,370 |
| | & FIT OUT COSTS | | | |
| **Construction Supervision Costs** | | Percent of Cost | | |
| Supervision | | 15% | $ | 9,485,306 |
| Supervision expenses | | 5% | $ | 3,161,769 |
| | SUB- TOTAL | | $ | 75,882,444 |
| **OWNED BY L.P.** | | | | |
| **Distribution & Marketing Rights** | | | | |
| TPLS | | | $ | 2,500,000 |
| Stem Cell Culture | | | $ | 2,500,000 |
| C-Pak | | | $ | 4,000,000 |
| E-Liver | | | $ | 1,000,000 |
| | SUB- TOTAL | | $ | 10,000,000 |
| **OTHER COSTS** | | | | |
| Design, Architecture & Engineering | | | $ | 2,100,000 |
| Parking, Access Roads, Drainage, Infrastructure | | | $ | 387,926 |
| Working Capital | | | $ | 15,629,630 |
| | SUB- TOTAL | | $ | 18,117,556 |
| **FUNDS / SERVICES**   From AnC Bio Vermont, LLC for certain Infrastructure, Utilities, Sewer, and Water | | | $ | 8,000,000 |
| | GRAND TOTAL | | $ | 118,000,000 |

(Ex. 20 at 5720039.)

All three defendants understood that Quiros and Choi were partners in Jay Peak and in the AnC EB-5 project. They knew that the figures in the budget provided to investors were not the result of arms-length transactions. Indeed, they knew that the investors would be

buying a portion of the Bogner property for $6 million, when Quiros had purchased the entire property for $3.2 million. Kelly and Stenger did not care about how Quiros and Choi were sharing various project profits beyond the land and the NECS fees. Their goals, however, had little to do with the well-being of the immigrant investors. During the final meeting to coordinate the AnC project in Korea in November 2012, Quiros and Choi documented their private understanding about their project profits. Choi would have the use of the then-agreed-upon $10 million to be paid by the investors for "marketing rights." (Quiros and Stenger's sponsor company was granted the technology rights in the "products" for nothing.) Quiros and Choi were to split the land profits, $10 million of the $16 million "working capital," and $12 million of the inflated $40 million equipment costs. (Ex. 129.) Choi also confirmed that Stenger was to receive $1 million from the AnC project.

I.     The Misapplication of AnC Investor Funds

Stenger began recruiting AnC investors before the project documents were finalized in early December 2012. This group included various investors who had initially signed on for Stateside but had lost Stateside slots because that project was full. Choi, who was desperate for funds, wanted money sent to Korea right away, but the first AnC investor funds went to Quiros for the slice of Bogner land to be sold to the AnC investors.[35] Although Stenger knew about funding shortfalls on Stateside and his obligations as general partner in Stateside and in AnC, Stenger authorized the payment of $6 million in AnC investor funds to Quiros to "buy" the AnC land in late 2012 and early 2013. (Exs. 130, 203, 204.) Quiros treated the

---

[35] While the defendants made sure that Quiros got his profit on the land sale immediately, they never legally transferred the property to the limited partners. GSI, Quiros's company, still held title to the entire Bogner property in April 2016. Quiros avoided paying property transfer taxes by holding off on actually transferring the land to the limited partnership.

money as his own, and Stenger and Kelly raised no concerns about Quiros considering it as his profit.

After the Korea meeting, the defendants planned to promptly invoice the AnC investors tens of millions of dollars to fund $52 million to be paid to AnC Korea—$10 million for distribution rights, $40 million for equipment, and $2 million for designing the AnC facility. Initially, the defendants anticipated that these funds would be sent directly to Choi in Korea. After Choi was arrested in early 2013, Quiros decided to route these funds through JCM instead of them going directly from the partnership account to Korea. The defendants also decided to send the funds in installments of $2.6 million each month for two years. Between November 2012 and June 2014, when CIS finally approved the project based on the false jobs numbers described above, Stenger authorized the payment of approximately $35 million to JCM and $8 million to NECS. During that same period, Peak CM was paid little for actual construction work and the facility design was not completed. Later in 2014, during the period when the defendants were barred from marketing the project, Stenger authorized the payment of another $11 million to JCM and NECS.[36] In short, Stenger was sending tens of millions of dollars to JCM and NECS when he knew the former to be Quiros's slush fund and the latter to be nothing more than profits for himself and the other defendants. Further, he distributed the AnC investor funds even as debts ran up from misuse of prior investor deposits.

Stenger also encouraged Quiros to misapply the JCM funds. Stenger was monitoring the Stateside construction. He knew that the defendants had run out of Stateside money by

---

[36] After Quiros's May 2014 SEC interview, Kelly stopped taking NECS payments in connection with JCM payments.

early 2014. Stateside construction had been broken into two steps. The first step consisted of constructing a hotel on the Stateside area of Jay Peak, which is a distance from other hotels and from the heart of the resort. DEW built the hotel in the second half of 2013, and Stenger opened the hotel by Christmas 2013. The second step included constructing other housing and amenities near the Stateside hotel. The defendants had run out of Stateside funds before the hotel construction—the first step—had been paid for. Stenger negotiated another delay in construction payments with DEW, like the delay he had negotiated for Phase 2, until April of 2014. (Ex. 131.) As with prior debt issues, Quiros and Gulisano had to funnel money from other sources, including JCM, to fund these Stateside costs. (*E.g.*, Ex. 132.)

Stenger's iPhone text messages with Quiros and Kelly provide useful insight into Stenger's relationship with these other defendants as well as his understanding of the commingling of funds—and desire to do so—to backfill Stateside construction. Stenger's text messages, retrieved from a phone he turned over to the Receiver in April 2016, date back to August 1, 2013.[37] In August 2013, the defendants met again in Miami about money issues. At this point, Gulisano reported that the defendants needed approximately $30 million in additional funds to complete the Lodge and Townhouse and Stateside projects. That fall, Stenger participated in a significant marketing trip to Asia. During the trip, he frequently texted Quiros and Kelly, reporting on his hopes for fundraising for AnC and Burke, which was also an approved EB-5 project by then. On September 26, 2013, Stenger made clear his request to Quiros that they use AnC money to pay for Stateside construction. He wrote

---

[37] The text messages also corroborate the witness testimony that the defendants were in almost constant phone communication.

"Please help me with getting some money to dew. The spates funding can be reduced[38] and other funds were supposed to be coming to you for ANC and Burke. 4million was received this week I'm told. You and bill can call me anytime." After Quiros questioned "any change to our schedule plan budget," Stenger wrote, "Several million were sent down [to Raymond James] this week I'm told. 3M for ANC and 1m for Burke. That 4m I'm hoping will allow us to keep construction [with DEW at Jay Peak] current. We need to talk about this, I guess. If the construction payments stop we or finished as everything will collapse. The word will get around that we can't finish and the state will audit Us We must find a way. I m raising funds as fast as I can. . . . I'm sick over this." (Ex. 133.) The day before, Stenger had expressed similar concern in texts with Kelly: "[t]his dew thing is going to get bad if we don't move some funds a bunch of new money [for AnC and Burke] has come in this week." (Ex. 134.)

