UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 JAN 19  PM 1:17

CLERK

BY _____
        CLERK

UNITED STATES OF AMERICA ) 
) 
v. )    Case No. 5:19-cr-76
) 
ARIEL QUIROS, WILLIAM KELLY, ) 
JONG WEON CHOI, and WILLIAM ) 
STENGER, ) 
) 
Defendants. ) 

## DECISION ON MOTION FOR RECONSIDERATION
### (Doc. 388)

In 2019, the Government obtained an indictment against three former officers of companies operating in Vermont that received EB-5 investment funds between 2011 and 2016.[1] (*See* Doc. 1.) A fourth defendant was an officer in a South Korean company that contracted to provide services to the Vermont enterprise.

Some of the investment funds were designated for the construction of a sophisticated bio-medical research facility in Newport, Vermont. The total amount raised for that project was approximately $85,000,000. The research facility was never built, and the funds were dispersed with little to show for such an expenditure. The three American defendants have pled guilty and await sentencing. (*See* Docs. 172, 319, 350 (plea agreements).) The fourth, a South Korean citizen, remains at large.

---

[1] EB-5 investments are investments by foreign nationals in qualifying private enterprises in the United States. If the investments, frequently made in the amount of $500,000, result in the creation of new jobs in an area targeted for economic development, the investor and his or her immediate family may qualify for permanent residence in the United States. *See* 8 U.S.C. § 1153(b)(5).

The Newport bio-medical facility was one of three development projects for which defendants Quiros, Kelly and Stenger obtained EB-5 financing.  The other two were more conventional construction projects at the Jay Peak and Burke Mountain ski areas.   Following Mr. Quiros's purchase of the Jay Peak ski area in 2008, he continued the practice of the previous owners of financing construction costs at Jay Peak through a series of EB-5 offerings.  In addition, Mr. Quiros purchased the Burke Mountain ski area and was in the process of building a hotel at the base of the mountain when an SEC enforcement action filed in 2016 brought a halt to his development activities in Vermont.  The Burke Mountain hotel was also funded through the EB-5 program.

The EB-5 scandal has resulted in multiple civil cases.  In 2016, the Securities and Exchange Commission filed a civil enforcement action against Mr. Quiros and other defendants in the Southern District of Florida.  *SEC v. Quiros*, No. 1:16-cv-21301-GAYLES, 2016 WL 11578637 (S.D. Fla. Nov. 21, 2016).  This lawsuit led to the appointment of a receiver who continues to manage the two ski area properties that were the subject of the EB-5 offerings.  The receiver has reached settlements with many financial and professional firms that provided services to companies associated with Mr. Quiros and the other American defendants.  *E.g.*, *Goldberg v. Mitchell Silberberg & Knupp LLP*, No. 19-cv-21862 (S.D. Fla. dismissed Oct. 22, 2021).

Other civil lawsuits have been filed in Vermont in state and federal court.  These include a lawsuit filed by the Barr Law Group against the State of Vermont and present and former state officials and employees in Vermont Superior Court.  *See Sutton v. Vermont Agency of Commerce & Community Development*, No. 100-5-17 Lecv (Vt. Super. Ct. filed May 30, 2017).  The plaintiffs are foreign investors who seek damages for negligent oversight, gross negligence and

related grounds for recovery.  Their claims are described in the decision of the Vermont Supreme Court in *Sutton v. Vermont Regional Center*, 2019 VT 71A, 212 Vt. 612, 238 A.3d 608.  The case awaits trial in Lamoille Superior Court.  Representing a similar group of plaintiffs, the Barr Law Group has recently filed a lawsuit in this court alleging a taking in violation of the due process clause and gross negligence.  *Abdel-Fakhara v. Vermont*, No. 5:21-cv-198-gwc (D. Vt. filed Aug. 24, 2021).

