# Exhibit 12

DISCOVERY 9.30.19



**DEPARTMENT OF THE TREASURY**
**Internal Revenue Service**
**Criminal Investigation**

# Memorandum of Interview

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000285105 | **Location:** | VT Dept. of Financial Regulation |
| **Investigation Name:** | ARIEL I QUIROS | | 89 Main St., Montpelier, VT 05602 |
| **Date:** | July 24, 2019 | | |
| **Time:** | Approximately 9:45 a.m. – 11:15 a.m. | | |
| **Participant(s):** | Anders J. Ostrum, Special Agent, IRS Criminal Investigation | | |
| | Paul Van de Graff, Assistant U.S. Attorney, U.S. Attorney's Office | | |
| | Michael S. Pieciak, Commissioner, VT Dept. of Financial Regulation | | |
| | Gavin Boyles, General Counsel, VT Dept. of Financial Regulation | | |
| | Bill Griffin, Deputy Attorney General, Office of the Attorney General | | |

On the above date and time, Commissioner Michael S. Pieciak (Pieciak) from the State of Vermont, Department of Financial Regulation was interviewed by Assistant United States Attorney (AUSA) Paul Van de Graaf and IRS-CI Special Agent Anders Ostrum. Also present for the interview, representing Pieciak, was Deputy Attorney General Bill Griffin of the Vermont Attorney General's Office and Gavin Boyles, General Counsel of the Vermont Department of Financial Regulation. After being advised of the identities of the interviewers and the nature of the interview, Pieciak provided the following information:

1. Pieciak showed AUSA Van de Graaf and SA Ostrum various Excel workbooks, including two titled "Global Funds Analysis" and "Net Flow to Ultimate Beneficiaries," which were compiled and used by Vermont Department of Financial Regulation (DFR) in their investigation of the Jay Peak and AnC Bio EB-5 projects. Excel workbooks were prepared for each of the entities and eight project phases showing the sources and uses of investor funds. Each workbook contained separate tabs which contained bank spreads of individual bank accounts of the entity or EB-5 project. Excel pivot tables and filters were then used to summarize the data for enhanced analysis. The Excel workbooks were prepared by the DFR during the approximate time period of April 2015 to April 2016, before a receiver was appointed. When the receiver hired Kapila Mukamal (Kapila), Kapila would have received anything it requested from the DFR. The Excel workbooks were likely provided and used by Kapila in their financial analysis of the Jay Peak EB-5 projects. Pieciak is unsure if the United States Attorney's Office received the Excel workbooks pursuant to their grand jury subpoena.

2. AUSA Van de Graaf showed Pieciak a document labeled "Meeting Between the Department of Financial Regulation and Primmer Piper Eggleston & Cramer PC, January 28, 2015, RED: Primmer comments from meeting." The document was subtitled "AnC Bio Transaction Questions and Comments." Pieciak confirmed that he prepared the questions outlined in this document - Chris Smith from the DFR

may have also helped with the questions. Pieciak confirmed that the responses below each question were input by DFR based on comments provided in the meeting by the developers' attorneys, Primmer Piper Eggleston & Cramer PC (Primmer). The purpose of the January 28th meeting was to go over questions and answers involving Jay Peak Biomedical Research Park L.P.'s private placement memorandum. Primmer attorneys were representing the developers to the AnC Bio project to include Ariel Quiros (Quiros), Bill Stenger, and Bill Kelly.

   a. AUSA Van de Graaf asked Pieciak about question one, specifically what the state's primary concern was regarding the details of the land transaction involving Jay Peak Biomedical Research Park L.P. (purchaser) and GSI of Dade County, Inc (seller). DFR's standpoint was that there was a conflict of interest between the ownership of the transacting entities, and as such, the Private Placement Memorandum (PPM) needed to be revised by adding a disclosure regarding the identity and ownership of the seller. The DFR was focused on the presence and accuracy of the disclosure in the PPM and not as concerned with how much the seller was profiting from the sale of the land. DFR's responsibility for Jay Peak Biomedical Research Park, L.P.'s revised PPM was that it contained accurate and full disclosures of material items and nothing misleading. DFR's approval of the revised PPM was purely for regional center purposes, not for regulatory purposes of security law.

   b. AUSA Van de Graaf asked Pieciak about question two.
      i. There is a January 8th letter referenced in question two; this is not a typo.
      ii. At the time of the January 28, 2015 meeting the DFR assumed the $10M valuation in distribution rights was negotiated between independent parties.

   c. AUSA Van de Graaf asked Pieciak about question five, specifically the answer provided by Primmer as it relates to the rational for the 80/20 ownership split between AnC Bio VT, LLC. and Jay Peak Biomedical Research Park L.P. pursuant to the Joint Venture Agreement. Pieciak said Primmer was referring to the Investment Company Act of 1940 which regulates mutual funds. Pieciak believes Primmer was saying the ownership split was designed to exempt the company from the act's coverage.

   d. AUSA Van de Graaf asked Pieciak about question six. Quiros and his attorneys are claiming the entire SEC filing was a mistake.

   e. AUSA Van de Graaf asked Pieciak about question eight, specifically Ike Lee's resume. It was noted that the Ike Lee resume submitted to the DFR did not contain Ike Lee's position with StemCutis, LLC.

