# Exhibit 15

To: Susan Donegan

From: Dave Cassetty

Re: EB-5 Litigation Management

Date: June 22, 201

### Potential Scenarios

There are 3 potential scenarios: one in which the SEC files a comprehensive action, including asset freezes and receivership, as a result of which our action is stayed; one where the SEC files such an action, but ours is not stayed; and one in which the SEC does not file, or files an action without seeking receivership or injunctive relief, in which ours is not stayed.

1.      If the SEC takes comprehensive action, including seeking preliminary injunctive relief, the more likely outcome is that our action will be stayed pending the resolution of their action. This avoids duplication of effort by the courts, as well as potential waste of project assets in redundant litigation. Were this scenario to occur, there would be very little for us to manage, and our task would be to monitor the progress of the other action. Were there any unresolved issues at the conclusion of that action, we would then address those in our action.

2.      Were the SEC to take a comprehensive approach, including preliminary injunctive relief, but our action was not stayed, then we would litigate both cases simultaneously. While not likely, this scenario could occur. For the sake of efficiency, we would likely coordinate discovery with their case, in order to reduce duplication of effort and to ensure comprehensive results. One significant difference between the actions will be that federal civil procedure requires initial disclosures, prior to the start of discovery; however, we could tailor our initial requests to mirror the initial disclosure requirements of federal court, should we choose, to keep the actions on similar footing. Were this scenario to occur, we would be investing more attorney (and staff) time into the action, but certainly within our capacity. Motion practice, discovery and document management would take the most resources, and these are tasks for which we are prepared.

3.      Finally, if we are faced with the unlikely scenario where the SEC does not seek preliminary injunctive relief, or does not take any action at all, we have the authority to seek a freeze on the financial accounts and to request a receiver be appointed. Depending on resources, we could choose not to seek a receiver and only seek to freeze financial accounts. This could result in a bankruptcy filing (or filings), which would then stay our action under the bankruptcy code's automatic stay provision.

### Resources Needed

1.      Under the first scenario, few resources would be needed. The complaint is drafted already, and it is likely that we would not have to litigate anything beyond a motion to dismiss prior to the action being stayed. This scenario could be staffed by myself and one attorney, with another attorney as backup if needed.

2.      The second scenario would not require much more than the first in resources. In this instance, the backup attorney would be brought in to participate actively, but three attorneys should be sufficient. We would call on staff, especially from the Securities Division, to help respond to discovery and to discuss technical questions, as well.

The litigation would be more intensive in motion practice, but we have the experience to manage such litigation. I have tried several dozen cases to verdicts, have litigated over 120 appeals, and have participated in litigating probably two hundred other cases. As a partner in a litigation firm, I also supervised associates in litigation routinely. The two attorneys assigned to this litigation are both very talented writers, researchers and will be able to acquit themselves well in this case. It is likely that I will argue any hearings we have, although there might be opportunities to get them some experience before the court in this case.

3.      Under the third scenario, considerable resources might be required. The same 3 attorneys would be assigned, but in addition to the foregoing matters, we would need to litigate the preliminary injunctive relief. The motion is currently being drafted, and would be ready by the time we file. However, the evidentiary hearing for this would require considerable preparation time, and include much of the Securities staff as well as the attorneys. We have identified most of the financial accounts at issue, for seeking a freeze, and can move to include others as we learn of them. If we include a receivorship, it is likely that we would have to bear that cost. While our business manager informs me that Securities has considerable funds available from their intake, this would ultimately come out of the amount we remit to the General Fund.

While the Department has considerable experience running receiverships, normally we fund them out of the receivorship's estate. Accordingly, this case would present an extra expense to the Department (and ultimately, the General Fund). So while this case would not present the extraordinary expense of the Ambassador Insurance receivership, in that instance Ambassador has funded the cost itself. It is possible that we could request the court order us to be reimbursed these expenses, as taxable costs upon a successful conclusion, but the Department would need to bear the costs initially at least.

**CONFIDENTIAL, EXECUTIVE AND ATTORNEY-CLIENT PRIVILEGE**

**DISCUSSION DOCUMENT**

Susan L. Donegan, Commissioner

Vermont Department of Financial Regulation (DFR)

Date: April 11, 201

This discussion document (in anticipation of enforcement, litigation and/or administrative actions) raises examples of potential violations of Vermont securities law in connection with certain EB-5 transactions related to Jay Peak, AnC Bio and Q Burke projects (collectively known as "Jay Peak") currently under financial review and securities investigation by DFR.  Evidence points to possible violations under Title 9 of Vermont Statutes Annotated, Vermont Uniform Securities Act  (VUSA), including, but not limited to, securities registration and exemption non-compliance, fraud with particularity including material misstatements and omissions, actual conflicts of interest, self-dealing, unjust enrichment, misuse of investor funds, breach of fiduciary duty, breach of contract and tax liability.  The principals would be liable for direct liability with other parties subject to liability for aiding and abetting in the advancement of

_____.

Potential consequences for violations of law include restitution, rescission, disgorgement, fines/penalties ($ per), costs, assets frozen, injunctive relief, receivership/conservatorship and other relief requested by the commissioner. Actions may be brought administratively under the Vermont Administrative Procedures Act or in Washington County Superior Court.

The examples in this document are indicative of the type and severity of violations being uncovered by DFR in their analysis of Jay Peak EB-5 properties and projects.  Although DFR is in the early stages of its investigation, it has identified accounting irregularities, contractual inconsistencies and significant conflicts of interest that point to potential violations of law.