The AnC investor money that Stenger was authorizing to send to JCM was supposed to go to Korea, but because of Choi's legal and financial problems Quiros was holding the money in JCM, where he could use it as he desired. By the end of 2013, Stenger had sent $13 million to JCM. Quiros had sent only $4.5 million of those funds to Korea. Nonetheless, the bank balance for JCM was under $5 million. Thus, Quiros had already misapplied over $3 million in AnC investor funds.

1.   *The 2014 Raymond James Margin Loan Payoff*

The Jay Peak Raymond James margin loan, which Quiros had opened in 2012, became another significant financial problem. The SEC began its investigation in June 2013

---

[38] Stenger convinced Quiros to buy the "Spates Block," a building on Main Street in Newport, in the hope that the defendants would develop an EB-5 project at that location. Because of problems with the existing building, they decided to tear down the old structure even though they lacked approval for the new project. The hoped-for project was never approved. Quiros and Stenger had to come up with approximately $3 million to buy and demolish the old structure. This kind of unfunded expenditure, driven by Stenger, contributed to the defendants' financial problems.

and subpoenaed records from Raymond James.[39]  Burstein told Quiros that Raymond James wanted Quiros to pay off the margin loan, but Quiros did not have the money to repay the loan.  He began paying $500,000 a month from JCM—which held AnC investor funds—in October 2013.  (Ex. 135.)  In February 2014, Raymond James demanded repayment of the remainder of the loan, which stood at approximately $19 million.  For a variety of reasons, the defendants had suspended AnC payments to JCM between June 2013 and February 2014.  Such prudence was reasonable considering that the project was not approved by CIS and fundraising had not gone particularly well.  There was no legitimate reason to send more money, which was supposedly for Korea, to JCM.  To pay off the Jay Peak margin loan as demanded, Quiros, Kelly, and Gulisano prepared the paperwork documenting Stenger's authorization of $18.2 million in AnC investor funds to be paid to JCM in late February 2014.  Stenger indeed authorized the payments.  (Ex. 136.)  Quiros and Kelly will testify that Stenger was told about the true use of the funds.[40]

At the time of the payments, Kelly and Gulisano created a justification for JCM's transfer that paid off the Raymond James margin loan in the name of Jay Peak.  They created a new fee that JCM was "obligated" to pay QResorts/Jay Peak for "managing" the construction for Golf and Mountain, Lodge and Townhouse, and Stateside.  At first blush, this new fee had the added advantages of avoiding taxes for JCM's "profits," by turning profits into expenses, and of decreasing QResorts' debt to JCM that had been created from the transfers used to pay off cost overruns.  (Ex. 137.)  Quiros will testify that he was hoping at

---

[39] Raymond James' handling of the margin loans led to the institution paying approximately $150 million to settle civil claims brought after the SEC suit was brought against Stenger and Quiros. The Receiver used those funds to pay back investors, including many AnC investors.

[40] The defendants and Gulisano were careful to prepare almost no written communications about this transaction, which appears to be the largest single transaction in the history of the Jay Peak EB-5 projects.

the time to find a new bank that would agree to another loan arrangement. He could then use the new loan to "pay back" the AnC money.[41]

In the spring of 2014, the SEC investigation was in full swing. SEC attorneys began to take sworn testimony from various potential witnesses and subjects. In May 2014, both Stenger and Quiros were questioned under oath by SEC investigators, who by that time had uncovered the margin loan payoff. During Quiros's sworn testimony, he was confronted with the details of the margin loan transactions.[42] Early in the discussion, he was asked about the source of funds for the margin loan payoff and he said that he understood that it was his "profits." The SEC lawyers then lead him through the documents showing that he had used AnC investor funds to pay off the margin loan.

Kelly and David Gordon, the attorney working closely with the defendants and representing the Jay Peak entities in the SEC investigation, immediately appreciated the problem with Quiros's testimony. The AnC business plan did not support the claim that Quiros was due $21 million (the total used to pay down the margin loan) in profits from AnC.[43] To deal with this problem, Kelly and Quiros came up with a fraudulent story to explain why AnC money was used to pay a JCM "obligation" unrelated to AnC. Gordon, Kelly, and Quiros prepared "declarations" from two AnC Korea executives, who happened to be in the United States in May for AnC VT design meetings. The declarations falsely represented that the AnC Korea executives had directed Quiros to use JCM money to pay off

---

[41] Quiros was in discussions with JP Morgan Chase Bank at the time, which tentatively agreed to a loan relationship. When Chase learned about the SEC investigation, however, it pulled back the loan approval.

[42] Stenger was interviewed the day before Quiros, but the SEC attorneys choose not to confront Stenger about the margin loan. Stenger's interview is discussed below.

[43] As noted above, Quiros and Choi had included over $21 million in hidden profits in the AnC project. Quiros's testimony might have been more "true" to the AnC deal with Choi than to the cover-up crafted by Kelly.

the margin loan in February 2014 and that AnC Korea considered this margin loan payment to be in lieu of payments to AnC Korea for distribution rights and equipment.[44]  (Ex. 138.)

Quiros and Kelly will testify that Stenger was told about the margin loan questions during Quiros's SEC testimony and the declarations.  Regardless of Stenger's knowledge of the margin loan payoff in late February 2014, the documents corroborate that Stenger was informed about it by late May 2014.  On May 22, 2014, the day of Quiros's SEC testimony, Stenger sent texts to Kelly about various events from his testimony the day before and asked at 1:48 p.m. "News?  Dying to hear something."  At 8:39 p.m., Stenger wrote to Kelly, "Talked to Ari.  He was uneasy about the pm [when Quiros was questioned about the margin loan payoff].  Jcm was the issue of concern.  Have you talked with him or David.  Very interested on how David felt about the pm."  Kelly responded that night, "I talked to Ariel for a bit.  He was uneasy about the pm. . . . I think I will try to talk with David and see if we can produce any clarifying documents if it would help."  (Ex. 139.)  The next day, Stenger followed up: "How did conversation go with Ari and David Gordon. ? ? Eager to know David's take."  (Ex. 140.)  Stenger's interest on Quiros's afternoon of questioning, and his focus in Gordon's "take," confirms that he understood how problematic the topics of testimony had been.[45]

Not only did Stenger communicate with Kelly and Quiros about Quiros's testimony and the plan to assuage the SEC's concerns, but the Gordon emails and billing records show that Gordon filled Stenger in on what transpired with the declarations.  Although Stenger was

---

[44] The AnC Korea executives' signing of the false declarations underscore the willingness of the Korean participants in the project to lie to keep the project moving.