Trial preparation in these cases has created an enormous collection of documents exchanged through discovery.  Following his appointment, the receiver in Florida took control of the records of multiple companies associated with defendant Ariel Quiros, including laptops containing many years of emails and other communications among the defendants, state officials, and professionals and others involved in the management of the companies and the promotion of the EB-5 investment scheme.  This collection grew in the course of the SEC civil enforcement lawsuit in Florida as well as litigation initiated by the receiver against third parties.  The court understands that witness statements and documents obtained through the SEC's original pre-suit investigation and the receiver's appointment as well as discovery exchanged in the Florida lawsuits have made their way to Vermont for use in the criminal prosecution.  The investigation of the criminal case in Vermont further increased this body of information.  The documents obtained from numerous sources by investigators from the FBI and the IRS number in the millions of pages.

Discovery in the criminal case has occurred without controversy or significant motion practice.  The Government has turned over substantial quantities of information to the defendants on a rolling basis and significantly earlier than its obligations under Fed. R. Crim. P. 16 and the Jencks Act, 18 U.S.C. § 3500.  The reports from counsel from both sides at status conferences in

3

the criminal case have shown satisfaction with the discovery process and a high level of cooperation by both sides.  The defense is now in possession of its own collection of documents, including witness statements obtained through interviews with federal law enforcement agencies and grand jury testimony.

The parties to the criminal case entered into a series of three protective agreements restricting release of discovery materials turned over to the defense.  The first agreement dated June 5, 2019, covers all discovery materials and limits their use to trial preparation, trial and related proceedings, including appeals.  It provides for redaction and enhanced protection of materials containing personal identification information.  All materials are to be destroyed or returned to the Government at the conclusion of the case.  (Doc. 386-2.)  The second agreement dated October 14, 2019, limits the dissemination of grand jury testimony and a law enforcement interview provided by one of the defendants.  (Doc. 386-3.)  The third agreement dated July 12, 2021, limits the dissemination of "Additional Restricted Materials."  (Doc. 386-4.)  These additional restricted materials include testimony and witness statements provided by Vermont officials involved in the regulation and promotion of the EB-5 investment scheme.

On October 22, 2021, the plaintiffs in the Lamoille County civil case served defense counsel for William Stenger with a subpoena seeking disclosure of "all documents produced by any government agency or third party in the matter of 5:19-cr-76-gwc-4 USA v. Ariel Quiros et al."  (Doc. 386-4.)  In response, the Government filed an unopposed motion for a protective order adopting the provisions of the three protective agreements.  (Doc. 386.)  The court signed the proposed order.  (Doc. 387.)

The plaintiffs in the Lamoille County case then filed a motion for reconsideration. (Doc. 388.)  The motion recounts their claim that the state "Regional Center (and various

coordinating state agencies) knew about rampant fraud, securities violations, and self-dealing, all while tens-of-millions of dollars were simultaneously raised from unwitting immigrant-investors." (*Id.* at 1.)  Plaintiffs accuse state officials of concealing information about wrongdoing by the criminal defendants in an effort to protect the stream of EB-5 investment to Jay Peak and related projects.  Plaintiffs' counsel argue that the Government failed to demonstrate the good cause required by Fed. R. Crim. P. 16(d)(1) for issuance of a protective order.   They describe the documents they seek as "material, perhaps dispositive, to Plaintiff-Investors' pending legal claims." (Doc. 388 at 3).  They seek "a narrower protective order—limited to the content of the Government's agreements with [defendant] Stenger's defense counsel." (*Id.*)

In response, the Government criticized the motion as proposing "an end-run around longstanding procedures addressing the disclosure of federal criminal investigative materials." (Doc. 389 at 4.)  The Government seeks to refer plaintiffs' counsel to the discovery tools available within the state tort case: subpoenas directed to third party witnesses and requests to produce directed to the state and the other tort defendants.  The Government highlighted the secrecy of the grand jury transcripts as well as the need to protect the safety and privacy of witnesses.