3. Prior to January 28, 2015, Pieciak became aware of the existence of a Raymond James margin loan. Pieciak had received approximately four pages of a Raymond James account statement from ███████ an early EB-5 investor. The Raymond

James statements contained limited information which showed the existence of a margin loan. In addition to the information received from ▬▬▬▬ Pieciak had limited conversations with Pat Moulton, Secretary of the Vermont Agency of Commerce and Community Development, where he also learned of the existence of the margin loan. Prior to January 28, 2015, Pieciak understood little as to the purpose of the Raymond James margin loan.

4. Present at the January 28, 2015 meeting between DFR and Primmer were three lawyers from Primmer to include Mark Scribner, Ralphine O'Rourke, and Gary Karnedy. Three representatives from the DFR were present including Pieciak, Chris Smith and David Cassidy. The meeting was held at DFR's office. The following conversations triggered several red flags for Pieciak during the meeting:

   a. When Primmer's lawyers were questioned about the Raymond James margin loan, Mark Scribner told Pieciak this was a smart move by Quiros. Scribner described the margin loan as a smart move because although the margin loan had an interest rate of approximately 2% the treasury bills yielded approximately 4%. Pieciak remembers Scribner's face as he made this statement. DFR asked for additional information on the margin loan, specifically detailed summary of accounts.

   b. The meeting involved discussion surrounding a $10M reserve fund for investors who do not re-subscribe. Mark Scribner told Pieciak that Quiros was a man of untold wealth and could come up with the $10M if needed.

   c. Through their attorneys, the developers misled the DFR when questioned about the SEC's level of interaction and interest in the AnC Bio project. Specifically, the developers led the DFR to believe the SEC's interest in the AnC Bio project was consistent to the SEC's general interests with other EB-5 projects. In addition, the developers led the DFR to believe there was limited interaction with the SEC. Subsequent to the January 28, 2015 meeting with Primmer, Pieciak called the SEC on approximately January 29, 2015 and spoke with Brian James and Trisha Sindler-Fuchs. Pieciak was told the SEC had concerns with the AnC Bio project, but the SEC would not elaborate much further at that time.

5. On approximately February 27, 2019, Pieciak received a letter from David Gordon, attorney for the developers, which described the purpose of the margin loan at Raymond James. A detailed summary of accounts did not accompany this letter.

6. AUSA Van de Graaf showed Pieciak a document labeled "INDEX OF DOCUMENTS FOR JANUARY 28, 2015 MEETING WITH DFR." Pieciak confirmed the index was prepared by Primmer. Before the January 28, 2015 meeting, Pieciak reviewed many of the items referenced in the "INDEX."

AUSA Paul Van de Graaf advised that a follow-up interview with Pieciak was desired after Pieciak had a chance to review documents and refresh his recollection.

I prepared this memorandum on August 9, 2019, after refreshing my memory from notes made during and immediately after the interview with Michael S. Pieciak. I also made a follow-up telephone call on August 9, 2019 to Michael S. Pieciak to clarify a few statements made by Pieciak in the July 24, 2019 meeting.

Anders J. Ostrum
Special Agent

FD-302 (Rev. 5-8-10)    - 1 of 5 -     OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    11/28/2018

Michael Pieciak, Commissioner, Department of Financial Regulation, State of Vermont, 89 Main Street Montpelier, Vermont, telephone (802) 828-2380, was interviewed at the United States Attorney's Office, District of Vermont, 11 Elmwood Avenue, Burlington, Vermont, by Assistant United States Attorney (AUSA) Paul Van de Graaf and FBI Special Agent Jennie Emmons. Also present for the interview, representing Pieciak, was Deputy Attorney General Bill Griffin of the Vermont Attorney General's Office. After being advised of the identities of the interviewers and the nature of the interview, Pieciak provided the following information:

Pieciak started working at the Vermont Department of Financial Regulation (DFR) in February 2014. His team was not aware of the SEC investigation of Jay Peak at that time. In January 2015, Brent Raymond was deposed by the SEC. After Raymond's deposition, DFR got a copy of the deposition.