The following four examples illustrate scenarios relating to Jay Peak Bio Medical Research Park, L.P. (AnC Bio)  that DFR has uncovered supporting the decision to halt placing any new investor funds ($500,000 plus $50,000 application fee) at risk until it completes the financial review of that project.

1) <u>Relationship of Jay Construction Management, Inc. and Ariel I. Quiros</u>

The Amended and Restated Private Placement Memorandum states that Jay Peak Bio Medical Research Park, L. P. (the "Limited Partnership") entered into a Design, Procurement and Construction Management Services Agreement dated as of March 15, 2013 with Jay

1

AGO0086712

Construction Management, Inc. ("JCM"), a Vermont corporation owned by Q-Resorts, Inc. (itself a Vermont corporation owned by Ariel Quiros). The agreement designates JCM as an agent of AnC Bio GP Services, LLC (the "General Partner") (the general partner of the Limited Partner whose members consist of Bill Stenger and Ariel Quiros), on behalf of the Limited Partnership, responsible for procuring equipment, intellectual property, licenses, industrial engineering, design/build and other goods and services integral to the project. According to the agreement, JCM is to receive $52,100,000 from the Limited Partnership over the course of the project in order to fulfill this role.

In 2015, Primmer (the project's Vermont law firm) provided the Department with a financial summary ("Financial Summary") highlighting the flow of monies thus far in connection with the AnC Bio Project. The Financial Summary indicates that the Limited Partnership raised $73,500,000 from 147 foreign investors, with $7,000,000 still in escrow. Of the $66,500,000, accessible o the LP, $47,000,000 has been transferred to JCM. Further, the Financial Summary indicates that out of $46,989,691 received by JCM thus far to procure intellectual property and equipment and pay architectural fees, $25,926,887 has been spent for these purposes and the outstanding $21,062,804 remains unspent in an unidentified JCM account. (**See Exhibit A**). Pursuant to the Amended PPM, JCM is still due to receive $4,700,000 from the LP.

The lack of documentation between JCM and AnC Bio Pharm is a concern to the Department. JCM's equipment procurements from AnC Bio Pharm alone totaled $40,000,000; however, counsel to the Project Principals were unable to produce a contract between JCM and AnC Bio Pharm, or any other project entity, for the equipment procurement. The only documentation produced by counsel to the Project Principals is a barebones Proforma Invoice between AnC Bio Pharm and AnC Bio Vt, LLC indicating $40,000,0000 will be paid to AnC Bio Pharm for certain equipment. (**See Exhibit B**). Further, counsel to the Project Principals has been unable to provide a reason for JCM's involvement in the $40,000,000 equipment procurement.

JCM's critical role as an intermediary between the Limited Partnership and project contractors, its access to considerable investor funds, and its status as a related party makes it an entity of particular interest to the Department. David Gordon, the attorney hired by Ariel Quiros to represent him before the U.S. Securities & Exchange Commission, seems to understand the state's concern regarding this final point when he insisted in a November 2014 letter to the Vermont Agency of Commerce and Community Development that "JCM was not a related party when the vast majority of money to it was paid. However, JCM became a related party in or about February 2014" (**See Exhibit C**). The implication of this statement is that Quiros' ownership of JCM (the company that touches over 78% of project money) should not concern state regulators because it did not commence until after most of the money was paid to JCM.

2

AGO0086713

However, documents provided to the Department from the brokerage firm Raymond James (where margin accounts were opened by all Jay Peak projects) demonstrate that this statement is a misrepresentation. In August 2011, former JCM President Jong Weon Choi appointed Ariel Quiros as Power of Attorney for Jay Construction Management, giving Quiros full control over the company's finances. (See **Exhibit D**). Not only was this relationship disclosed to neither investors nor the Department in the project's initial Private Placement Memorandum but the letter from the Limited Partnership's representation suggests the LP made efforts to conceal it.

2) <u>Inconsistency Regarding Payments to Procure Equipment from Anc Bio Pharm</u>

The Financial Summary indicates that JCM has spent approximately $14,500,000 out of a total of $40,000,000 to procure equipment from AnC Bio Pharm. The Department has received conflicting reasons for the partial payment to AnC Bio Pharm.

In a November 24, 2014 letter, David Gordon explains the partial payment is due to "delays in equipment purchases by AnC Bio Pharm, [therefore] JCM has elected to hold back payments due to AnC Bio Pharm temporarily." (See **Exhibit C**).

Contrast that to the March 11, 2015 document entitled "Legal and Business Rationales for Expenditures to Date" from Primmer to the Department that provides the following explanation for the partial payment "[t]he specialized nature of much of the equipment that would outfit the new facility mandated prepayment of substantial deposits before the designer and manufacturer of equipment would begin their work." (See **Exhibit E**).

Last, the explanations from the two law firms are inconsistent with the Proforma Invoice from AnC Bio Pharm to Ariel Quiros / AnC Bio VT LLC regarding the $40,000,000 in equipment. The Proforma Invoice provides that for eighteen months beginning in April 2013 the Project shall pay $1,000,0000 per month as deposits upon equipment to be ordered. Accordingly, under the Proforma Invoice, $9,000,000 should have been paid to AnC Bio Pharm with an additional $9,000,000 paid to AnC Bio Pharm in 2014. However, the Financial Summary indicates that only $500,000 was paid to AnC Bio Pharm in 2013, but over $14,000,000 was paid to AnC Bio Pharm in 2014. Accordingly, the parties actions are not consistent with the terms of their agreement and the explanations provided are in conflict, both with each other and with the actions of the entities.