[45] It seems like too much of coincidence that, out of hundreds of text messages obtained from Stenger's iPhone, there are no Stenger text messages with Quiros or Kelly in late February 2014 when the margin loan is paid off and in late May 2014 when the declarations were prepared.

not a participant in the drafting of the declarations, on May 25, 2014, Gordon wrote to Stenger:

> Bill, since we parted in Miami, it's been crazy busy. As Ariel may have mentioned, I have been working with him to address a question the SEC raised re: certain payments involving JCM. I think we are getting some sworn statements that should address some of the SEC's questions. I'd be glad to get you caught up again soon. Again, you have my sincere apologies for my delay in getting you caught up.

(Ex. 141.) Gordon's billing records show a phone call with Stenger on May 27, 2014. (Ex. 142.) In short, Gordon, Quiros, and Kelly were all talking with Stenger about the margin loan questions in the Quiros testimony and the declaration explanation. By late May 2014, Stenger knew that Quiros had used AnC investor funds to pay the Raymond James margin loan.[46]

### 2.    *The Citibank Line of Credit*

After May 2014, Stenger authorized the payment of another $11 million of AnC investor funds to JCM. (Ex. 143.) By early 2015, Quiros had accumulated millions of dollars of AnC investor funds in JCM. He used these AnC funds for the next significant misapplication of AnC funds, the Citibank Line of Credit. Again, Stenger was told about these financial decisions.

Quiros had been looking for a new bank that would extend him credit since the fall of 2013, when Raymond James asked him to pay off its margin loan. In early 2015, he connected with Citibank, which agreed to provide a line of credit collateralized by ready funds. Quiros posted as collateral a Citibank account in JCM's name containing $15 million primarily in AnC investor funds. Quiros fully drew down that $15 million line of credit during 2015. The

---

[46] As noted below, Stenger falsely testified to the SEC that he was unaware of a margin loan at Raymond James.

first payment from the line of credit, which was $6 million, was used to pay a personal tax debt owed by Quiros as a result of the decision to pay QResorts the management fee from JCM.[47]

Quiros will testify that Stenger was kept informed about the line of credit, and the text messages corroborate Stenger's understanding.   In 2015, Stenger was pressuring Quiros to provide funding to construct the second step on Stateside, which had been postponed in 2014 because of a lack of available funds.   In late May 2015, Stenger attempted to get a bank statement from JCM showing a balance of $4 million to help move forward Stateside construction.   He was also requesting funds to pay DEW for Stateside construction. Quiros agreed to expend only limited funds.   Stenger also pressed Kelly in texts about the need to continue Stateside construction: "[n]eed to figure the plan.   Know what to do til sep.   Then sept til jan.   And beyond."   (Ex. 144.)   Stenger also asked about bank account verification. Quiros agreed to fax Stenger the JCM account statement showing a $15 million balance, even though the account was being used as collateral for the line of credit.   Stenger was instructed to show the statement to DEW but not to leave a copy, and to shred it afterwards.   In June, Stenger documented the plan with DEW, which consisted of committing $4.5 million through September "as long as DEW is willing to agree to defer payment of $2.5 mm of the $4.5 mm until Dec. 31."   (Ex. 145.)   In the same text, Stenger also reconfirmed his knowledge about the lack of funds and his hope that he would be able to misapply AnC funds to Stateside,

---

[47] This payment provided the basis for the money laundering charge to which Quiros pleaded guilty. As noted above, Kelly and Gulisano had envisioned that the "fees" associated with the margin loan payoff would be treated as a decrease in QResorts' debt with JCM, but Quiros's accountants disagreed. They made Quiros take the "fees" as income to QResorts, income that travelled directly onto Quiros's personal return, creating a large tax liability for Quiros personally.

noting that new AnC money might be available later in 2015 that could be used to pay DEW for Stateside construction.[48]

By July 2015, Stenger wrote, "I feel we must pay the 2.1 million. It pays work done, keeps things calm. While we slow down pace. It is vital we do this. I will send you again the wire info. But I will have a big problem if these guys don't get paid Dew will do what ever we say the pace should be. But we must show some movement or state will be on us and then Feds." Quiros responded, "There is now way I can make a wire transfer today anyway two you must speak to Kelly on way or another. three you can't talk to me as though I did something wrong please understand you have taken a blin[d] eye to the situation. This has been upon us for a long time. Kelly explain to you how to fix this and you understood." (Ex. 146.) By this point, the defendants understood that the ongoing debt could not be paid off unless they got approval for later projects, like the Spates block project, which would hopefully provide new owner "profits."

Stenger also arranged a meeting between Quiros and the President of DEW, Don Wells, in Florida. In preparation for the meeting, Stenger wrote, "one of the things you might consider sharing with don is that the short term issue we have is that we had to pay 6 million of taxes. If that were not needing to be payed we could get thru this But it needed payment. He will wonder why the funds are short given we showed proof of 15 million. A thought." (Ex. 147.) Thus, Stenger documented that he was being kept informed by Quiros about the funding issues, including the $6 million tax bill and the line of credit. At that point, Quiros used the Citibank line of credit, backed by AnC investor funds, to pay $2 million for Stateside

---

[48] When the VRC allowed AnC to go back into the market, it required that the new AnC investor funds be escrowed and not used unless one of two conditions occurred: either VRC approval of release of the funds (which VRC was not going to do without outside review of the prior use of AnC funds) or I-526 approval by CIS for new investors.

construction expenses. Kelly and Quiros shared a plan to use limited additional funds from the line of credit to pay DEW later in 2015. In short, the defendants were laundering AnC funds through the line of credit to pay for Stateside construction and tax issues caused by the 2014 margin loan payoff.

Stateside was not completed before the filed SEC suit in April 2016. There were simply no funds available. Stateside was the resort project left unfunded after the music stopped.

J.      Financial Misrepresentations to the SEC

When Hulme separated from Stenger, Quiros, and Kelly in 2012, the defendants had the chance to come clean with investors, the VRC, and the politicians about the financial problems they had encountered. Instead, they doubled down on the financial fraud. They continued and expanded their fraudulent scheme even though Hulme's lawyer told Stenger in early 2012 that their commingling of funds could bring down the entire Jay Peak EB-5 house of cards. Ultimately, that is precisely what did happen.

When the SEC began investigating the issues Hulme's attorneys had questioned and challenged, the defendants tried to deceive the SEC. They hid the truth in interviews and provided the SEC with bogus documents. Moreover, they concealed the scope and risk from the SEC investigation from the investors and, for a time, from the VRC. But despite Stenger, Quiros, and Kelly's efforts to conceal their fraudulent scheme throughout the SEC's three-year investigation, Hulme's lawyer's prediction proved accurate and the SEC shut them down in April 2016.

Stenger was an active participant in the SEC deception efforts. From the outset, the SEC's first subpoenas—to GSI, QResorts, and JCM—made clear that the SEC was attuned to the very issues that Hulme had raised with Stenger and the other defendants. These

subpoenas closely tracked the Hulme issues: how the resort was purchased, the commingling of investor funds, money transfers through JCM, and project cost overruns. (Ex. 148.)[49] The defendants' narrative to the SEC was that they only used funds that they were authorized to use. Stenger appears to still cling to this narrative today.