On December 28, 2021, the court held a hearing at which counsel for all sides participated.  The Government raised concerns about the standing of a third-party to file a motion in a criminal case as well as the availability of "reconsideration" to a party who played no part in the original motion.  On the substantive issues, the Government renewed its concerns about the intrusion of the civil plaintiffs into the criminal discovery process and the potential in future prosecution that documents could be turned over to the defense later or only made available for

inspection at the office of the U.S. Attorney if the parties' protective agreements were not enforced.

In response, counsel for the plaintiffs greatly reduced the scope of their demand. Plaintiffs' counsel now seeks copies of the FBI and IRS interview summaries only. Defense counsel in this case have already allowed attorneys from the Barr Law Group to read many of these interview summaries, but they were not given copies.

Counsel in the Lamoille County case do not seek the disclosure of grand jury transcripts or the millions of pages of documents turned over to the defense in the criminal case. The court recognizes that this position may change and that the production of a large volume of information in electronic form, much of it containing personal information, may present additional problems in the future. But for purposes of this ruling, the court addresses only the question of production of the interview summaries because these are the documents plaintiffs' counsel has singled out for consideration.

In its post-hearing memorandum, the Government identified 23 interviews of state officials, six involving second interviews of people who had spoken with investigators before. With few exceptions, the content of these summaries is already known to both sides in the Lamoille County case. The Government advises that "most if not all these documents were reviewed by the Barr Law Group." (Doc. 397 at 2.) All but six summaries were also provided to the Attorney General's office in order to assist the state's witnesses to prepare for their depositions in the Lamoille County case. (*Id.* at 3.) In short, the prosecution and the defense have voluntarily disclosed the interview summaries (with a few exceptions) to counsel for both sides in the Lamoille County case. If these summaries are secret, it is a secret that has already been widely shared.

The court has reviewed all 23 interviews *in camera*. The interviews were primarily conducted by the federal prosecutors responsible for the case. The persons interviewed include former Governor Peter Shumlin, his chief of staff, and multiple senior figures within the administration. In many cases, witnesses were represented at their interviews by lawyers from the Vermont attorney general's office.

The interviews focused tightly on the use of the EB-5 program by the defendants. They provide a detailed account of how officials in state government gradually learned about the criminality of the defendants' conduct. The prosecutors asked specific questions and sought information about particular documents and meetings. The answers they received were factual and responsive to their questions. The tone of everyone interviewed was cooperative and frequently rueful in describing the dawning realization that the defendants were engaged in a substantial fraud, different in scale from anything the state has previously experienced, and unique because of the active role state government played in promoting the EB-5 investment vehicle.

The interviews contain very little irrelevant information about other EB-5 projects or individuals not involved in the Jay Peak, Bio-Tech, and Burke Mountain projects. There is also very little personal information about the families or private lives of the defendants and others involved in these projects. The few personal details that appear such as cell phone numbers and other identifying information can be redacted without compromising the content of the interviews. The prosecutors conducting the interviews offered no information about their own views, the direction of their investigation, their litigation strategy or their sources and methods. The interviews were conducted only to gather facts, and the prosecutors were able to limit and direct the interviews toward this end.

The 23 interview summaries are listed on Appendix A to this decision.   They are attached to this decision as sealed exhibits.    For the reasons explained below, the sealing is a temporary measure.

## ANALYSIS

Before diving into the issues raised by the parties, it is helpful to consider the general principles that apply to the motion for reconsideration.  The motion concerns an effort by litigants in a state court case to use a state court subpoena to seek information held by a federal criminal defendant.   As the parties have recognized in their briefing, the narrow issue before the court concerns the argument by the parties to the criminal case—both of whom seek to prevent further disclosure—that the court's protective order is supported by the good cause required by Fed. R. Crim. P. 16(d).

The motion does not directly concern the principles and case law governing public access to judicial documents under the First Amendment and the common law.  The decisional law governing public access to court records does not extend to discovery materials.  *See Seattle Times Co. v. Rinehart*, 467 U.S. 20, 33 (1984) ("Moreover, pretrial depositions and interrogatories are not public components of a civil trial.  Such proceedings were not open to the public at common law, and, in general, they are conducted in private as a matter of modern practice.") (cleaned up).