On January 28, 2015, DFR met with attorneys from a law firm representing the Jay Peak developer (hereafter referred to as the Developer, meaning Ariel Quiros, Bill Stenger and Bill Kelly). In attendance at the meeting were three lawyers from law firm Primmer, Piper, Eggleston and Kramer, to include Gary Karnedy and Mark Scribner, and three lawyers from the state of Vermont, to include Pieciak, David Cassidy and Chris Smith. Neither Quiros, Stenger or Kelly attended.

Prior to the meeting, a Jay Peak investor by the name of ▓▓▓▓ had sent the Vermont Agency of Commerce and Community Development (ACCD) three pages of Raymond James documents showing the existence of margin loans. In the meeting, DFR asked the Developer's attorneys about the margin loans. The response was that Quiros was a man of extraordinary wealth. Later, a letter was received by the state from Quiros's attorney, David Gordon, providing a rationale for the margin loans: it was saavy business decision on the part of Quiros because interest was being earned and Raymond James provided FDIC protection for the investments. These answers were red flags to DFR.

When DFR asked in the meeting if there was an SEC investigation, they were told that the SEC had just asked for documents. DFR called the SEC

Investigation on    11/19/2018    at   Burlington, Vermont, United States (In Person)

File #   318B-AL-6464304                                        Date drafted   11/23/2018

by   EMMONS JENNIE MCGLYNN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Michael Pieciak , On 11/19/2018 , Page 2 of 5

the next day and learned that the SEC had serious concerns about the AnC Bio Vermont project, in particular. The SEC further advised that they were engaged in conversations with the Developer.

The Developer's lawyers seemed pleased that DFR was involved because DFR understood financial matters, securities, and offering documents. They seemed to appreciate the oversight and regulation by DFR. DFR had about 17 issues on a list to address, about 10 of which were knocked out in the meeting. Among the follow-up items for the Developer's team was an explanation of the margin loans and financial information about the spending on the AnC Bio Vermont project.

DFR's involvement in the EB-5 program came about when the relationship between the Developer and ACCD broke down. Governor Shumlin's office was receiving complaints and got a sense of the mounting frustrations. A decision was made by the Governor's office for the joint administration of the EB-5 program. DFR became the regulatory agency and ACCD stayed in its promotional role. ACCD did not have experience with investigations or subpoena power; hence, this decision made sense.

Pieciak focused on the investigation. John Kessler (the General Counsel for ACCD) sent Pieciak the offering memorandums for Burke and AnC Bio Vermont along with correspondence involving David Gordon, for Pieciak's review.

AUSA Van de Graaf observed that communications around this time indicate there was a fight about what the Developers had to disclose. In response, Pieciak noted that DFR became resigned, but negotiated the point that material issues had to be disclosed in the offering documents. AUSA Van de Graaf asked what changes were made under DFR's oversight, noting that in the first section of the revised offering more information was added about risks, the Korean entities, and the lack of FDA approval. Pieciak stated that all 500 pages of the offering - in other words, the whole investment package - had to be honest and include full disclosures.

Ralphine O'Rourke, another lawyer with the Primmer law firm, provided DFR a document, by way of email, which contained an accounting of all the AnC Bio Vermont spending (a copy of this document was shown to Pieciak) along with a copy of the revised offering memorandum.

In regard to the Bogner land deal, Pieciak could not recall when he uncovered all the relevant facts. Pieciak believes he pushed for a disclosure about Quiros's conflict of interest in the land transaction, but does not recall what details went into the offering memorandum. AUSA Van de Graaf noted that ACCD had asked for an appraisal for the land and Stenger obtained what appeared to be an bogus appraisal. Pieciak noted

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Michael Pieciak , On 11/19/2018 , Page 3 of 5

that DFR considered "disclosure" over "merit" as the most appropriate method of regulation.

DFR realized there was a problem, but building the whole financial picture from the a beginning was taking a long time. DFR did not want to tip off the Developers that there was an investigation. At some point, the decision to let the Developers go back to the market with AnC Bio Vermont was "academic" because DFR knew they would never be able to spend new money. The Burke project, however, was fundamentally different. The investigation showed that the Burke project did not have the massive co-mingling and redirection of funds as was the case in AnC Bio Vermont.

DFR investigated the $500,000 transaction involving an invoice from PeakCM for the purpose of refunding an investor. The Developer had to pull the money out of a project for the refund and came up with a bogus excuse. At the time, the state allowed the Developer to spend money only four different ways and refunds were not one of them. Pieciak became concerned that PeakCM had nefarious involvement.