Again, it is concerning that no formal contract was produced between AnC Bio Pharm and JCM, or any other entity, regarding the $40,000,000 of equipment that might shed light on the entities conflicting statements and actions. Further, Attorney Gordon has not provided any further explanation regarding the equipment delay since him November 24, 2014 letter, if Attorney Gordon's statements are correct, what is the current status of the equipment procurement, if Primmer is correct regarding the $14,500,000 as a down payment, than what

AGO0086714

is the delivery time table. These questions remain unanswered while JCM controls approximately $21,000,000 of investor/project money allocated to equipment procurement.

### 3) Payments made to North East Contract Services, LLC

The General Partner, the Project Sponsor and North East Contract Services, LLC ("NECS") entered into an Agreement calling for NECS to procure and supervise certain construction contracts (the "Agreement"). The sole member of NECS is Bill Kelly. Under the Agreement, NECS is entitled to twenty percent (20%) of the value of the contracts procured as a fee for service and reimbursement of expenses ("NECS Compensation"). Under the Agreement, NECS Compensation is to be paid on a "schedule that will coincide with the payments made to all contracted . . . suppliers of products and services. . . " (**See Exhibit F**).

The November 30, 2012 Business Plan indicates approximately $63,000,000 of contracts were needed to be procured to construct the AnC Project Facility. Therefore, NECS is entitled to approximately $9,500,000 in supervision fees (representing 15% of the total of contracts procured) and approximately $3,100,000 in expense reimbursement (representing 5% of the total of contracts procured) (**See Exhibit G**). Accordingly, NECS was entitled to approximately $12,600,000 in fees and expenses, which under the Agreement, payments to NECS were to coincide with payments made to contracted suppliers of products and services.

The Financial Summary indicates that approximately $900,000 has been paid to Peak CM for construction and $14,500,000 has been paid to AnC Bio Pharm for fit out/equipment. (**See Exhibit A**). Accordingly, $15,400,000 out of a total of $63,000,000 has been spent under construction and fit out/equipment constructs. In other words approximately 24.4% of construction related expenses have been paid. Regarding NECS's payments, the Financial Summary indicates NECS has been paid $7,900,000 out of an approximate total of $12,600,000. In other words, NECS has been paid 62.7% of its fees although only 24.4% of payments have been made under contracts it is supervising. This represents an overpayment of approximately $4,800,000 to NESC.

Further, Primmer provided the Department a document entitled "Legal and Business Rationales for Expenditures to Date" that inaccurately provided "approximately $7.9MM out of $12.6MM budgeted and disclosed to investors has been paid to [NECS] *pursuant to the terms of the offering documents and the underlying contractual agreements*" (emphasis added) (**See Exhibit E**).

Further, the November 30, 2012 Private Placement Memorandum did not disclose that NECS had been contracted for construction supervision or was the relationship between Bill Kelly and the Project Principals disclosed.

Finally, it is unexplained as to why the NECS Compensation included the $40,000,000 equipment procurement, while such equipment is actually being procured by JCM.

AGO0086715

**4)  172 Bognor Road Real Estate Transaction**

The Department has a number of concerns with the real estate transaction between the Limited Partner and GSI of Dade County, Inc. ("GSI").

i)  Lack of Disclosure Regarding Actual Conflicts of Interest

> The real estate sale of 172 Bognor Drive from GSI to the Limited Partnership had an inherent conflict of interest. The General Partner is a limited liability company with two members (i) Bill Stenger and Ariel Quiros, while GSI has one shareholder – Ariel Quiros. Accordingly, Ariel Quiros was negotiating with himself on the land transaction and this fact was not adequately disclosed in the November 30, 2012 Private Placement Memorandum to investors.

ii)  Unsubstantiated Sale Price

> GSI purchased 25 acres at 172 Bognor Drive in September 2011 for $3,150,000. In December 2012, GSI sold 7 of those acres to the Limited Partner for $6,000,000. The Private Placement Memorandum did not contain any justification for a $6,000,000 valuation. The Project Principals subsequently had the 7 acres appraised. (**See Exhibit H**). However, the appraisal does not support the valuation of $6,000,000 at the time of the sale to the Limited Partner; instead, the appraisal states that the property will be worth at least $6,000,000 *after* the $30,000,000 of improvements to the property are complete.

iii) Failure to Pass Title

> Although the purchase and sale agreement is dated December 12, 2012 and two payments of $3,000,000 each were sent on December 12, 2012 and April 9, 2013 respectively, (**See Exhibit I**) title to the 7 acres at 172 Bognor Drive has not passed from GSI of Dade County, Inc. to the Limited Partnership. (**See Exhibit J**). The Project Principals have not provided an explanation for the failure of GSI of Dade County, Inc. to pass title despite its receipt of the full purchase price. This also raises tax liability questions for Vermont land transfer gains.