To try to convince the SEC of this narrative, Stenger (among other things) signed and backdated fraudulent documents supporting the defendants' story about the Phase 2 cost overruns. During late 2013, Kelly, Quiros, and Stenger created bogus documents for David Gordon, the attorney Quiros hired to handle the SEC investigation, to send to the SEC. Kelly had taken the lead on fashioning responses and collecting documents to provide to Gordon for the SEC. The defendants' financial narrative about the Phase 2 cost overruns was that QResorts had loaned money to Jay Peak to pay the overruns. Jay Peak in turn "loaned" the money to the Phase 2 investors, who then transferred ownership of the waterpark to the Jay Peak owners (Quiros and Stenger) in consideration for the cost overrun "loans." (Ex. 150.) As noted above, this story allowed the defendants to hide the fact that they used other projects' construction funds to cover the cost overruns through QResorts and JCM. To support the story, Kelly created a series of unsigned promissory notes and emailed them to Stenger in early November 2013. The promissory notes falsely claimed to have been created from 2010 to 2012 as evidence for the "loans" from Jay Peak to the partnerships. Stenger signed hard copies of the documents and had them falsely backdated and notarized by his assistant. (Ex. 151.) These false documents were then produced to the SEC. (Ex. 152.) A few weeks later in 2013, Kelly sent Stenger the "Asset Transfer Agreement" documenting the transfer of the

---

[49] In July 2013, Stenger received an SEC subpoena that also included demands for these documents, as well as others. (Ex. 149.)

waterpark. (Ex. 153.) Again, Stenger signed the false document in an effort to make it look like it was created and signed in 2011. (Ex. 154.) And again, the false document was produced to the SEC. (Ex. 155.) Just as Stenger was preparing false and fraudulent documents in January 2015 to deceive the VRC about the viability of the AnC project, as he admitted in his guilty plea, he was preparing false and fraudulent documents in late 2013 to deceive the SEC about his and Quiros's financial machinations. Both were part of the scheme charged in Count One to keep the house of cards from falling.

Stenger also participated in the fraud on the SEC during his sworn testimony, which was given in two parts: the first on May 21, 2014, and the second on September 17, 2015. In both sessions, Stenger actively attempted to deceive the SEC. For example, in the May 2014 interview, Stenger was asked detailed questions about the funds used to purchase the resort. He provided misleading information about his knowledge of the Raymond James margin loan and the borrowing used to buy the resort. (Ex. 156.) Indeed, Stenger denied knowing about the margin loan. Stenger's reaction after having endured this detailed questioning further corroborates his actual knowledge. Had Stenger not already been aware in May of 2014, he would certainly have tried to figure out what had happened. Further, in the second interview in September 2015, Stenger falsely denied being aware that Quiros, Kelly, and Gulisano were involved in commingling investor funds. (Ex. 157.) In short, Stenger had bought into the false narrative at least as early as the SEC investigation.

K.   Financial Misrepresentations to the VRC

The defendants not only sought to deceive the VRC about job creation and financial projections, they also sought to deceive the VRC about the misuse of AnC investor funds. The VRC began asking questions about the defendants' prior use of AnC investor funds by

the fall of 2014, during the period that VRC had suspended marketing and demanded revised offering materials. In November 2014, ACCD's attorney sent Mark Scribner, the Vermont attorney assisting Stenger and his co-defendants with the VRC issues, a list of questions that asked for a description of the use of investor funds already raised. (Ex. 158.) David Gordon submitted a response to VRC a few weeks later. (Ex. 160.) The response, which Kelly had taken the lead on crafting, and which had been shared with Stenger before finalization, falsely represented that JCM had paid AnC Korea $24.5 million for distribution rights and equipment procurement. (Ex. 161.) The defendants did not disclose the Raymond James margin loan payoff and the false declarations submitted to the SEC to cover the margin loan payoff. It was obvious that the VRC would have wanted to know about the margin loan payoff and the Koreans' declarations. This important information was concealed near the same time, and as part of the same concerted effort to get AnC back into the market, when Stenger was providing the documents to the VRC that he has admitted were false.

The VRC also asked about the Raymond James margin loan relationship—an issue related to the use of AnC investor funds—in late 2014. Earlier in the year, disgruntled Phase 1 investors questioned Stenger about his use of Phase 1 funds, which as noted above had been used to purchase the resort. Some of the Phase 1 investors were unhappy about the defendants' decision to buy back their equity interest with promissory notes, which Stenger had executed in 2013 without notice to or input from the immigrant investors. In 2014, Phase 1 investors asked for documents about the use of their funds in 2008, including account statements. (Ex. 162.) The defendants refused to provide the requested documentation. The submissions to CIS to get their green card conditions removed, however, contained some bank records revealing the original Phase 1 margin loan. The Phase 1 investors found these

81

bank records and submitted them to the VRC with questions about what Stenger and Quiros had done with their money.

In late 2014, the VRC forwarded its own questions about these bank statements to Stenger. (Ex. 163.) Instead of telling the truth to the VRC about their use of margin loans, the defendants crafted a false and fraudulent narrative about the margin loans. They admitted that there had been a margin loan at Raymond James but claimed that it was only used for liquidity purposes. In other words, Quiros and Stenger had decided that investor funds should be placed in government bonds (Treasury Bills) and that, because of the maturity dates of bonds, money might be needed before the bonds could be sold. The margin loan thus allowed for fund liquidity.[50] While this explanation was partially true, it hid the important fact that Quiros and Stenger had used the loan funds for purposes other than the designated EB-5 projects, including the purchase of Jay Peak and the purchase of Burke. By late 2014, all three defendants knew about the margin loans at Raymond James. They all knew that the VRC was asking about them. Kelly and Stenger participated in a December 2014 meeting with Patricia Moulton, the ACCD Commissioner, in which they, along with Gordon, presented the misleading and incomplete liquidity-only explanation.[51]

As noted above, in early 2015, DFR began to participate in the VRC. In late January, DFR lawyers addressed open questions concerning the AnC project. They asked for more details about both the prior use of AnC investor funds and the Raymond James margin loans.

---

[50] In a recent filing, Stenger described this as a "preposterous" narrative. (ECF No. 359 at 5.)

[51] Stenger's participation the margin loans misrepresentations is further revealed by his dissembling to Alex MacLean, who asked Stenger about Raymond's questions. In an email to MacLean, Stenger does not claim that he knows nothing about the Raymond James statements. Instead, he assures her that the accounting was a mess, but that the SEC "found nothing missing or wrong." (Ex. 167.) To the contrary, the misuse of the margin loan would play a major role in the SEC's suit in 2016.