Instead, this motion is governed by principles of access to evidence by a litigant.  These principles were identified as early as Justice Holmes' opinion in *Ex parte Uppercu*, 239 U.S. 435 (1915).  In that case, the Supreme Court held that a protective order issued in a civil case could not prevent the disclosure of sealed evidence in a subsequent case.  "So long as the object physically exists, anyone needing it as evidence at a trial has a right to call for it, unless some

exception is shown to the general rule." *Id.* at 440.  This general rule, stated decades before the adoption of the federal rules of criminal and civil procedure, remains good law.  It is commonly invoked by the Government when it seeks access to civil discovery material.  *See United States v. GAF Corp.*, 596 F.2d 10 (2d Cir. 1979) (government may obtain confidential civil discovery through civil investigative demand); *United States v. Davis*, 702 F.2d 418, 423 (2d Cir. 1983) (previously sealed testimony may be released pursuant to grand jury subpoena "upon a proper showing of need").

Whether materials may be withheld from production after service of a subpoena depends on what Justice Holmes described as exceptions to the general rule that evidence is available by subpoena to litigants.  The exceptions at issue in this case are defined by Fed. R. Crim. P. 6(e) (grand jury secrecy) and Fed. R. Crim. P. 16(d), which authorizes protective orders in criminal discovery.  In the absence of an exception, every person is entitled to obtain the evidence needed for trial through compulsory process even if that evidence was first developed in a separate civil or criminal case.   The central issue raised by the motion to reconsider is whether an exception to the general rule applies.

I.       **Procedural Issues**

The Government opposes the motion for reconsideration on procedural grounds.  These include plaintiffs' counsel's failure to file a motion to intervene as well as the position that a third-party has no right of access to materials exchanged in discovery and, therefore, plaintiffs' counsel lacks standing to complain about the denial of access of documents which they have no right to see.  The court's discussion begins with the question of intervention.

### A.    Lack of Motion to Intervene

The right of third parties, frequently journalists, to file motions seeking access to court proceedings and records has long been recognized by the federal courts.  Examples in civil and criminal cases are legion.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006); *Brown v. Maxwell*, 929 F.3d 41 (2d Cir. 2019); *In re New York Times*, 799 F. App'x 62 (2d Cir. 2020).  In civil cases, Fed. R. Civ. P. 24 provides a means for a party to intervene to seek modification of a protective order.  *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291 (2d Cir. 1979).

No such mechanism appears in the Federal Rules of Criminal Procedure.  *See In re New York Times Co.*, 878 F.2d 67, 67 (2d Cir. 1989) (per curiam) ("No rule of federal criminal procedure allows intervention by third parties in a criminal proceeding . . . .").  Rule 17 governing subpoenas permits a non-party witness to file a motion to quash or modify, but in general the criminal rules anticipate only two participants: the prosecution and the accused.  Still, the absence of an intervention rule has not prevented district courts from hearing complaints from third parties who were denied access to court hearings or documents.  *See United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008) ("The Federal Rules of Criminal Procedure make no reference to a motion to intervene in a criminal case… However, such motions are common in this Circuit to assert the public's First Amendment Right of access to criminal proceedings.").

As might be expected from a procedure not expressly permitted by rule, district courts differ in the manner in which they permit intervention in criminal cases.  In *In re New York Times*, for example, the New York Times filed a letter followed by a motion for intervenor status.  The trial judge later created "a separate civil matter . . . for filings related to the Times's unsealing requests."  799 F. App'x at 64; *see also United States v. Nojay*, 224 F. Supp. 3d 208,

211 (W.D.N.Y. 2016) (local newspaper filed a motion to intervene and unseal records in a criminal case; the motion was opened in a separate miscellaneous civil case). In *United States v. Doe*, 629 F. App'x 69, 71 (2d Cir. 2015), the district court permitted an independent journalist to intervene "to assert the public's right of access to the sealed information." *See also, e.g.*, *United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008) (citing cases); *United States v. Suarez*, 880 F.2d 626, 628 (2d Cir. 1989) (district court granted newspaper's motion to intervene in criminal case seeking access to court files); *United States v. Pasqua*, No. 16-cr-591 (NSR), 2020 WL 7338082, at *1 (S.D.N.Y. Dec. 12, 2020) (granting in part motions filed by journalist "intervenors" to criminal case).