Pieciak was shown an email communication (Bates USAO-DFR00102016 - Bates USAO-DFR00102018), beginning February 20, 2015, in which Pieciak communicated to Scribner that the financial information provided by the Developer showed that AnC Bio Vermont had $25,000,000 remaining (i.e., not spent) which could be used for construction costs until "successful completion of the audit." Pieciak later learned that money was not actually available. The fact that money was diverted to something else was a material fact - the money was not in the bank as the Developers claimed it was.

The Letter Agreement (Bates USAO-DRF00006709 - USAO-DRF00006711) looks to Pieciak like something created by DFR.

The SEC investigation was not disclosed in the revised offering memorandum because the SEC did not call it an investigation - although Pieciak knew it was - and because the SEC did not want the investigation disclosed.

In regard to questions about the intellectual property that was purchased for $10,000,000 (a January 23, 2015 letter [Bates ACCD0005173 - ACCD0005189] from Bill Stenger to Pat Moulton of ACCD was referenced in the interview, in which questions were addressed), Pieciak stated that the Raymond James-related materials promised on page 4 were never provided to the state.

Around January 20, 2015, Moulton received the aforementioned materials from the Phase I investor, ▮▮▮▮▮▮▮▮▮▮, related to the margin loans. DFR

5756880

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Michael Pieciak , On 11/19/2018 , Page 4 of 5

then got the letter from Gordon explaining Quiros's use of the margin loans. Thereafter, DFR realized it needed to go directly to the source. DFR then contacted Raymond James and requested information on all the accounts associated with the Jay Peak entities.
With reference to the Developer's justification of the $41,500,000 spent on AnC Bio Vermont, AUSA Van de Graaf noted that DFR's investigation showed that $10,000,000 (for the intellectual property) was not paid and the $14,000,000 was not paid in full. AUSA Van de Graaf added that the SEC learned of the Declarations (i.e., the declarations by AnC Biopharms officials) after Quiros's deposition. In response, Pieciak stated that the SEC told DFR about the Declarations around April 2016. Initially, the SEC was leery about sharing information with DFR about their investigation. DFR later learned that Quiros paid off the margin loan with AnC Bio Vermont money. In March 2015, Pieciak knew an audit needed to be done, but also understood that it would never get done.

Governor Shumlin was not briefed on DFR's investigation until 2015. A meeting with Governor Shumlin, which included Liz Miller and Susan Donegan, occurred around late March 2015. On April 1, 2015, the escrowed funds were released so the meeting probably happened a week prior (an email was referenced in the interview [Bates USAO-DFR00102319], subject "DFRs response to today's meeting for AnC Bio and QBurke), dated March 27, 2015, from Susan Donegan to Kelly).

Pieciak observed that forces were colliding. DFR received 2,000 pages of Raymond James documents and was only 2% into its investigation. From the Governor's perspective, the SEC had been investigating for two years, but had never stopped the Developers from fundraising. ACCD was frustrated, and ACCD did not know all that DFR knew. DFR sensed that the $25 million the Developers claimed to have on hand was not really there; hence DFR felt it was okay to say "go ahead and use it." DFR knew that the agreement with the state would prevent new money from being misused.

Governor Shumlin and his staff had direct contact with the Developers. The Developers exerted political influence. The Developers had brought $300,000,000 worth of development to the Northeast Kingdom - or at least that was the belief at the time. Further, there was a sense that the state was slowing down the development.

According to securities law, if a deal changed materially, the offering memorandum had to be revised. Pieciak recalled talk about anticipating refunds for initial investors who might pull out when the offering was reissued. The Developer claimed to have a $10,000,000 reserve on hand to deal with such refunds.

5756881

FD-302a (Rev. 05-08-10)

318B-AL-6464304

Continuation of FD-302 of (U) Interview of Michael Pieciak ,On 11/19/2018 ,Page 5 of 5

When the Developer argued that an audit was too expensive, DFR hired a company called CohnResnik to conduct the audit and analyze the Raymond James records. CohnResnik submitted document requests, but Kelly was not responding to them. The audit never even got close to completion. Then the case against the Developers was filed.

During the investigation, from about April to July 2015, Pieciak was thinking there must be an explanation, that they would find the missing funds in some account. It took a long time to figure out that there was no explanation and that the funds had been misused. ACCD and the Governor's office were then brought into the picture. By June or July 2015, concerns about the Burke project were resolved, while Phases One through Seven were a "disaster." Pieciak was letting more and more people outside DFR know about the problems with the projects. By September 2015, DFR was 75% of the way through its investigation.

AUSA Paul Van de Graaf advised that a follow-up interview with Pieciak was desired after Pieciak had a chance to review documents and refresh his recollection.

5756882