AGO0086716

**CONFIDENTIAL, EXECUTIVE AND ATTORNEY-CLIENT PRIVILEGE**

**DISCUSSION DOCUMENT**

Susan L. Donegan, Commissioner

Vermont Department of Financial Regulation (DFR)

Date: April 11, 201

This discussion document (in anticipation of enforcement, litigation and/or administrative actions) raises examples of potential violations of Vermont securities law in connection with certain EB-5 transactions related to Jay Peak, AnC Bio and Q Burke projects (collectively known as "Jay Peak") currently under financial review and securities investigation by DFR. Evidence points to possible violations under Title 9 of Vermont Statutes Annotated, Vermont Uniform Securities Act (VUSA), including, but not limited to, securities registration and exemption non-compliance, fraud with particularity including material misstatements and omissions, actual conflicts of interest, self-dealing, unjust enrichment, misuse of investor funds, breach of fiduciary duty, breach of contract and tax liability. The principals would be liable for direct liability with other parties subject to liability for aiding and abetting in the advancement of a course of business that violates 9 V.S.A. c. 150.

Potential consequences for violations of law include restitution, rescission, disgorgement, fines/penalties ($ per), costs, assets frozen, injunctive relief, receivership/conservatorship and other relief requested by the commissioner. Actions may be brought administratively under the Vermont Administrative Procedures Act or in Washington County Superior Court.

The examples in this document are indicative of the type and severity of violations being uncovered by DFR in their analysis of Jay Peak EB-5 properties and projects. Although DFR is in the early stages of its investigation, it has identified accounting irregularities, contractual inconsistencies and significant conflicts of interest that point to potential violations of law.

The following four examples illustrate scenarios relating to Jay Peak Bio Medical Research Park, L.P. (AnC Bio) that DFR has uncovered supporting the decision to halt placing any new investor funds ($500,000 plus $50,000 application fee) at risk until it completes the financial review of that project.

1) <u>**Relationship of Jay Construction Management, Inc. and Ariel I. Quiros**</u>

The Amended and Restated Private Placement Memorandum states that Jay Peak Bio Medical Research Park, L. P. (the "Limited Partnership") entered into a Design, Procurement and Construction Management Services Agreement dated as of March 15, 2013 with Jay

1

AGO0086717

However, documents provided to the Department from the brokerage firm Raymond James (where margin accounts were opened by all Jay Peak projects) demonstrate that this statement is a misrepresentation. In August 2011, former JCM President Jong Weon Choi appointed Ariel Quiros as Power of Attorney for Jay Construction Management, giving Quiros full control over the company's finances. (**See Exhibit D**). Not only was this relationship disclosed to neither investors nor the Department in the project's initial Private Placement Memorandum but the letter from the Limited Partnership's representation suggests the LP made efforts to conceal it.

### 2) Inconsistency Regarding Payments to Procure Equipment from Anc Bio Pharm

The Financial Summary indicates that JCM has spent approximately $14,500,000 out of a total of $40,000,000 to procure equipment from AnC Bio Pharm. The Department has received conflicting reasons for the partial payment to AnC Bio Pharm.

In a November 24, 2014 letter, David Gordon explains the partial payment is due to "delays in equipment purchases by AnC Bio Pharm, [therefore] JCM has elected to hold back payments due to AnC Bio Pharm temporarily." (**See Exhibit C**).

Contrast that to the March 11, 2015 document entitled "Legal and Business Rationales for Expenditures to Date" from Primmer to the Department that provides the following explanation for the partial payment "[t]he specialized nature of much of the equipment that would outfit the new facility mandated prepayment of substantial deposits before the designer and manufacturer of equipment would begin their work." (**See Exhibit E**).

Last, the explanations from the two law firms are inconsistent with the Proforma Invoice from AnC Bio Pharm to Ariel Quiros / AnC Bio VT LLC regarding the $40,000,000 in equipment (**See Exhibit B**). The Proforma Invoice provides that for eighteen months beginning in April 2013 the Project shall pay $1,000,0000 per month as deposits upon equipment to be ordered. Accordingly, under the Proforma Invoice, $9,000,000 should have been paid to AnC Bio Pharm with an additional $9,000,000 paid to AnC Bio Pharm in 2014. However, the Financial Summary indicates that only $500,000 was paid to AnC Bio Pharm in 2013, but over $14,000,000 was paid to AnC Bio Pharm in 2014. Accordingly, the parties actions are not consistent with the terms of their agreement and the explanations provided are in conflict, both with each other and with the actions of the entities. (**See Exhibit A**).

Again, it is concerning that no formal contract was produced between AnC Bio Pharm and JCM, or any other entity, regarding the $40,000,000 of equipment that might shed light on the entities conflicting statements and actions. Further, Attorney Gordon has not provided any further explanation regarding the equipment delay since him November 24, 2014 letter, if Attorney Gordon's statements are correct, what is the current status of the equipment procurement, if Primmer is correct regarding the $14,500,000 as a down payment, than what

AGO0086718

is the delivery time table.   These questions remain unanswered while JCM controls approximately $21,000,000 of investor/project money allocated to equipment procurement.

**3)   Payments made to North East Contract Services, LLC**

The General Partner, the Project Sponsor and North East Contract Services, LLC ("NECS") entered into an Agreement calling for NECS to procure and supervise certain construction contracts (the "Agreement"). The sole member of NECS is Bill Kelly. Under the Agreement, NECS is entitled to twenty percent (20%) of the value of the contracts procured as a fee for service and reimbursement of expenses ("NECS Compensation"). Under the Agreement, NECS Compensation is to be paid on a "schedule that will coincide with the payments made to all contracted . . . suppliers of products and services. . . " (**See Exhibit F**).