Kelly and Stenger hid the truth from DFR. In February 2015, they submitted a new version of the use of funds chart, along with JCM invoices, again hiding the margin loan payoff and declaration story and falsely maintaining that $25 million had been sent to AnC Korea. (Ex. 164.) This chart was later supplemented with a written narrative, initially drafted by Kelly and revised by Kelly, Stenger, and the Primmer lawyers,[52] more concretely misrepresenting the prior use of funds. (Ex. 165.) Also in February, Gordon sent DFR a letter again explaining the use of the Raymond James margin loan with only the liquidity story. (Ex. 166.) Kelly has pleaded guilty to deceiving the VRC by hiding the Raymond James margin loan payoff.

Kelly and Gordon took the lead in this deception of the VRC about the use of AnC funds and the margin loan, but Stenger was actively involved in the meetings and the written submissions furthering this aspect of the fraud.[53] As noted above, Stenger knew that Raymond James margin loans had been used for more than liquidity and he knew about the Korean declarations. With this knowledge, he understood that Kelly and others were concealing critical information from the VRC, and that the VRC was expressly requesting this information. Again, Stenger went along with the other defendants with misrepresentations regarding the misuse of investor funds. As in 2012 when Stenger relied on the trust others placed in him to falsely claim to the VRC that "everything was fine" in spite of Hulme's vague allegations, in 2014 and 2015 he used his reputation to help support the equally false claim

---

[52] The defendants hid the margin loan payoff and the declarations from the Primmer attorneys.

[53] Quiros's role in this deceit illustrates his common reaction to let others, including Kelly, take the lead in dealing with the details. Quiros clearly understood that the defendants needed to conceal the truth to keep going, but he avoided being the lead speaker or drafter. Though Stenger wants to label Quiros as the mastermind, the upcoming evidentiary hearing will permit the Court to assess the defendants' various roles and responsibilities in the fraud scheme.

that everything was fine with AnC investor funds. Throughout the fraud, Stenger maintained his perspective that the ends justify the means, that implementing his vision was paramount, that the "regulatory crap" should be ignored. In an email to the team working on getting the AnC project re-approved, Stenger wrote a long email describing what can only be read as his desperation to move forward. (Ex. 168.) Among many other things, Stenger wrote that "economic development is part capital, part vision and a big part momentum and perception of success." Stenger knowingly sacrificed honesty and investor security for that perception.

V.      Other Marketing Misrepresentations

Stenger had primary responsibility for the marketing of the AnC Vermont project. With Hulme's departure in early 2012, AnC Vermont was the first project that Stenger marketed without assistance from Hulme.[54] Stenger made a variety of misleading statements to assist his marketing plans, but here the government will focus on four key deceptions. First, Stenger repeatedly lied to investors about the success of the AnC marketing itself. Second, Stenger created a false marketing pitch that the State of Vermont was "auditing" the investor funds. Third, Stenger deceived investors about the timeline for facility construction. Fourth, Stenger misrepresented the seriousness of the SEC investigation of the Jay Peak projects. Stenger knew that all four matters were highly material to AnC investors. Stenger misled the investors to keep raising money for a project that could not sell itself. His vision mattered more than the truth.

---

[54] Stateside was marketed by Stenger in 2012, but Stenger relied on marketing materials Hulme helped design and draft.

A.    Misrepresentations about the Number of Current Investors

The EB-5 projects involving construction at Jay Peak had sold out quickly. Investors obviously cared deeply about whether the project would be fully funded because without sufficient investor funds the project likely would not be able to move forward, certainly not as outlined in the project's business plan. In short, Stenger's ability to recruit the required number of investors posed an important investment risk. As it turned out, this risk was particularly significant for the AnC Vermont project. Stenger had difficulty marketing AnC for several reasons, including the growth in other available EB-5 projects, the unusual business plan for AnC Vermont, and even the marketing of the Burke project at the same time as AnC.

Stenger regularly misled investors about the number of AnC investors to falsely minimize this investment risk. Stenger's lies began at the beginning of the marketing effort. On February 25, 2013, Stenger wrote to a Houston immigration attorney, "we have about 80 of the 220 slots left and they will be full by May 1st." (Ex. 169.) This was not a minor fib. By late February 2013, over 180 of the 220 slots were "left." Stenger and his assistants were carefully tracking the number of investors committed to the program. Thus, Stenger knew that he was lying to make his AnC marketing look more successful than it was.

He continued this fraud. He was not always consistent, however, with his lies. On April 2, 2013, he wrote to another immigration attorney that "[w]e are more than half subscribed and will be full in about six more weeks." (Ex. 170.) On May 3, 2013, he wrote to a recruiter for Chinese investors, "AnC is doing very well. About 50 spots left." (Ex. 171.) In May, Stenger was not even close to filling the project; there were over 150 spots left. (Ex. 172.)

Moreover, at that point, Stenger was worried about the success of AnC marketing. On May 13, 2013, Stenger wrote one of his assistants, "We need an accelerated AnC plan. I'm worried that AnC will stall once these other choices [Burke] get on the street. We need to brainstorm about how to make AnC look stronger." (Ex. 173.) On August 6, 2013, Stenger wrote to still another immigration lawyer:

> We have Anc/Bio Vt open with about 50 positions open out of the 220 in the project. Also Burke Mt. Hotel project is available. I will have my assistant Lizzy Button send project summarys of the Burke project. The Anc project will offer 4-6 % return once the business opens in the 3 year and 6-8% in year 5. We plan to repay the investors after they are in the project for 5 years. Hope this helps.

(Ex. 174.) Again, Stenger was nowhere close to having only 50 positions open in the AnC project, nor could he possibly guarantee a positive return on investment. This misrepresentation was a regular part of Stenger's marketing. The government will provide at the hearing additional examples of similar emails from Stenger or his employees misrepresenting the success of AnC Vermont fundraising.

B.    Deceit about VRC Oversight

In his marketing of AnC Vermont, as well as the earlier projects, Stenger also emphasized the unique nature of the VRC and its oversight of the projects. Stenger pointed to the support of federal and state politicians to convince investors that their money was protected by the State of Vermont. (*See, e.g.*, Ex. 23 (touting that "AnC Bio Vermont has significant governmental support at the local, state and federal levels[,]" describing support of state and federal Vermont politicians).) At the same time, Stenger was deceiving the VRC about various aspects of the AnC project, including those described earlier in this brief. For purposes of this brief, the government will highlight two additional, related deceptions about VRC oversight.

First, Stenger knew that he and his business partners had refused in 2012 to conduct financial audits of investor funds as requested by the VRC. Nevertheless, during 2013 and 2014, Stenger falsely represented to investors that the VRC was auditing the projects. Second, Stenger failed to advise investors in mid-2014 that the VRC had asked Stenger to suspend marketing based on the prior offering materials. Indeed, Stenger continued to accept investors based the misleading marketing materials.