Motions to intervene in criminal cases to assert the public's First Amendment right of access to criminal proceedings are proper. *Aref*, 533 F.3d at 81. . Research reveals no case in which a member of the public was denied an opportunity to object to sealing or exclusion from a hearing for lack of an intervention rule in federal criminal practice. A litigant in a civil case should have no lesser opportunity to challenge a court order restricting his or her access to information.

The court allows the moving parties to seek reconsideration of the protective order. The stipulated protective order issued in response to their subpoena. There is no other practical route to consider the issues it seeks to raise. *See Aref*, 533 F.3d at 81 ("[V]indication of [the] right [of public access] requires some meaningful opportunity for protest by persons other than the initial litigants." (second and third alterations in original) (quoting *In re Herald Co.*, 734 F.2d 93, 102 (2d Cir. 1984))). There are alternative ways to get before the court, but they are unlikely to lead

to a timely resolution of the dispute.[2]   The court recognizes the improvisational qualities of the motion for reconsideration (and its own decision to issue a ruling on the motion) but finds no practical alternative except to allow plaintiffs' counsel to intervene in this limited manner in the criminal case.

### B.    Standing

The court turns to the issue of standing.  Standing is a constitutional requirement that cannot be avoided for pragmatic reasons.  The required elements for standing are well-established.  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016).  These elements are necessary to establish compliance with the Article III "case or controversy" requirement.  The court accepts that the standing requirement applies to intervenors in criminal cases seeking to assert a right of access to case records.  *Cf. Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651

---

[2] One alternative would be a motion to enforce the subpoena in state court.  Or the Government could file its own motion to quash in state court.  The state court judge hearing the motion would lack authority to alter the federal protective order.  A state court judge is unlikely to enforce a subpoena in violation of the federal order.

There are more arcane routes to reconsideration.  Following a denial of relief by this court, defense counsel could seek a writ of mandamus from the Court of Appeals ordering the district court to review its ruling on the merits.  That is a long way around Robin Hood's barn and was specifically rejected by the Second Circuit in the *Martindell* ruling "where the only purpose [of the extraordinary writ] was to obtain modification of a pretrial order for investigative purposes."  594 F.2d at 294.

Another alternative would be to obtain a subpoena in the federal civil case raising some of the same issues that are before the Vermont Superior Court.  A motion to enforce the subpoena would bring the issue before the federal court and, conveniently enough, I am assigned to both cases.  But the federal civil case was recently filed and discovery is stayed pending a decision on a broad motion to dismiss.

(2017) (standing requirement applies to intervenors of right under Fed. R. Civ. P. 24(a)(2) who seek "relief that is different from that which is sought by a party with standing").

The undisputed facts readily establish the moving parties' standing. The injury in fact is the likely denial of access to evidence or other information otherwise subject to discovery in the state court case. The denial is fairly traceable to this court's protective order. In this case, the stipulated motion for the protective order was motivated by service of the state court subpoena. With the federal order in place, plaintiffs' counsel is unlikely to persuade a state court judge to enforce their subpoena. A favorable judicial decision will clear the path in state court to enforcement of the subpoena with whatever limitations the state court determines to be appropriate. Plaintiffs clearly meet *Spokeo* requirements for standing.

The Government raises a final procedural objection. Since plaintiffs' counsel appears here for the first time concerning the protective order, can they seek "reconsideration" when their position was never considered in the first place? The court will not honor form over substance. The motion is best understood as a motion to modify or vacate the existing protective order. The court will address the motion in that light. *Cf. Rosado v. Johnson*, 589 F. Supp. 2d 398, 400 (S.D.N.Y. 2008) ("[T]he nature of a motion is determined by its substance and not the label attached to it . . . .").