The November 30, 2012 Business Plan indicates approximately $63,000,000 of contracts were needed to be procured to construct the AnC Project Facility. Therefore, NECS is entitled to approximately $9,500,000 in supervision fees (representing 15% of the total of contracts procured) and approximately $3,100,000 in expense reimbursement (representing 5% of the total of contracts procured) (**See Exhibit G**).  Accordingly, NECS was entitled to approximately $12,600,000 in fees and expenses, which under the Agreement, payments to NECS were to coincide with payments made to contracted suppliers of products and services.

The Financial Summary indicates that approximately $900,000 has been paid to Peak CM for construction and $14,500,000 has been paid to AnC Bio Pharm for fit out/equipment. (**See Exhibit A**). Accordingly, $15,400,000 out of a total of $63,000,000 has been spent under construction and fit out/equipment constructs. In other words approximately 24.4% of construction related expenses have been paid. Regarding NECS's payments, the Financial Summary indicates NECS has been paid $7,900,000 out of an approximate total of $12,600,000. In other words, NECS has been paid 62.7% of its fees although only 24.4% of payments have been made under contracts it is supervising. This represents an overpayment of approximately $4,800,000 to NESC.

Further, Primmer provided the Department a document entitled "Legal and Business Rationales for Expenditures to Date" that inaccurately provided "approximately $7.9MM out of $12.6MM budgeted and disclosed to investors has been paid to [NECS] *pursuant to the terms of the offering documents and the underlying contractual agreements*" (emphasis added) (**See Exhibit E**).

Further, the November 30, 2012 Private Placement Memorandum did not disclose that NECS had been contracted for construction supervision or was the relationship between Bill Kelly and the Project Principals disclosed.  (Disclosed in amended PPM.)

Finally, it is unexplained as to why the NECS Compensation included the $40,000,000 equipment procurement, while such equipment is actually being procured by JCM.

AGO0086719

4) **172 Bognor Road Real Estate Transaction**

The Department has a number of concerns with the real estate transaction between the Limited Partner and GSI of Dade County, Inc. ("GSI").

i)   Lack of Disclosure Regarding Actual Conflicts of Interest

The real estate sale of 172 Bognor Drive from GSI to the Limited Partnership had an inherent conflict of interest. The General Partner is a limited liability company with two members (i) Bill Stenger and Ariel Quiros, while GSI has one shareholder – Ariel Quiros. Accordingly, Ariel Quiros was negotiating with himself on the land transaction and this fact was not adequately disclosed in the November 30, 2012 Private Placement Memorandum to investors.

ii)  Unsubstantiated Sale Price

GSI purchased 25 acres at 172 Bognor Drive in September 2011 for $3,150,000. In December 2012, GSI sold 7 of those acres to the Limited Partner for $6,000,000. The Private Placement Memorandum did not contain any justification for a $6,000,000 valuation. The Project Principals subsequently had the 7 acres appraised. (**See Exhibit H**). However, the appraisal does not support the valuation of $6,000,000 at the time of the sale to the Limited Partner; instead, the appraisal states that the property will be worth at least $6,000,000 *after* the $30,000,000 of improvements to the property are complete.

iii) Failure to Pass Title

Although the purchase and sale agreement is dated December 12, 2012 and two payments of $3,000,000 each were sent on December 12, 2012 and April 9, 2013 respectively, (**See Exhibit I**) title to the 7 acres at 172 Bognor Drive has not passed from GSI of Dade County, Inc. to the Limited Partnership. (**See Exhibit J**). The Project Principals have not provided an explanation for the failure of GSI of Dade County, Inc. to pass title despite its receipt of the full purchase price. This also raises tax liability questions for Vermont land transfer gains.

AGO0086720

# GENERAL STRATEGY:

How to Handle:

1) MAIN MESSAGE:  The State, through the relationship between ACCD and DFR discovered irregularities and have acted upon them.
    a. When we tracked these irregularities we acted.
    b. Because of this relationship, Vermont is a safer investment because of the oversight by both agencies.

2) Be thoughtful in responding and show how much you care that jobs may be potentially lost.

3) Use the general:  :"This is very disturbing to hear may be happening. But it was detected due to the relationship between ACCD and DFR. "

4) Use social media tools to tout the many good Vermont EB-5 stories to tell.

5) Stress Vermont's financial oversight (DFR and ACCD) as unparalleled and timely. Vermont is a "safe investment"

6) Be as transparent as we can be, but stick to our strengths – notably oversight works!  Remember Warren Buffet once said: "It takes 20 years to build a reputation and five minutes to ruin it. If you think about that, you'll do things differently."

# EB-5 Talking Points

Vermont EB-5 Regional Center:

1) Today's growing complexity of EB-5 projects require robust regulation and oversight.

2) As the program has grown, the level of oversight has increased, as it should.

3) This growing complexity can be seen in increased SEC surveillance as well as the most recent GAO in-depth look at how USCIS is administering the program.

4) We have stayed on top of and often ahead of USCIS responding to the need to incorporate best practices.

5) In February 2015, the Agency of Commerce & Economic Development (ACCD), responsible for Vermont's EB-5 Regional Center, announced its own independent response to the growing EB-5 market by establishing an oversight partnership with the Department of Financial Regulation (DFR).