As noted above, Stenger and the other defendants sought to hide the financial problems with the Jay Peak projects from investors and the VRC in early 2012 after Hulme separated from Jay Peak and sent his letter expressing concerns about Jay Peak EB-5 accounting. Stenger met with James Candido and concealed the festering financial illness gripping the Jay Peak resort projects. In the aftermath of Stenger's false assurances to VRC, VRC representatives tried to get more information from Hulme, who declined to provide much in the way of the details that would undercut Stenger's contrary, rosy outlook.[55] In 2012, Brent Raymond began working at the VRC. He thought that financial audits of the EB-5 investor funds would provide further assurance to the VRC and the investors. The defendants declined to prepare such audits, claiming that they would be too expensive. (Ex. 175.) Stenger hid that an important reason to avoid audits was that they might well reveal the financial problems and the ongoing commingling of funds.

Despite Stenger's knowledge that he was not going to support audits of investor funds, he set out to mislead investors about VRC audits. Stenger highlighted the audit misstatement in two ways.

---

[55] In an effort to make Hulme look like a liar, Stenger told people that Hulme was a disgruntled former associate who had separated from Jay Peak for reasons unrelated to the financial allegation.

To begin with, in September 2012, within weeks of refusing to conduct audits, Stenger created a short video of Governor Peter Shumlin touting Jay Peak projects and mentioning that the state audits the projects. Pierce Williams, a local video producer, shot this short video on September 27, 2012, the day that Stenger held a huge press conference rolling out the Northeast Kingdom Economic Development Initiative, Stenger's package of Newport area EB-5 projects that included AnC Vermont and the Spates block. Shumlin attended the press conference. He was running for re-election within weeks and obviously wanted to associate himself with the apparent success of the Jay Peak projects—politicians get votes supporting job creation. Shumlin made the following statement on camera:

> Vermont is the only EB-5 program that covers the entire state of Vermont and is audited by the State of Vermont. We make sure that our EB-5 program offerings are good investments for the investor and good economic development job creators for the state of Vermont. There is no better workforce, no better quality of life, no better place to invest than the state of Vermont.

Whatever Shumlin meant when he made the statement,[56] it was obviously misleading to repeat the statement to investors without clarification.

In February 2013, Stenger hired Williams to create a marketing video for potential AnC investors. That video begins with Stenger repeating his deceptive claims about the success of the resort projects. He failed to mention that at the time he was authorizing funds from Stateside investors to cover costs on other earlier projects. Stenger then chose to include Shumlin's audit statement, without any clarification. An objective potential investor listening

---

[56] Shumlin has told the government that he did not mean that the State conducted financial audits. He was under the impression at the time that the VRC oversight amounted to a performance audit of the EB-5 projects. He did not run his statements by VRC personal for input, nor did he tell VRC personal what he said. Also in late 2012, Shumlin participated in another short video, prepared for presentation in Korea during November 2012, supporting the VRC's involvement in AnC. This statement did not include a reference to audits. Presumably, Shumlin understood that Stenger would be using either or both statements for marketing purposes.

to Shumlin's statement would understand it to refer to financial audits, particularly in the context of his further statement that "[w]e make sure that our EB-5 program offerings are good investments." The VRC, however, could not fulfill that promise because of the defendants' stonewalling and deceit.

Stenger incorporated the misleading audit representation in another marketing document. This second statement falsely corroborated the Shumlin statement. In the wake of his September 2012 press conference, Stenger met with the New York Times, which was reporting on the EB-5 projects at Jay Peak and Newport. In the resulting article the reporter wrote, "Along with the state officials, who monitor and audit their projects, and Senator Patrick J. Leahy . . . [Stenger and Quiros] have sought to make Jay Peak a national showcase for the investor program." (Ex. 176.) It is unclear how the New York Times made this factually misleading statement, but it seems that it likely originated from Stenger, the principal source for the story. Stenger picked that one statement from the article to highlight in AnC marketing brochures. It was quoted alone in large type on one page early in the brochure. (Ex. 177.) Stenger maintained this language in the brochure all the way through 2016, despite having been admonished by the VRC about the audit video in June 2014. (Exs. 178, 205.)

Stenger wanted investors to think that their money was being watched by state officials when he knew both that the money was not being watched and that he and his partners were misusing funds. Further, he hid important information about the misuse of investor funds from state officials. He knowingly chose to highlight material misrepresentations about the safety of the investment to mislead potential investors.

Stenger's intent to defraud investors is also revealed in how he handled the suspension of AnC marketing in 2014. From late 2013 through mid-2014, the VRC questioned a variety

of potential problems with the AnC project.  In 2013, the VRC hired a Korean intern who conducted some on-line investigation into AnC Korea.  As part of that work, in October 2013, the VRC questioned the defendants about the possibility of Alex Choi having legal problems in Korea.[57]  Stenger knew that Choi had been involved in AnC Bio Holdings, a company linked to a criminal investigation in Korea.  Indeed, the defendants knew that Choi had been arrested earlier in 2013 as part of that criminal investigation.  Quiros had Choi put together misleading documents claiming that Choi was not under investigation.  Kelly put together a separate document, which Stenger provided to the VRC, falsely hiding Choi's connection to AnC Bio Holdings.  (Ex. 179.)

Early 2014 brought more questions about the AnC project, questions that the defendants were not answering to VRC's satisfaction.  For example, in May 2014, Brent Raymond met with Stenger to ask him about information the VRC received that AnC Korea's facility had been auctioned. Stenger expressed surprise.[58]  He did not, however, try to figure out the truth about AnC Korea and report his findings back to the VRC.

In late June 2014, around the time that Patricia Moulton took over responsibility for the VRC, the VRC held a meeting with the defendants.  The VRC prepared a detailed agenda outlining the topics of VRC concerns.  (Ex. 180.)  After the meeting, the VRC and the defendants agreed to suspend additional marketing at least until various questions could be adequately answered and until revised offering materials were approved by the VRC.  (Ex. 181.)

---

[57] As noted above, in October 2013, the VRC also began asking pointed questions about the AnC financial projections.

[58] Quiros will testify that he kept Stenger in the dark about the extent of AnC Korea's financial problems.

Instead of telling the AnC limited partners who had already invested about this significant project setback, Stenger continued to market the project. Moreover, when investors asked about press reports on VRC's concerns, Stenger falsely minimized the issues. In April 2015, after VTDigger reported on the VRC suspension, Stenger wrote to an inquiring investor, "[t]he reference to the project as suspended was particularly damaging and unnecessary. The project was not suspended. We voluntarily refrained from marketing while the market study was being conducted and the ppm was updated. I would be delighted if you would come for the ground breaking so you can see for yourself the large community support we have for this project." (Ex. 182.)