## II.     **"Good Cause" for Issuance of the Protective Order**

The court turns now to the main issue: whether good cause continues to support the issuance of the protective order. The court received authority to issue the protective order in this case from the first sentence of Fed. R. Crim. P. 16(d), which provides: "At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."

Federal courts have long recognized that this section of the rule permits courts to prohibit the dissemination of discovery to non-parties. That is the purpose of most protective orders. "Good cause" is frequently derived from requirements of privilege, individual privacy and secrecy that appear in other provisions of federal law.

### A.     Secrecy, individual privacy, and privilege

#### 1.     Secrecy by rule or statute

The court starts with the requirements of secrecy. Foremost among these is the requirement of grand jury secrecy that appears in Fed. R. Crim. P. 6(e). In this case, the Government has provided grand jury transcripts to defense counsel. Counsel for the state court plaintiffs do not seek production of grand jury transcripts. The court will not alter the protection of grand jury secrecy. Grand jury transcripts and related materials provided to the defense remain secret. Defense counsel may not disclose these to third-parties without a court order.

#### 2.     Individual Privacy

The second category of protected information concerns personal identifying information such as home addresses, telephone numbers, birth dates, and social security numbers. The parties previously agreed to protect this information from disclosure in their protective agreement dated June 5, 2019. (Doc. 386-2.) The court adopted this protection in the protective agreement. It will continue to require that this information be protected from disclosure to third-parties, including plaintiffs' counsel, due to the risk of misuse and identity fraud.

#### 3.     Privilege

The third category of information for which the Government seeks a general exemption from disclosure are the statements and other evidence collected by law enforcement. Here we approach the real issue in the case. In the course of the criminal investigation, federal

prosecutors, assisted by federal agents, interviewed state officials and employees.  These interviews included former officials from the highest levels of state government.  Because the Lamoille County case concerns conduct by these officials, plaintiffs' counsel seek to obtain copies of the summaries of these interviews.  Defense counsel for Mr. Stenger have already allowed them to read many or all of the summaries.  The Government has also turned over copies of the summaries to attorneys with the Office of the Vermont Attorney General when state attorneys appeared to represent the individuals who were interviewed.  These interview records are something of an open secret.

The Government is correct in its assertion that criminal discovery provided to a defendant is generally not made public during the pendency of a criminal case.  *See United States v. Smith*, 985 F. Supp. 2d 506 (S.D.N.Y. 2013).  In contrast to grand jury transcripts, law enforcement reports such as the summaries at issue here are not made categorically secret by law.  The reports may be considered confidential because the prosecution's discovery obligation is specifically defined by Rule 16, *Brady* principles and the Jencks Act, 18 U.S.C. § 3500.  Unless one of these applies, the prosecution has no obligation to turn over the law enforcement reports.  When such reports are provided in discovery, they are frequently designated as confidential by the parties or through stipulated protective orders.   But there is no requirement of secrecy like that accorded to grand jury transcripts, wiretap recordings or documents containing classified information.

Once the defense receives its discovery, the rules contain no limit on its use and dissemination.  Here again it is practice that governs.  In exchange for early disclosure, the Government frequently obtains a protective agreement or order.  That is what has happened here.  In the absence of the three successive letter agreements, the defense would have been free to

share the records it received (except for grand jury materials) with anyone.  At the present time,

it is the protective order issued by the court that restricts distribution of the interview summaries.

When a private litigant requests discovery relating to a criminal prosecution, he or she

may be met with a claim of law enforcement investigatory privilege.  Such a claim must be

"presented in a deliberate, considered, and reasonably specific manner" by a departmental

official with first-hand knowledge of the basis for the claim.  *In re Sealed Case*, 856 F.2d 268,

271 (2d Cir. 1988).  The purpose of the privilege is to protect "law enforcement techniques and

procedures, information that would undermine the confidentiality of sources, information that

would endanger witness and law enforcement personnel or the privacy of individuals involved in

an investigation, and information that would otherwise . . . interfere with an investigation." *In re

The City of New York*, 607 F.3d 923, 944 (2d Cir. 2010) (cleaned up).