6) Why did Vermont do this: because ACCD, a governmental unit of the State of Vermont, is charged with enhancing the Vermont business climate, marketing Vermont to businesses by facilitating, promoting and creating commercial and business opportunities within Vermont to contribute to the economic viability of and benefit the growth of the state.  This is in marked contrast to other for-profit regional centers.

7) Similarly, DFR, a governmental unit of the State of Vermont, is statutorily charged with supervising organizations that offer financial services and products to ensure the solvency, liquidity, stability and efficiency of all such organizations; protecting consumers against certain unfair and unlawful business practices; promoting reasonable and orderly competition; encouraging the development, expansion and availability of financial services and products advantageous to the public welfare; and maintaining close cooperation with other supervisory authorities.

8) This partnership reaffirms Vermont's dedication to first-rate regulation and exceptional oversight of all aspects of financial services.

9) For example, DFR has hired two additional staff members to assist with oversight and compliance of projects affiliated with the Regional Center.

10) EB-5 investors choose Vermont because it offers businesses unique advantages, such as: State oversight; pre-approval of projects; quarterly project reviews to monitor development progress; and, a long and credible track-record of success.

11) Equally important, Vermont's EB-5 programs has helped create jobs in some of most needy parts of the state, Northeast Kingdom, Windsor, Vergennes, Waitsfield, Dover, and more.

12) Since 2008, the EB-5 Immigrant Investor program has successfully stimulated the US economy through capital investments by foreign investors to create jobs.  In FY 2014, 10,928 EB-5 petitions were filed with the USCIS, 5,155 approved, and 12,453 pending, which translates to over 2.5B approved investment and an additional 6.2B in capital awaiting federal adjudication.  FY 2015 pace is expected to exceed that of 2014.

13) We have X I-526's approved and Y I-829's.
   a. We are not able to divulge the #'s of investors at individual projects.  We publish aggregate information only, on all EB5 projects.

14) **If asked:** We are actively monitoring all projects. Quarterly visits. Quarterly and weekly reports.
   a. We follow up on complaints appropriate to ACCD.  If there are questions about fraud or related to the PPM, we forward to DFR and/or encourage the person to file a formal complaint if appropriate.
   b. At present we are not investigating other projects because we do not see any indications of issues. No investor complaints and no irregularities in the projects that cause us any concern.
   c. Not at liberty to discuss evidence of irregularities projects due to pending mitigation.

AGO0086722

15) Every new project is going thru an ACCD initial vetting then DFR review of PPM's
   a. **If asked**: We review the business plan, ask for 3rd party marketing study to back up assumptions. Review the principals and their background.  Assure they are fully able to undertake the project in question.  If it passes our initial review, we ask them to produce a PPM for DFR review.  We collaborate with DFR on whether or not to approve.
   b. Yes, we have projects in the hopper.  Not at liberty to discuss as we are still negotiating with them. Will discuss when we have a signed MOU.

**Specific to the RC:**

16) We at the State of Vermont Regional Center are deeply dismayed that this has happened.

17) EB-5 program is a very useful and helpful economic development tool: especially in Vermont and the rural areas. And we understood the need for strong oversight.

18) We are in the unique position to have the Dept of Finance and Regulation investigate claims of misdeeds and proceed accordingly as they have in this case.

19) We will not tolerate actions that put the program at risk of not realizing the end goal:  economic development.

20) We have other projects that are complying with our oversight. We are committed to continue to promote this regional center and eb5 projects within the state.

21) Job creation continues to be the key goal of the investments. This program has enabled tremendous opportunity for VT and elsewhere and as such the state will continue to promote this program for its enormous economic impact to the state. (See significant stats.)

22) The state cannot fully insure nor guaranty that the project developers will act in good faith or be assured of success. But we can and have stepped up surveillance and monitoring of current projects and going forward.

23) We cannot discuss ongoing federal and state 'litigation'?

AGO0086723

**QBURKE PROJECT --- EXECUTIVE PRIVILEGE, ATTY-CLIENT PRIVILEG, CONFIDENTIAL  DFR/4.13.15**

**QUESTION:**

QBurke is, I believe, the only EB5 project statewide to currently be under construction, with a substantial % complete.  It also differs from AnC Bio in that it is a tangible/real project; the questions that have arisen in AnC Bio re: whether IP and FDA approvals and corporate relationships are (or ever will be) as represented are not present in the Burke situation, where the project is indeed underway and being built, and the questions center more on $ flow and costs and disclosures of same.  How does/how should these distinctions between the projects affect the analysis and treatment?

**DFR ANSWER:**

Yes, there are differences between the AnC Bio and Q Burke projects.  However, those differences do not and should not affect the analysis and treatment of QBurke.  Three issues jump right out:

First, the project is not substantially complete, it is a 98 million project which has only raised 34 million.

Second, QBurke is not free of conflicts of interest regarding corporate relationships. The QBurke project has inherent conflicts between the general partner (as agent of the limited partnership) and the Resort in the land transaction and the General Partner (as agent to the limited partnership) and the hotel/facilities management company - these conflicts resulted in deals that were great for the project principals and awful for the investors, with minimum disclosure, which is similar to AnC Bio and the other 6 Jay Peak Projects.

Third, at this point, the issue is not project viability (the AnC bio project may very well produce revenue and eventually be successful, we have no idea) it is really about the fact a set of individuals fraudulently induced investment in what we believe to be eight cost-inflated projects for the direct benefit of themselves and to the detriment of the investors (i.e. building a 40 million dollar hotel for 100 million dollars and pocketing the difference).