Finally, Stenger lied to the VRC about suspending AnC marketing. In a letter documenting the results of the June 27, 2014 meeting, the VRC noted that the defendants agreed "to suspend for thirty days, or until August 1, 2014, the marketing and offering of EB5 investments in AnC BIO Vermont to allow for all of the marketing and offering materials to be thoroughly reviewed and approved by very experienced securities attorneys familiar with private offerings similar in scale and complexity to AnC BIO Vermont." Because of various issues, including the questions leading to Stenger's conviction on Count 14, the suspension continued until late March 2015. Within days of the suspension letter in July 2014, Stenger accepted $550,000 from a new AnC investor (Ex. 183) and continued sending out marketing emails to potential investors (Ex. 184). On July 23, an investor agent, Tina Harwood, sent Stenger and Brent Raymond an email about possible AnC investors from a recent marketing trip to Vietnam. Raymond wrote to Stenger, "I thought it was agreed AnC Bio marketing would be stopped and redirected to Q-Burke until such time as requested research, information, materials and legal opinion were provided to the Regional Center for review?

Tina's email shows her to still be actively recruiting AnC Bio investors." Stenger responded, "I know we have stopped sending things to inquiring investors on AnC until we get the work done you requested. I know we emphasized Burke in Vietnam. I will check with Chuck [Leamy] on what else was emphasized. We are trying and doing what you requested. Pulled info off our sites and stopped use of video[59] etc. I will look into this more right away." (Ex. 185.) Despite his assurances, Stenger continued "sending things to inquiring investors on AnC" and continued accepting AnC investor funds.

C.   Misleading Statements about AnC Construction Timeline

Another important consideration for potential AnC investors was how long it would take for the AnC facility to be constructed. As noted above, the defendants performed little due diligence on the time necessary for designing, constructing, and validating the AnC facility. Prior to marketing, the defendants hoped that they could use the plans for the Korean facility and that construction could begin in mid-2013. The timeline for construction had several important impacts. First, job creation depended on operations, which could not begin until the facility was open. Second, operational success would also impact the revenues generated by the project. Third, only operational success could allow for the investors to get their investments back after five or six years, as Stenger repeatedly proposed as part of his marketing. Design and construction for AnC was postponed for a variety of reasons. Stenger misled investors about the status of construction.

In his first marketing materials, Stenger misled investors about the progress of building design. Choi's early business plans were based on investor fundraising beginning in 2011.

---

[59] In mid-2014, the VRC learned about the 2013 marketing video with Shumlin's audit statement. VRC representatives demanded that Stenger stop using the video in light of the misleading nature of the audit statement.

Choi created a building timeline showing that building design would be completed in 2012. The delay in getting the AnC project off the ground led to this timeline being out of date, since no design efforts were made prior to fundraising. But in his initial marketing package for AnC Stenger included the out-of-date timeline, which misrepresented the pace of construction from the start of marketing. (Ex. 23.)

The AnC plan contemplated that AnC Korea was responsible for facility design. In January 2013, before any serious design efforts could start, Choi was arrested for the first time. This led to a delay in hiring NNE Pharmaplan to assist with the design effort. NNE did not begin its work until spring 2013, when construction was supposed to begin according to the business plan in the offering documents. Stenger was aware of the delay and did not correct the business plan.

NNE and PeakCM quickly realized that the Vermont developers could not rely on the Korean drawings. That building had far fewer clean rooms than contemplated by the Vermont job creation plan and would have cost far too much to construct. For most of 2013, NNE and PeakCM navigated these limitations with AnC Korea representatives and Kelly. In late September 2013, Stenger was informed that the conceptual design plans had been completed. The project was still not ready for construction; AnC Korea and NNE had to complete basic design and detailed design. Those additional steps required another $1.5 million contract with NNE. The Koreans, however, had run out of money, and Quiros was not sending them more. Instead, the design process slowed as Quiros picked up the tab for the design costs. Basic design was completed in approximately May 2014, but detailed design (90% complete) drawings were never completed by NNE.

Moreover, in 2015, Stenger and his new assistant, Candace Campbell, under Frost & Sullivan's guidance, began offering suggestions for changing the design plans. In January 2016, Stenger led a meeting where he discussed changing the scope of the project and the design of the building. The team disagreed about fundamental aspects of the building and was essentially back to the drawing board: in mid-February 2016, Campbell forwarded Stenger a hand-drawn sketch of what the second floor of the building could look like. (Ex. 186.) The building design progress had gone backward, yet Stenger still moved forward, promoting the project with the same party line.

In mid-2014, as part of the response to the Second RFE, Stenger's team revised the business plan, as discussed above. At that point, they also revised the construction timeline, suggesting at that point that construction would begin later in 2014. That hope was quickly dashed, but Stenger continued to use that construction timeline when peddling the AnC project in 2015. Stenger knew the construction timeline was false—and becoming more false all the time—but did not change his investor pitch.

Another significant problem for the construction timeline was that the defendants had run out of money to build the AnC facility. By mid-2015, they had only a few million dollars left from AnC investors.[60] At Stenger's urging, Quiros released about $2 million to Peak CM to perform some limited sitework. In the fall of 2015, Peak CM suggested the possibility of executing a guaranteed maximum price contract for construction (even though the design plans were still a bit in flux) (Ex. 187) but Quiros refused to sign it. He and Stenger did not have the money to construct the facility.

---

[60] The funds from new investors after April 2015 were placed in escrow and never released to the defendants for use.

Yet, Stenger continued to broadcast to the public and investors that construction was moving forward. As soon as the VRC allowed them back in the market in late March 2015, Stenger decided to have a "ground breaking" even though there was no plan to pay for construction. Stenger organized this charade as part of his plan to cover up the problems with the AnC project. He bragged about the groundbreaking to current investors and used it to recruit new ones. (Ex. 188.) Stenger concealed the fact that he and Quiros could not afford to build the facility and had misspent the money that he had already raised. In September 2015, Stenger misled the VRC, "foundation is scheduled for September installation." Throughout 2015, Stenger hid the true construction timeline problems from investors both in updates to those investors and in response to questions from investors. (*E.g.*, Exs. 189, 206, 207.)

## D.     The Misleading Narrative about the SEC Investigation

In February 2012, Gene Lindsey, Hulme's securities attorney, warned Stenger that Jay Peak's EB-5 financial practices would cause the SEC to shut them down. Four years later that is precisely what occurred, despite the defendants' attempts to mislead the SEC. The SEC began investigating those financial practices in June 2013, as noted above. The defendants immediately appreciated that Hulme, or his attorneys, had blown the whistle on them. Thus, from the very beginning the defendants had reason to believe that the SEC investigation posed a serious financial risk to the AnC investors, as well as the immigrant investors in other projects. Stenger participated in hiding the true nature of the SEC investigation from investors and the VRC.

To begin with, Stenger failed to notify the VRC about the investigation when it began. In 2012 he had misled the VRC about the truth behind Hulme's claims and in 2013 he hid the

fallout from Hulme's claims. The defendants kept the SEC investigation secret until the VRC and several investors were contacted by the SEC as part of the investigation. One investor decided to withdraw from AnC in May 2014 after being contacted by the SEC. Stenger wrote to her, urging her to stay in the project, and offering what the defendants would repeat as their misleading narrative about the SEC investigation.