There is no claim in this case of law enforcement privilege and for good reason.  The

materials at issue are not sought from law enforcement.  They have already been disclosed to the

defense.  In the conventional expression, the cat is out of the bag.  Had the case gone to trial or to

the contested sentencing hearing previously contemplated, defense counsel would have been

within their rights to make public use of any of the materials they received.  The Government

makes no assertion that disclosure of any particular documents would endanger their

investigation or their witnesses.

Rather, the Government has a preference, rooted in practice developed over time, for

limiting the disclosure of federal discovery materials to the criminal defense counsel and their

clients.  That practice is reasonable.  Many investigations involve disclosures by victims and

others for whom confidentiality is appropriate.  Some investigations may require the protection

of confidential informants.   Disclosure to pre-trial detainees and prisoners raises special

problems of individual security.  There are many instances in which the court should impose a protective order, even over the objection of third parties.  But this is not such a case.  The crimes to which the defendants have pled guilty are business crimes resulting in financial loss.  The actions of the state officials that plaintiffs' counsel seek to investigate are—generally speaking— actions taken in the course of the officials' duties, not allegations of private misconduct.  The meetings and emails described in the interview summaries tell us much about how the defendants interacted with state officials, but they reveal little or nothing about confidential sources of information or methods of investigation.   Issues of privilege, including law enforcement privilege, do not support withholding the summaries from production.

**B.     Good Cause**

We return now to where we started—the good cause standard for issuance of a protective order.  Many of the most compelling bases for a pre-trial protective order are no longer present in this case.  These include the protection of an ongoing criminal investigation and the prosecution's trial strategy, the protection of the reputation of the accused, and the limitation of pre-trial publicity that could interfere with the selection of an impartial jury.  *United States v. Amodeo*, 71 F.3d 1044 (2d Cir. 1995).   Trial strategy is no longer an issue for either side.   Pre-trial publicity is no longer an issue either.  The protection of the reputation of the accused is critical while he or she enjoys the presumption of innocence.  A guilty plea reduces the significance of this factor.   Preserving an impartial pool of potential jurors is no longer a concern.

The remaining bases advanced in support of maintaining the protective order include the protection of witness safety and privacy, a desire to maintain a practice of providing discovery sooner than required by the Jencks Act, and a preference that plaintiffs' counsel obtain records

concerning state officials through state court discovery directed to these individuals and the State of Vermont.  (Doc. 389 at 2, 4.)

The court has considered the Government's objections to disclosure with respect to the interview summaries..  With the exception of grand jury materials and personal identity information, the court finds that the reasons that supported the protective agreement prior to the guilty pleas are no longer sufficient to prevent the disclosure of the discovery materials to plaintiffs' counsel.  The guilt phase of the prosecution is over.  The risk that disclosure will interfere with a continuing criminal investigation is minimal—and not suggested by the Government.

The court cannot give much weight to concerns about a potential trial of the fourth defendant—Alex Choi.  He has been a fugitive for years.  It is not known whether he will ever appear in this court.  He scarcely features in any of the witness summaries.

The protection of witness safety and privacy through disclosure of their prior statements to law enforcement is reduced by the narrow focus of the prosecutors' interviews.  The interviews contain little private information.  They concern the subjects' knowledge of the EB-5 projects at Jay Peak, Newport and Burke Mountain as well as their meetings and communications with defendants.  The interviews were "all business."  They do not contain the type of personal information such as an embarrassing photo or private family details that place the officials at risk.

 The concern that the prosecution may be less willing to provide early discovery is offset by the relative rarity of cases in which there is a parallel civil case for damages.  Such cases are not common in this district and the risk of harm to the Government's interests in future cases, especially prior to a guilty plea, can be addressed on a case-by-case basis.