QBurke cannot be carved out of Jay Peak.  The SEC will not see the QBurke project as a standalone project and neither should DFR. The are 8 projects and 13+ various entities involved in the Jay Peak EB-5 initiatives, but there is one person from which every project begins and ends - Ariel Quiros.  Bill Stenger, Ary Quiros, Joel Burstien and Bill Kelly have aided and continue to aid the effort. Every project appears to be involved in an array of deceptive practices. Every single additional penny of investor money that moves through the projects will invariably be lost for good. New investors most certainly will not be issued visas as the SEC will act long before the two year job creation period ends.

To look at QBurke from the point of view of saving jobs for current workers of a subcontractor or as a partially built endeavor is problematic. The fact that Burke is being built does not trump DFR's legal job of protecting investors and the State of Vermont, given all we know. Basically, the principals are the problem, and we have no reason to believe that they are behaving differently on Q Burke than they have on all the other projects.

Miller, Lawrence

Executive Order No. 09-11
Exhibit B

Ethics Questionnaire

```
┌─────────────────────────────┐
│         RECEIVED            │
│   GOVERNOR'S OFFICE         │
│                             │
│       JUN 2 5 2013          │
│                             │
│   MONTPELIER, VT 05609      │
└─────────────────────────────┘
```

In accordance with Executive Order No. 09-11, Executive Code of Ethics, every gubernatorial appointee as defined therein, who earns $30,000 or more per year, shall fill out and file this questionnaire annually on or by June 30, with the Secretary of Civil and Military Affairs.  This questionnaire shall be treated as a confidential personnel document pursuant to 1 V.S.A. § 317(c)(7) and kept as such during the gubernatorial administration in which the appointee serves, or for one year after the appointee leaves office, whichever occurs first.

The purpose of this questionnaire is to determine any significant personal interests of gubernatorial appointees that might conflict with the best interests of the state.  It is understood that individuals serving the state as gubernatorial appointees may have pecuniary interests that may relate to matters arising in the course of the performance of their official responsibilities.  This form is intended to identify those interests and provide assurance that conflicts of interest will not impair fair and impartial state actions.  Gubernatorial appointees should, whenever possible, avoid conflicts of interest and, where they do occur, make them clearly evident.

In answering questions, please disclose not only your own direct interests but also any indirect or beneficial interests which could arise through members of your immediate family (spouses, dependent children) or through persons who reside in your home or by reason of a trust or partnership arrangement in which you or a member of your immediate family or household participates or has an interest.

(Use reverse side to give additional information, if necessary.)

1. Are you, your spouse, or a member of your immediate family the director, officer, partner or employee of any enterprise that, to your knowledge, does business or has a financial relationship with the state?  If yes, please list all such positions.

    Yes _____        No ___X____

2. Except for securities that are listed on a national exchange, do you own directly, indirectly, or beneficially, securities, options, or rights to purchase securities or share in profits of companies, to your knowledge, doing business with the state?  If yes, list company and percent of total shares.  **Danforth Pewter – 2%**

    Yes __X_____        No _____

3. Do you directly, indirectly or beneficially, have any ownership interest in a proprietorship, partnership, or syndicate that, to your knowledge, operates any business which does business with the state?  If yes, explain briefly.

AGO0086725

Yes _____          No ___X____

4. Does there currently exist any creditor-debtor relationship between you, directly or indirectly, and any non-financial organization, to your knowledge, doing business with the state, except normal charge accounts and installment purchase accounts?  If yes, explain briefly.

Yes _____          No ___X____

5. Are you receiving commissions or any forms of compensation, gift or reward on business transacted with the state either directly or through a third person?  If yes, explain briefly.

Yes _____          No ___X____

6. In addition to the information reported above, do you have any direct or indirect business relationships which may reasonably be considered to have some influence on your judgment and decisions involving transactions with the state, or otherwise during the performance of your duties and responsibilities as a gubernatorial appointee?  If yes, explain briefly.

Yes _____          No ___X___

7. Are you in good standing with respect to, or in full compliance with a plan to pay, any and all taxes due the State of Vermont?  If no, explain.

Yes __X____          No _____

8. If you are under an obligation to pay child support, are you in good standing with respect to that obligation?

Yes __X____          No _____

9. If no, have you entered into a payment plan with the Vermont Office of Child Support and are you in full compliance with that payment plan?

Yes _____          No _____

I agree to disassociate myself from situations where possible conflicts of interest pertaining to any matter addressed in this questionnaire might occur, when requested by the Governor or his or her representative, the Secretary of Civil & Military Affairs.

To the best of my knowledge, the answers to all of the above questions are true and complete in every respect.

Date:  June 24, 2013          Signed: _____

Name:          Lawrence W. Miller II

Position:          Secretary, ACCD

Kessler, John

RECEIVED
GOVERNOR'S OFFICE
JUN 2 5 2013
MONTPELIER, VT 05609

Executive Order No. 09-11
Exhibit B

Ethics Questionnaire

In accordance with Executive Order No. 09-11, Executive Code of Ethics, every gubernatorial appointee as defined therein, who earns $30,000 or more per year, shall fill out and file this questionnaire annually on or by June 30, with the Secretary of Civil and Military Affairs. This questionnaire shall be treated as a confidential personnel document pursuant to 1 V.S.A. § 317(c)(7) and kept as such during the gubernatorial administration in which the appointee serves, or for one year after the appointee leaves office, whichever occurs first.