> As for the SEC, because of issues with some larger projects in other parts of the country having nothing to do with us the SEC has decided to look at all the larger EB 5 projects in the US and are doing spot checks. We are one of those projects because we are among the top 3 most popular in the USA. We have been fully cooperative and expect no issues. What they seem to want to see is if the materials we gave them are the same as were given to investors, and of course they are. Thus the interest in seeing if your materials match what we gave them. These other projects appeared to have two sets of documents and of course this is improper to say the least.

(Ex. 190.) Stenger affirmatively denied the critical fact that the SEC was investigating the defendants' misuse of investor funds in the purchase of the resort and the payments for cost overruns. Again, Stenger himself was actively deceiving investors about critical information to maintain the scheme to raise more money.

Patricia Moulton and Brent Raymond raised the SEC investigation in the meeting with all three defendants on June 27, 2014. The defendants maintained their misleading narrative with a few tweaks. Moulton's contemporaneous notes reflect that the defendants admitted their understanding that "Hulme was behind" the SEC's questions, but claimed that the SEC's inquiry was not an investigation, that other EB-5 projects were being looked at, that the SEC was comparing the materials they provided to investors to what they provided to the SEC, and that the SEC had found no "irregularities" in the AnC offering materials. They failed to mention to the VRC, who were supposedly "auditing" the projects, that just weeks earlier the SEC had confronted Quiros about the margin loan payoff and they had

orchestrated the Korean declarations as part of the SEC cover-up. The VRC brought the SEC issue up again later in 2014 in connection with the need for a disclosure in the revised AnC offering materials. Kelly took the lead in responding that there was no need to disclose the SEC inquiry to potential investors unless and until the SEC announced a finding of wrongdoing, which the SEC had not done.  (Ex. 191.)  The defendants knew there was wrongdoing and that the SEC was looking into those areas, but the defendants hoped that the SEC would not find it.  Obviously, this risk to the investors should have been disclosed.[61] Stenger knew the truth.  He chose not to tell it.

Stenger also pedaled this misleading narrative to the Vermont press and investors. VTDigger heard about the SEC inquiry and asked Stenger directly about the nature of that inquiry.  In June 2015, Stenger wrote, "The SEC review is fully voluntary and is something that many large projects are participating in nationwide.  The number of projects in the USA went from a few dozen 7 years ago to many hundreds today.  It is logical that SEC review and guidance would be seen and indeed we are seeing this.  Several operating clarifications have come from the SEC to all eb 5 projects in the past few months some no doubt as a result of this national review."  (Ex. 192.)  This statement was deceptive in various ways.  For instance, the SEC investigation was not voluntary; Stenger, Quiros, Kelly, and many others had been subpoenaed to provide documents and sworn testimony.  The investigation by the Miami SEC office focused only on the Jay Peak projects; it was not a nationwide review. Stenger knew that the SEC was investigating particular wrongdoing in connection with the

---

[61] The defendants continued to try to hide the truth from investors until the SEC filed suit. In the revised offering materials, the defendants heeded the VRC's directive to make reference to the SEC investigation, but again provided the misleading narrative, referring to it as a "review" despite David Gordon's March 2015 advisement to Stenger, Kelly, and Quiros that "[i]nvestigation is the right term, unfortunately." (Ex. 193.)

Jay Peak projects.  And Stenger knew that the SEC was right to investigate: the defendants had lied to investors and misused their funds.

Stenger and his underlings made similar misrepresentations when asked by investors or their representatives.  (Ex. 194.)  In a letter to the attorney representing the largest number of AnC investors, Stenger responded to questions about the Phase 1 investor questions, the marketing suspension, and the SEC matter.  (Ex. 195.)  Stenger hid the fact that the SEC investigation in Miami was triggered by Hulme's allegations: "The SEC has been asked by USCIS to conduct a wide ranging review of EB-5 projects around the country."  He also continued to falsely minimize the seriousness of the investigation: "Some projects have come under 'investigation' because of fraudulent activity but we are not under an investigation, but rather a review.  A review is very different than an investigation."  Ironically, Stenger was at that moment scheduled for his second SEC recorded interview, which took place on September 17, 2015.

VI.    Conclusion

Stenger had the legal duty to understand how the AnC investors' funds were being used.  The AnC project was his baby; it was the cornerstone of his Northeast Kingdom Economic Development Initiative.  He had caused an immense need for "backfill capital" by helping Quiros purchase the resort with investor funds and creating huge cost overruns on the early projects.  He had assumed the responsibility for the finding that "backfill capital."  He had gladly assumed the role of general partner approving the use of investor funds.  He knew that JCM was a vehicle for commingling funds.  He knew that Hulme's SEC lawyer thought that commingling funds through JCM was improper.  He knew that Stateside funds were not available to finish that project.  He knew that the SEC was investigating not only the purchase

of the resort but the use of JCM to fund project costs. He was willing to provide false documents to the SEC. He sent tens of millions of dollars in AnC investor funds to JCM. He had the ability and power to figure out where the money was going. To the extent he did not know the details, the only reason he did not know was because he did not ask. Any claim that he was misled by Quiros, Kelly, and Gulisano should be rejected.

Stenger's involvement in fraudulent conduct began when he initiated QResorts' involvement at Jay Peak, and Stenger shares responsibility for the full extent of the charged fraud. Stenger assumed the role of the voice of the project, and he reassured investors, the VRC, CIS, and others that he knew that AnC Vermont was built on a solid foundation and would be a successful biotechnology product. In reality, Stenger did not know any such thing. Claiming that he knew when he did not was a lie. His lies were all the more egregious because he traded on the trust that regulators had in him, and he had a duty to the investors to handle their funds responsibly. He abused this trust and this duty over and over again.

Dated at Burlington, in the District of Vermont, this 20th day of September, 2021.

Respectfully submitted,

UNITED STATES OF AMERICA

JONATHAN A. OPHARDT
Acting United States Attorney

By:

Nicole P. Cate
Paul J. Van de Graaf
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Case No. 5:19-cr-00076-4 |
| | ) |
| WILLIAM STENGER, | ) |
| Defendant. | ) |

## CERTIFICATE OF SERVICE

I, Erin Thompson, Legal Assistant, do hereby certify that on  September 20, 2021, I hand

filed the **GOVERNMENT'S BRIEF REGARDING WILLIAM STENGER'S RELEVANT**

**CONDUCT** with the Clerk of the Court.  A complete and accurate copy of the filing (including

this certificate) was sent through an electronic filing system to Brooks McArthur, Esq.

Dated at Burlington, in the District of Vermont, September 20, 2021.

Respectfully submitted,
UNITED STATES OF AMERICA

JONATHAN A. OPHARDT
Acting United States Attorney

By:

Erin E. Thompson
Legal Assistant
Burlington, VT 05402-0570
(802) 951-6725