The court has also considered the Government's contention that plaintiffs' counsel should address their discovery requests to the state officials and agencies directly rather than engage in an "end-run" by seeking federal criminal investigative materials.  At this point, the moving parties' request is limited to 23 witness summaries.  The Government has them all.  The state has many of them but evidently not all.  The defense attorneys may have them all.  Plaintiffs' counsel in the Lamoille County case has read some of them but was not permitted to make copies.   The only source that can reliably produce all the summaries is the Government.

**III.     Modification of the Protective Order**

The court modifies the protective order (Doc. 387) in the following respects:

a.  The order remains in place with respect to grand jury transcripts and related materials. Defense counsel in this case shall not produce these in response to the state court subpoena.  The court will continue to enforce the secrecy provisions of Fed. R. Crim. P. 6(e).

b.  The 23 witness interview summaries identified on page 3 of the Government's Supplemental Memorandum (Doc. 397) will be provided through the court.   Defense counsel previously provided many of the summaries as sealed attachments to Document 312.  In response to a request from the court, the Government has provided the remaining summaries for *in camera* review.   The court has reviewed these documents and performed its own redaction of personal identifying information.  The court has also removed references to companies and individuals not involved in this case and, in one case, an unflattering epithet offered about an individual.  All 23 summaries are attached as sealed exhibits to this order.   All parties in this case as well as counsel for both sides in the Lamoille County case have seven days to review the sealed exhibits and propose

any further redaction for the purpose of protecting personal privacy or other concerns. At the end of the seven day period, the court will unseal the exhibits.

c. The remaining collection of discovery documents, numbering in the millions of pages, obtained by defense counsel in this case remain subject to the protective order because the plaintiffs in the state court case reduced the scope of their discovery request to the interview summaries only. These documents present significant issues of review and redaction in order to protect private information. The court enters no ruling at this time concerning the modification of the protective order and potential release of these documents. Any future request must include a detailed plan for review and redaction, page by page, of this immense body of information.

## SUMMARY

The Motion to Reconsider (Doc. 388) is GRANTED as follows. The court modifies the protective order (Doc. 387) and will unseal the 23 witness interview statements in seven days. The parties, including the attorneys, shall have seven days to request any further redaction. After seven days, the summaries shall be unsealed.

The protective order remains in effect concerning the other discovery documents supplied to defense counsel subject to the right of plaintiffs' counsel in *Sutton v. Vermont Agency of Commerce & Community Development*, No. 100-5-17 Lecv (Vt. Super. Ct. filed May 30, 2017) to seek further modification.

No grand jury transcripts or related materials shall be released in response to the state court subpoena.

Dated at Burlington, in the District of Vermont, this 19th day of January, 2022.

Geoffrey W. Crawford, Chief Judge
United States District Court

- APPENDIX A -

US v. William Stenger

Case No. 5:19-CR-76

INTERVIEW REPORT LISTING

| Exhibit No. | Interview Name |
|---|---|
| 1 | Candido, James |
| 2 | Casssetty, David and Kessler, John |
| 3 | Donegan, Susan 1 |
| 4 | Donegan, Susan 2 |
| 5 | Dorn, Kevin |
| 6 | Douglas, James |
| 7 | Fu Von Trapp, Becky |
| 8 | Kessler, John |
| 9 | London, Sarah |
| 10 | Lofy, Bill |
| 11 | Miller, Elizabeth 1 |
| 12 | Miller, Elizabeth 2 |
| 13 | Miller, Lawrence |
| 14 | Moulton, Patricia 1 |
| 15 | Moulton, Patricia 2 |
| 16 | Pieciak, Michael 1 |
| 17 | Pieciak, Michael 2 |
| 18 | Purinton, Tyler |
| 19 | Raymond, Brent 1 |
| 20 | Raymond, Brent 2 |
| 21 | Shumlin, Peter 1 |
| 22 | Shumlin, Peter 2 |
| 23 | Spaulding, Jeb |