The purpose of this questionnaire is to determine any significant personal interests of gubernatorial appointees that might conflict with the best interests of the state. It is understood that individuals serving the state as gubernatorial appointees may have pecuniary interests that may relate to matters arising in the course of the performance of their official responsibilities. This form is intended to identify those interests and provide assurance that conflicts of interest will not impair fair and impartial state actions. Gubernatorial appointees should, whenever possible, avoid conflicts of interest and, where they do occur, make them clearly evident.

In answering questions, please disclose not only your own direct interests but also any indirect or beneficial interests which could arise through members of your immediate family (spouses, dependent children) or through persons who reside in your home or by reason of a trust or partnership arrangement in which you or a member of your immediate family or household participates or has an interest.

(Use reverse side to give additional information, if necessary.)

1. Are you, your spouse, or a member of your immediate family the director, officer, partner or employee of any enterprise that, to your knowledge, does business or has a financial relationship with the state? If yes, please list all such positions.

   Yes _____          No __✕✕__

2. Except for securities that are listed on a national exchange, do you own directly, indirectly, or beneficially, securities, options, or rights to purchase securities or share in profits of companies, to your knowledge, doing business with the state? If yes, list company and percent of total shares.

   Yes _____          No __✕✕__

3. Do you directly, indirectly or beneficially, have any ownership interest in a proprietorship, partnership, or syndicate that, to your knowledge, operates any business which does business with the state? If yes, explain briefly.

AGO0086727

Yes _____        No  ☒

4. Does there currently exist any creditor-debtor relationship between you, directly or indirectly, and any non-financial organization, to your knowledge, doing business with the state, except normal charge accounts and installment purchase accounts?  If yes, explain briefly:

Yes _____        No  ☒

5. Are you receiving commissions or any forms of compensation, gift or reward on business transacted with the state either directly or through a third person?  If yes, explain briefly.

*Will be teaching Environmental Law at Johnson State College, Fall 2013.*

Yes  ☒

6. In addition to the information reported above, do you have any direct or indirect business relationships which may reasonably be considered to have some influence on your judgment and decisions involving transactions with the state, or otherwise during the performance of your duties and responsibilities as a gubernatorial appointee?  If yes, explain briefly.

Yes _____        No  ☒

7. Are you in good standing with respect to, or in full compliance with a plan to pay, any and all taxes due the State of Vermont?  If no, explain.

Yes  ☒        No _____

8. If you are under an obligation to pay child support, are you in good standing with respect to that obligation?

*N/A*

Yes  ☒        No _____

9. If no, have you entered into a payment plan with the Vermont Office of Child Support and are you in full compliance with that payment plan?  *N/A*

Yes  ☒        No _____

I agree to disassociate myself from situations where possible conflicts of interest pertaining to any matter addressed in this questionnaire might occur, when requested by the Governor or his or her representative, the Secretary of Civil & Military Affairs.

To the best of my knowledge, the answers to all of the above questions are true and complete in every respect.

Date: 6/24/13        Signed: John W Kessler

Name: John W. Kessler

Position: ACCD General Counsel

AGO0086728

Raymond, Brents

RECEIVED
GOVERNOR'S OFFICE

JUL 18 2013

MONTPELIER, VT 05609

Executive Order No. 09-11
Exhibit B

Ethics Questionnaire

In accordance with Executive Order No. 09-11, Executive Code of Ethics, every gubernatorial appointee as defined therein, who earns $30,000 or more per year, shall fill out and file this questionnaire annually on or by June 30, with the Secretary of Civil and Military Affairs.  This questionnaire shall be treated as a confidential personnel document pursuant to 1 V.S.A. § 317(c)(7) and kept as such during the gubernatorial administration in which the appointee serves, or for one year after the appointee leaves office, whichever occurs first.

The purpose of this questionnaire is to determine any significant personal interests of gubernatorial appointees that might conflict with the best interests of the state.  It is understood that individuals serving the state as gubernatorial appointees may have pecuniary interests that may relate to matters arising in the course of the performance of their official responsibilities.  This form is intended to identify those interests and provide assurance that conflicts of interest will not impair fair and impartial state actions.  Gubernatorial appointees should, whenever possible, avoid conflicts of interest and, where they do occur, make them clearly evident.

In answering questions, please disclose not only your own direct interests but also any indirect or beneficial interests which could arise through members of your immediate family (spouses, dependent children) or through persons who reside in your home or by reason of a trust or partnership arrangement in which you or a member of your immediate family or household participates or has an interest.

(Use reverse side to give additional information, if necessary.)

1.  Are you, your spouse, or a member of your immediate family the director, officer, partner or employee of any enterprise that, to your knowledge, does business or has a financial relationship with the state?  If yes, please list all such positions.

    Yes _____          No ____✓____

2.  Except for securities that are listed on a national exchange, do you own directly, indirectly, or beneficially, securities, options, or rights to purchase securities or share in profits of companies, to your knowledge, doing business with the state?  If yes, list company and percent of total shares.

    Yes _____          No ____✓____

3.  Do you directly, indirectly or beneficially, have any ownership interest in a proprietorship, partnership, or syndicate that, to your knowledge, operates any business which does business with the state?  If yes, explain briefly.

AGO0086729